IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

JOHN D. HOPKINS, III.,

                      Plaintiff,

                                              Civ. Action No.
          v.                                  9:08-CV-0001 (DNH/DEP)

MICHAEL ALLARD, Superintendent,
GARDNER, Sergeant; JOHN DOE 1,
Correction Officer; JOHN DOE 2,
Correction Officer; B. BRUE, Nurse;
C. VOLPE, Nurse; JANE DOE, Nurse,

                      Defendants.

_____

APPEARANCES:                    OF COUNSEL:

FOR PLAINTIFF:

JOHN D. HOPKINS, III, *Pro Se*
03-A-5282
Wallkill Correctional Facility
Box G
Wallkill, NY 12589

FOR DEFENDANTS:

HON. ANDREW M. CUOMO          AARON M. BALDWIN, ESQ.
Attorney General of           Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff John D. Hopkins, III, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, *inter alia*, complaining of civil rights violations allegedly occurring during the period of his confinement. The events giving rise to plaintiff's claims arose out of an incident involving a prison nurse, which later ripened into the issuance of an allegedly false misbehavior report, alleged beatings, and plaintiff's disciplinary confinement in a special housing unit ("SHU") under unsavory conditions which included his being deprived of meals, water, and showers.  The plaintiff asserts that defendants' actions were in retaliation for his having engaged in constitutionally protected activity and resulted in his being subjected to cruel and unusual punishment and denied due process.  As relief, plaintiff demands $5 million in compensatory damages plus an additional award of punitive damages.

Presently before the court is defendants' motion for partial summary judgment dismissing all of plaintiff's claims with the exception of those relating to the alleged assault.  In their motion, defendants assert a variety of procedural and substantive arguments in support of their

2

request for partial dismissal of plaintiff's claims, including failure to exhaust administrative remedies, lack of personal involvement, failure to state viable claims as a matter of law, and qualified immunity from suit. Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has opposed, be granted and that all claims, except those relating to the alleged assault including the claimed failure of certain of the defendants to protect him from the assault, be dismissed.

I.      BACKGROUND[1]

Plaintiff is an inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); although plaintiff is presently designated to another prison facility, at the times relevant to his claims, including between approximately October 22, 2003 through April 20, 2005, he was housed in the Franklin Correctional Facility ("Franklin"), located in Malone, New York.  *See generally* Complaint (Dkt. No. 1); *see also* Allard Decl. (Dkt. No. 58-2) ¶ 8.

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

The events giving rise to plaintiff's claims were precipitated on February 10, 2005, when plaintiff was seen at the prison infirmary by defendant B. Brue, a prison nurse, complaining of a cough, sore throat, and "green phlegm".  Complaint (Dkt. No. 1) ¶¶ 2-3.  The parties' version of the events that followed differ markedly.  According to the plaintiff, after Nurse Brue said that she would give him something for his symptoms, he asked her for some foot powder, to which she responded by firmly stating that his session was over.  Defendants' Exh. L (Dkt. No. 58-21) p. 40.[2] Hopkins admits that at this point he did not immediately leave the infirmary, claiming that Nurse Brue did not end the conversation, but instead went on to tell him that he was asking for too many items. Hopkins Decl. (Dkt. No. 64) ¶ 5.  Hopkins questioned Nurse Brue as to whether that was her normal procedure.  Hopkins Tr. at p. 40.  According to plaintiff, however, when Nurse Brue then instructed him to go wait in the hallway, he complied with that directive.  *Id.* at p. 41.

Defendant Brue's description of the events that transpired is somewhat different.  *See* Brue. Decl. (Dkt. No. 58-4).  Nurse Brue states that when she saw plaintiff in the infirmary he demanded antibiotics, but

---

[2]     Defendants' Exhibit L represents selected portions of the transcript of plaintiff's deposition and will be referred to herein as "Hopkins Tr.".

after taking his temperature and determining that it was not elevated, she determined that antibiotics were not indicated. *Id.* at ¶¶ 4. Brue gave plaintiff throat lozenges and cough syrup, advised that the session was over, and instructed him to wait in the hall. *Id.* at ¶¶ 5-6. Ignoring several of Brue's direct orders to retreat to the hall, Hopkins instead remained, began demanding different medications, and became agitated, making arm gestures. *Id.* at ¶ 6-7. Feeling threatened, defendant Brue notified a corrections officer in the hallway, R. Johnston, who entered the infirmary and twice ordered Hopkins to exit the room. *Id.* at ¶¶ 7-8. After receiving Johnston's second order, Hopkins finally moved from the room into the hallway. *Id.* Nurse Brue then walked out into the hallway, at which time the plaintiff approached her with his hands and arms raised outward, interfering with her duties and once again making her feel threatened. *Id.* at ¶ 9. The incident resulted in Nurse Brue's issuance of a misbehavior report, co-signed by Corrections Officer R. Johnston, charging Hopkins with three prison rule violations, including making threats, disobeying a direct order, and interference.[3]  Brue Decl. (58-4) ¶ 10; *see also*

---

[3]       Plaintiff's complaint names "Johnson, correction officer" as a defendant in the action and alleges that Johnson was the corrections officer that was involved in the events leading to issuance of the misbehavior report. *See* Complaint (Dkt. No. 1) Statement of Facts. In support of defendants' motion James Johnson, a corrections

Defendants' Exh. A (Dkt. No. 58-10).

While plaintiff stood in the hallway, he claims he heard Nurse Brue loudly state to Corrections Officer Johnston, "I don't like this black asshole! help [sic] me get him, [sic] he's a complainer," to which Johnston allegedly responded, "sure, no problem."  Complaint (Dkt. No. 1) ¶¶ 24, 25; Hopkins Decl. (Dkt. No. 64) ¶¶ 12, 14.  Plaintiff alleges that thereafter he was brutally and repeatedly beaten by defendants Gardner and Titus, in the presence of Johnston and two unidentified corrections officers, at various locations including at the infirmary, in draft processing, on the way to the SHU, and in the SHU, during which he was punched in the head and face and upper body, kicked in the head and in the side, and had his head slammed into the cinder block wall.  *See* Complaint (Dkt. No. 64) Statement of Facts; Hopkins Decl. (Dkt. No. 64) ¶ 15.  Plaintiff claims that during the assault Gardner threatened to kill him for "harassing Nurse Brue" and also said, "I'll kill your black ass, nigger, for harassing a white

---

officer employed at Franklin and the defendant Johnson who was served and has appeared in the action, has submitted a declaration stating that he was named in the complaint in error because he is not the officer who co-signed the February 10, 2005 misbehavior report.  *See generally* Johnson Decl. (Dkt. No. 58-5).  Defendant Johnson states he was not on duty in the infirmary or involved in the misbehavior report or plaintiff's transfer to SHU on the day in question, and further that "R. Johnston" is the co-signer of the misbehavior report.  *See id.*  In response, plaintiff has stated that he has no objection to dismissal of his claims against Johnson.  *See* Plaintiff's Memorandum (Dkt. No. 64) p. 13.

woman!"  Complaint (Dkt. No. 64) ¶¶ 44, 46.

Following the incident in the infirmary plaintiff claims he was taken to the SHU reception room, bleeding profusely from his mouth, and was ordered to strip off all his clothing and beaten further.  Complaint (Dkt. No. 1) ¶¶ 70-82.  After the assault subsided, defendant Gardner ordered Hopkins to put on his underwear and threatened, "when medical see's [sic] you, you better not tell medical we did this to you, you will lose your teeth, eye or your life!"  *Id.* at ¶ 83.

In accordance with the protocols for admission into SHU, *see* Volpe Decl. (Dkt. No. 58-6) ¶ 4, defendant Volpe, a registered nurse employed at the facility, was called into the SHU frisk examination area just after 6:00 p.m. on February 10, 2005 to conduct a visual inspection of the plaintiff.  *Id.* ¶¶ 5-6.  Upon her examination, defendant Volpe did not see any blood, areas of swelling, or other signs of injury to the plaintiff.  *Id.* ¶ 6.  Nurse Volpe then asked Hopkins if he had any injuries, which he denied, although he did report taking mediation for high blood pressure, and Volpe arranged for a prescription for the plaintiff while in SHU confinement.  *Id.* ¶¶ 9-10; *see also* Defendants' Exh. N (Dkt. No. 58-23).

Plaintiff contends that he was thereafter placed in an SHU cell, still

bleeding, and was not given any supper on that date, and further that on

defendant Gardner's order, the water to his cell was turned off and he was

deprived of showers and food until February 14, 2005.[4]  Complaint (Dkt.

No. 1) ¶¶ 91-98.

Once again, defendants deny plaintiff's allegations regarding any

claimed deprivation of food and water.  Defendant Titus, the supervising

officer on duty in the SHU on February 10, 2005, explains that the dinner

meal was served in the unit at 4:48 p.m. on February 10, 2005, the date of

plaintiff's admission, and that because the plaintiff was not admitted until

5:55 p.m., and was not placed in his cell until 6:10 p.m., he did not receive

his evening meal that day.  Titus Decl. (Dkt. No. 58-3) ¶¶ 3, 5, and 8.  The

SHU log book, in which the delivery, inspection, and service of meals to

inmates each day, among other things, are recorded also reflects that

Hopkins also missed the lunch meal on February 12, 2005 because he

was off unit on a visit at the time[5], and plaintiff refused the evening meal

on that same date; the log book further shows, however, that plaintiff

---

[4]      Ordinarily, prisoners placed in SHU confinement are allowed two
showers per week as well as one hour of outdoor exercise per day.  *Husbands v.
McClellan*, 990 F. Supp. 214, 218 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. Pt. 304.

[5]      Plaintiff admits that he was visiting with his fiancé, Willida Davis, on that
date.  Complaint (Dkt. No. 1) ¶ 111.

8

received every other meal served during the period between February 11 and 14, 2005.  *See generally id*.; *see also* Defendants' Exh. I (Dkt. No. 58-18).

Defendants also contest plaintiff's allegations regarding the unavailability of showers.  The SHU log book reveals that plaintiff refused the opportunity to shower on February 13 and 14, 2005.  *See* Defendants' Exh. I  (Dkt. No. 58-18).  In terms of the availability of water, after noting that every meal is served with a beverage defendant Titus, a corrections officer, indicates that due to the configuration of the plumbing in the SHU cells at Franklin it is not possible to turn off the water to an individual cell.  Titus Decl. (Dkt. No. 58-3) ¶ 22; *see also* Defendants' Exh. I (Dkt. No. 58-18).  Titus also states that Hopkins never complained to him that he had missed any meal or lacked running water, nor was Titus ever instructed by anyone to withhold food, water, or showers from plaintiff while he was in SHU confinement.[6]   Titus Decl. (Dkt. No. 58-3) ¶¶ 19-20.

_____

[6]      The Deputy Superintendent of Security at Franklin, Steven Brown, describes the SHU at Franklin as comprised of thirty-six single occupancy cells, each of which is equipped with a sink with running water and a toilet.  Brown Decl. (Dkt. No. 58-8) ¶ 10.  The configuration of the cells at the time plaintiff was housed in the SHU did not permit independently shutting off a toilet and sink in a single cell without also turning off the water to the adjacent cell.  *Id.* at ¶ 14.  During the time that plaintiff was confined in the SHU, the adjacent cell was occupied, and at no time were complaints made by its occupants that there was a lack of running water.  *Id.* at ¶¶ 15-16, 19.

On February 14, 2005, a Tier III disciplinary hearing was conducted by Captain Phelix, who is not named as a defendant in this action, to address the charges set forth in the misbehavior report issued by Nurse Brue.[7]  *See* Defendants' Exh. B (Dkt. No. 58-11).  At the outset of the hearing, the plaintiff acknowledged on the record that he was served with a copy of the misbehavior report on February 11, 2005, that he was afforded an opportunity to select an assistant, which he did, and that before the hearing he received the materials he had requested.  *Id.* at p. 1; *see also* Defendants' Exh. A (Dkt. No. 58-10).  While Hopkins initially denied all three charges, he later pleaded guilty to interference with a corrections employee and refusing a direct order, but persisted in his disclaimer of having made threats.  *Id.*  As a result of plaintiff's plea, the hearing officer imposed a sentence of two months of disciplinary confinement in SHU, with one month suspended and deferred for three

---

[7]     The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246 (1998).

months, together with a recommended loss of good time credit in the amount of thirty days, and a loss of package, commissary, and telephone privileges for two months.[8]  *Id*. at p. 9; *see also* Defendants' Exh. A (Dkt. No. 58-10).  Plaintiff was released from SHU confinement on March 11, 2005, after having served his one month disciplinary sentence.  Allard Decl. (Dkt. No. 58-2) ¶ 16.

In his complaint, plaintiff maintains that following the multiple assaults of February 10, 2005 he was denied adequate medical treatment both for his injuries resulting from the incident and for other conditions. The record now before the court reveals that daily rounds are made by nursing staff at Franklin; if an inmate makes a complaint or requests medical attention while in the SHU, a note is made by the nurse in the inmate's ambulatory health record ("AHR") and also in the SHU log book.[9] Volpe Decl. (Dkt. No. 58-6) ¶ 14.  Plaintiff's AHR reveals that on February 18, 2005, he was seen, and his high blood pressure medication was re-filled during rounds.  *Id.* at ¶ 15; *see also* Defendants' Exh. N (Dkt. No. 58-

---

[8]     When asked at the close of the hearing whether he had any procedural objections to the way the hearing was conducted, Hopkins responded that he did not. Defendants' Exh. B (Dkt. No. 58-11) at p.10.

[9]     Nurse Volpe saw plaintiff on occasion during rounds in the SHU; at no time during those visits did plaintiff complain to Volpe that he had not been fed or was deprived of running water.  Volpe Decl. (Dkt. No. 58-6) ¶ 21.

23).  In addition, it is noted that during rounds on February 24, 2005

Hopkins complained to the nurse of a "sore mouth", which came "10 days

ago," but which the nurse noted appeared "minimal to non-existent", and

Orajel, a topical antiseptic, pain reliever and astringent, was administered.

Volpe Decl. (Dkt. No. 58-6) ¶ 16; *see also* Defendants' Exh. N (Dkt. No.

58-23).  The following day, plaintiff once again complained to the nurse

conducting rounds that he had a sore mouth, and additionally claimed to

having experienced dizziness upon changing positions.  Volpe Decl. (Dkt.

No. 58-6) ¶ 17*; see also* Defendants' Exh. N (Dkt. No. 58-23).  Plaintiff

again was given Orajel and was also advised to change positions slowly

to avoid dizziness.  Hopkins' blood pressure medications were re-filled

again on February 27, 2005 and March 7, 2005.  Volpe Decl. (Dkt. No. 58-

6) ¶ 18.

     While at Franklin, plaintiff made no other complaints of injury or

requests for medical treatment, except for treatment of a blister on his

hand on April 6, 2005 and, upon his discharge from SHU confinement on

March 11, 2005, making a request for assignment to a bottom bunk and

threatening to "intentionally fall and take care of business" if the request

was not granted.  Volpe Decl. (Dkt. No. 58-6) ¶¶ 18-20;  *see also*

Defendants' Exh. N (Dkt. No. 58-23).

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on January 2, 2008.  Dkt. No. 1.

Named as defendants in plaintiff's complaint are Michael Allard, the

Superintendent at Franklin; Corrections Sergeant Gardner and a John

Doe Sergeant; Corrections Officer Titus and two John Doe corrections

officers; and Nurses Brue and Volpe, as well as a Jane Doe Nurse.  *Id.*

The complaint states eleven separate causes of action, alleging violations

of the First, Fifth, Eighth, and Fourteenth Amendments of the United

States Constitution as well as claims of retaliation, conspiracy in violation

of section 1983, and a separate claim for conspiracy in violation of 42

U.S.C. § 1985(3).  *Id.*

On September 28, 2009, following the completion of pretrial

discovery, defendants filed a motion for summary judgment seeking

dismissal of all of plaintiff's claims with the exception of those alleging the

use of and failure to protect him from excessive force.  Dkt. No. 58.  In

their motion, defendants argue that plaintiff's claims should be dismissed

on the grounds that 1) he failed to exhaust his administrative remedies as

to most of his claims; 2) his claim relating to the receipt of a false

misbehavior report lacks merit; 3) plaintiff's retaliation claim fails under the

doctrine of collateral estoppel, as well as on the merits; 4) plaintiff's due

process claim is legally deficient because he cannot establish either the

deprivation of a liberty interest or that he was denied due process; 5) the

facts do not support a cognizable Eighth Amendment claim; 6) certain of

the defendants were not personally involved in the conduct giving rise to

plaintiff's constitutional claims; 7) plaintiff cannot demonstrate viable court

access denial and conspiracy claims; 8) plaintiff's Fifth Amendment claim

fails as a matter of law; and, 9) in any event, defendants Volpe, Brue,

Allard, and Johnston are entitled to qualified immunity.[10]  On December

29, 2009, plaintiff responded in opposition to the defendants' motion, Dkt.

No. 64, and defendants have since filed a reply.[11]  Dkt. No. 67.

_____

[10]     In response to defendants' motion, plaintiff has withdrawn his Fifth
Amendment claim.  Plaintiff's Memorandum (Dkt. No. 64) at p. 17.

[11]     With their motion, defendants properly filed with the court a statement of
materials facts alleged not to be in dispute, as required under Northern District of New
York Local Rule 7.1(a)(3).  Under that rule, in opposition to defendants' motion plaintiff
was required to submit a response mirroring defendants' Local Rule 7.1(a)(3)
Statement and either admitting or denying each of the assertions contained within it, in
matching numbered paragraphs.  N.D.N.Y.L.R. 7.1(a)(3).  While plaintiff filed a
response to Defendants' Rule 7.1(a)(3) Statement, his response only addresses
paragraphs 1-37 of defendants' statement and completely fails to address the
remaining paragraphs.  In light of plaintiff's failure to provide such a statement, the
assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, paragraphs 38-96
of that statement are now deemed to have been admitted by him.  *Id.; see, e.g.,*
*Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000)
(McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.*, 214

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28. U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rules 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

---

F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S.Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary

judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.   Exhaustion

In their motion defendants first contend that plaintiff has failed to pursue to completion his administrative remedies for all of his claims except those alleging that he was subjected to assault and denied food and water, and that the balance of plaintiff's claims must therefore be dismissed as unexhausted.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the

ability of prisoners to maintain federal civil rights actions, expressly

requires that "[n]o action shall be brought with respect to prison conditions

under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."  42 U.S.C. §

1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382

(2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6

(E.D.N.Y. Jan. 31, 2007).[12]  "[T]he PLRA's exhaustion requirement applies

to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive

force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532, 122

S.Ct. 983, 992 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion

requirement is not jurisdictional, but instead gives rise to a defense which

must affirmatively be raised by a defendant in response to an inmate suit.

*Jones v. Block*, 549 U.S. 199*, 212,* 127 S.Ct. 910, 919 (2007).  In the

event a defendant named in such an action establishes that the inmate

plaintiff failed properly to exhaust available remedies prior to commencing

---

[12]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

the action, his or her complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies).  "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules."  *Woodford*, 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).

### 1.    The *Hemphill* Test

In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[13]  *Macias*, 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was

---

[13]    As will be seen, whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See, e.g.*, *Newman v. Duncan,* No. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.) .

available, the court must next examine whether the defendants have

forfeited the affirmative defense of non-exhaustion by failing to properly

raise or preserve it or whether, through their own actions preventing the

exhaustion of plaintiff's remedies, they should be estopped from asserting

failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380

F.3d at 686.  In the event the proffered defense survives these first two

levels of scrutiny, the court lastly must examine whether special

circumstances nonetheless exist and "have been plausibly alleged" to

justify the plaintiff's failure to comply with the applicable administrative

procedural requirements.[14]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at

686.

a)    Availability of Remedy

New York prison inmates are subject to an Inmate Grievance

Program ("IGP") established by the DOCS and recognized as an

"available" remedy for purposes of the PLRA.  *See Mingues v. Nelson*,

No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing

*Mojias v. Johnston*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*,

---

[14]    In practicality these three prongs of the prescribed test, though perhaps
intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL
389003, at *8 n.14; *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[15]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp.2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

   Despite an inmate's entitlement in most instances to file and pursue a grievance in accordance with the IGP, there are circumstances

---

[15]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

under which the grievance procedure nonetheless is deemed not to have

been available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88.

Thus, for example, "[e]xhaustion may be considered unavailable in

situations where plaintiff is unaware of the grievance procedures or did

not understand it, . . . or where defendants' behavior prevents plaintiff

from seeking administrative remedies."  *Hargrove,* 2007 WL 389003, at *8

(citations omitted) (noting, for example, that a defendant's failure to

advance plaintiff's grievances or the issuance of threats against an inmate

to deter the filing of a grievance may effectively render the administrative

process unavailable).  When testing the availability of administrative

remedies in the face of claims that undue influence from prison workers

has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated

individual of ordinary firmness [would] have deemed them available."

*Hemphill*, 380 F.3d at 688 (quotations and citations omitted); *see*

*Hargrove,* 2007 WL 389003, at *8.

b)      <u>Presentation of Defense/Estoppel</u>

The second prong of the *Hemphill* analysis focuses upon "whether

the defendants may have forfeited the affirmative defense of non-

22

exhaustion by failing to raise or preserve it, or whether the defendants'

own actions inhibiting the inmate's exhaustion of remedies may estop one

or more of the defendants from raising the plaintiff's failure to exhaust as a

defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

c)    <u>Special Circumstances</u>

The third, catchall factor to be considered under the Second

Circuit's prescribed exhaustion rubric focuses upon whether special

circumstances have been plausibly alleged which, if demonstrated, would

justify excusing a plaintiff's failure to exhaust administrative remedies.

*Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676-77; *Hargrove,*

2007 WL 389003, at *10.  Among the circumstances potentially qualifying

as "special" under this prong of the test include where a plaintiff's

reasonable interpretation of applicable regulations regarding the grievance

process differs from that of prison officials and leads him or her to

conclude that the dispute is not grievable.  *Giano*, 380 F.3d at 676-77; *see*

*also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

2.    <u>Plaintiff's Exhaustion</u>

In response to defendants' motion, plaintiff contends that he

availed himself of all available avenues for registering his complaints with

23

prison officials, including by filing an administrative appeal of his Tier III

disciplinary determination.  As an initial matter, it is well established that

while placing prison officials on notice of a grievance through less formal

channels may constitute claim exhaustion "in a substantive sense", an

inmate plaintiff nonetheless must meet the procedural requirement of

exhausting his or her available administrative remedies within the

appropriate grievance construct in order to satisfy the PLRA.  *Macias*, 495

F.3d at 43 (quoting *Johnston v. Testman*, 380 F.3d 691, 697-98 (2d Cir.

2004) (emphasis omitted).  "An appeal from a disciplinary hearing does

not satisfy the grievance exhaustion requirement for a [constitutional]

claim, even if the hearing is based on the same set of facts underlying the

grievance."  *Labounty v. Johnston*, 253 F. Supp.2d 496, 501-502

(W.D.N.Y. 2003) (citing *McNair v. Sgt. Jones*, No. 01 Civ. 3253, 2002 WL

31082948, *7 (S.D.N.Y. Sept. 18, 2002) (dismissing § 1983 where plaintiff

failed to exhaust administrative remedies despite having appealed from

disciplinary hearing on the same facts alleged in support of his excessive

force claim)); *Benjamin v. Goord*, No. 02 Civ. 1703, 2002 WL 1586880, *2

(S.D.N.Y. July 17, 2002) ("exhausting appeals of a disciplinary hearing

determination does not constitute exhausting administrative remedies for

his grievance, even if the underlying facts are the same.") (other citation

omitted)).   Thus, to the extent that plaintiff claims to have exhausted his

administrative remedies via his appeal of the disciplinary determination,

his argument must fail.

      Following his transfer into the Bare Hill Correctional Facility ("Bare

Hill") on or about April 20, 2005, *see* Allard Decl. (Dkt. No. 58-2) ¶ 35,

plaintiff filed grievance no. BR11-677-05, dated May 2, 2005, complaining

of the issuance of a misbehavior report by Nurse Brue, the repeated

assaults which he claims followed, and the denial of food and water in the

ensuing days.  Defendants' Exh. H (Dkt. No. 58-17).  As relief, in the

grievance Hopkins requested that he be afforded a safe environment free

from retaliation, harassment, assault and battery.  *Id.*  Although filed late,

on May 17, 2005 the grievance was accepted and forwarded to Franklin

for investigation.  *Id.*  Following denial of the grievance by the

superintendent at Bare Hill, plaintiff appealed to the CORC.  Defendants'

Exh. K (Dkt. No. 58-10).  In that appeal, in addition to alleging that he was

repeatedly beaten, and that Nurse Brue was confrontational and negligent

in failing to examine him and report his injuries to authorities, plaintiff also

alleged, for the first time, the existence of a conspiracy; like the original

25

grievance, however, plaintiff's appeal of the superintendent's determination makes no reference to the alleged denial of access to the court or procedural due process, nor does it include the allegation that Nurse Brue and the correctional officers participating in the assault were acting in retaliation for plaintiff having exercised his First Amendment rights.[16]  Upon close examination of plaintiff's grievance and appeal, therefore, it is at least arguable that plaintiff attempted to exhaust not just his claims relating to the assault and deprivation of food and water, as defendants now contend, but also the deprivation of medical treatment after the assault and an alleged conspiracy.

To combat defendants' exhaustion defense, plaintiff also alleges that on July 4, 2005, he filed a grievance complaining that Nurse Volpe ignored his injuries, and that "Nurse Jane Doe" similarly neglected his

---

[16]      As noted in *LaBounty*, there are exceptions to the general rule that for the purposes of the PLRA an appeal of a disciplinary determination does not serve to exhaust claims arising out of the same set of circumstances, such as when an inmate files a section 1983 claim based on a violation of his due process rights in connection with the disciplinary hearing. An appeal from that hearing that raises the precise procedural infirmities may be sufficient to exhaust the grievance procedure as well. 253 F. Supp.2d at 502 n. 5 (citing and quoting *Flanagan v. Maly*, 99 Civ. 12336, 2002 WL 122921, *2 (S.D.N.Y. Jan. 29, 2002) ("once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.").  Plaintiff did not raise any due process claims in his appeal of the disciplinary determination.  For these reasons, plaintiff's allegation that he appealed to the Director of Special Housing Unit Appeals, Donald Selsky, is of no moment.

injuries when examining him on February 11, 2005.  A copy of this

grievance, stamped received July 8, 2005, is attached to plaintiff's

declaration submitted in opposition to defendants' motion.[17]  Hopkins

Decl. (Dkt. No. 64) Exh. D.  Defendants have completely failed to address

this grievance, and the question of whether it was pursued to completion

is not disclosed in the record now before the court.  In view of the

foregoing, I am unable to conclude on the record before me that Hopkins

failed to exhaust his administrative remedies as to all of the matters

alleged in the complaint, except as to his claims of assault and his

contention that he was denied food and water.  Instead, questions of fact

remain as to whether plaintiff fully exhausted his complaints regarding

medical indifference and conspiracy.

Accordingly, it seems evident that certain of plaintiff's claims in this

action are exhausted, while others are not.  Plaintiff's complaint is

therefore properly regarded as a "mixed complaint".  Under the

circumstances thus presented, the Second Circuit has determined "that

exhausted claims filed alongside unexhausted ones may proceed even

---

[17]     In the grievance, plaintiff explains that he is filing "late because [he] contacted the I.G., the Inspector General's Office regarding this matter and believed that it was sufficient.  I was also afraid of retaliation by the staff involved."  Plaintiff's Exh. D. (Dkt. No. 64) at p. 3.

though the unexhausted claims must be dismissed." *Giano*, 380 F.3d at

675 (citing *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004)).

For these reasons, I recommend that defendants' motion for

summary judgment dismissing plaintiff's claims alleging retaliation, denial

of access to courts,[18] the filing of a false misbehavior report, failure to

protect, denial of showers, and denial of due process be granted, and that

these claims  be dismissed as a result of plaintiff's failure to exhaust his

administrative remedies.

C.    Retaliation/False Misbehavior Report

Even assuming that plaintiff had fully exhausted his administrative

remedies with respect to his claims premised upon Nurse Brue's false

misbehavior report and defendants' alleged retaliation, defendants

---

[18]      Plaintiff's access to court claim seems to be premised upon his late grievance and the alleged loss of his appeal of his disciplinary determination.  To establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her to suffer actual injury – that is, that a "nonfrivolous legal claim had been frustrated or was being impeded" as a result of defendants' conduct.  *Lewis v. Casey*, 518 U.S. 343, 353, 116 S.Ct. 2174, 2181 (1996).  To the extent that plaintiff is asserting a denial of access to courts claim, the record is devoid of any evidence showing that his efforts to bring a legal claim were thwarted by defendants' alleged interference, and this claim should also be dismissed on the merits.  Even if defendants' interference with plaintiff's grievance and disciplinary appeal could support a claim for denial of access to courts, on the record before the court plaintiff has no such claim because it is undisputed that both his late grievance and disciplinary appeal were accepted and decided.

contend additionally that those claims lack merit.[19]

As an initial matter, it should be noted that standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273 (1988)).  The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, suffices to state a claim for retaliation.  *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

---

[19]     In support of their quest for dismissal of this cause of action, defendants assert that it is precluded by the doctrine of collateral estoppel in light of a decision rendered by the New York State Supreme Court denying an Article 78 petition filed by Hopkins, in which he also alleged retaliation.  Issue preclusion, often referred to as collateral estoppel, bars a party that has had a full and fair opportunity to litigate an issue of fact or law from relitigating the same issue once it has been decided against that party or its privy.  *McKithen v. Brown*, 481 F.3d 89, 105 (2d Cir. 2007); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288-89 (2d Cir. 2002).  Under New York law, in order for issue preclusion to apply two elements must be established; first, the issue must both "actually and necessarily" have been decided in a prior proceeding, and secondly, the party against whom the doctrine is being urged must have been afforded a full and fair opportunity to litigate the issue in the first proceeding.  *McKithen*, 481 F.3d at 105; *see also Giakoumelos v. Coughlin*, 88 F.3d 56, 59 (2d Cir. 1996); *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995).  Although plaintiff raised retaliation in the context of the second of the two Article 78 proceedings he filed, on the record before the court it does not appear that the state court addressed and determined the issue of whether the defendants in this lawsuit retaliated against plaintiff in violation of his constitutional rights.  *See* Defendants' Exh. F (Dkt. No. 58-15).  As a result, it appears that collateral estoppel is inapplicable.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies.  *See Franco*, 854 F.2d at 588-90.  As the Second Circuit has repeatedly cautioned, however, such claims are easily incanted and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care."  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002); *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.

*Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287,

97 S.Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir.

2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).  If the plaintiff carries this

burden, then to avoid liability the defendants must show by a

preponderance of the evidence that they would have taken action against

the plaintiff "even in the absence of the protected conduct."  *Mount

Healthy*, 429 U.S. at 287, 97 S.Ct. at 576.  If taken for both proper and

improper reasons, state action may be upheld if the action would have

been taken based on the proper reasons alone.  *Graham v. Henderson*,

89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of

the protected activity in which the inmate plaintiff has engaged, the

adverse action taken against him or her, and the evidence tending to link

the two.  When such claims, which are exceedingly case specific, are

alleged in only conclusory fashion, and are not supported by evidence

establishing the requisite nexus between any protected activity and the

adverse action complained of, a defendant is entitled to summary

judgment dismissing plaintiff's retaliation claims.  *Flaherty*, 713 F.2d at 13.

Here, although the grounds for plaintiff's retaliation claims are not

31

entirely clear, broadly construing his opposition to defendants' motion it appears plaintiff is asserting that defendants retaliated against him for having filed a 2004 appeal of a disciplinary determination and for filing an Article 78 proceeding in New York State Supreme Court in September of 2004.   As to the former, plaintiff alleges that approximately four months before Nurse Brue issued her misbehavior report to him, he was involved in an incident with another nurse at the Franklin infirmary.  According to plaintiff, he had complained of an earache and was accused of lying about his ear being an emergency, and was issued a misbehavior report by Nurse Mcintosh.  Plaintiff states further that he was subsequently called back to the clinic where it was determined that plaintiff's ear required treatment by a specialist and that he was ultimately given a hearing aid upon a finding that he had suffered partial hearing loss.  Submitted with his opposition papers is an appeal from an October 20, 2004 disciplinary determination wherein Hopkins disputes the hearing officer's finding of guilt, apparently on two of the charges included within Nurse Mcintosh's misbehavior report, including alleged interference with staff and making false statements.  Plaintiff argues that this prior incident led to the acts of retaliation against him on February 10, 2005.

32

Additionally, plaintiff suggests that the defendants' conduct was further motivated by plaintiff's September 2004 Article 78 proceeding, wherein he was successful in his challenge to the denial of his application for presumptive release; he also points out that he had received a notification dated March 22, 2005 again denying presumptive release, this time due to Captain Phelix's Tier III determination.[20]

At least with regard to the Article 78 proceeding, its is clear that plaintiff's resort to the state courts to challenge a DOCS determination constitutes protected activity. *Reid v. New York State Dep't of Corr.,*

---

[20]   On March 27, 2005, plaintiff wrote a letter to Superintendent Allard requesting that he review the Tier III disciplinary penalty imposed upon him, voicing concern that with a loss of thirty days of good time credit and the imposition of a thirty day disciplinary confinement period would preclude him from being presumptively released as scheduled.  *See* Defendants' Exh. C (Dkt. No. 58-12).  Six months earlier, on September 28, 2004, plaintiff had commenced a proceeding in New York State Supreme Court, pursuant to Article 78 of the New York Civil Practice Law and Rules, challenging the denial of his application for presumptive relief.  *See* Dft's Exh. F (Dkt. No. 58-15) at p. 25 (unnumbered).  Plaintiff was successful, and on March 14, 2005, the court (Teresi, J.S.C.) vacated the DOCS determination of June 1, 2004 denying plaintiff presumptive release and directed the respondent to reconsider Hopkins' petition.  *See id.* at p. 25 (unnumbered).  On March 22, 2005, Hopkins was again denied presumptive release.  Plaintiff brought a second Article 78 proceeding challenging the March 22, 2005 determination, this time asserting that after the court directed the DOCS to reconsider its earlier decisions, it was improper for the DOCS to consider the Tier III disciplinary action in its presumptive release decision because Justice Teresi's decision should have him placed his back to his original status of February 25, 2004 and June 2004, when he initially applied for presumptive release.  *See* Defendants' Exh. F (Dkt. No. 58-15).  Hopkins also claimed that the Tier III misbehavior report was retaliatory.  *See id.*  The court rejected Hopkins' claims, finding that they were without merit and that the retaliation claim was unsupported by any relevant evidence, and dismissed the petition.  *See id.*

No.9:05-CV-0006, 2008 WL 4279488, at * 54 (N.D.N.Y. Sept. 15, 2008)

(Kahn, D.J. and DiBianco, M.J.).  Insofar as plaintiff claims that

defendants retaliated for his attempts to redress the 2004 disciplinary

determination by way of an appeal, it similarly would appear that plaintiff's

allegations are sufficient to establish the first prong of a retaliation claim.

*See Colon*, 58 F.3d at 872 (holding that prison officials are prohibited from

retaliating against prisoners who exercise the right to petition for redress

of grievances).   Accordingly, the first element of the retaliation test is

satisfied.

The only retaliatory act that Nurse Brue is alleged to have

committed was to issue a false misbehavior report.  As District Judge

David N. Hurd recognized in his decision in *Barclay v. New York*, 477 F.

Supp.2d 546 (N.D.N.Y. 2007), in cases involving allegations of retaliation

based on the filing of allegedly false misbehavior reports, "[t]he difficulty

lies in establishing a retaliatory motive." *Barclay*, 477 F. Supp.2d at 558.

More than conclusory allegations are required to survive a summary

judgment motion; the "types of circumstantial evidence that can show a

causal connection between the protected conduct and the alleged

retaliation include temporal proximity, prior good discipline, finding of not

guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord*, 119 F. Supp.2d 327, 339 (S.D.N.Y. 2000).

In this instance, the first Article 78 proceeding preceded Nurse Brue's misbehavior report by several months, as did plaintiff's disciplinary appeal, which occurred four months before Nurse Brue issued her misbehavior report, and there is not a shred of evidence connecting Nurse Brue to either the presumptive release denial or the previous misbehavior report.  To the contrary, Nurse Brue has unequivocally stated that she was unaware of any prior complaints by the plaintiff against her or any other nursing staff, and plaintiff has adduced no evidence contradicting this statement.  Brue Decl. (Dkt. No. 58-4) ¶ 12.  As a result, plaintiff's conclusory retaliation claim against Nurse Brue cannot be sustained.

Plaintiff's retaliation claims also extend to defendant Volpe, who is alleged to have denied him medical treatment, and to defendants Gardner and Titus, who allegedly retaliated against him by their repeated assaults and use of excessive force.  Once again, however, there is no evidence in the record to link any of these defendants with plaintiff's prior protected activity.  I therefore recommend that defendants' motion, to the extent that

it seeks dismissal of plaintiff's retaliation claim, be granted.

D.    Due Process

Plaintiff's second cause of action appears to assert a violation of his right to due process in connection with his disciplinary proceedings. Defendants make three separate arguments in support of their request for dismissal of this claim.  Relying principally upon *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584 (1997) and its progeny, defendants first contend that plaintiff's due process claim is subject to dismissal because it includes a challenge to his loss of good time credits, which affects the length of plaintiff's confinement, without a showing that the underlying determination has been set aside.  Next, defendants contend that plaintiff was not deprived of a protected liberty interest, and finally, they argue for dismissal of the claim on the grounds that plaintiff received all of the process that he was due.

1.    *Edwards v. Balisok*

In *Balisok*, the Supreme Court held that a claim for damages for a violation of procedural due process in the context of a prison disciplinary hearing is not cognizable under section 1983 where the nature of the challenge to the procedures followed necessarily implies the invalidity of

36

the resulting judgment and/or punishment imposed, unless the disciplinary disposition has already been reversed through a state administrative or judicial proceeding or a habeas proceeding. *Balisok*, 520 U.S. at 645, 117 S.Ct. at 1588-89.  If a prisoner, however, as a prerequisite for maintaining his § 1983 action, both agrees to and can successfully abandon once and for all the duration claim, then his success in the § 1983 action would have no effect on the sanctions that relate to the length of time he served in prison, and he can proceed on his due process claim. *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006).  "[B]*ut . . .  he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement*.  In other words, the prisoner must abandon, not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding he is attacking in his current § 1983 suit." *Id.* at 104 (emphasis in original).

In the face of defendants' motion, expressly citing *Peralta*, plaintiff has stated that he "hereby, once and for all, waives any future challenges affecting the duration of my confinement related to this matter" and requests that he be allowed to proceed on this issue.  Plaintiff's

Memorandum (Dkt. No. 64) p. 9.  In view of plaintiff's waiver, the court will consider the merits of plaintiff's procedural due process claim.

        2.    <u>Merits</u>

      To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

      From the record now before the court, it seems clear that plaintiff cannot demonstrate that he has suffered deprivation of a constitutionally protected liberty interest as a result of the allegedly flawed Tier III disciplinary hearing.  The Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293).  Atypicality in a *Sandin* inquiry is normally a question of law.[21]  *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey*, 197 F.3d at 585.   When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997); *see also Williams v. Goord*, 111 F.Supp.2d 280, 289 (S.D.N.Y. 2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

While not the only factor to be considered, the duration of an inmate's disciplinary confinement remains paramount under *Sandin*.[22]  *Colon*, 215 F.3d at 231.  Specifically, while under certain circumstances

---

[21]     In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution.  *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585.

[22]     Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate.  515 U.S. at 485-86, 115 S.Ct. at 2301.  In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence.  *Id.*

confinement of less than 101 days in theory could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n.5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.  *Id.* at 231-32.[23]

Here, the record establishes that plaintiff was confined to the SHU from February 10, 2005 to March 11, 2005, a period of not more than thirty days.  Nowhere does plaintiff allege, nor is there any evidence suggesting, that the conditions to which he was exposed while in SHU confinement imposed an atypical and substantial hardship in relation to conditions experienced by inmates in the general population at Franklin. Plaintiff's confinement to SHU for a period of thirty days, without more, is insufficient to raise a constitutionally protected liberty interest.  *Mortimer Excell v. Fischer*, No. 08-CV-945, 2009 WL 3111711, at *9 (N.D.N.Y. Sept. 24, 2009) (Hurd, J.) ("[C]ourts have roundly rejected the notion that . . . a short period of confinement, without additional hardships, creates a liberty interest even when confinement is completely segregated, such as

---

[23]     In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

when an inmate is sent to . . .[SHU].") (citing *Sealey*, 197 F.3d at 589-90);
*see also Borcsok v. Early*, No. 9:03-CV-395, 2007 WL 2454196, at *9
(N.D.N.Y. 2007) (Sharpe, J.) (finding that 90-day confinement in SHU
alone with 90-day loss of packages, commissary and telephone privileges
insufficient to raise a liberty interest without showing there as an atypical
and significant hardship).  Accordingly, in light of his failure to establish a
deprivation of a constitutional cognizable liberty interest, plaintiff's due
process claim is subject to dismissal on this basis.[24],[25]

---

[24]    Even if plaintiff were able to prove the deprivation of a cognizable liberty
interest, his procedural due process claim would nonetheless be subject to dismissal in
light of the fact that the record establishes that the necessary procedures, including
those articulated in *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80
(1974), were provided.  The record establishes that plaintiff received a copy of the
misbehavior report setting forth the charges against him in advance of the hearing.
*See* Defendants' Exh. A (Dkt. No. 58-10).  The disciplinary hearing was conducted and
was recorded.  *See generally* Defendants' Exh. B. (Dkt. No. 58-11).  At the
commencement of the hearing, the plaintiff confirmed that he was had requested and
received assistance in advance of the hearing.  *Id.* at pp. 1-2.  Plaintiff was permitted
to testify at the hearing and was afforded the opportunity to call witnesses, which he
declined after deciding to enter a plea of guilty to two of the three charges.  Plaintiff
confirmed twice on the record that his plea was voluntarily entered.  *Id*. at p. 8.  After
announcing his disposition, the hearing officer explained the implications of his
decision to Hopkins, asked Hopkins if he had any procedural objections, to which
plaintiff responded "no", and advised plaintiff of his right of appeal.  *Id.* at pp. 9-11.
Plaintiff later sought review by the superintendent, and the hearing officer's decision
was upheld on appeal.  Defendants' Exh. C (Dkt. No. 58-12).

[25]    Though not entirely clear, and it is not addressed by defendants, it
appears that plaintiff may also be advancing a substantive due process cause of
action.  The Due Process Clause of the Fourteenth Amendment contains both a
substantive and a procedural component.  *Zinermon v. Burch*, 494 U.S. 113, 125, 110
S.Ct. 975 (1990).  The substantive component "bars certain arbitrary and wrongful
government action regardless of the fairness of the procedures used to implement
them."  *Id.* at 125, 110 S.Ct. at 983 (internal quotations and citation omitted).

E.    Medical Indifference

In his third cause of action, plaintiff asserts that Nurses Brue and Volpe, as well as Superintendent Allard, were deliberately indifferent to his medical needs, by failing to provide him with treatment for his injuries suffered in the alleged assaults in violation of the constitutional protection of the Eighth Amendment against cruel and unusual punishment.  In their motion, defendants seek dismissal of this claim on the basis that plaintiff's condition was not sufficiently serious to warrant constitutional protection, and because the defendants did not act with the requisite state of mind to support an Eighth Amendment violation.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth

_____

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised."  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotations and citations omitted) (citing cases).  "The first step in a substantive due process analysis is to identify the constitutional right at stake.*"  Excell v. Woods*, No. 9:07-CV-0305, 2009 WL 3124424, at *23 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J. and Lowe, M. J.) (citing *Lowrance*, 20 F.3d at 537).  There are few circumstances arising in the context of prison life that ascend to the level of shocking and suffice to state a substantive due process violation.  *Shuler v. Brown*, No. 07-CV-0937, 2009 WL 790973, at *9 (N.D.N.Y. Mar. 23, 2009) (McAvoy, S. J. and Lowe, M. J.).  There is no evidence in the record before the court upon which a reasonable jury could conclude that defendants acted in such a shocking manner as to give rise to damages for violation of plaintiff's right to substantive due process.

Amendment.  *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976).  The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citing, *inter alia, Estelle).*  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements.  *Wright v. Goord*, 554 F.3d 255,

43

268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL

889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective

element, to prevail a plaintiff must demonstrate a violation sufficiently

serious by objective terms, "in the sense that a condition of urgency, one

that may produce death, degeneration, or extreme pain exists."  *Hathaway*

*v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the

subjective element, a plaintiff must also demonstrate that the defendant

had "the necessary level of culpability, shown by actions characterized by

'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

Claims of medical indifference are subject to analysis utilizing this Eighth

Amendment paradigm.  *See Salhuddin v. Goord,* 467 F.3d 263, 279-81

(2d Cir. 2006).

### 1.    Objective Requirement

Analysis of the objective, "sufficiently serious" requirement of an

Eighth Amendment medical indifference claim begins with an inquiry into

"whether the prisoner was actually deprived of adequate medical care . .

.", and centers upon whether prison officials acted reasonably in treating

the plaintiff.  *Salahuddin*, 467 F.3d at 279.  A second prong of the

objective test addresses whether the inadequacy in medical treatment

44

was sufficiently serious.  *Id*. at 280.  If there is a complete failure to

provide treatment, the court must look to the seriousness of the inmate's

medical condition.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir.

2003).  If, on the other hand, the complaint alleges that treatment was

provided but was inadequate, the seriousness inquiry is more narrowly

confined to that alleged inadequacy, rather than focusing upon the

seriousness of the prisoner's medical condition.  *Salahuddin*, 467 F.3d at

280.  "For example, if the prisoner is receiving on-going treatment and the

offending conduct is an unreasonable delay or interruption in treatment. . .

[the focus of] the inquiry is on the challenged delay or interruption, rather

that the prisoner's underlying medical condition alone."  *Id.* (quoting *Smith*,

316 F.3d at 185) (internal quotations omitted).  In other words, at the heart

of the relevant inquiry is the seriousness of the medical need, and

whether from an objective viewpoint the temporary deprivation was

sufficiently harmful to establish a constitutional violation.  *Smith*, 316 F.3d

at 186.  Of course, "when medical treatment is denied for a prolonged

period of time, or when a degenerative medical condition is neglected over

sufficient time, the alleged deprivation of care can no longer be

characterized as 'delayed treatment, but may properly be viewed as a

'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that " 'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

The essence of plaintiff's claim in this regard appears to be that after he was subjected to beatings and when admitted into the SHU, Nurse Volpe intentionally ignored the obvious injuries that he had sustained. Additionally, plaintiff claims that on the following day, after the superintendent had ordered an investigation of plaintiff's complaint that he had been assaulted, Nurse Jane Doe, whom he has never identified or

served but who appears to be Nurse Caban, *see* Volpe Decl. (Dkt. No. 58-6) ¶12, refused to acknowledge or treat his injuries.  Because plaintiff alleges that these defendants completely failed to treat his injuries, the seriousness of the injuries sustained becomes an important consideration when evaluating the objective prong of the deliberate indifference test.

In this instance, plaintiff alleges that he sustained "a bleeding swollen and bruised lip, several lacerations about the inner and lower lip area, a swollen and bruised head underneath the hair portion, mental anguish, anxiety, post Traumatic Stress Disorder, [and] emotiional [sic] distress . . . ."  A review of the pleadings and evidence before the court leads to the inescapable conclusion that plaintiff has offered no proof to sustain his burden of showing that his injuries were sufficiently serious.

At the outset, I note that plaintiff has offered nothing but conclusory assertions to support his claims.  Nurse Volpe, on the other hand, has stated that she observed Hopkins in his undershorts at the time of his admission to SHU, and she did not see any blood, areas of redness or swelling, or any other sign of injury on plaintiff.  Volpe Decl. (Dkt. No. 58-6) ¶ 6.  Moreover, when questioned by Volpe regarding his injuries plaintiff denied that he had any.  *Id.* ¶ 10; *see also* Defendants' Exh. N (Dkt. No.

47

58-23).  Nurse Volpe has also stated that plaintiff was seen by Nurse

Caban the following day, who noted in an injury report that she "viewed

[Hopkins] in shorts, has mid lower back birthmark, no other bruises or

injuries noted.  Has slight discoloration noted to the bottom lip.  No

treatment indicated."  Volpe Decl. (Dkt. No. 58-6) ¶¶12-13;  *see also*

Defendants' Exh. N (Dkt. No. 58-23).  The next entry in plaintiff's AHR

appears fourteen days later, on February 24, 2005, stating that during

SHU rounds plaintiff complained of a "sore mouth", which started ten days

earlier, but appeared to be "minimal to non-existent" and only subjective to

the nurse doing rounds.  On that day, as well as the next, plaintiff was

given a topical antiseptic for the mouth pain.  Plaintiff made no other

complaints of injury or illness or requests for treatment while at Franklin,

except for complaining of a blister on his hand from raking on April 6,

2005, which was treated by a nurse.

Even crediting plaintiff's claims that he sustained a bleeding

swollen and bruised lip, several lacerations about the inner and lower lip

area, a swollen and bruised head, it does not appear that plaintiff has

shown a "sufficiently serious" condition to support a claim for medical

indifference.[26]  *See Tapp v. Tougas*, No. 9:05-CV-0149, 2008 WL
4371766, at * 9 (N.D.N.Y. Aug. 11, 2008) (citing *Peterson v. Miller*, No.
9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (noting
that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did
not raise a constitutional issue) (citing *Hathaway*, 37 F.3d at 66; *Salaam v.
Adams*, No. 03-CV-0517, 2006 WL 2827687 (N.D.N.Y. Sept. 29, 2006)),
*Report and Recommendation Adopted in Part, Rejected in Part,* 2008 WL
4371762 (N.D.N.Y. Sep 18, 2008) (Mordue, C.J.); *see also Ford v.
Phillips*, No. 05 Civ. 6646, 2007 WL 946703, at *12 & n.70 (S.D.N.Y. Mar.
27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and
blood in his urine for a few weeks did not constitute a sufficiently serious
condition giving rise to a medical indifference claim); *Sonds v. St.
Barnabas Hosp. Corr. Health Servs*., 151 F. Supp.2d 303, 311
(S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious);
*Bonner v. N.Y. City Police Dep't*, No. 99 Civ. 3207, 2000 WL 1171150, at
*4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling
insufficiently serious to constitute Eighth Amendment violation); *Gomez v.
Zwillinger*, 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6,

---

[26]      Moreover, there is no evidence in the record to suggest that plaintiff
sustained and sought treatment for post traumatic stress disorder.

1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.*, 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

In view of the foregoing, no reasonable factfinder could conclude that plaintiff suffered a medical condition sufficiently serious to sustain an Eighth Amendment medical indifference claim.

### 2.    Subjective Element

Had plaintiff been able to successfully meet the objective element of the deliberate indifference standard, his claim would nonetheless fail upon the lack of any showing in the record that any of the defendants at issue in connection with this claim were subjectively indifferent to his medical condition.

The subjective prong of the deliberate indifference standard mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300, 111 S.Ct. 2321). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same).  Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin*, 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct. 1970).,

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action.  *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.   If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is

actionable as deliberate indifference.  *Harrison,* 219 F.3d at 138;  *Kearsey v. Williams,* 2005 WL 2125874, at *5  (S.D.N.Y. Sep. 1, 2005).

With respect to Nurse Brue, the record is clear that plaintiff received medical treatment from her for the conditions of which he was complaining on February 10, 2005.  Indeed, plaintiff's admits that on that date he complained of a cough, sore throat, and green phlegm, and that Nurse Brue took his temperature and determined that throat lozenges and cough syrup were appropriate for plaintiff's condition.  Defendants' Rule 7.1(a)(3) Statement ¶¶4, 5.  Thereafter, Nurse Brue instructed plaintiff to leave the infirmary, and although plaintiff alleges that Nurse Brue then wrote a false misbehavior report accusing plaintiff in misconduct, there are no allegations and no evidence to suggest that Nurse Brue was involved with plaintiff thereafter.  To the contrary Nurse Brue has stated, without contradiction from plaintiff, that after the incident in the infirmary on February 10, 2005, she had no further involvement in the care and treatment of Hopkins.  Based upon these undisputed facts, no reasonable factfinder could find in favor of plaintiff on his medical indifference claim against Nurse Brue.

Turning next to plaintiff's claim against Nurse Volpe, she states she

saw plaintiff upon his admission to the SHU, at which time she observed no sign of injury, a fact that is deemed admitted by virtue of plaintiff's failure to dispute that statement in defendants' Rule 7.1(a)(3) Statement. Moreover, plaintiff has admitted that when Nurse Volpe asked if he had any injuries, he denied that he did.  Hopkins Tr. at p. 91-92.  Under the circumstances presented, no reasonable factfinder could conclude that Nurse Volpe was aware of and consciously disregarded a serious risk to plaintiff's health and safety.

Plaintiff's medical indifference claims against Superintendent Allard are even weaker than those interposed against Nurses Brue and Volpe. Plaintiff's deliberate indifference claim against defendant Allard appears to spring from his complaint to the superintendent on February 11, 2005 when he stopped Superintendent Allard, while making his rounds, regarding the assault the evening before. It should be noted that during the conversation with Allard plaintiff did not identify an specific injuries, nor did Allard observe any.  *See* Complaint (Dkt. No. 1) ¶ 99; Allard Decl. (Dkt. No. 58-2) ¶ 25.  In response to plaintiff's complaint Allard delegated investigation of the alleged assault to Deputy Superintendent D. Locke. Allard Decl. (Dkt. No. 58-2) ¶ 26.  As part of that the ensuing investigation

Hopkins was interviewed and photographed, and additionally was seen on February 11, 2005 by Nurse Caban, who noted a slight discoloration on his bottom lip, but no other bruises or injuries.  The Defendants' Exh. G (Dkt. No. 58-16).  Based upon these facts, no reasonable factfinder could conclude that defendant Allard acted with the requisite degree of medical indifference to plaintiff's medical needs.

      F.    <u>Conditions of Confinement</u>

      Plaintiff advances a second claim under the Eighth Amendment, alleging that he was deprived of food for three days, running water in his cell for two days, and the opportunity to shower for four days. Defendants urge the court to dismiss these claims as not constitutionally viable.  The conditions associated with a convicted inmate's confinement are subject to Eighth Amendment scrutiny, and must meet the constitutional minimum under that constitutional provision.  *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer,* 511 U.S.

832, 114 S.Ct. at 1976.

A claim alleging that prison conditions violate the Eighth Amendment, like plaintiff's medical indifference claim, must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach,* 103 F. Supp.2d at 546 (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo*, 1998 WL 713809, at *2; *see also, generally, Wilson*, 501 U.S. 294, 111 S.Ct. 2321.

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety."  *May v. DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland*, Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society."  *May*, 2010 WL 1286800,

55

at *4 (quoting *Alvarez*,1009 WL 750200, at *2).  The Second Circuit has

recognized that the Eighth Amendment requires that prisoners be

provided with "nutritionally adequate food that is prepared and served

under conditions which do not present an immediate danger to the health

and well being of the inmates who consume it."  *Robles v. Couglin*, 725

F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 9:08-

CV-0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy,

S.J.) (citations omitted); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006 WL

2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations

omitted).

        "While no court has explicitly said that denial of food is a *per se*

violation of a prisoner's Eighth Amendment rights, under certain

circumstances a substantial deprivation of food may well be recognized as

being of constitutional dimension."  *Moss v. Ward*, 450 F. Supp. 591,

596-97 (W.D.N.Y. 1978).  When corrections officials deny a prison inmate

the measure of food necessary to maintain health, the Eighth

Amendment's prohibition against cruel and unusual punishment is

implicated.  *Robles*, 725 F.2d at 15-16.  If, on the other hand, meals are

withheld from a prisoner on an isolated basis such conduct, though not

necessarily to be condoned, does not typically rise to a level of

constitutional significance. *See Cunningham v. Jones*, 567 F.2d 653,

659-60 (2d Cir. 1977) (remanding case for a determination of nutritional

adequacy where complaint alleging that prisoners were served only one

meal per day had been dismissed); *Moss*, 450 F. Supp. at 596-97

(indicating that "being deprived of one or two meals might not be cruel and

unusual punishment", but finding, where it was undisputed that the plaintiff

was deprived food for four consecutive days, the punishment was

unconstitutionally disproportionate for violation of a prison disciplinary

rule).

In the face of defendants' pending motion for summary judgment,

plaintiff has failed to come forward with anything of evidentiary value

establishing that he was in fact deprived of food, not by his own actions

but rather those of prison officials.  The record before the court

demonstrates that plaintiff arrived in SHU at approximately 5:55 p.m. on

February 10, 2005, after the dinner meal had been served.  He claims that

thereafter he was not fed for four days.  In support of their motion,

however, defendants have produced the SHU log book reflecting the

inspection and delivery of meals to inmates within the Franklin SHU.  *See*

Defendants' Exh. I (Dkt. No. 58-18).  The log book reflects that on

February 11, 12, 13, and 14, 2005, plaintiff was provided all meals except

for lunch on February 12, 2005, when he was off the unit visiting with his

fiancé, and dinner on that same date, which he refused.  *Id.*  These are

facts, moreover, which are deemed admitted due to plaintiff's failure to

dispute defendants' Rule 7.1(a)(3) Statement.  *See* Defendants' Rule

7.1(a)(3) Statement (Dkt. No. 58-9) ¶¶ 79, 80, and 81.

Additionally, plaintiff does not claim the alleged deprivation of food

resulted in any physical harm or threat to his well-being.  In fact, there is

nothing in his AHR that would suggest that he suffered physical

consequences, like weight loss, dehydration, or any other medical

problems, from a lack of food.  Simply stated, plaintiff's allegations are no

more than generalized assertions which, while perhaps troublesome at

first blush, lack the specifics necessary to substantiate an Eighth

Amendment.  *Brown*, 2009 WL 815724, at *10; *see also Cruz v.  Church*,

No. 9:05-CV-1067, 2008 WL 4891165, at *12 (N.D.N.Y. 2008) (Suddaby,

J. and Peebles, M.J.).

Plaintiff's claims regarding the deprivation of water and showers

are similarly without merit.  Like his claims regarding food, these claims

are premised upon mere allegations, which plaintiff has failed to substantiate in the face of defendants' evidence to the contrary. Defendant has produced unrefuted evidence that the water in plaintiff's cell could not have could not have been shut off for two days and that plaintiff was provided a drink with each meal, as well as evidence showing that plaintiff was not denied, but instead refused, a shower on two occasions.  In any event, even if true, neither of these allegations is sufficient to support an Eighth Amendment claim.  *See Lunney v. Brureton*, No. 04 Civ. 2438, 2007 WL 1544629, at *15 (S.D.N.Y. May 29, 2007) (""[l]ack of access to running water, by itself, does not constitute the denial of minimal civilized measures of life's necessities") (collecting cases); *McCoy v. Goord*, 255 F. Supp.2d 233, 260 (S.D.N.Y. 2003) (a two-week suspension of shower privileges does not suffice as a denial of "basic hygienic needs") (citation omitted).

Under these circumstances I conclude that no reasonable factfinder could determine that defendants have violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by denying him meals, water, or showers.

G.    Failure to Protect

59

Embedded within the fourth cause of action of plaintiff's complaint is an allegation against defendants Gardner, Brue, Titus and Allard, as well as two John Doe correctional officers and a Jane Doe Nurse to the effect that they failed to intercede and protect plaintiff from the use of excessive force by defendants Titus and Gardner.  That claim implicates the Eighth Amendment's prohibition against cruel and unusual punishment.  Defendants also seek summary dismissal of this cause of action.

### 1.   Eighth Amendment

Unquestionably, under the Eighth Amendment prison officials are required to take reasonable measures to guarantee the safety of inmates; this duty includes within it an obligation to protect prisoners from harm caused by fellow inmates.  *Farmer*, 511 U.S. at 833-34, 114 S.Ct. at 1976-77; *see also Matthews v. Armitage*, 36 F. Supp.2d 121, 124 (N.D.N.Y. 1999) (Homer, M.J.) (citing, *inter alia*, *Farmer*).  On all three of plaintiff's Eighth Amendment claims the analysis is virtually the same.   When examining plaintiff's failure to protect claim under the Eighth Amendment, the court must determine whether the inmate has demonstrated that 1) he or she was incarcerated under conditions posing a substantial risk of

60

serious harm, and that 2) prison officials exhibited deliberate indifference to the inmate's plight.  *Farmer*, 511 U.S. at 834, 837, 114 S.Ct. at 1977, 1979; *Matthews*, 36 F. Supp.2d at 124-25; *Coronado v. Lefevre*, 886 F. Supp. 220, 224 (N.D.N.Y. 1995) (Scullin, J.).  As with plaintiff's other Eighth Amendment claims, the analysis of his failure to protect claim entails both an objective and subjective inquiry.  *Farmer*, 511 U.S. at 834, 837.

According to the plaintiff three corrections officers, including defendant Johnston and two John Doe defendants, while not actively participants, were physically present when he was assaulted by defendants Gardner and Titus, but failed to prevent the attacks.  These allegations suffice to survive summary judgment with regard to those defendants.

A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation.  *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).  It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other

61

officers.  *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at

*4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern*, 268

F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [section 1983]

liability where an officer observes excessive force being used or has

reason to know that it will be.") (citations omitted).  In order to establish

liability on the part of a defendant under this theory, a plaintiff must prove

the use of excessive force by someone other than the individual, and that

the defendant under consideration 1) possessed actual knowledge of the

use by another corrections officer of excessive force; 2) had a realistic

opportunity to intervene and prevent the harm from occurring; and 3)

nonetheless disregarded that risk by intentionally refusing or failing to take

reasonable measures to end the use of excessive force.  *See Curley*, 268

F.3d at 72; *see also Espada v. Schneider*, 522 F. Supp.2d 544, 555

(S.D.N.Y. 2007).  Mere inattention or inadvertence, it should be noted,

does not rise to a level of deliberate indifference sufficient to support

liability for failure to intervene.  *See, e.g., Schultz v. Amick*, 955 F. Supp.

1087, 1096 (N.D. Iowa 1997) (noting that "liability in a § 1983 'excessive

force' action cannot be founded on mere negligence") (citing, *inter alia*,

*Daniels v. Williams*, 474 U.S. 327, 335-36, 106 S.Ct. 662, 667 (1986)).

Plaintiff's failure to protect claims against defendants Brue, Nurse Jane Doe, and Allard, however, cannot be sustained.  None of those defendants had any prior awareness that plaintiff was exposed to danger at the hands of defendants Gardner and Titus, and it appears that plaintiff has admitted an inability to identify any prior acts of violence or other prior misconduct toward him by defendants Gardner and Titus.  Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 58-9) ¶ 96.  Nor has plaintiff alleged facts plausibly suggesting, or produced evidence raising a triable issue of fact as to whether he was incarcerated under conditions posing a substantial risk of serious harm.  Such conditions can be shown by evidence that an inmate had a previous altercation with his attacker and has complained about the incident or has requested separation from the attacker.  *Desulma v. City of New York,* No. 98 Civ.2078, 2001 WL 798002 at *6 (S.D.N.Y. Jul. 6, 2001).  Plaintiff's complaints to Allard regarding the assault came only after the assault occurred.  Again, by plaintiff's own admission there is no evidence that Allard was aware of any prior acts of violence committed against plaintiff or any other inmates by Gardner and Titus.  As a result, no reasonable jury could conclude that Allard, or for that matter defendants Brue and Nurse Jane Doe, knew of

and disregarded a substantial risk of serious harm to plaintiff posed by Gardner and Titus.  Accordingly, Hopkins' failure to protect from excessive use of force claim cannot be sustained as against those defendants.

>    H.    Personal Involvement

As a separate basis for dismissal of plaintiff's claims, defendants challenge the sufficiency of his allegations concerning their personal involvement in the constitutional violations alleged.  Plaintiff's response to this contention is directed solely to defendant Allard, who he appears to hold responsible solely as the superintendent at Franklin.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Defendants cannot be held responsible for any alleged misconduct

in which they were not involved.  The only allegations against Titus and Gardner relate to the alleged assaults on February 10, 2005.  Accordingly, the only claims for which those defendants may be held responsible are those relating to the alleged use of force, in violation of the Eighth Amendment.

With regard to defendant Allard, I note that as a supervisor he cannot be liable for damages under section 1983 solely by virtue of his position; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson*, 347 F.3d at 435 (citations omitted); *see also, e.g., Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir. 1985) (same).  He can, however, be held accountable as a supervisory official for a civil rights in one of several ways, including when it is shown that he 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3)

65

created or allowed to continue a policy or custom under which

unconstitutional practices occurred; 4) was grossly negligent in managing

the subordinates who caused the unlawful event; or 5) failed to act on

information indicating that unconstitutional acts were occurring.  *Iqbal v.*

*Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), rev'd on other grounds sub

nom., *Ashcroft v. Iqbal*, ___ U.S. ___,129 S.Ct. 1937 (2009); see also

*Richardson*, 347 F.3d at 435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995); *Wright*, 21 F.3d at 501.

Plaintiff seeks to premise liability on the part of defendant Allard for

the conduct of the other corrections officers at Franklin on the basis of

letters that he and his father wrote to Allard, and because he denied

plaintiff's grievance.  As was previously noted, plaintiff's complaints to

Allard, including his letters, occurred after the alleged defendants had

engaged in the alleged unconstitutional conduct.  Significantly,

immediately upon receiving plaintiff's first complaint, which occurred on

February 11, 2005 while Superintendent Allard was making rounds, the

superintendent directed the deputy superintendent of security at the

facility to conduct an investigation.  Allard received the letter of February

15, 2005 from plaintiff's father, also relating to the assault of February 10,

2005, while the investigation was pending, which he also referred to the deputy superintendent, and Allard additionally responded to the letter.

After the investigation was concluded, finding no basis to substantiate plaintiff's claims, Hopkins wrote an undated memorandum outlining the events of February 10, 2005, which was received in the administrative office on March 3, 2005 and which Allard, once again, referred to the deputy superintendent for a comparison with the results of the investigation.  The acts of receipt and referral of these complaints to subordinates for investigation are insufficient to establish personal involvement in the events at issue, nor do they establish that the superintendent's policies or neglect led to those events.  *Garvin v. Goord,* 212 F. Supp.2d 123, 126 (W.D.N.Y. 2002)("the only contact alleged by plaintiff between himself and [defendant] are certain letters and replies between himself and [defendant]. . .[which] is insufficient to establish [defendant's] personal involvement.")*; see also Hendricks* v. Coughlin, 114 F.3d 390, 394 (2d Cir. 1997); *Farid v. Goord*, 200 F. Supp.2d 220, 234-35 (W.D.N.Y. 2002).

As to plaintiff's allegation that Superintendent Allard denied his grievance, the record establishes that the only grievance filed concerning

67

the incidents forming the basis for the complaint occurred after he was transferred from Franklin to Bare Hill, and that the grievance was denied by the superintendent at Bare Hill, not Superintendent Allard.  Defendants' Rule 7.1(a)(3) Statement ¶ 94.  To the extent plaintiff seeks to hold Allard liable on the basis of his denial of plaintiff's request for review of the Tier III disciplinary penalty, because I have already determined that no due process violations arose out of that proceeding there is no constitutional violation for which Superintendent Allard can be held responsible.

     I.    Conspiracy

Plaintiff asserts two causes of action for conspiracy, one pursuant to section 1983 and the other under section 1985(3).  Defendants' final contention is that those conspiracy claims are precluded by the intra-agency conspiracy doctrine, and in any event lack merit.

     1.    Section 1983 Conspiracy

To sustain a conspiracy claim under § 42 U.S.C. 1983, a plaintiff must demonstrate that a defendant "acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, that violated the plaintiff's rights . . . secured by the Constitution or the federal courts." *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and

internal quotation marks omitted).  Conclusory, vague or general

allegations of a conspiracy to deprive a person of constitutional rights do

not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709

F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S.Ct. 177 (1983).

### 2.   Section 1985(3)

To sustain a cause of action for conspiracy to violate civil rights

under section 1985(3), a plaintiff must allege and demonstrate that

defendants acted with racial or other class based animus in conspiring to

deprive the plaintiff of his or her equal protection of the laws, or of equal

privileges and immunity secured by law.  *United Brotherhood of*

*Carpenters & Joiners, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 834-39,

103 S.Ct. 3352, 3359-61 (1983); *Gagliardi v. Village of Pawling,* 18 F.3d

188, 194 (2d Cir. 1994); *Gleason v. McBride*, 869 F.2d 688, 694 (2d Cir.

1989); *Patterson v. County of Oneida*, No. 00-CV-1940, 2002 WL

31677033, at *4 (N.D.N.Y. 2002) (Hurd, J.), *aff'd in relevant part*, 375 F.3d

206 (2d Cir. 2004); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412,

427 (2d Cir. 1995).  A plaintiff asserting a claim under section 1985(3)

need not necessarily offer proof of an explicit agreement; a conspiracy

can in the alternative be evidenced circumstantially, through a showing

that the parties had a "'tacit understanding to carry out the prohibited

conduct.'"  *LeBlanc-Sternberry*, 67 F.3d at 427 (quoting *United States v.

Rubin,* 844 F.2d 979, 984 (2d Cir.1988)).  This notwithstanding, in order to

properly plead such a claim, a plaintiff must make more than "conclusory,

vague, or general allegations of conspiracy."  *Sommer*, 709 F.2d at 175;

*Williams v. Reilly*, 743 F. Supp. 168, 173 (S.D.N.Y. 1990)

("[u]nsubstantiated, conclusory, vague or general allegations of a

conspiracy to deprive constitutional rights are not enough to survive [even]

a motion to dismiss").  "[D]iffuse and expansive allegations are insufficient,

unless amplified by specific instances of misconduct."  *Ciambriello v.

County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v.

City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).

### 3.    Intra-Agency Conspiracy Doctrine

In a doctrine rooted in the conspiracy provision of section one of

the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed

in the context of business entities, since its inception has been expanded

to apply to business corporations and public entities as well, the intra-

corporate conspiracy doctrine provides that with exceptions not now

presented, an entity cannot conspire with one or more of its employees,

acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances.  *See, e.g., Everson v. New York City Transit Auth.*, 216 F. Supp.2d 71, 75-76 (E.D.N.Y. 2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).

4.     Merits of Plaintiff's Conspiracy Claims

Addressing the merits of plaintiff's conspiracy claims, I note that in the face of defendants' motion for summary judgment, plaintiff has come forward with no evidence to support the conclusory allegations in the complaint that two or more of the defendants conspired for the purpose of depriving plaintiff his civil rights.  Instead, plaintiff does nothing more than repeat the alleged misconduct of each individual defendant.  In this instance plaintiff alleges that defendants, all employees of the DOCS conspired to violate his constitutional rights.  Since those conspiracy claims are asserted against the DOCS and its officers, agents or employees, each acting within the scope of his or her employment, they are precluded by virtue of the intra-corporate conspiracy doctrine.  *Little v. City of New York,* 487 F. Supp.2d 426, 441-42 (S.D.N.Y. 2007) (citations omitted).

71

"An exception to the intracorporate conspiracy doctrine exists when individuals pursue 'personal interests wholly separate and apart from the entity.'" *Orafan v. Goord*, 411 F. Supp.2d 153, 164-65 (N.D.N.Y. 2006), *vacated and remanded on other grounds*, 249 Fed. App'x 217 (2d Cir. 2007) (quoting *Bond v. Bd. of Educ. of City of N.Y.*, No. 971337, 1999 WL 151702, at *2 (E.D.N.Y. Mar. 17, 1999)).  Here, however, there is no suggestion that defendants were acting in furtherance of their own personal interests and outside the scope of their employment.  *Walker v. New York City Dep't of Corr.*, No. 01 Civ. 1116, 2008 WL 4974425, at * 12 (S.D.N.Y. Nov. 19, 2008); *Orafan*, 411 F. Supp.2d at 164-65.

For these reasons, I find plaintiff's section 1983 and 1985(3) causes of action for conspiracy subject to dismissal on the merits, even assuming inapplicability of the intra-corporate conspiracy doctrine. *Boddie*, 105 F.3d at 862 (citing *Flaherty*, 713 F.3d at 13).

　　J.　　Dismissal of John and Jane Doe Defendants

Although defendants' motion does not explicitly request this relief, I have *sua sponte* chosen to raise the question of whether plaintiff's claims should proceed against the three remaining, unserved John and Jane Doe defendants. The decision to raise this issue is bottomed upon the

72

requirement, imposed by Rule 4(m) of the Federal Rules of Civil

Procedure, that service in a case be made within 120 days of issuance of

the summons, absent a court order extending that period.[27]  "[W]here

good cause is shown, the court has no choice but to extend the time for

service, and the inquiry is ended."  *Panaras v. Liquid Carbonic Indus.*

*Corp.*, 94 F.3d 338, 340 (7th Cir. 1996).  "If, however, good cause does

not exist, the court may, in its discretion, either dismiss the action without

prejudice or direct that service be effected within a specified time."  *Id.*

(citing Fed. R. Civ. P. 4(m)); *Zapata v. City of New York*, 502 F.3d 192,

196 (2d Cir. 2007) ("[D]istrict courts have discretion to grant extensions

even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*,

807 F.2d 309, 311 (2d Cir. 1986).  When examining whether to extend the

prescribed period for service, a district court is afforded ample discretion

---

[27]     That rule provides that

> [i]f a defendant is not served within 120 days after the
> complaint is filed, the court – on motion or on its own after
> notice to the plaintiff – must dismiss the action without
> prejudice against that defendant or order that service be
> made within a specified time.  But if the plaintiff shows good
> cause for the failure, the court must extend the time for
> service for an appropriate period. . . .

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120
day period under Rule 4(m) to sixty days.  *See* N.D.N.Y.L.R. 4.1(b).

to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata*, 502 F.3d at 197.

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991). When a plaintiff proceeds *in forma pauperis*, such as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin*, 304 F. Supp.2d 934, 938-43 (E.D. Mich. 2004). In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States

74

Marshals Service.  *See VanDiver*, 304 F. Supp.2d at 942.

In this case, which has been pending since January 2, 2008, the three defendants at issue have not been served or otherwise appeared in the action within the appropriate time period.  Moreover, at no time has plaintiff sought to avail himself of discovery opportunities in order to ascertain the identities of the unknown defendants.  Under these circumstances I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and discern no sufficient basis presented to exercise my discretion in favor of extending the governing period of service.  Accordingly, since this court has never acquired jurisdiction over them, plaintiff's complaint should be dismissed as against those defendants, without prejudice.  *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989) (citing *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

## IV.   SUMMARY AND RECOMMENDATION

Plaintiff's complaint alleges an array of civil rights violations and the existence of a conspiracy in violation of 42 U.S.C. §§ 1983 and 1985(3).

The focus of plaintiff's complaint, however, seems to be centered upon his contention that he was issued a false misbehavior report, denied adequate medical treatment, and assaulted in retaliation for having lodged a grievance and commenced a state court legal proceeding, both filed some months earlier.  Defendants seek dismissal of all claims asserted in the complaint, except those relating to the alleged assault, on various grounds, including the procedural basis that plaintiff has failed to exhaust his administrative remedies.

As to Hopkins' claims for retaliation, denial of access to courts, issuance of a false misbehavior report, failure to protect, denial of showers while in SHU, and denial of due process in association with his disciplinary proceeding, I have determined that these claims should be dismissed either due to plaintiff's failure to exhaust his administrative remedies and/or on the merits.  With regard to plaintiff's Eighth Amendment medical indifference, conditions of confinement and conspiracy causes of action, I have found that plaintiff has failed to come forward with evidence to support viable claims, and as a result, these claims are also subject to dismissal.  Finally, as an additional basis for dismissal of certain claims, I have concluded all claims against Allard as

well as those against Gardner and Titus, except those relating to

excessive use of force, must be dismissed due to a lack of personal

involvement.[28]

Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment

(Dkt. No. 58) be granted in its entirety, and that all claims in plaintiff's

complaint, except those relating to excessive use of force against

defendants Titus and Gardner, be dismissed with prejudice; and it is

further

RECOMMENDED, that all claims against the John and Jane Doe

defendants be dismissed, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of

---

[28]     In light of my determinations, I have declined to address defendants'
claim of qualified immunity.

this report and recommendation upon the parties in accordance with this

court's local rules.

Dated:        August 23, 2010
              Syracuse, New York

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4.  Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither the "sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord.Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

## II. Retaliation

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

> FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

> FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray*, 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants made separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro se* prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8]*Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9]*Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. See April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. See March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. See generally Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. See County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original).) Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

*8 Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); Sloane, 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of Woodford, if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); Collins v. Goord, 438 F.Supp.2d at 411 n. 13 (acknowledging that Woodford and Hemphill may be in tension, but deciding exhaustion claims under Hemphill inquiry); Hernandez v. Coffey, No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under Hemphill; therefore, there is no occasion to address the potential effect Woodford may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the Hemphill inquiry requires a court to determine whether administrative remedies were available to the prisoner. Hemphill, 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." Id. at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, Ruggiero, 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] Hemphill v. State of New York, 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming arguendo that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

## I. INTRODUCTION

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the

Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

### REPORT-RECOMMENDATION AND ORDER[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [FN2] *See*
Compl. (Docket No. 1). Presently pending is defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

> FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

## I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See* Ertman v. United States, 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

> FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

## II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

**\*2** A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir.1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.*; *see also* Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

### B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 925054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

*3 when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

**\*5** Therefore, it is recommended that defendants' motion on this ground be granted.

### C. Eighth Amendment[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified

his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at \*2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at \*2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. _Blisset v. Casey,_ 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. _Scott v. Coughlin,_ 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for _in forma pauperis_ relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, _i.e.,_ May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a _de novo_ determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a _de novo_ hearing on the matter. _United States v. Raddatz,_ 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. _Nelson v. Smith,_ 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting _Hernandez v. Estelle,_ 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. _Raddatz,_ 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5 Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY, Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of New York, New York, NY, By: S. Kenneth Jones, Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past Superintendent of Sing Sing Correctional Facility ("Sing Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams ("Williams"), and Dr. Lofton ("Lofton"), all of the Sing Sing Medical Department, (collectively, the "Defendants"), have moved to dismiss the amended complaint of *pro se* inmate Roger Sulton ("Sulton"), pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure to exhaust administrative remedies. For the reasons set forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2, 2000, asserting a claim against the Defendants under Section 1983 for alleged violation of his constitutional rights under the Eighth Amendment for acting with deliberate indifference to his serious medical needs. Sulton filed an amended complaint on May 3, 2000, to identify additional defendants to his suit. Additionally, Sulton alleges negligent malpractice by the Sing Sing medical staff. Sulton seeks monetary damages. The instant motion was filed on August 9, 2000, and was marked fully submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). However, both the Defendants and Sulton have submitted materials outside the pleadings. Where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one for summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v. Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court has determined to treat the instant motion as a motion for summary judgment. Therefore, the following facts are gleaned from the parties' submissions, with all inferences drawn in favor of the non-movant as required on a motion for summary judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing Sing at the time of the incidents in question. Greiner was Superintendent of Sing Sing at that time. Halko was and is a doctor on medical staff at Sing Sing. Williams and Lofton are alleged to be affiliated with the Sing Sing Medical Department.

According to Sulton, on October 8, 1998, he slipped on a flight of wet stairs, where there was no "wet floor" sign posted, and injured his left knee. The next day his knee was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See* In re Patterson, 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See* Petit v. Bender, No. 99 Civ. 0969. 2000 WL 303280, at \*2- \*3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. Snider v. Dylag, 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." Santiago v. Meinsen, 89 F.Supp.2d at 440; *see* Snider v. Melindez, 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf.* Nussle v. Willette, 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. Coronado v. Goord, No. 99 Civ. 1674, 2000 WL 52488, at \*2 (S.D.N.Y. Jan. 24, 2000); Edney v. Karrigan, No. 99 Civ. 1675, 1999 WL 958921, at \*4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See* Petit, 2000 WL 303280, at \*3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Larry McNAIR, Plaintiff,
v.
SGT. JONES, C.O. Shepherd, C.O. Zoufaly, Registered
Nurse Matthews, C.O. K. Koenig, Sick Call Nurse for
Shu, Dr. Supple, Capt. Lowry, Superintendent Strack,
Jose Pico, Nurse Daly and Lieutenant A. Caves,
Defendants.
**No. 01 Civ. 3253(RCC)(GWG).**

Sept. 18, 2002.

State prisoner brought § 1983 action against prison
officials alleging claims such as excessive force,
unsanitary conditions, conspiracy, and denial of medical
needs. Prison officials moved to dismiss. The District
Court, Gorenstein, J., recommended that: (1) prisoner
failed to exhaust his administrative remedies pursuant to
Prison Litigation Reform Act (PLRA) regarding certain
claims or justify such failure, and (2) allegations that
conduct of prison disciplinary hearings was procedurally
flawed and that inappropriate penalties were imposed did
not state a claim under § 1983.

Report and recommendation issued.

West Headnotes

**[1] Civil Rights 78 &#128273; 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner did not file grievance through state
administrative prison grievance process regarding his §
1983 claims of excessive force, unsanitary conditions,
conspiracy, and denial of medical needs, and, thus, failed
to exhaust his administrative remedies pursuant to Prison
Litigation Reform Act (PLRA) regarding these claims. 42
U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

**[2] Civil Rights 78 &#128273; 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner's verbal complaints of confinement
conditions, letters to legal aid organization for indigent
litigants, and letters to offices for prison superintendent
and inspector general were not sufficient to satisfy
requirement of Prison Litigation Reform Act (PLRA) that
he exhaust his administrative remedies before bringing §
1983 action; prisoner was required to go through prison
administrative process requiring written grievances and
setting forth procedure for such grievances which did not
allow submission of letters directly to prison management.
42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

**[3] Civil Rights 78 &#128273; 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner's general allegations of conspiracy by prison
officials, and his claims that he did not file prison
grievance due to pending disciplinary charges against him
because he did not trust prison officers to file charges and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

because such grievance would be futile, did not excuse prisoner's failure to file prison grievance regarding disciplinary charges before bringing § 1983 action, for purposes of showing exhaustion of administrative remedies under Prison Litigation Reform Act (PLRA). 42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

[4] Civil Rights 78 ☞ 1308

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1308 k. Administrative Remedies in General. Most Cited Cases
        (Formerly 78k194)
Exhaustion of administrative remedies after § 1983 complaint is filed will not save case from dismissal for failure to exhaust administrative remedies. 42 U.S.C.A. §§ 1983, 1997e(a).

[5] Civil Rights 78 ☞ 1092

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1089 Prisons
            78k1092 k. Discipline and Classification; Grievances. Most Cited Cases
        (Formerly 78k135)
Prison disciplinary proceeding and penalties imposed on state prisoner, such as loss of good time credit, were not invalidated on appeal, and thus prisoner's claims that conduct of hearings was procedurally flawed and that inappropriate penalties were imposed did not state a claim under § 1983. 42 U.S.C.A. §1983.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, Magistrate Judge.

**\*1** Larry McNair, the *pro se* plaintiff, brings this action pursuant to 42 U.S.C. § 1983, alleging that correction officers used excessive force against him during a pat frisk that occurred on June 7, 1999 while McNair was imprisoned in the Fishkill Correctional Facility; that medical personnel were deliberately indifferent to his serious medical needs; that he was forced to live in unsanitary conditions while confined as part of a "drug watch"; that all of the defendants were involved in a conspiracy to cover up the officers' malicious conduct; and that certain procedural defects occurred during his disciplinary hearing. The defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b) or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the defendants' motions should be granted.

I. *STATEMENT OF FACTS*

The details of the incident underlying the complaint are not directly relevant to the grounds for dismissal that are the subject of this Report and Recommendation. Nonetheless, they are recounted here to provide some background for the dispute.

A. *Allegations of Excessive Force*

At approximately 5:50 p.m. on June 7, 1999, while McNair was proceeding to his evening program at the Fishkill prison, Sergeant Jones directed McNair into the prison yard for a random pat frisk. Complaint, dated March 1, 2001 ("Complaint"), at § IV; Memorandum from E. Shepherd, dated June 7, 1999 ("Shepherd Report") (reproduced as Ex. D to Exhibits "A to D" in Support of Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated April 15, 2002), at 1.[FN1] Officer Shepherd instructed McNair to remove everything from his pockets and to stand against the wall so that the search could be performed. Shepherd Report at 1. McNair cooperated, first handing the officers his books, cigarettes and wallet, and then turning to place his hands on the wall. Complaint at § IV; Shepherd Report at 1.

FN1. A number of documents discussed herein, including the Rule 56.1 Statement cited above, were not filed with the Clerk at the time of their service or submission to Chambers. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

documents consist of: (1) the defendants' notice of motion and memorandum of law dated August 6, 2001; (2) the exhibits, identified as "A to U," that were submitted as part of McNair's opposition papers to this motion, dated September 5, 2001; and (3) McNair's papers submitted in opposition to the defendants' February 2002 motion to dismiss or for summary judgment, consisting of an affirmation, memorandum of law, statement under Rule 56.1, a declaration and two sets of exhibits, all of which are dated April 15, 2002. These documents are now being docketed along with this Report and Recommendation.

According to a misbehavior report filed by Officer Shepherd, during the frisk Shepherd discovered a rolled up piece of toilet paper containing a small white packet of paper in McNair's wallet. At this point, according to the report, McNair began pushing Shepherd's hands, knocking the white packet to the ground. McNair immediately bent down, picked up the white packet and put it in his mouth. A struggle ensued, during which Shepherd lost his balance and fell to the ground. Shepherd ordered McNair to spit out the packet but McNair refused. Shepherd then placed his hands under McNair's chin in an attempt to force McNair to spit out the item. McNair, however, responded "I swallowed it." Officers Shepherd and Zoufaly then placed restraints on McNair, with Shepherd controlling McNair's left arm and Zoufaly controlling his right. Shepherd Report at 1-2.

According to McNair's version of events, however, Shepherd never discovered a white packet of paper in McNair's wallet. Rather, after McNair placed his hands against the wall, Shepherd asked McNair about a bulge in his left shoe. McNair, who was injured in a basketball game the night before, reached down to his ankle, revealing an ace bandage protecting his Achilles tendon. Shepherd reacted to this gesture by attacking McNair-choking him and knocking him to the ground. Sergeant Jones then instructed Zoufaly to grab McNair's right arm and to break it if necessary. McNair claims that Shepherd held him on the ground in a choke hold as Zoufaly twisted his arm and wrist. When Sergeant Jones asked Shepherd what happened, Shepherd replied that he thought McNair had swallowed something. Complaint at § IV.

**\*2** Officer Jones and another unnamed officer then escorted McNair through the facility, toward the Special Housing Unit. McNair claims that the officers took a route that placed the men out of view of the general population. According to McNair, during this trip Sergeant Jones threatened to harm him if he reported any injuries to the medical staff. Complaint at § IV.

B. *Medical Examination and Drug Watch*

Upon arrival at the Special Housing Unit, Nurse Matthews examined McNair. Complaint at § IV. Matthews asserts that, although McNair told Matthews that he had a cut on his face, Matthews was not able to find any damage. Defendant Matthews' Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002 ("Matthews Decl.") (annexed to Notice of Motion to Dismiss And/Or for Summary Judgment, filed February 22, 2002 ("Feb.Mot.") (Docket # 22)), at ¶ 7. Nurse Matthews did notice that McNair's knuckle was swollen but states that McNair retained a full range of motion in his hand. *Id.* McNair denies this, claiming that he was unable to clench his hand into a fist. Complaint at § IV. During the examination, Matthews states that McNair also drew attention to his ankle, which had been injured the previous night. Matthews Decl. at ¶ 7. Matthews' observations, however, revealed that McNair did not have difficulty walking. *Id.*

McNair asserts that he also discussed his history of high blood pressure with Nurse Matthews but was not placed on a low cholesterol diet. Complaint at § IV. McNair alleges that Dr. Supple, a physician who had examined McNair on three prior occasions for problems unrelated to the June 7 incident, should have either placed Nurse Matthews on notice of his condition or prescribed a remedy himself. *See* Affirmation in Opposition, dated September 5, 2001, ("McNair Aff.") (filed December 4, 2001, Docket # 20), at ¶¶ 2-3. Dr. Supple states that upon review of McNair's medical records, McNair did have high cholesterol, but his failure to prescribe special dietary provisions did not affect McNair negatively. Defendant Dr. Supple's Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002, at ¶ 7. After the exam, McNair was not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

given any medication nor was he deemed to require any further medical attention. Matthews Decl. at ¶ 10.

At the conclusion of his examination, Officer Koenig took pictures of McNair as required by Directive No. 4944. *See* Photographs Taken by Officer K. Koenig After Use of Force and Directive 4944 (reproduced as Ex. O to Exhibits "A to U" in Support of Affirmation in Opposition, dated September 5, 2001 ("9/5/2001 Exs.")). McNair, however, claims that Officer Koenig refused to take pictures of his ankle and right hand. Complaint at § IV. McNair was then placed on a drug watch in the Special Housing Unit. *Id.* The purpose of such a watch is to monitor the progress of contraband suspected to have been ingested by the inmate. Declaration of Robert Ercole in Support of Defendants' Motion to Dismiss And/Or Summary Judgment, dated February 21, 2002 ("Ercole Decl.") (annexed to Feb. Mot.), at ¶ 6. Consequently, McNair was placed in a "dry cell" in which the water supply was turned off to enable the officers to monitor his bowel movements. Ercole Decl. at ¶ 7. McNair's cell was also lacking soap, a towel, toothpaste and a toothbrush. Complaint at § IV. However, as required by DOCS Directive No. 4910, such items were to have been provided to McNair when he was allowed out of his cell to wash himself. Ercole Decl. at ¶¶ 6-8. Though inmates are permitted to have bed linens in their cells, Ercole Decl. at ¶ 7, McNair alleges that his mattress remained undressed. Complaint at § IV.

**\*3** On the morning of June 8, 1999, Nurse Daly walked through the Special Housing Unit. Though she refused to stop at his cell, as she walked by, McNair told her that his ankle was causing him pain. According to McNair, Daly agreed to send him something to relieve his discomfort. However, no medication was ever sent. Complaint at § IV; Amended Complaint, dated July 2001 ("Amended Complaint"), at ¶ 2.

McNair remained on the drug watch for a total of 48 hours. Complaint at § IV. During this time, no contraband was found. A urinalysis test designed to recognize the existence of drugs also came back negative. *Id.*

McNair received no further medical treatment during his stay at the Fishkill Facility. Plaintiff's Statement Pursuant to [Local Civil Rule 56.1](), dated April 15, 2002 ("McNair 56.1"), at ¶ 24. McNair alleges that as a result of the incident, the tendon in his right hand was torn and his left [ankle was injured](). Complaint at § IV-A. He also alleges that he needed physical therapy on his right hand and surgery, resulting in diminished usage of his hand. *Id.*

On July 6, 1999, McNair was transferred to Southport Correctional Facility. McNair 56.1 at ¶ 24. At Southport, McNair was given a health screening, Ambulatory Health Record, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 1, after which he was placed on a low cholesterol, low fat diet. Therapeutic Diet Order Form, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 2. In July 2000, a medical report showed that the tendon in the long finger of McNair's right hand had been torn. Surgical Pathology Report, dated July 11, 2000 (reproduced as Ex. T to 9/5/2001 Exs.).

### C. *The Disciplinary Charge and Appeal*

On June 7, 1999, the day of the pat frisk, Shepherd filed an Inmate Misbehavior Report in which he described his version of events. Inmate Misbehavior Report, dated June 7, 1999 (reproduced as Ex. E to Strack Declaration in Support of Defendants' Motion to Dismiss And/Or Summary Judgment, dated February 21, 2002 ("Strack Decl.") (annexed to Feb. Mot.)). As a result, a disciplinary hearing was held before officer Jose Pico on June 18, 1999 in which McNair was charged with refusing a direct order, assaulting staff, and refusing to be searched or frisked. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). In support of his version of events, McNair presented a witness. Excerpt of Transcript from Disciplinary Hearing ("Disc.Hg.Transcript") (reproduced as Ex. P to 9/5/2001 Exs.), at 2. Nevertheless, Officer Pico found McNair guilty of all charges and sentenced him to loss of twelve months "good time" credits and 365 days in the Special Housing Unit, with a loss of package, commissary and phone call privileges. Disc. Hg. Transcript at 1.

McNair immediately sought to appeal this finding. On July 2, 1999, McNair sent Superintendent Strack the first of two letters requesting discretionary review of his disciplinary hearing. Letter to Wayne Strack, dated July 2,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

1999 (reproduced as Ex. I to Exhibits "A to M" in Support of Plaintiff's Affirmation in Opposition to Defendant's Motion to Dismiss And/Or Summary Judgment, dated April 15, 2002 ("4/15/2002 A to M Exs.")). In his first letter, McNair stated that Officer Pico denied him his right to call a witness during the hearing. *Id.* That same day, William Mazzuca, on Strack's behalf, wrote to McNair, refusing to alter the results of the disciplinary hearing. Letter to McNair, dated July 2, 1999 (reproduced as Ex. K to 4/15/2002 A to M Exs.). On July 3, 1999, McNair sent a second letter to Superintendent Strack, this time informing him that he may be held personally liable if he failed to remedy the alleged violation of McNair's right to call witnesses. Letter to Wayne Strack, dated July 3, 1999 (reproduced as Ex. J to 4/15/2002 A to M Exs.).

**\*4** McNair also claims that he sent a letter to Superintendent Strack on June 16, 1999 in which he complained about the lack of medical attention he was receiving. McNair 56.1 at ¶ 20. Superintendent William Mazzuca apparently received this letter, although he asserted in January 2001 that he no longer had a copy. *See* Mazzuca Sworn Affidavit, dated January 26, 2001 (reproduced as Ex. G to 9/5/2001 Exs.), at ¶¶ 215, 220. Confusingly, defendants have submitted a copy of a letter dated June 16, 1999, from McNair to Superintendent Strack, which does not mention McNair's medical status or his disciplinary hearing but relates only to a missing package of cigarettes. Letter dated June 16, 1999 (reproduced as Ex. B to Hartofilis Declaration in Support of Defendant's Motion for Summary Judgment, dated February 22, 2002).

On September 1, 1999, McNair formally appealed the ruling in the disciplinary hearing. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). His appeal was heard by Donald Selsky, the Director of the Special Housing and Inmate Disciplinary Programs, who affirmed Hearing Officer Pico's order. *Id.* McNair sent out another letter appealing the ruling on October 19, 1999. *See* Response from Donald Selsky, dated October 28, 1999 ("Selsky Response") (reproduced as Ex. C to Affirmation in Opposition Exhibits "A to P", Docket # 41, dated June 11, 2002 ("6/11/2002 Exs.")). Selsky and Lucien J. Leclaire, Jr., Deputy Commissioner of the Department of Correctional Services, each received copies of the letter. Both declined to reconsider Pico's ruling and refused to reduce McNair's confinement time. *See* Selsky

Response; Letter from Lucien J. Leclaire, Jr., dated November 8, 1999 (reproduced as Ex. D to 6/11/2002 Exs.).

McNair then filed a petition with the Supreme Court of the State of New York, Dutchess County, challenging his disciplinary hearing. *See* Order to Show Cause, dated November 29, 1999 (reproduced as Ex. A to 6/11/2002 Exs.). On August 11, 2000, that court entered a judgment against McNair. *Cf.* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.). McNair then filed a notice of appeal on August 23, 2000. *Id.* On May 30, 2001, the Appellate Division, Second Department, dismissed the appeal because it had not been perfected within the time limit specified in 22 N.Y.C.R.R. § 670.8(e). Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3.

### D. *Complaint to Inspector General*

In December 1999, McNair made a complaint to the Inspector General's Office. *See* Inspector General's Office Investigative Report, dated May 25, 2000 ("Investigative Report") (annexed to Memorandum of Law in Opposition of Defendant's Motion to Dismiss And/Or Summary Judgment and Supplemental Brief, dated April 15, 2002 ("McNair 4/15/2002 Mem.")). On December 15, 1999, Officer Todd of the Inspector General's Office interviewed McNair about his complaints. Supplemental Brief and Memorandum of Law in Decision of Interest, dated June 11, 2002 (Docket # 40) ("McNair Supp. Mem."), at 2. In May 2000, a second officer, Investigator Holland took over the investigation. *Id.* This officer, Investigator Holland, found McNair's claims to be unsubstantiated and recommended that the case be closed. *See* Investigative Report.

### E. *The Present Action*

**\*5** On April 19, 2001, McNair filed the complaint in this matter pursuant to 42 U.S.C. § 1983 against defendants Jones, Shepherd, Zoufaly, Matthews, Koenig, an unidentified "sick call nurse," Dr. Supple, Captain Lowry and Superintendent Strack. The complaint, brought under 42 U.S.C. § 1983, describes the alleged attack, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

resulting injuries, the denial of medical care and unsanitary conditions. McNair seeks monetary damages in the amount of $5 million. Complaint at § V. On July 25, 2001, McNair filed an Amended Complaint which did not repeat any of the allegations in the original complaint but instead stated that it was being filed to add three new defendants: Jose Pico, Nurse T. Daly and a "Watch Commander." Amended Complaint at ¶¶ 1-3. McNair alleges that Pico, as Hearing Officer of McNair's disciplinary hearing, imposed improper penalties, denied "witnesses" and "adequate assistance," and was arbitrary and capricious. *Id.* at ¶ 1. McNair alleges that Daly failed to provide adequate medical care. *Id.* at ¶ 2. The "Watch Commander" is alleged to have "approved the photographs[ ] that were taken on June 7, 1999, with knowledge that these photographs were not in accordance with the 'Use of Force' Directive." *Id.* at ¶ 3.

On August 6, 2001, the defendants submitted a motion to dismiss the complaint arguing that the complaint should be dismissed because of McNair's failure to exhaust his administrative remedies and because the complaint did not state a claim for the various constitutional violations alleged. McNair thereafter submitted an "Affirmation in Opposition" dated September 5, 2001, along with other papers, that provided additional detail about his allegations-particularly the allegations regarding his improper medical treatment. *See* McNair Aff.; Memorandum of Law dated September 5, 2001, filed December 4, 2001 (Docket # 21). Upon McNair's request, made by letter dated November 3, 2001, the Court construed this affirmation as supplementing his complaint. *See generally* Order, dated October 25, 2001 (Docket # 18).

On February 22, 2002, defendants Shepherd, Matthews, Supple and Strack moved to dismiss McNair's complaint, as amended, pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and/or 56(c). *See* Feb. Mot. They argued that the complaint should be dismissed for a number of reasons: McNair had not exhausted his administrative remedies; he had failed to state a "deliberate indifference" claim with respect to his medical needs; there was no personal involvement by certain of the defendants; the defendants were entitled to qualified immunity; McNair had failed to state a claim regarding the allegation that a false misbehavior report had been filed; and he had failed to state a claim for conspiracy. On March 28, 2002, these

same defendants filed a supplemental memorandum (Docket # 30) to argue the effect of the Supreme Court's decision the previous month in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). By memorandum endorsement dated, April 2, 2002 (Docket # 31), the defendants' motion was deemed to include defendants Pico, Daly, Jones, and the Watch Commander (who had since been identified as A. Caves). The plaintiff submitted opposition papers to this motion, which are all dated April 15, 2002, and included an affirmation, a statement under Local Civil Rule 56.1, a memorandum of law, and exhibits identified as "A to M." On May 9, 2002, the defendants filed a reply memorandum of law (Docket # 34).

**\*6** On the same date that the defendants filed the reply brief on the pending motion, defendants Pico and Strack again moved to dismiss McNair's complaint-this time citing Fed.R.Civ.P. 12(b)(1) and (6). *See* Notice of Motion, dated May 9, 2002 (Docket # 32). While Pico and Strack had previously made (or, in Pico's case, been deemed to have made) the motion filed February 22, 2002 to dismiss or in the alternative for summary judgment, Pico and Strack filed the 12(b)(1) and (6) motion in order to make specific arguments regarding McNair's claims that the disciplinary hearing had not been properly conducted. *See* Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33), at 1 n. 1. McNair opposed this new motion with an affirmation, exhibits and a brief, all of which are dated June 11, 2002 (Docket # 's 39, 40 and 41). The defendants filed a reply brief on July 26, 2002 (Docket # 42).

## II. *Discussion*

### A. *Summary Judgment Standard*

A district court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *New York Stock Exchange, Inc. v. New York,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

*New York Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). A material issue is a "dispute[ ] over facts that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Thus, " '[a] reasonably disputed, legally essential issue is both genuine and material' " and precludes a finding of summary judgment. *McPherson,* 174 F.3d at 280 (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *McPherson,* 174 F.3d at 280. Moreover, the pleadings of a pro se plaintiff must be read liberally and interpreted "to raise the strongest arguments that they suggest." *Id.* (citation omitted). Nonetheless, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

B. *Exhaustion of Administrative Remedies*

Under the Prison Litigation Reform Act, 110 Stat. 1321-73, as amended, 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This means the prisoner "must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing suit." *Flanagan v.. Maly,* 2002 WL 122921, at *2 (S.D.N.Y. Jan.29, 2002); *see also Porter v. Nussle,* 534 U.S. 516, ----, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy and effective.' ") (citations omitted). The Supreme Court has clarified that "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 122 S.Ct. at 992.[FN2]

FN2. Even though McNair filed this action before *Porter v. Nussle* was decided, "the broad exhaustion requirement announced in *Nussle* applies with full force" to litigants in such a situation. *Espinal v. Goord,* 2002 WL 1585549, at *2 n. 3 (S.D.N.Y. July 17, 2002). *See generally Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.").

*7 7 N.Y.C.R.R. § 701 outlines the Inmate Grievance Program under which New York prison inmates may file grievances regarding prison life. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.7(a). Next, after receiving a response from the IGRC, the inmate may appeal to the Superintendent of the facility. *Id. at § 701.7(b).* Finally, after receiving a response from the Superintendent, the prisoner can seek review of the Superintendent's decision with the Central Office Review Committee ("CORC"). *Id. at § 701.7(c). See, e.g., Anderson v. Pinto,* 2002 WL 1585907, at *1 (S.D.N.Y. July 17, 2002). In New York, a "prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002). As was noted in *Flanagan,* "New York permits inmates to file internal grievances as to virtually any issue affecting their confinement." 2002 WL 122921, at *1. Exhaustion is not accomplished by an inmate's appeal of a disciplinary hearing decision brought against the inmate. *See, e.g., Benjamin v. Goord,* 2002 WL 1586880, at *2 (S.D.N.Y. July 17, 2002) (citing *Cherry v. Selsky,* 2000 WL 943436, at *7 (S.D.N.Y. July 7, 2000)).

[1] McNair's claims regarding the assault and subsequent denial of medical care were grievable under the prison regulations. *See* 7 N.Y.C.R.R. § 701.2(a) (permitting grievances for any "complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

policy, regulation, procedure or rule"); 7 N.Y.C.R.R. § 701.11 (describing special expedited grievance process for "[e]mployee misconduct meant to ... harm an inmate"); *see also Espinal v. Goord,* 2002 WL 1585549, at *2 (S.D.N.Y. July 17, 2002) ("It is undisputed that '[a] claim of excessive force is a proper subject of a grievance inmates may file through [DOCS's] Inmate Grievance Program.' ") (citation omitted); *Cruz v. Jordan,* 80 F.Supp.2d 109, 111-12 (S.D.N.Y.1999) ("New York State provides administrative remedies that are available to prevent, stop and mitigate deliberate indifference to the medical needs of prisoners."); Thomas G. Eagen's Affidavit in Support of Defendant's Motion to Dismiss, dated August 2, 2001 ("Eagen Aff.) (annexed to Feb. Mot.), at ¶ 4.

[2] In the face of defendants' assertions that McNair's complaint must be dismissed for his failure to exhaust administrative remedies, McNair argues that he accomplished exhaustion through verbal complaints and by writing to the Legal Aid Society, the Superintendent's office, and the Inspector General's Office. McNair 4/15/2002 Mem. at 2.

Making a verbal complaint, however, does not satisfy the exhaustion requirement because the administrative grievance process permits only written grievances. *See Flanagan,* 2002 WL 122921, at *2. A complaint made to the Legal Aid Society is likewise not permitted by the administrative grievance process. McNair's letters to the Superintendent could not satisfy the exhaustion requirement for two reasons. First, the only letters in the record complain of procedural defects in the disciplinary hearing and do not assert any of his other claims. *See* Exhibits "A to M", dated April 15, 2002, Exs. I, J. Second, forgoing the step of filing a claim with the IGRC by submitting letters directly to the superintendent does not satisfy the exhaustion requirement. *See, e.g., Byas v. New York,* 2002 WL 1586963, at *2 (S.D.N.Y. July 17, 2002) ("Permitting a plaintiff to bypass the codified grievance procedure by sending letters directly to the facility's superintendent would undermine the efficiency and the effectiveness that the prison grievance program is intended to achieve."); *Nunez v. Goord,* 2002 WL 1162905, at *1 (S.D.N.Y. June 3, 2002).[FN3]

FN3. Although the Inmate Grievance Program

does allow for an expedited procedure for allegations of inmate harassment by prison employees, which in some cases allows for review by the IGRC to be bypassed, the inmate must still file a grievance with the employee's supervisor before the superintendent can review the allegations to determine if the grievance presents a bona fide harassment issue. *See* 7 N.Y.C.R.R. § 701.11(b); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) (describing expedited grievance procedure). The regulations provide that if the superintendent fails to respond, the prisoner may appeal the grievance to the CORC. 7 N.Y.C.R.R. § 701.11(b)(6).

**\*8** Finally, although McNair eventually made a complaint to the Inspector General, that action does not satisfy the exhaustion requirement. *Grey v. Sparhawk,* 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint [plaintiff] may have made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures. To allow plaintiff to bypass those procedures would obviate the purpose for which the procedures were enacted."); *Houze v. Segarra,* 2002 WL 1301555, at *2 (S.D.N.Y. July 16, 2002).

In any event, McNair at no time suggests that he went through the appeal process permitted by 7 N.Y.C.R.R. §§ 701.7(b), (c); 701.11(b)(6). This failure alone means that McNair has not exhausted his administrative remedies. *Hemphill,* 198 F.Supp.2d at 548.

[3] McNair offers several arguments why the lack of exhaustion should be excused. First, he seems to argue that he should be excused from the exhaustion requirement because he seeks "monetary damages." McNair 4/15/2002 Mem. at 2. In *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), however, the Supreme Court held that the exhaustion requirement applies to a plaintiff seeking relief unavailable in the prison administrative proceeding such as monetary damages. *Id.* at 740-41. Second, McNair adverts generally to a conspiracy among the defendants to cover up their misconduct. *See, e.g.,* Complaint at § IV. He does not, however, claim that any of the defendants prevented him

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

from filing a grievance complaint.

Third, McNair contends that had he filed a complaint earlier it would have been disregarded because of the pending disciplinary charges against him. McNair 4/15/2002 Mem. at 1. Assuming for purposes of argument that use of the administrative process would have been futile, the Supreme Court has made clear that where a statute mandates exhaustion, even a futile administrative process must be observed. *Booth,* 532 U.S. at 741 n. 6. Fourth, McNair implies that the "Grievance supervisor" failed to conduct his rounds in the segregated housing unit he was in at the time. McNair 4/15/2002 Mem. at 1-2.[FN4] But the grievance process allowed McNair to have filed a grievance without interacting with the "Grievance supervisor"-either by requesting a grievance form from any accessible officer, 7 N.Y.C.R.R. 701.13(a)(1), or simply writing the complaint on a plain sheet of paper. 7 N.Y.C.R.R. 701.7(a)(1).

> FN4. McNair never directly states that the "Grievance supervisor" failed to conduct these rounds. Instead, his memorandum states that the defendants' motion papers did not verify that this occurred. McNair 4/15/2002 Mem. at 2.

In fact, McNair admits that the reason the grievance was not filed was not due to any inability to file such a grievance but rather that he "could not mail an officer to mail his grievance due to the assault on staff he was being charged with." McNair 4/15/2002 Mem. at 3. McNair's own distrust of the system, however, in the absence of any indication that he made an affirmative effort to file a grievance, does not permit avoidance of the exhaustion requirement. *See Reyes v. Punzal,* 206 F.Supp.2d 431, 434 (W.D.N.Y.2002) ("There is no suggestion in the record that plaintiff was somehow prevented from appealing his grievance, and even if plaintiff believed that further attempts to seek relief through administrative channels would prove fruitless, 'the alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies when Congress has specifically mandated that he do so.' ") (citing *Giano v. Goord,* 250 F.3d 146, 150-51 (2d Cir.2001)). The fact that McNair does not suggest that prison employees prevented him from filing a complaint distinguishes this case from those where the failure to

exhaust was excused because the prisoner made reasonable efforts to exhaust but was prevented from doing so by prison employees. *See, e.g., Rodriguez v. Hahn,* 2000 WL 1738430 (S.D.N.Y. Nov.22, 2000); *see also Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)").

**\*9** With respect to his medical needs claim, McNair states that he was threatened by Sergeant Jones and warned not to complain to the medical staff about his injuries. Complaint at § IV. Mere verbal threats from correctional officers, however, do not excuse the exhaustion requirement. *See Flanagan v. Maly,* 2002 WL 122921, at *2 n. 3 (rejecting argument that prisoner could be excused from exhausting administrative remedies where correctional officers threatened him with violence if he filed a grievance because the prisoner "made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance").

Finally, McNair argues that he has not submitted "sufficient information" to establish whether he exhausted administrative remedies and that he should be allowed to take discovery concerning the Inspector General's investigations and to depose various prison officials. McNair Supp. Mem. at 4. In support of this argument he cites *Perez v. Blot,* 195 F.Supp.2d 539 (S.D.N.Y.2002). In *Perez,* the plaintiff was permitted to take discovery on his informal grievance efforts because the Court concluded that it was not clear if the plaintiff had complied with the "informal" provisions of § 701.11. *Id.* at 546. Here, McNair has explicitly stated what he in fact did with respect to submitting his complaints and nothing he states suggests that he complied with the § 701.11 procedures. Thus, discovery is not necessary. *See, e.g., Byas,* 2002 WL 1586963, at *3 (plaintiff's attempt to invoke *Perez* to suggest that he satisfied exhaustion requirement unavailing because, among other reasons, he did not submit evidence that he notified the defendants' supervisor of the alleged assaults as required by § 701.11).

In sum, having determined that McNair has not exhausted his administrative remedies nor offered a justification for failing to do so, the claims of excessive force, unsanitary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

conditions, conspiracy, and denial of medical needs must be dismissed without prejudice. *See Morales v. Mackalm,* 278 F.3d 126, 126 (2d Cir.2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion).

[4] In a recent filing with the Court, McNair states that on April 7, 2002, nearly a year after the complaint in this case was filed, he filed a grievance with the Inmate Grievance Resolution Committee. *See* Grievance, dated April 7, 2002 (annexed to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). He does not contend, however, that he has completed this process.[FN5] In any event, exhausting administrative remedies after a complaint is filed will not save a case from dismissal. *Neal v. Goord,* 267 F.3d 116, 121-23 (2d Cir.2001), overruled on other grounds by *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN5. In fact, McNair complains that the Department of Corrections has failed to respond to his grievance complaint. *See* Letter, dated June 11, 2002 (annexed as last page to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). The Court notes that McNair filed this grievance nearly three years after the alleged incidents, and that inmate grievances must be filed within 14 days of the incident or be time-barred, unless the inmate demonstrates mitigating circumstances justifying the delay. 7 N.Y.C.R.R. § 701.7(a)(1). In any event, the Inmate Grievance Program regulations provide that "matters not decided within the time limits" for the initial step of review (14 days) "may be appealed to the next step." 7 N.Y.C.R.R. § 701.8.

C. *Claims of Procedural Defects*

[5] At the conclusion of his disciplinary hearing on June 18, 1999, McNair was found guilty of various rule violations. Disc. Hg. Transcript at 1. McNair challenges the conduct of this hearing on the grounds that it was procedurally flawed. He alleges that Pico "imposed inappropriate penalties of 365 days Special Housing Unit,

365 days loss of Telephones, Packages, and 365 days of recommended loss of good time" based on a prior weapons charge and a misbehavior report that is not in McNair's disciplinary record. Amended Complaint at ¶ 1; McNair Aff. at ¶ 3. McNair also claims that Pico denied McNair his right to call witnesses in his defense, denied him "adequate assistance," and that his ruling was "arbitrary and capricious." Amended Complaint at ¶ 1. In addition, McNair claims that because he gave Superintendent Strack notice of the alleged constitutional violations by way of his July 3, 1999 letter, Strack is also liable for damages. *See* Affirmation in Opposition Of Motion To Dismiss And/Or for Summary Judgment, dated April 15, 2002 ("McNair April Aff."). Defendants now move to dismiss these claims not on exhaustion grounds but rather pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6) on the ground that McNair's claims are not cognizable under 42 U.S.C. § 1983. *See* Notice of Motion, dated May 9, 2002 (Docket # 32); Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33).

1. *Standard for Motion to Dismiss*

**10** A court should dismiss a complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint that would entitle the plaintiff to relief. *See, e.g., Strougo v. Bassini,* 282 F.3d 162, 167 (2d Cir.2002); *King v. Simpson,* 189 F.3d 284, 286-87 (2d Cir.1999). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). The issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his or her claims. *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), cert. denied, 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). The Court must "confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

When considering motions to dismiss the claims of a plaintiff proceeding *pro se,* pleadings must be construed liberally. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Lerman v. Board of Elections,* 232 F.3d 135, 139-40 (2d Cir.2000), *cert. denied,* 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001); *Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999).

2. *Merits of McNair's Claims*

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner can demonstrate that the conviction or sentence had previously been invalidated. *Id.* at 486-87. Later in *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court made clear that a claim may not be brought under 42 U.S.C. § 1983 alleging a violation of procedural due process in a prison disciplinary proceeding where the nature of the challenge necessarily implies the invalidity of the judgment or punishment imposed, unless of course the disciplinary proceeding is first invalidated. *Id.* at 648.

Here, McNair seeks damages based on his allegations that the disciplinary proceedings were improperly conducted, *inter alia,* because McNair was not permitted to call witnesses, he did not have adequate assistance, and the hearing officer relied on improper evidence (the prior weapons charge). Amended Complaint at ¶ 1. McNair's own filings with this Court concede that his disciplinary sanction-the loss of good time credits and other privileges-has never been invalidated. *See, e.g.,* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.); Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3. Thus, *Heck* and *Edwards* bar consideration

of his claim in a § 1983 action.

**\*11** McNair asserts in reply that his appeal to the Appellate Division, Second Department, was dismissed for failure to perfect his appeal within 10 days and that he was unable to perfect the appeal because of the disruption of his legal mail. *See* Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39), at ¶ 19. But even assuming this to be true, any attempt to seek relief for the untimely filing would have been properly addressed only to the state court. Because McNair has not "fully exhausted available state remedies," he has "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck,* 512 U.S. at 489. In fact, nothing prevents McNair from returning to federal court on some later date if in fact he is able to obtain review from the state court and that review results in a reversal or expungement of the disciplinary action. *See id.* (statute of limitations for bringing § 1983 claim does not commence until state court proceedings have terminated in plaintiff's favor).

In addition, the Court notes that the case of *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999), is of no help to McNair because *Jenkins* held only that a § 1983 action would be available to a prisoner challenging the constitutionality of a disciplinary proceeding where the suit "does not affect the overall length of the prisoner's confinement." *Id.* at 27. Here, however, the sanction against McNair included the loss of "good time" credits, which is precisely the sort of sanction that affects the length of confinement. *See Edwards,* 520 U.S. at 646-48; *Hyman v. Holder,* 2001 WL 262665, at \*3 (S.D.N.Y. Mar.15, 2001).

While McNair does not make the argument, it is also of no moment that McNair's disciplinary hearing resulted in additional sanctions that did not affect the length of McNair's sentence (for example, the placement in segregated housing and the loss of telephone privileges). This is because a judgment in favor of McNair in a § 1983 suit for damages would nonetheless imply the invalidity of his sentence through its reinstatement of good-time credits. McNair has not suggested that he seeks damages for the non-good-time sanctions by themselves and he would be unable in any event to so "split" his claim. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

*Gomez v. Kaplan,* 2000 WL 1458804, at *7-11 (S.D.N.Y. Sept.29, 2000) (citing cases) (dictum).

Accordingly, McNair's claim challenging the process and validity of the disciplinary decision is not cognizable under § 1983 and must be dismissed with prejudice for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).[FN6]

> FN6. The claim is not so patently without merit, however, that dismissal is appropriate for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *See, e.g., Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990). Accordingly, the defendants' motion must be denied on this ground.

> Additionally, the request to dismiss unserved defendants, made in a reply brief, *see* Defendants Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint And/Or For Summary Judgment, dated July 26, 2002, at 1 n. 1, is now moot as the complaint does not state a claim against any defendant.

III. *CONCLUSION*

Judgment should be entered in favor of the defendants on all claims. With respect to McNair's claims against Pico and Strack alleging due process violations, these claims should be dismissed with prejudice. All other claims should be dismissed without prejudice for failure to exhaust administrative remedies.

**Notice of Procedure for Filing of Objections to this Report and Recommendation**

**\*12** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Richard C. Casey, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Casey. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

S.D.N.Y.,2002.
McNair v. Sgt. Jones
Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 1586880 (S.D.N.Y.)
(Cite as: 2002 WL 1586880 (S.D.N.Y.))

▶

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
David BENJAMIN, Plaintiff,
v.
Glen GOORD, Commissioner of New York State
Department of Correctional Services, and Charles
O'Connor, Correctional Officer of New York State
Department of Correctional Services Defendants.
**No. 02 CIV. 1703(NRB).**

July 17, 2002.

State prisoner filed § 1983 suit alleging that prison officials violated his Eighth Amendment rights by their use of excessive force against him. On officials' motion to dismiss, the District Court, Buchwald, J., held that prisoner had to exhaust his administrative remedies before filing suit.

Motion granted.

West Headnotes

**Civil Rights 78 ⚷ 1319**

78 Civil Rights
   78III Federal Remedies in General
      78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
         78k1319 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
   (Formerly 78k209)
State prisoner was required, under Prison Litigation Reform Act (PLRA), to exhaust his administrative remedies with regard to his excessive force claim against prison officials before bringing § 1983 suit, even if he appealed disciplinary hearing determination based on

same incident. 42 U.S.C.A. §§ 1983, 1997e(a).

MEMORANDUM AND ORDER

BUCHWALD, District J.

**\*1** Plaintiff David Benjamin ("plaintiff or "Benjamin"), an inmate at Green Haven Correctional Facility ("Green Haven"), brings this *pro se* action pursuant to 42 U.S.C. § 1983 against Commissioner Glenn Goord ("Goord") of the New York State Department of Correction Services ("DOCS"), and Correctional Officer Charles O'Connor ("O'Connor"), alleging that defendants violated his Eighth Amendment rights on March 24, 1999, by their use of excessive force against him. For the reasons discussed below, we now dismiss the complaint, without prejudice, on the grounds that plaintiff failed to exhaust his available administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"). 42 U.S.C. § 1997e(a).

BACKGROUND [FN1]

FN1. Unless otherwise noted, all facts are taken from plaintiff's complaint, dated February 14, 2002, and plaintiff's affirmations of June 10, 2002, and June 17, 2002.

Plaintiff alleges that on March 24, 1999, while an inmate at Green Haven, he was subjected to excessive force in violation of the Eighth Amendment. [FN2] Plaintiff maintains that he arrived at the Green Haven visiting room to await a visit from his attorney. At 2:15 p.m., O'Connor announced that attorney visitation had ended for the day and denied plaintiff's subsequent request for a brief meeting with his attorney. Plaintiff alleges that, while he was waiting alone in the visiting room, O'Connor jumped on his back and lifted up his shirt. Plaintiff further claims that officers from the Special Housing Unit arrived shortly thereafter and took him to an isolated room, where they twisted his arms to his back and handcuffed him, after which defendant O'Connor punched him in the right

Not Reported in F.Supp.2d, 2002 WL 1586880 (S.D.N.Y.)
(Cite as: 2002 WL 1586880 (S.D.N.Y.))

shoulder. Two other officers then threw plaintiff into a small holding cell, allegedly causing him to injure his knees as he fell to the floor.[FN3] O'Connor issued plaintiff a misbehavior report for his conduct during the alleged incident. Plaintiff was found guilty at a disciplinary hearing and his appeal to the DOCS Commissioner's Office was denied.

FN2. In his complaint, plaintiff also generally alleges violations of the First and Fourteenth Amendments but fails to plead specific allegations or facts that would support a claim under either Amendment.

FN3. Hereinafter, we will refer to this alleged series of events as "the alleged incident."

Plaintiff maintains that the alleged incident has rendered him permanently physically disabled, as he is unable to raise his right arm or walk without pain. Plaintiff also asserts that his injuries would significantly impair his post-imprisonment employment as an obstetrics-gynecologist. Plaintiff admits that he did not file a grievance, but claims he failed to do so out of fear of retaliatory attacks.

On March 5, 2002, plaintiff filed this complaint to recover compensatory and punitive damages for his alleged injuries arising from the incident.[FN4] In light of the Supreme Court's decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002), on April 2, 2002, we ordered plaintiff to show cause why we should not dismiss his excessive force claim for failure to exhaust his available administrative remedies. Although plaintiff's complaint admits that he did not pursue any administrative grievance remedies prior to filing this action, plaintiff filed an Affidavit, dated April 8, 2002, contending that he exhausted his administrative remedies by appealing the disciplinary hearing's determination. On May 24, 2002, defendants submitted an affidavit of DOCS Inmate Grievance Program ("IGP") Director Thomas G. Eagen, which stated that plaintiff had never filed an appeal of a grievance alleging the use of excessive force on May 24, 1999. (Eagen Aff. at ¶ 5).

FN4. By letter to the court, dated April 11, 2002, plaintiff stated that he anticipates instituting a future action alleging deliberate indifference, arising in part out of facts related to this claim. He also makes reference to this claim in his rambling April 11 Affidavit. However, as it is not pled in his Complaint, we do not reach the issue of deliberate indifference. We note, however, that the exhaustion issues discussed below will be equally applicable to any claim for deliberate indifference.

DISCUSSION

*2 Plaintiff failed to exhaust his available administrative remedies prior to instituting this claim and is therefore barred from pursuing this action. The PLRA provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Porter v. Nussle,* the Supreme Court rejected the Second Circuit rule that excessive force claims need not be grieved. 122 S.Ct. at 992 ("the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"), *overruling in part Neal v. Goord,* 267 F.3d 116, 120 (2d Cir.2001). A plaintiff must file a valid grievance and exhaust all appeals prior to bringing suit, or the case will be dismissed, even if the plaintiff attempts to exhaust after the suit is filed. *Neal,* 267 F.3d, at 117-118.

New York provides both formal and informal administrative grievance procedures for inmates in New York State Correctional Facilities. 7 N.Y.C.R.R. §§ 701.1-.16. Plaintiff admits that he did not follow either procedure. *See* Complaint Part II(B). Benjamin instead contends that he exhausted his administrative remedies with regard to his excessive force claim because he appealed the disciplinary hearing determination. Exhausting appeals of a disciplinary hearing determination does not constitute exhausting administrative remedies for his grievance, even if the underlying facts are the same. *See Cherry v. Selsky,* 2000 WL 943436, at *7 (S.D.N.Y. July 7, 2000) (finding that required exhaustion of IGP

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 1586880 (S.D.N.Y.)
(Cite as: 2002 WL 1586880 (S.D.N.Y.))

grievance procedure was necessary where inmate had already appealed disciplinary charges).

Moreover, plaintiff's complaint concedes that he did not grieve the facts relating to his excessive force claim through Green Haven's Inmate Grievance Program-either formally or informally. Benjamin thus failed to exhaust all available administrative remedies prior to filing suit. Therefore we dismiss plaintiff's claim, without prejudice, for failure to exhaust his administrative grievance remedies.[FN5]

> FN5. We note that plaintiff may not be able to exhaust his administrative remedies because he is required to file a grievance within fourteen days of the incident, unless he is granted a waiver. 7 N.Y.C.R.R. § 701.7(a)(1). An inmate filing an untimely grievance may submit an explanation with his grievance, upon which the IGP supervisor may waive the timeliness requirement due to "mitigating circumstances." *Id.* Accordingly, the appropriate course is to dismiss Benjamin's complaint without prejudice, enabling him to seek a waiver to permit a late filing. *See Santiago v. Meinsen,* 89 F.Supp.2d 435, 441 (S.D.N.Y.2000) (dismissing inmate complaint without prejudice, allowing inmate to seek a waiver to the time-bar for filing grievances). If the time limit is not waived, plaintiff will be precluded from filing suit for the excessive force claim on the grounds that he failed to submit a timely grievance and therefore can no longer exhaust his administrative remedies. *See Indelicato v. Suarez,* 2002 WL 1349736, at *3 (S.D.N.Y. June 20, 2002); *Burns v. Moore,* 2002 WL 91607, at *7 (S.D.N.Y. Jan.24, 2002).

CONCLUSION

Because plaintiff failed to exhaust his available administrative remedies prior to commencing this action, we grant defendant's motion and dismiss plaintiff's complaint without prejudice. The Clerk of Court is respectfully directed to close this case.

IT IS SO ORDERED.

S.D.N.Y.,2002.
Benjamin v. Goord
Not Reported in F.Supp.2d, 2002 WL 1586880 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis FLANAGAN, Plaintiff,
v.
J. MALY, Captain at Downstate Corr. Fac., A. Sedlak, Sergeant at Downstate Corr. Fac., P. Artuz, Corr. Officer at Downstate Corr. Fac ., S. KIERNAN, Corr. Officer at Downstate Corr. Fac., J. Whalen, Corr. Officer at Downstate Corr. Fac., D. Alfonso, Corr. Officer at Downstate Corr. Fac., Individually and in their Official Capacity, Defendants.
No. 99 CIV 12336 GEL.

Jan. 29, 2002.

Dennis Flanagan, for Plaintiff Dennis Flanagan, pro se.

Eliot Spitzer, Attorney General of the State of New York (Melinda Chester-Spitzer, Assistant Attorney General of the State of New York,), for Defendants J. Maly, A. Sedlak, P. Artuz, S. Kiernan, J. Whalen, D. Alfonso, of counsel.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Dennis Flanagan, a New York State prisoner, brings this action against a number of corrections officers at Downstate Correctional Facility, where he was formerly incarcerated, charging that they violated his constitutional rights. Specifically, he alleges that all the defendants except John Maly used excessive force against him in an altercation on June 4, 1999; that Maly, who conducted a disciplinary hearing on charges brought against Flanagan as a result of that incident, denied him due process of law; and that the defendants collectively denied him access to

medical care and to the law library. Defendants move for dismissal of the complaint and/or summary judgment, on a variety of grounds. The motion is granted in substantial part as to all claims except the excessive force claim, as to which proceedings will be stayed pending the Supreme Court's decision in *Porter v. Nussle,* 122 S.Ct. 455 (2001).

The facts underlying plaintiff's claims will be addressed, to the extent necessary, in the discussion of the defendants' various arguments.

*DISCUSSION*

I. *Exhaustion of Administrative Remedies*

Defendants argue that the entire complaint should be dismissed for failure to exhaust available administrative remedies as required by 42 U.S.C. § 1997a(e), which provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available have been exhausted.

A. *Medical and Legal Needs*

Unquestionably, Flanagan's claims about inadequate access to medical care and legal materials are complaints about "prison conditions" within the meaning of this statute. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-440 (S.D.N.Y.2000) (deliberate indifference to medical needs and access to courts are "prison conditions"); *Cruz v. Jordan,* 80 F.Supp.2d 109 (S.D.N.Y.1999) (deliberate indifference to medical needs are "prison conditions"); *Carter v. Kiernan,* 2000 WL 760303 (S.D.N .Y. June 12, 2000) (same). Equally unquestionably, Flanagan has failed to exhaust available administrative remedies with respect to those claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

New York permits inmates to file internal grievances as to virtually any issue affecting their confinement. *See* N.Y. Corr. Law § 139 (authorizing inmate grievances); 7 N.Y.C.R.R. § 701.7 (establishing procedures for processing such grievances); *Petit v. Bender* 2000 U.S. Dist LEXIS 3536 at *6-8 (S.D.N.Y. March 22, 2000) (describing procedures); *Vasquez v. Artuz,* 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (same).

Prison records show no written grievances filed by Flanagan with respect to his medical or legal access. (Hughes Aff. Ex. BB at 4 ¶ 13.) Flanagan essentially concedes that he filed no such written grievance.[FN1] He does contend that he made an oral complaint to both the area supervisor, Sergeant Sedlak, (Pl.'s Br. at 3 ¶ 10), and a grievance supervisor, Skip Hughes -contentions which both officers deny (Sedlak Aff. Ex. G at 7 ¶ 26; Hughes Aff. Ex. BB at 4 ¶ 17).

> FN1. Flanagan states under oath that he submitted a "verbal grievance" to Sergeant Sedlak and "another verbal grievance" to supervisor Hughes who "ignored" his complaint. (Flanagan Aff. ¶¶ 3-4; Pl.'s Br. 1.) Although Flanagan's brief opposing summary judgment later states that "plaintiff did file a written grievance," the remainder of the same sentence suggests that he unintentionally omitted the word "not," as plaintiff proceeds to explain why an oral grievance should be considered the equivalent of a written grievance. (Pl.'s Br. 8.) Evaluating this in conjunction with Flanagan's affidavit, which nowhere states that he made a written complaint, it is clear that Flanagan is not claiming to have made a written report.

**\*2** But even if Flanagan made oral complaints or filed a written report of some kind, that would not satisfy the statutory requirement. To comply with 1997(e), a prisoner must "exhaust[ ]" his administrative remedies, meaning that he must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit. *Sonds v. St. Barnabas Hosp. Corr. Health Serve.,* 2001 U.S. Dist. LEXIS 7839 at *4 (S.D.N.Y. May 21, 2001); *Santiago,* 89 F.Supp.2d at 438, 438. The New York procedures provide for several levels of administrative review, beginning with

the filing of a written grievance, 7 N.Y.C.R.R. § 701.7(a)(1), and continuing through several levels of administrative appeal, 7 N.Y.C.R.R. § 701.7(a)(4), (b), and (c). The record demonstrates that Flanagan was fully aware of the availability of these grievance procedures. They are described in a booklet provided to all inmates on arrival, (Defs.' Br. 15), and Flanagan himself filed grievances over other issues.[FN2] Flanagan does not claim, let alone provide any evidence, that he pursued his grievance through these channels. [FN3]

> FN2. Prison records indicate that Flanagan filed a written grievance regarding the prison food served in the Downstate Correctional Facility. (Hughes Aff. Ex. BB at 4 ¶¶ 13, 17; Ex. CC.)

> FN3. As previously stated, Flanagan claims that he submitted only verbal grievances to complaint supervisor Hughes and defendant Sedlak, who reacted with hostility to the complaint and threatened plaintiff with violence if he continued to complain. (Pl.'s Br. at 1, 6, 8-9; Flanagan Aff. ¶ 3.) No doubt, under some circumstances, behavior by prison officials that prevented a prisoner from complying with § 1997a(e) would excuse compliance. But Flanagan alleges nothing approaching conduct that would present this issue. He evidently made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance.

Accordingly, Flanagan's claims of deliberate indifference to his medical needs and denial of access to the law library must be dismissed for failure to exhaust administrative remedies.

B. *Due Process*

Flanagan's due process claim, in contrast, cannot be so easily dismissed on exhaustion grounds. Flanagan argues that in conducting his disciplinary hearing, which resulted in a sentence of 24 months in Special Housing and various other administrative sanctions, Maly denied him due process by denying him the right to call a witness and to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

introduce certain medical records. Flanagan appealed this decision internally, to no avail. (Spitzer Decl. Ex. X.)

To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

Defendants essentially concede as much. Although their brief asserts that Flanagan's entire "action" should be dismissed for failure to exhaust (Defs.' Br. 13), the brief goes on to argue extensively for such dismissal of the medical and legal access claims (*id.* 14-16), and of the excessive force claim (*id.* 16-21), without directing any argument toward the exhaustion of the due process claim.[FN4]

> FN4. The exhaustion rule does require a plaintiff to have appealed his disciplinary case to the fullest extent provided by administrative regulations. *Sonds,* 2001 U.S. Dist. LEXIS 7830 at *4. It is not entirely clear on this record that Flanagan did. Given that (1) it is clear that Flanagan unsuccessfully pursued some appeal of the result of his hearing, (2) defendants have not pointed out any further levels of appeal available to him that he failed to utilize, and (3) the due process claim must be dismissed on the merits in any event, there is no need to pursue further clarification of the matter.

**\*3** For these reasons, the motion to dismiss the due process claim for failure to exhaust administrative remedies must be denied.[FN5]

> FN5. Flanagan's complaint, construed liberally as pro se pleadings must be, also appears to claim that certain defendants conspired to file false reports against him. (Compl.¶¶ 21-22.) Defendants do not address an exhaustion argument specifically to this claim. Arguably, the same logic set out above as to the due process claim would permit the conclusion that, by contesting the reports at his hearing and exhausting his appeals, Flanagan has exhausted his remedies as to this claim as well. Assuming without deciding that the exhaustion requirement has been met, this claim must nevertheless be dismissed for failure to state a claim, since a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir.1986); see also Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir.1997),* and there is no claim here that the false report constituted retaliation for exercise of a constitutional right, rather than simply a rationalization for the use of allegedly excessive force. *Cf. Franco v. Kelly 854 F.2d 584, 588 (2d Cir.1988).*

C. *Excessive Force*

Flanagan's excessive force claim also survives the defendants' exhaustion argument. The claim that individual officers assaulted an inmate on a particular occasion does not fit easily within the ordinary meaning of "[an] action ... with respect to prison conditions," and the Second Circuit has ruled that such a complaint is not subject to the exhaustion requirement. *Nussle v. Willette, 224 F.3d 95 (2d Cir.2000).*

Defendants structure much of their argument against the excessive force claim as an attack on the Second Circuit's decision in *Nussle,* recommending that this Court, in effect, overrule *Nussle* from below. Defendants' arguments that *Nussle* was wrongly decided are appropriately addressed only to higher authority - and have been. The Supreme Court has granted certiorari in *Nussle, Porter v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

*Nussle,* 122 S.Ct. 455 (2001).[FN6] While that Court's recent decision in *Booth v. Churner,* 121 S.Ct. 1819 (2001), suggests that the Court might reverse, until and unless it does, *Nussle* remains the law of this circuit, and requires denial of defendants' motion to dismiss the excessive force claim.

> FN6. Indeed, New York's Attorney General has himself presented his arguments for reversal of *Nussle* in an amicus brief in that case. *See* Brief of Amici Curiae New York, *et al., Porter v. Nussle* (No. 00-853), 122 S.Ct. 455 (2001).

II. *Summary Judgment*

Defendant Maly moves in the alternative for summary judgment on Flanagan's due process claim. That motion will be granted.

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252).

**\*4** It is settled that the "[p]rocedures established by the New York Department of Correctional Services governing disciplinary hearings comport with the due process procedural rights to which prison inmates are entitled." *Rodriguez v. Ghoslaw,* 2001 WL 755398 at \*9 (S.D.N.Y. July 5, 2001), citing *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Flanagan nevertheless claims that Maly deprived him of due process by evidentiary rulings made during the hearing.

The facts relating to these claims are essentially undisputed, and on those facts no denial of due process can be found. Flanagan offers no evidence to dispute Maly's testimony that the witness Flanagan sought to call, an inmate named Sanabria, refused to testify at the hearing. (Spitzer Decl. Ex. U at 24.) Indeed, upon learning that Sanabria would not appear at the hearing, Maly went to Sanabria's cell to inquire further, and Sanabria again refused.[FN7] (*Id.* at 25; Spitzer Decl. Ex. V at 19.) It is thus not true that Maly precluded a relevant witness from testifying.

> FN7. Sanabria told Maly he would not testify because he had been threatened by a corrections officer named Lee. There is, of course, no admissible evidence that this was so, Sanabria's statement being hearsay. But even if such a threat had occurred, nothing in the record casts doubt on Maly's testimony that he reassured Sanabria that his safety would be guaranteed if he testified, as three other inmates, including Flanagan, did. (Maly Aff. Ex. U at ¶¶ 25-26.)

As for the documentary evidence, Maly refused to admit photographs taken of Flanagan on the date of the incident, which Flanagan asserted would show that his hands were not bruised, arguably tending to show that he had not assaulted a corrections officer as charged. Maly ruled the photos irrelevant. The photographs were of limited

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

probative value, and while the better course might have been to admit them, it can hardly be said that their exclusion was prejudicial error, let alone that it rises to the level of a denial of due process.

Maly heard testimony from Flanagan and two inmate witnesses, as well as from three corrections officers and the nurse who treated Flanagan and the officers after the fight. He also reviewed various medical records. The hearing provided Flanagan an opportunity to be heard "at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976), and thus comported with the requirements of due process. At a minimum, Maly is entitled to qualified immunity against Flanagan's claims, since his conduct of the hearing did not violate any "clearly established statutory or constitutional right," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989), as established by Supreme Court or Second Circuit precedent, *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

Accordingly, Maly's motion for summary judgment must be granted.

III. *Stay of Proceedings*

Defendants do not seek summary judgment on the one remaining claim, for the alleged use of excessive force. Nor could they successfully do so, since the parties' conflicting testimony as to the events precipitating the use of force and the degree of force used presents classic questions of fact for jury resolution.[FN8] Accordingly, Flanagan's excessive force claim can proceed to trial.

> FN8. The only one of defendants' remaining arguments that applies to this claim is their weakly-presented contention that the Court lacks jurisdiction under the Eleventh Amendment to the extent that they are sued in their official capacities. (Defs.' Br. at 39-40.) However, according Flanagan's complaint the liberal construction to which he is entitled, it is clear that he means to assert an ordinary claim that defendants as individuals violated his rights

under color of state law.

It would be imprudent, however, to schedule a trial at this time, in view of the pending Supreme Court decision in *Nussle.* Oral argument has already been heard, and a decision is likely within a few months. If the Supreme Court reverses and holds that exhaustion of administrative remedies is required in excessive force cases, Flanagan's one remaining claim will have to be dismissed, and any additional proceedings in this matter will have been wasted. If the Court affirms, in contrast, neither party will have been prejudiced by a brief delay. Therefore, proceedings in this case will be stayed pending the Supreme Court's decision.

*CONCLUSION*

**\*5** For the reasons set forth above, plaintiff's claim that defendants deprived him of access to medical care and to the courts are dismissed for failure to exhaust administrative remedies. Plaintiff's claim that defendants conspired to file false disciplinary reports is dismissed for failure to state a claim on which relief can be granted. Summary judgment for defendant Maly is granted on plaintiff's claim that he was denied due process of law at his disciplinary hearing; since this is the only claim against Maly, the case is terminated as to him.

The remaining defendants' motions to dismiss or for summary judgment with respect to plaintiff's claim of excessive force are denied, and further proceedings on that claim are stayed pending the Supreme Court's decision in *Porter v. Nussle.*

SO ORDERED:

S.D.N.Y.,2002.
Flanagan v. Maly
Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Befe REID, Plaintiff,
v.
NEW YORK STATE DEP'T OF CORRECTIONAL
SERVICES, et al., Defendants.
**No. 9:05-CV-0006 (LEK/GJD).**

Sept. 15, 2008.

Befe Reid, pro se.

David Fruchter, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 8, 2005, by the Honorable Gustave J. Bianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 68). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by the plaintiff, which were filed on August 15, 2008. Objections (Dkt. No. 69).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has

undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 68) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion for summary judgment (Dkt. No. 64) is **GRANTED;** and it is further

**ORDERED** that the Amended Complaint (Dkt. No. 8) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this amended civil rights complaint, plaintiff alleges that due to the actions of defendant Keefe, plaintiff was not able to participate in a mandated sex offender program, and as a result, plaintiff lost a substantial amount of good time. (Dkt. No. 8). Plaintiff seeks monetary and injunctive relief.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

Presently before the court is defendants' second motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 64). Plaintiff has responded in opposition to the motion. (Dkt. No. 66). For the following reasons, this court agrees with defendants and will recommend dismissing the action in its entirety.

**DISCUSSION**

**1. *Summary Judgment***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*2** At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id. See also Burt Rigid Box v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir.2002) (citations omitted). However, only disputes over facts that might affect the outcome of the suit under governing law will properly preclude summary judgment. *Salahuddin v. Coughlin,* 674 F.Supp. 1048, 1052 (S.D.N.Y.1987) (citation omitted).

**2. *Facts and Procedural History***

A review of the facts and the procedural history of this case is important for clarity. In the amended complaint, plaintiff alleges that in August of 2001, while he was incarcerated at the Fishkill Correctional Facility, he was given a misbehavior report for violating three different

DOCS Rules: 106.10 (violating a direct order); 107.10 (interference); and 101.10 (a "sexual offense"). Plaintiff states that the sexual offense involved plaintiff placing his hand in a "male private part" area. Amended Complaint (AC) ¶ 6 (Dkt. No. 8). Plaintiff was found guilty of the interference charge as well as the "sexual offense" charge. AC at ¶ 7. Plaintiff received a penalty of 90 days keeplock, a loss of privileges, and a loss of three months of good time. *Id.* In addition, plaintiff states that he was forbidden to have contact with female personnel. *Id.*

Plaintiff appealed this determination, but the finding was affirmed at all administrative levels. AC ¶ 8. Prior to his final administrative appeal, plaintiff alleges that he was transferred to Gouverneur Correctional Facility. *Id.* Plaintiff states that he was told by a corrections counselor at Gouverneur that because of the "sexual offense" misbehavior, plaintiff would be required to participate in the "Sexual Offender Program (SOP)." *Id.*

On October 22, 2001, plaintiff was transferred to Auburn Correctional Facility and filed an Article 78 proceeding in New York State court, challenging the August 2001 disciplinary determination. AC ¶ 9. Plaintiff alleges that although the Article 78 proceeding was dismissed because of untimeliness, plaintiff moved for, and was granted re-argument. The petition was ultimately dismissed, but plaintiff states that he filed an appeal. Plaintiff states that in November of 2002, he was transferred to Comstock Correctional Facility, where he was interviewed for the SOP. However, plaintiff states that he was never placed into the program, and he wrote a letter to a corrections counselor stating that plaintiff believed that he was not being placed in the program due to the pending appeal of the Article 78 proceeding. AC at ¶ 10.

Plaintiff states that he filed a grievance on March 25, 2003 regarding the failure to place him into the SOP, and that on April 16, 2003, the grievance was denied, stating that plaintiff had been notified of the SOP and had signed an acknowledgment of the SOP. *Id.* The notice further stated that plaintiff was required to complete the SOP prior to release. *Id.* Plaintiff states that two months later, he was transferred to Franklin Correctional Facility, but that Franklin did not offer the SOP. Plaintiff claims that at Franklin, he was interviewed by defendant Keefe, who told plaintiff that he was required to complete the SOP and

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

that again, plaintiff signed an acknowledgment of this information. AC at ¶ 11.

**\*3** Plaintiff claims that defendant Keefe made a false entry in plaintiff's guidance file, stating that plaintiff *refused* the SOP. *Id.* Plaintiff states that he obtained the "Guidance Quarterlies" from the other facilities in which he was incarcerated, but that these documents showed that plaintiff was on the "waiting list" for the SOP. Plaintiff then quotes the allegedly "false" entry. The paragraph quoted by plaintiff states that the plaintiff "acknowledged his need for the sex offender program and indicated his willingness to attend and participate." *Id.* The next portion of the quote states that "[h]owever, the inmate does not admit guilt stating that he is appealing under Article 78." Finally, the quote ends by stating that plaintiff was "advised this would be the same as a refusal of the program and [sic] could face 5 years potential loss of good time from time allowance committee." *Id.*

Plaintiff claims that defendant Keefe has abused his authority by stating that plaintiff's Article 78 proceeding is deemed a "refusal" to participate in the SOP. Plaintiff claims that he has been denied the opportunity to participate in the SOP because of defendant Keefe, and that defendants "retaliated" against plaintiff for exercising his right to appeal the disciplinary determination. Plaintiff also alleges that defendant Keefe made racial threats and comments and verbally harassed plaintiff. AC ¶ 17. Plaintiff claims that defendant Keefe prevented plaintiff from being transferred to a facility in which the SOP was available. *Id* .

Finally, plaintiff claims that defendant Keefe conspired with the other defendants to prevent plaintiff from completing the required program which ultimately led to the Time Allowance Committee's denial of four years of good time. Complaint ¶ 23. Plaintiff claims that the conspiracy was "racially motivated." *Id.* In addition to seeking monetary damages, plaintiff requests that the court order defendant Goord to allow plaintiff to appear before another Time Allowance Committee so that plaintiff's good time may be reinstated. Complaint ¶ 24.

In September of 2005, plaintiff moved for summary judgment. (Dkt. No. 21). At the time plaintiff filed his motion, only defendant Goord had been served with process. Defendant Goord opposed plaintiff's motion for summary judgment and cross-moved for summary judgment. (Dkt. No. 35). On May 2, 2006, this court recommended that plaintiff's motion be denied, and that defendant Goord's motion be granted to the extent that plaintiff's request for damages against defendant Goord be dismissed and plaintiff's request for restoration of good time be dismissed. (Dkt. No. 49). On September 26, 2006, the Honorable Lawrence E. Kahn approved and adopted the recommendation in its entirety. (Dkt. No. 55).

Defendants Michael Keefe and the Department of Correctional Services (DOCS) were ultimately served with process and answered the amended complaint. All defendants now move for summary judgment as to any and all claims that were not dismissed by Judge Kahn's September 26, 2006 decision. (Dkt. No. 64).

**\*4** The remaining claims are against defendant Keefe for damages, any claim for injunctive relief asking for a new hearing before the Time Allowance Committee,[FN1] and claims against the Department of Correctional Services (DOCS) because DOCS had not been served at the time of the previous dispositive motions.

> FN1. The court notes that defendant Goord has retired from DOCS. As the result of Judge Kahn's decision, defendant Goord was kept in this case in his official capacity for purposes of injunctive relief only. Defendants correctly state that pursuant to FED. R. CIV. P. 25(d), the current Commissioner, Brian Fischer, is automatically substituted as a party in place of defendant Goord as to claims in defendant Goord's official capacity. Thus, defendant Goord is no longer a defendant in this action.

### 3. *Michael Keefe*

#### A. Verbal Harassment

Michael Keefe was the plaintiff's Corrections Counselor while plaintiff was at Franklin Correctional Facility. In

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

addition to plaintiff's claim that defendant Keefe placed incorrect information in plaintiff's inmate records, plaintiff also claims that defendant Keefe called plaintiff a "Black Indian Bastard, and that he told plaintiff to "drop" his Article 78 proceeding. AC ¶¶ 14, 17.

It is well-settled that verbal harassment itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations. *See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Ramirez v. Holmes, 921 F.Supp. 204, 210 (S.D.N.Y.1996)* (threats or verbal harassment without injury, "although indefensible and unprofessional," do not rise to the level of constitutional violations).

In this case, defendant Keefe maintains that he never made such statements to the plaintiff,[FN2] however, even if these statements had been made, plaintiff's claim of verbal harassment and threats would have to be dismissed.

FN2. Keefe Aff. ¶ 9 (Dkt. No. 64-4).

**B. Retaliation**

Any action taken by a defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988).* The law is well-settled that an inmate has no right to be free from false accusations or false misbehavior reports, unless they are made in retaliation for the exercise of a constitutional right. *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997)* (citing *Franco, 854 F.2d at 588-90).*

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord, 343 F.3d 133, 137 (2d Cir.2003)* (citing *Gayle v. Gonyea, 313 F.3d 677 (2d Cir.2002); Hendricks v. Coughlin, 114 F.3d 390 (2d Cir.1997)).* The court must

keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).*

In this case, plaintiff states that in 2003, defendant Keefe placed incorrect information into plaintiff's prison file that would prevent plaintiff from participating in the SOP, resulting in a substantial loss of good time. Plaintiff claims that his file contained the incorrect notation that he "refused" to accept the SOP. Plaintiff also claims that this action by defendant Keefe was in retaliation for plaintiff filing an Article 78 proceeding, challenging the disciplinary disposition. Clearly, plaintiff's resort to the state court for a challenge to his disciplinary determination is protected activity. Thus, plaintiff meets the first requirement for a retaliation claim. However, plaintiff cannot meet the other requirements.

**\*5** It is odd that plaintiff blames this "incorrect" information on defendant Keefe. In the amended complaint itself, plaintiff alleges that the initial disciplinary hearing that resulted in the imposition of the SOP requirement occurred in Fishkill Correctional Facility. AC ¶ 6. Plaintiff was found guilty, and appealed the result administratively. AC ¶ 8. While awaiting the decision on his administrative appeal, plaintiff was transferred to Gouverneur Correctional Facility and was told that an SOP was "imposed" as a result of the disciplinary hearing. *Id.*

Plaintiff was transferred to Auburn Correctional Facility in October of 2001. AC ¶ 9. Plaintiff claims that he filed his Article 78 proceeding in New York State Court while he was incarcerated at Auburn. *Id.* Plaintiff was clearly challenging his guilt of the misbehavior. If plaintiff's Article 78 proceeding had been granted, the requirement of the SOP would most likely have been removed. Although plaintiff's Article 78 proceeding was dismissed, plaintiff moved for, and was granted reargument. *Id.* Plaintiff states that the petition was subsequently dismissed, but he filed another appeal. *Id.*

Plaintiff was then transferred to "Comstock"[FN3]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

Correctional Facility in November of 2002. Plaintiff states that Great Meadow Facility has an SOP. AC ¶ 10. These programs are apparently not available at every facility. At Great Meadow, plaintiff's counselor was Mr. Richard Celmer. Plaintiff states that Counselor Celmer told plaintiff that he was eligible for the SOP. Plaintiff also states that he told Counselor Celmer that he "believed that he is not being placed in the SOP ... because of his pending appel [sic] of the Teir [sic] III Disciplinary Hearing ...." AC ¶ 10. Plaintiff claims that Counselor Celmer never responded to plaintiff's letter. *Id.*

> FN3. "Comstock" Correctional Facility is actually "Great Meadow" Correctional Facility, that is located in Comstock, New York. The court will refer to "Comstock" as Great Meadow.

In an "Inmate Review Worksheet," dated December 3, 2002 to March 3, 2003, Counselor Celmer stated that plaintiff was doing "well," had no major problems and was "currently appealing *his need to be in the sex offender program."* Def. Ex. F (emphasis added). As a result of this review, Counselor Celmer concluded that plaintiff met the criteria for "reduced custody," and thus, recommended transfer to a "medium" FN4 security facility. *Id.* at p. 3. Counselor Celmer again stated that plaintiff was appealing *"the need"* to participate in the SOP. *Id.*

> FN4. Great Meadow is a maximum security facility.

Plaintiff was then transferred to Franklin Correctional Facility, a medium security facility. Although the security level was lower, Franklin did *not* have an SOP. Since Franklin does not have an SOP, the corrections personnel at Great Meadow knew that plaintiff would not be able to participate in an SOP if transferred to Franklin. The documents support this finding. Plaintiff filed a grievance on November 12, 2004, complaining about defendant Keefe, however, the Superintendent's decision states that plaintiff "was transferred from Great Meadow to Franklin in June 2003 because he was appealing his need for sex offender treatment and therefore no longer met the criteria for the program." Def. Ex. G at p. 2.

*6 Defendant Keefe did not "deprive" plaintiff of his ability to participate in the program. Plaintiff was deemed ineligible to participate in the program when he was at Great Meadow Correctional Facility. It is true that the ineligibility for the program, initially stemmed from his "appeal." However, this is logical because plaintiff was appealing *his need* to be in the program. If plaintiff's appeal had succeeded, he would no longer have been required to participate in the program. Thus, defendants' failure to place plaintiff in the SOP while his appeal was pending was not retaliation for filing an appeal, it was a practical solution in case the disciplinary determination was overturned. Plaintiff was transferred to a *lower* security facility when he became ineligible for the program due to the appeal.

Plaintiff insisted then, as he insists now, that he was not guilty of the misbehavior that resulted in the imposition of the SOP requirement. On January 29, 2005,FN plaintiff was quite clear in a letter to defendant Keefe that he was angry because defendant Keefe placed a "refusal" on plaintiff's file. Keefe Aff. Ex. A at 2. It appears from the letter that plaintiff was being offered the program, but that plaintiff was refusing the program. *Id.* Plaintiff stated in his letter that he had always denied that he was guilty of the misbehavior, and that he did not "want the Program eny [sic] more" and that he was not "going to take a program for something I am not guilty of." Keefe Aff. Ex. A at 2.

> FN5. The Appellate Division, Third Department denied plaintiff's appeal on January 27, 2005. *Reid v. Goord,* 14 A.D.2d 950, 787 N.Y.S.2d 917 (3d Dep't 2005).

There is *no evidence* that defendant Keefe placed the "refusal" on plaintiff's record "in retaliation" for plaintiff's appeal. Plaintiff cannot survive summary judgment if the defendant can show that he would have taken the same action "even in the absence of the protected conduct." *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Regardless of plaintiff's "appeal," his failure to admit guilt would have prevented him from participating in the program. Plaintiff does not challenge the policy requiring the admission of guilt, he challenges defendant Keefe's interpretation of "refusal." Plaintiff clearly did not admit guilt, nor apparently would he have admitted guilt of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

underlying misbehavior, first because of his pending appeal, and then because he simply did not believe that he committed the misbehavior of which he was found guilty. Plaintiff claims, however, that this failure to admit guilt should not be equated with a refusal to take the SOP, resulting in a denial of good time credits by the Time Allowance Committee.

The court would point out that if the admission of responsibility for the conduct is a requisite for the program, then a refusal to accept responsibility is tantamount to a refusal to accept the program. Defendant Keefe affirms that this was his understanding of the program.[FN6] Keefe Aff. ¶ 6. Ultimately, plaintiff was allowed to take the program at Gowanda Correctional Facility. Def. Ex. I. He was admitted to the program on November 13, 2006, however, on November 17, 2006, plaintiff was removed from the program because of his belligerent behavior, his refusal to accept "feedback," and his failure to consider himself a sex offender. *Id.* The counselor stated that plaintiff was a "poor candidate for treatment at this time." *Id.* at p. 3. The fact that plaintiff was removed from the SOP for failure to accept responsibility for his conduct and for other belligerent actions shows that defendant Keefe's understanding of the program was correct.[FN7] There is no basis for plaintiff's claim of retaliation, and this claim may be dismissed.

> **FN6.** Defendant Keefe states that on various occasions, he spoke with plaintiff who, while agreeing to participate in a program, "firmly insisted that he had not committed the sexual misconduct of which he was found guilty at his August 7, 2001 Tier III hearing ...." Keefe Aff. ¶ 6.

> **FN7.** The court notes that plaintiff is not making any constitutional claims other than the retaliation claim against any of the defendants. In *Johnson v. Baker,* 108 F.3d 10 (2d Cir.1997), the court held that admission of the facts of the sexual offense of which an individual was convicted as a prerequisite to participating in the Family Reunion Program did not violate a plaintiff's Fifth Amendment rights or his right to Equal Protection. In *McKune v. Lile,* 536 U.S. 24, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2001), the

Supreme Court held that a sex offender program requiring that the inmate complete an "Admission of Responsibility" form did not violate the inmate's Fifth Amendment rights. The court stated that acceptance of responsibility furthers a legitimate objective of the program. *Id. at 36.* These cases have been distinguished in situations where the inmate would, as plaintiff did in this case, lose good time credits. See *Fifield v. Eaton,* 07-CV-6521, 2007 U.S. Dist. LEXIS 87056 at *4, 2007 WL 4208318 (W.D.N.Y. Nov. 21, 2007) (citing *inter alia McKune,* 536 U.S. at 38). However, the cases distinguishing *McKune* dealt with incidents in which the inmate was being required to admit to conduct of which he was not convicted. Plaintiff in this case was not being required to accept responsibility for anything of which he was not found guilty at the disciplinary hearing. Additionally, it is clear that he appeared before a Time Allowance Committee at which he was able to argue that his good time credits should not be forfeited.

## C. Conspiracy

**\*7** In order to prove a section 1983 conspiracy, a plaintiff must show an agreement between two or more state actors, to act in concert to inflict a constitutional injury, and an overt act done in furtherance of that goal, causing injury to plaintiff. *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999). Conclusory allegations of conspiracy, however, are insufficient to state a claim. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

Plaintiff in this case simply states that defendant Keefe "conspired" to keep plaintiff from participating in the SOP. There is absolutely no basis for plaintiff's claim of conspiracy, and any such claim may be dismissed.

## 4. *Commissioner Fischer* [FN8] *and DOCS*

> **FN8.** As stated above, the current Commissioner, Brian Fischer, replaced defendant Goord in his official capacity. *See supra* n. 1.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4279488 (N.D.N.Y.)
(Cite as: 2008 WL 4279488 (N.D.N.Y.))

(N.D.N.Y.)

Because this court has found that plaintiff's constitutional retaliation claim may be dismissed, this action may be also dismissed as against defendants Commissioner of DOCS and DOCS. These defendants were maintained after Judge Kahn's prior decision for purposes of injunctive relief only.[FN9]

END OF DOCUMENT

> FN9. This court found in its previous decision that defendant Goord had no personal involvement for purposes of the assessment of any damages in his individual capacity. (Dkt. No. 49 at 6-8). Clearly DOCS as a state entity would be immune from damages based on the Eleventh Amendment. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815 (2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)); *Yorktown Medical Laboratory v. Perales,* 984 F.2d 84, 87 (2d Cir.1991). Thus, the only question in this action was whether these two defendants would be able to afford plaintiff injunctive relief.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED** and the amended complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.
Reid v. New York State Dept. of Correctional Services
Not Reported in F.Supp.2d, 2008 WL 4279488

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Mortimer EXCELL, Plaintiff,
v.
Robert K. WOODS, Supt., Upstate C.F.; N. Bezio, Dep.
Supt., Upstate C.F.; Glenn S. Goord, Comm'r, Docs;
Lucien J. LeClaire, Jr., Dep. Comm'r, Docs; Donnie
Wood, C.O., Upstate C.F.; Brian Lewis, C.O ., Upstate
C.F.; Timothy Ramsdell, C.O., Upstate C.F.; John
Moore, Corr. Supervisor, Upstate C.F.; Kenneth
McLaughlin, Dir. of Ops., Inspector Gen.; D. Quinn,
Captain, Upstate C.F.; R.N. Maria Travers, Nurse,
Upstate C.F.; Gary Steinberg, C.O., Auburn C.F.; Dr.
Lester Wright, Assoc. Comm'r, Docs; Brad Smith, C.O.,
Auburn C.F.; Joseph Belliner, Dep. Supt., Auburn C.F.;
Jeffrey Clafflin, C.O., Auburn C.F.; John Burge, Supt.,
Auburn C.F.; Joseph Wolczyk, Hearing Officer, Auburn
C.F.; Donald Hess, C.O., Auburn C.F.; D. Selsky, Dir.
of Special Housing, Docs; Gordon Simons, C.O.,
Auburn C.F., Brian Fischer; Comm'r, Docs; Richard
Roy, Inspector Gen.; Alan Croce, Chairman, Comm'n of
Corr., and Comm'r, Div. of Parole; Daniel Stewart,
Chairman, Comm'r, Comm'n of Corr.; Vernon Manley,
Comm'r, NYS Div. of Parole; Thomas Grant, Comm'r,
NYS Div. of Parole; John Capacci, NYS Div. of Parole;
Maria Tirone, Dep. Supt., Upstate C.F.; Ashley Allen,
Corr. Counselor, Upstate C.F.; Linda A. Hayes, KBSI,
Upstate C.F.; Patricia Salvage, Auburn C.F.; Raymond
Head, Lt., Auburn C.F.; James Anctil, Lt., Upstate C.F.;
R.N. Nancy Smith, Nurse Administrator, Upstate C.F.;
Labetz, Correctional Supervisor, Auburn C.F.; William
Devito, C.O., Auburn C.F.; J. Sourwine, C.O., Auburn
C.F.; Michael Bray, C.O., Auburn C.F.; Kevin Premo,
C.O., Upstate C.F.; Darrin Corrigeux, C.O., Upstate
C.F.; Sheila Sauve, C.O., Upstate C.F.; and M.
Mackdonal, C.O., Upstate C.F., Defendants.
No. 9:07-CV-0305 (GTS/GHL).

Sept. 29, 2009.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Adele M. Taylor-Scott, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner civil
rights action filed by Mortimer Excell ("Plaintiff") against
forty-three employees of several New York State
departments and/or agencies ("Defendants") pursuant to
42 U.S.C. § 1983 are the following: (1) a motion, filed by
thirty-six of the Defendants, to dismiss part of Plaintiff's
Second Amended and Supplemental Complaint for failure
to state a claim pursuant to Fed.R.Civ.P. 12(b)(6); (2)
United States Magistrate Judge George H. Lowe's
Report-Recommendation recommending that the motion
be granted in part and denied in part; (3) Plaintiff's
Objections to those portions of the
Report-Recommendation recommending dismissal; and
(4) Plaintiff's fourth motion for the appointment of
counsel. (Dkt.Nos.67, 84, 87, 93.) For the reasons set forth
below, the Report-Recommendation is accepted and
adopted in its entirety; Defendants' motion is granted in
part and denied in part; Plaintiff's Second Amended and
Supplemental Complaint is dismissed in part, as detailed
in the "Ordered" Clauses of this Decision and Order; and
Plaintiff's fourth motion for the appointment of counsel is
denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Pleadings in This Action**

On March 23, 2007, Plaintiff filed his original Complaint
in this action pursuant to 42 U.S.C. § 1983, asserting
numerous claims arising out of his confinement at Auburn

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

and Upstate Correctional Facilities between approximately August 9, 2005, and March 16, 2007 (the date of the Complaint). (Dkt. No. 1, at 36.) On April 18, 2007, the Court required Plaintiff to file an Amended Complaint. (Dkt. No. 6.) On May 17, 2007, Plaintiff filed an Amended *and Supplemental* Complaint asserting similar claims arising out of his confinement at Auburn Correctional Facility between approximately May 5, 2005, and May 14, 2007 (the date of the Amended and Supplemental Complaint). (Dkt. No. 10.) On July 3, 2007, with leave of the Court, Plaintiff filed a Second Amended and Supplemental Complaint asserting similar claims arising out of his confinement at Auburn and Upstate Correctional Facilities between approximately June 17, 2005, and July 3, 2007 (the date of the Second Amended and Supplemental Complaint). (Dkt. No. 17.)

Generally, in his Second Amended and Supplemental Complaint, Plaintiff alleges that, on at least five separate occasions, between approximately June 17, 2005, and July 3, 2007, correctional officers at Auburn and Upstate Correctional Facilities harassed him based on his race and religion. (*See generally* Dkt. No. 17.) As a result, Plaintiff brings claims arising under First, Fourth, Eighth and Fourteenth Amendments, against forty-three employees of several New York State departments and/or agencies, listed in the caption of this Decision and Order. (*Id.*) In his Report-Recommendation, Magistrate Judge Lowe accurately and thoroughly recites the allegations, and prayer for relief, of Plaintiff's Second Amended and Supplemental Complaint. (*See* Report-Recommendation at Parts I.B. and I.C.) As a result, that recitation is incorporated by reference herein.

**B. Plaintiff's Related Action**

*2 In his Report-Recommendation, Magistrate Judge Lowe also accurately and thoroughly recites the allegations, claims and procedural posture of Plaintiff's Complaint in a previously filed action that is currently pending in this Court before the undersigned-*Excell v. Burge,* 05-CV1231-GTS-GJD (N.D.N.Y.). (*See* Report-Recommendation at Part I.A.) As a result, that recitation is incorporated by reference herein. The Court would note two additional facts regarding that action's procedural posture.

First, although this fact is not expressly stated in Magistrate Judge Lowe's Report-Recommendation, Senior United States District Judge Lawrence E. Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). Then, after being assigned the case on October 2, 2008, the undersigned denied Plaintiff's motion for reconsideration of Judge Kahn's decision and order on January 21, 2009. *See Excell v. Burge,* 05-CV-1231, 2008 WL 152585 (N.D.N.Y. Jan. 21, 2009) (Suddaby, J.).

Second, after Magistrate Judge Lowe issued his Report-Recommendation in this action, the undersigned scheduled trial in the action of *Excell v. Burge,* 05-CV-1231, for December 14, 2009, and appointed *pro bono* trial counsel for Plaintiff.

**C. Defendants' Motion to Dismiss**

On March 6, 2008, thirty-six of the forty-three Defendants in this action filed a motion to dismiss part of Plaintiff's Second Amended and Supplemental Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 67.) FN1 In his Report-Recommendation, Magistrate Judge Lowe accurately summarizes Defendants' arguments on their motion to dismiss. (*See* Report-Recommendation at Part I.D.) As a result, that summary is incorporated by reference herein.

FN1. To the extent that the current motion is filed on behalf of Defendants who had already filed an Answer to Plaintiff's Second Amended and Supplemental Complaint (*see* Dkt. No. 66), that motion is properly brought under Fed.R.Civ.P. 12(c), which governs the entry of judgment on the pleadings. However, courts analyzing a motion filed under Rule 12(c) must apply the same standard as that applicable to a motion filed under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994); *Wynn v. Uhler,* 941

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

After being granted two extensions of time by Magistrate Judge Lowe to file a response to the motion, Plaintiff filed a lengthy response on June 30, 2008, and July 7, 2008. (Dkt.Nos.74, 75.) More specifically, Plaintiff's response consisted of thirty pages of singled-spaced legal argument and affidavit testimony, as well as forty-nine pages of exhibits. (*Id.*) Liberally construed, the crux of Plaintiff's response is that Defendants' motion should be denied for three reasons: (1) his lengthy Second Amended and Supplemental Complaint and his declaration in response to Defendants' motion provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); (2) his response exhibits and his declaration in response to Defendants' motion, demonstrate genuine issues of material fact for trial; and (3) Defendants have failed to comply with Plaintiff's discovery requests. (*Id.*)

**\*3** On March 12, 2009, Magistrate Judge Lowe issued a Report-Recommendation recommending that the motion be granted in part and denied in part. (Dkt. No. 84.) Familiarity with the specific recommendations and analysis therefor offered in Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order. (*See* Report-Recommendation at Part III.)

On March 27, 2009, Plaintiff filed his Objections to those portions of the Report-Recommendation recommending dismissal. (Dkt. No. 87.) [FN2] Liberally construed, the crux of Plaintiff's Objections argue that the undersigned should reject Magistrate Judge Lowe's Report-Recommendation for two reasons: (1) Plaintiff's lengthy Second Amended and Supplemental Complaint, his declaration in response to Defendants' motion, and his Objections to Magistrate Judge Lowe's Report-Recommendation provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); and (2) Plaintiff's response exhibits, his declaration in response to Defendants' motion, and his verified Objections to Magistrate Judge Lowe's Report-Recommendation demonstrate genuine issues of material fact for trial. (*Id.*)

FN2. The Court notes that, on March 20, 2009, Plaintiff filed a document entitled "Declaration," which was mistakenly docketed as an "Objection" to the Report-Recommendation.

(Dkt. No. 85.) The Court concludes that the Declaration does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation, and it constitutes evidence (which is immaterial on a motion to dismiss). (*Id.*) The Court notes also that, on March 25, 2009, Plaintiff filed a "Respon[se] to Opposition of Defendants ['] Memorandum Motion for Preliminary Injunctive Relief," which was incorrectly docketed as a "Supplemental Objection" to the Report-Recommendation. (Dkt. No. 86.) The Court concludes that this document does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation but Plaintiff's then-pending motion for preliminary injunction. (*Id.*) *As a result, the Clerk's Office is directed to re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," to re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and to re-docket Dkt. No. 87 as "Objection to Report-Recommendation."*

**D. Plaintiff's Fourth Motion for Counsel**

On June 2, 2009, Plaintiff filed his fourth motion for the appointment of counsel. (Dkt. No. 93.) Plaintiff's first three such motions were filed on May 27, 2008, June 2, 2008, and March 4, 2009, and were denied on December 29, 2008, and April 7, 2009. (Dkt.Nos.71, 72, 80, 82, 88.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review of a Report-Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo determination of those portions of the report or specified*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN3. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN4. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not

be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

**B. Standard Governing a Motion to Dismiss for Failure to State a Claim**

Magistrate Judge Lowe thoroughly and correctly recited the legal standard governing a motion to dismiss for failure to state a claim, including the standard governing such motions to dismiss pleadings drafted by *pro se* litigants. (*See* Report-Recommendation at Part II.) As a result, that standard is incorporated by reference herein.

**III. ANALYSIS**

**A. Defendants' Motion to Dismiss**

**\*4** As indicated above in Part I.C. of this Decision and Order, Plaintiff's Objections do not contain specific challenges to those portions of the Report-Recommendation recommending the partial denial of Defendants' motion to dismiss. Thus, the Court reviews those portions of the Report-Recommendation for only clear error. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, and the referenced portions of Magistrate Judge Lowe's Report-Recommendation), the Court concludes that the referenced portions of the Report-Recommendation are well-reasoned and not clearly erroneous. As a result, the Court accepts and adopts these portions of the Report-Recommendation for the reasons stated therein.

With regard to the one portion of Magistrate Judge Lowe's Report-Recommendation to which Plaintiff's Objections do specifically challenge-i.e., Magistrate Judge Lowe's recommendation that Defendants' motion to dismiss be partially granted-a *de novo* review is appropriate. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Complaint, the referenced portion of Magistrate Judge Lowe's Report-Recommendation, and Plaintiff's Objections), the Court concludes that the referenced portion of the Report-Recommendation is correct in all respects. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court also accepts and adopts this portion of the Report-Recommendation for the reasons stated therein. The Court would add only five points.

First, contrary to Plaintiff's reading of Magistrate Judge Lowe's Report-Recommendation, the vast majority of Magistrate Judge Lowe's recommendations were not premised on a failure by Plaintiff to allege sufficient facts for purposes of Fed.R.Civ.P. 8(a). Rather, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question, though factually detailed, were simply not cognizable under Fed.R.Civ.P. 12(b)(6). (See Report-Recommendation at Part II [describing the two grounds on which a defendant may move to dismiss for failure to state a claim].) FN5 As a result, his argument that he provided a "short and plain statement of [his] claim," as required by Fed.R.Civ.P. 8(a), is almost entirely irrelevant.

FN5. More specifically, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question were not actionable under the following legal authorities: (1) the proscription against duplicitous and malicious prosecutions, pursuant to Fed.R.Civ.P. 11(b)(2), the first-in-time rule, and the Court's inherent power to manage its docket; (2) the principle of sovereign immunity under the Eleventh Amendment; (3) the doctrine of absolute immunity; (4) the requirement that supervisors be personally involved in constitutional violations under 42 U.S.C. § 1983; (5) the legal standard governing substantive and procedural due process claims arising from prison disciplinary hearings under the Fourteenth Amendment; (6) the legal standard governing access-to-courts claims arising under the First Amendment; (7) the legal standard governing free-exercise claims arising under the First Amendment; (8) the legal standard governing unreasonable-search claims under the Fourth

Amendment; (9) the legal standard governing due process claims arising from the receipt of a false prison misbehavior report in prison under the Fourteenth Amendment; (10) the intra-corporate conspiracy doctrine; and (11) the legal standard governing claims of deliberate indifference to a serious medical need and inadequate prison conditions arising under the Eighth Amendment. (See Report-Recommendation at Part III.)

Second, contrary to Plaintiff's understanding of the legal standard governing motions to dismiss under Fed.R.Civ.P. 12(b) (6), extrinsic evidence cannot be considered by the Court when deciding such motions. See Fed.R.Civ.P. 12(d). Nor can matters outside the four corners of the pleadings be considered by the Court when deciding such motions, with a few exceptions. Here, the Court finds none of the exceptions are applicable. The exhibits and declarations on which Plaintiff relies in opposition to Defendants' motion were not exhibits to his lengthy Second Amended and Supplemental Complaint. (See Dkt. No. 17, Part 1.) Thus, they are not deemed part of that pleading pursuant to Fed.R.Civ.P. 10(c). Moreover, Plaintiff has already had three chances to amend his operative pleading in this action. As a result, he has no absolute right, under Fed.R.Civ.P. 15(a)(2), to constructively amend it through the Court's consideration of the materials in question. Finally, Plaintiff has not shown that the materials in question are sufficiently consistent with the allegations of his Second Amended and Supplemental Complaint. FN6 As a result, it would not be appropriate for the Court to consider them out of an extension of special solicitude to Plaintiff. FN7 For all these reasons, it is irrelevant (for purposes of the motion to dismiss currently pending before the Court) whether or not Plaintiff has submitted response exhibits, a declaration in response to Defendants' motion, and verified Objections to Magistrate Judge Lowe's Report-Recommendation, which demonstrate genuine issues of material fact for trial.

FN6. The Court notes that, under the circumstances, considering the materials in question would result in piecemeal litigation, requiring Defendants, in their Answer or Amended Answer (see Dkt. No. 66), to admit or deny-at their peril-facts never plausibly alleged in Plaintiff's Second Amended and Supplemental

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Complaint.

FN7. The Court notes that an additional reason it should not treat his Objections as effectively amending his Second Amended and Supplemental Complaint is that such a treatment would contravene the rule that a district court will ordinarily refuse to consider material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, supra,* note 3 of this Decision and Order.

**\*5** Third, Plaintiff neglects to mention, in his Objections, that several of the dismissals recommended by Magistrate Judge Lowe are dismissals *with leave to amend.* Such a recommendation is extremely generous to Plaintiff, who has already had three chances to amend his operative pleading in this action, and who, on one occasion, took the opportunity to file a *supplemental* pleading without prior leave of the Court. (*Compare* Dkt. No. 15 *with* Dkt. No. 17.) *See* Fed.R.Civ.P. 15(d); Local Rule 7.1(a)(4). While the Court accepts Magistrate Judge Lowe's recommendation, *the Court cautions Plaintiff that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

Fourth, as stated above in Part I.B. of this Decision and Order, although this fact is not relied on in Magistrate Judge Lowe's Report-Recommendation, Judge Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See* Excell v. Burge, 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). As a result, Plaintiff's litigation of those claims in this action are precluded for the additional reason of res judicata, also known as claim preclusion.

Fifth, and finally, in addition to the intracorporate-conspiracy-doctrine cases cited by Magistrate Judge Lowe, the Court relies on the cases cited by the undersigned in *Murray v. Pataki,* 03-CV-1263,

2009 WL 981217, at \*4 & n. 11 (N.D.N.Y. Apr. 9, 2009) (Suddaby, J.).

**B. Plaintiff's Motion to Appoint Counsel**

Plaintiff's fourth motion for the appointment of counsel is denied for the same reasons that his third motion was denied by Magistrate Judge Lowe on April 7, 2009. (Dkt. No. 88.) More specifically, after carefully reviewing the file in this action, the Court finds as follows: (1) it appears as though, to date, Plaintiff has been able to effectively litigate this action; (2) it appears that the case does not present issues that are novel or more complex than those raised in most prisoner civil rights actions; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial (as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants), it is highly probable that this Court will appoint trial counsel at the final pretrial conference (should this case survive the filing of any further dispositive motions); and (4) the Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

**ACCORDINGLY,** it is

**\*6 ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 84) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 67) is *GRANTED* **in part** and *DENIED* **in part;** and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are *DISMISSED* **without leave to amend:**

    (1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

(2) the First Amendment religion claims alleged in ¶¶ 1-26 of the Second Amended and Supplemental Complaint against Defendant Hess;

(3) all claims against Defendant Burge;

(4) all claims against Defendants in their official capacities;

(5) all claims against Defendants Manley, Grant, and Capacci;

(6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole;

(7) the claims against Defendants Goord, Burge, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored complaints and grievances;

(8) the procedural due process claims against Defendants Salvage, Hayes, and Allen;

(9) the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample;

(12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and

(13) the claim that Defendant McDonald used "racial and discrimination and indecent and profane language"; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are *DISMISSED* with leave to amend:

(1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances;

(2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen;

(3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report;

(4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report;

(6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food;

(7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats;

(8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and

**\*7** (9) the Eighth Amendment medical care claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

against Defendant McDonald arising from her interference with Plaintiff's medical interview; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) hereby survive Defendants' motion to dismiss:

(1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test;

(2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test;

(3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report;

(5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and

(6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements; and it is further

**ORDERED** that, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff shall file, for the Court's review and acceptance, a **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT,** in which he asserts the six claims described in the preceding paragraph, and in which he amends the nine claims that have been hereby dismissed with leave to amend; and it is further

**ORDERED** that, after Plaintiff's Third Amended and Supplemental Complaint, Defendants shall file an Answer (or an Amended Answer, if appropriate) in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiff's fourth motion for the appointment of counsel (Dkt. No. 93) is **DENIED;** and it is further

**ORDERED** that the Clerk's Office shall re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and re-docket Dkt. No. 87 as "Objection to Report-Recommendation."

*Plaintiff is advised that, should his Third Amended and Supplemental Complaint fail to state a claim with regard to the nine claims that have been hereby dismissed with leave to amend, those claims will be sua sponte dismissed by the Court. Plaintiff is also advised that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is a motion by some of the Defendants to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 67.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

**A. Plaintiff's complaint in Case No. 9:05-CV-1231 (GTS/GJD)**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*8** On September 28, 2005, Plaintiff Mortimer Excell filed a previous action in this Court. *Excell v. Burge,* No. 9:05-CV-1231 (GTS/GJD) (*"Burge"* ). The operative complaint in that case alleges that on five separate occasions, correctional officers at Auburn Correctional Facility harassed Plaintiff based on his race and religion. (*Burge* Dkt. No. 7.)

Specifically, the *Burge* complaint alleges that on June 17, 2005, officers G. Simons and Labetz taunted Plaintiff with religious and racial epithets, threw his religious headgear ("Tsalot-Kob") on the ground, and threatened to harm Plaintiff if he filed any grievances. (*Burge* Dkt. No. 7 at ¶¶ 1-8.) The officers then issued a misbehavior report charging Plaintiff with violating various disciplinary rules. *Id.* at ¶ 9. After a disciplinary hearing, Plaintiff was found guilty of the charges. *Id.* at ¶ 10. Plaintiff filed an administrative appeal with John W. Burge, the superintendent of the facility, which was denied. Plaintiff's written complaint to DOCS commissioner Glenn Goord was 'neglected.' *Id.* at ¶ 11.

On July 20, 2005, officer Hess removed Plaintiff from a religious studies class and informed him that he was not allowed to wear a colored Tsalot-Kob. When Plaintiff protested that DOCS directives allowed him to wear a colored Tsalot-Kobb, Hess summoned several officers, who returned Plaintiff to his cell and placed him on keeplock status. (*Burge* Dkt. No. 7 at ¶ 12.) Plaintiff subsequently received a misbehavior report charging him with "out of place." *Id.* at ¶ 13. Plaintiff was found not guilty after a disciplinary hearing, but did not receive a copy of the written disposition. *Id.* at ¶ 14.

On July 26, 2005, officer Simons approached Plaintiff in the mess hall, began calling him racially derogatory names, and ordered him to remove his Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 15.) Simons and two other officers then removed Plaintiff from the mess hall, confiscated his Tsalot-Kob, and returned him to his cell on keeplock status. *Id.* at ¶ 16. Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id.* at ¶ 17. After a disciplinary hearing, Plaintiff was found not guilty. *Id.* at ¶ 18.

On August 4, 2005, officer Devito removed Plaintiff from

his religious class and demanded to know why he was wearing a colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 20.) Devito threatened to kill Plaintiff if he filed any complaints against him. *Id.* He then went into the class and stated that the organization would not be allowed to continue to operate if Plaintiff remained in the organization. *Id.* Devito returned Plaintiff to his cell and placed him on keeplock status. *Id.* at ¶ 21. Devito subsequently issued Plaintiff a misbehavior report charging Plaintiff with refusing a direct order. *Id.* at ¶ 22. Plaintiff was found not guilty after a disciplinary hearing. *Id.* at ¶ 23. However, when he requested a written disposition, hearing officer Head told him to "get the fuck out [of] the hearing office [FN1]." *Id.*

> [FN1.](#) Because a motion to dismiss tests the face of a plaintiff's complaint, this Report-Recommendation includes many direct quotes from Plaintiff's complaint. Any grammatical errors or idiosyncratic turns of phrase are Plaintiff's, not the Court's.

**\*9** On August 9, 2005, officer Sourwine approached Plaintiff in the mess hall and ordered him to remove his colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 24.) When Plaintiff showed Sourwine a copy of the DOCS directive allowing colored Tsalot-Kobs, Sourwine began calling Plaintiff racially derogatory names. *Id.* Officer Bray then approached Plaintiff, began calling Plaintiff racially derogatory names, said he did not "give a dam[n] fuck about ... the Directive," and ordered Plaintiff to leave the mess hall. *Id .* Bray returned Plaintiff to his cell and placed him on keeplock status. *Id.* Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id .* at ¶ 25. At the disciplinary hearing on the charges, hearing officer Head would not allow Plaintiff to present a defense and ordered that Plaintiff be removed from the hearing room. *Id.* at ¶ 26. Plaintiff was found guilty of the charges. *Id.*

In addition to these five incidents, Plaintiff alleged that he had filed a grievance against officer G. Steinberg for mail theft, sexual harassment, and threats. (*Burge* Dkt. No. 7 at ¶ 30.) However, Plaintiff did not name Steinberg as a defendant in the *Burge* action. Rather, he stated that he was simply 'notifying' the Court about the incident. *Id.* The Court did not interpret the *Burge* complaint as making

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

any allegations against Steinberg. (*Burge* Dkt. No. 52 at 8.)

The *Burge* case has proceeded past the summary judgment stage. On summary judgment, the Court dismissed all claims against Head and the First Amendment religion claims against Hess, Devito, Bray, and Sourwine. Retaliation claims against those defendants remain pending.

**B. Plaintiff's complaint in this case**

On March 23, 2007, Plaintiff filed the case pending before the undersigned. The operative complaint is the amended complaint filed on July 9, 2007. (Dkt. No. 17) ("the complaint.") The first 27 paragraphs of the complaint's statement of facts repeat, nearly verbatim, the allegations of the *Burge* case. (Compare Dkt. No. 17 at ¶¶ 1-27 with *Burge* Dkt. No. 7 at ¶¶ 1-30.) In addition, the complaint includes allegations about the lack of response to Plaintiff's complaints and grievances, the denial of Plaintiff's parole, and ten other incidents of mistreatment by staff.

1. *Allegations against Defendants Hess, Bellinger, Steinberg, Smith, Claflin, Wolczyk, Salvage, Goord and Burge re: urine sample, cell search and falsified transcript*

On August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess, whom Plaintiff had not seen for two or three weeks. *Id.* As Plaintiff was being escorted, Defendant Joseph Bellinger [FN2] told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" the July 20, 2005, misbehavior report. *Id.*

FN2. The complaint refers to this defendant as "Joseph Bellier." (Dkt. No. 17 at A-5.) I have used the spelling provided in Defendants' motion

to dismiss.

**\*10** While Plaintiff was giving the urine sample, Defendants Steinberg, B. Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, B. Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.*

On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty after an August 25, 2005, disciplinary hearing conducted by Defendant Joseph Wolczyk at which Plaintiff was not allowed to present a defense. *Id.* He was sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

On August 26, 2005, Plaintiff filed complaints with Defendants Goord and Burge. He did not receive a response. (Dkt. No. 17 at ¶ 32.)

Plaintiff appealed his disciplinary sentence through the prison appeals system and filed an Article 78 proceeding in state court. (Dkt. No. 17 at ¶ 33.) Plaintiff alleges that defendant stenographer Patricia Salvage "falsified the transcri[pt] of the Tier Three hearing ... in an effort to cover up staff misconduct ." *Id.*

I construe the complaint as asserting the following causes of action as a result of these events: (1) a retaliation claim against Defendants Hess and Bellinger; (2) a First Amendment religion claim, a Fourth Amendment claim, and substantive and procedural due process claims against Defendants Steinberg, B. Smith, and Claflin; (3) a procedural due process claim against Defendant Wolczyk [FN3]; and (4) a First Amendment access to the courts claim, a substantive due process claim, and a procedural due process claim against Defendant Salvage.

FN3. Defendant Wolczyk has answered the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

complaint. (Dkt. No. 66.)

2. *Allegations against Defendants Premo, Wood, and Corrigeux re: falsified drug test*

On April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 38.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a urine specimen. Premo said "Albany" had requested the sample. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered to submit urine specimens. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood drafted the report in a way that ensured that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) Defendant N. Bezio conducted a disciplinary hearing on May 25, 2006. (Dkt. No. 17 at ¶ 40.) As part of his defense, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. *Id.* Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

**\*11** I construe the complaint as asserting the following causes of action as a result of these events: (1) a Fourth Amendment claim, a conspiracy claim, and a due process claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants Wood and Corrigeux.

3. *Allegations against Defendants Lewis, Moore, Ramsdell and Woods re: drug test*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* Plaintiff complained verbally to the building supervisor, Defendant Moore, and filed a written complaint with Defendant R. Woods. *Id.*

On June 22, 2006, Defendant Lewis issued a misbehavior report charging Plaintiff with refusing a direct order. (Dkt. No. 17 at ¶¶ 42, 45.) On July 10, 2006, Defendant T. Ramsdell and another officer escorted Plaintiff to a disciplinary hearing. (Dkt. No. 17 at ¶ 45.) When Plaintiff protested, Defendant Ramsdell and another officer told Plaintiff that "if he do[es] not stop his jail house lawyer shit and plead guilty they will issue[ ] the Plaintiff [another] false misbehavior report." *Id.* When Plaintiff refused and began to present a defense, Defendant Ramsdell and the other officer ordered the hearing officer to stop the hearing tape. *Id.* They threatened Plaintiff with bodily harm, escorted him back to his cell, and ordered him to assume the frisk position. *Id.* While Plaintiff was positioned against the wall, the officers put all of his personal items on the floor, including his Bible [FN4], and removed Plaintiff's pillow and toilet paper. *Id.* Plaintiff immediately verbally complained to the housing supervisor. (Dkt. No. 17 at ¶ 46.)

FN4. Plaintiff does not claim that Defendant Ramsdell violated his First Amendment rights. (Dkt. No. 17 at 56.)

On July 11, 2006, Plaintiff filed a "complaint to Defendant Woods and a grievance against Defendant Ramsdell" regarding the July 10 hearing room incident. (Dkt. No. 17 at ¶ 48.) Plaintiff alleged that Ramsdell acted in retaliation for a grievance Plaintiff filed against N. Bezio on July 9, 2006. *Id.*

On July 12, 2006, Plaintiff received a copy of a not guilty disposition from the July 10 hearing. (Dkt. No. 17 at ¶ 47.)

I construe the complaint as asserting the following causes

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

of action as a result of these events: (1) a substantive due process claim, a procedural due process claim, and a conspiracy claim against Defendant Lewis; and (2) an Eighth Amendment claim, a substantive due process claim, and a procedural due process claim against Defendant Ramsdell [FN5].

> [FN5.] Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

4. *Allegations against Defendants Moore and Travers re: glass in food*

On June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.*

***12** On June 30, 2006, Defendants Moore and Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

I construe the complaint as asserting Eighth Amendment medical care claims against Defendants Moore and Travers as a result of these events.

5. *Allegations against Defendants Bezio, LeClair, Ramsdell, and Sauve re: excessive force*

As mentioned above, on July 9, 2006, Plaintiff filed a grievance complaint against Defendant N. Bezio. (Dkt. No. 17 at ¶ 45.) On July 12, 2006, Plaintiff received a misbehavior report. (Dkt. No. 17 at ¶ 47.)

On July 21, 2006, Defendant Bezio commenced a disciplinary hearing. (Dkt. No. 17 at ¶ 49.) He denied Plaintiff's requests for the video of the July 10 hearing and copies of the July 11 complaint letters and grievance. *Id.*

On July 24, 2006, Plaintiff filed a complaint against

Defendant Bezio with Defendant LeClaire. (Dkt. No. 17 at ¶ 50.) Plaintiff requested that Bezio be removed as his hearing officer. *Id.*

On July 27, 2006, Defendants Ramsdell and Sheila Sauve and five other officers arrived at Plaintiff's cell to escort him to a disciplinary hearing. (Dkt. No. 17 at ¶ 51.) Ramsdell ordered Plaintiff to turn his back to the cell door and put his hands behind his back and through the slot in the door. *Id.* Plaintiff complied, and Sauve applied mechanical restraints. *Id.* Plaintiff told Defendants that the restraints were too tight. *Id.* Ramsdell pat frisked Plaintiff "in a very hostile and sexual assault manner that offended Plaintiff['s] manhood and offend[ed] his dignity." *Id.* When Plaintiff arrived at the hearing room, Defendant Bezio told him to stop resisting. *Id.* Ramsdell and Sauve then pushed Plaintiff into the wall and tried to break Plaintiff's right index finger. *Id.* Defendant Bezio and five other officers pushed Plaintiff's face into the wall until it "burst open" and bled. *Id.* Plaintiff's wrists were also bleeding. *Id.* Plaintiff was escorted back to his cell and his legal documents were not returned. *Id.* Plaintiff did not receive medical care despite filing numerous complaints. (Dkt. No. 17 at ¶¶ 51, 58.)

Bezio found Plaintiff guilty of all charges and sentenced him to six months' SHU confinement, three months' loss of good time, and six months' loss of recreation, commissary, packages, and telephone privileges. (Dkt. No. 17 at ¶ 51.)

Plaintiff alleges that Defendant Linda A. Hayes, the stenographer for the hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 77 [FN6].)

> [FN6.] Plaintiff alleges that Defendant Hayes also "knowingly and willfully ma[d]e a false official report" on another occasion, but it is not clear from the complaint to which disciplinary hearing Plaintiff is referring. (Dkt. No. 17 at ¶ 79.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment, substantive due process, and procedural due process claims against Defendant Bezio [FN7]; (2) Eighth Amendment claims against Defendants Ramsdell [FN8] and

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Sauve [FN9]; and (3) First Amendment access to the court, substantive due process, and procedural due process claims against Defendant Hayes.

> FN7. Defendant Bezio has answered the complaint. (Dkt. No. 66.)

> FN8. As noted above, Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

> FN9. Defendant Sauve has answered the complaint. (Dkt. No. 66.)

6. *Allegations against Defendants Ramsdell, Bezio, Allen, Goord and Selsky re: false misbehavior report and transcription*

**\*13** On July 28, 2006, Defendant Ramsdell and officer Comstock issued misbehavior reports charging Plaintiff with refusing a direct order, violating lock in/lock out procedures, violent conduct, interference with employees, and harassment. (Dkt. No. 17 at ¶ 52.) Officer Comstock's report "said he had only written [it] because he was ordered to do so by Defendant Bezio." *Id.* The disciplinary hearing on the charges was conducted on several dates in August 2006. (Dkt. No. 17 at ¶ 53.) The hearing officer, Defendant D. Quinn, denied Plaintiff's requests to present evidence. *Id.* Plaintiff did not immediately receive a disposition document or any determination of guilt. *Id*

On October 15, 2006, Plaintiff filed a grievance with Defendant Goord. (Dkt. No. 17 at ¶ 54.) In response, Defendant Selsky sent Plaintiff a copy of a disposition from an August 29 hearing. *Id.* Plaintiff had been found guilty and sentenced to three months' SHU confinement, three months' loss of good time, and three months' loss of recreation, commissary, packages, and telephone privileges. *Id.* Plaintiff alleges that Defendant Ashley Allen, the stenographer for the August 29 hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 78.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) substantive due process, procedural due process, and conspiracy claims against Defendants Ramsdell and Bezio [FN10]; (2) a procedural due process claim against Defendant Quinn [FN11]; and (3) First Amendment access to the courts, substantive due process, and procedural due process claims against Defendant Allen.

> FN10. As noted above, Defendants Ramsdell and Bezio have answered the complaint. (Dkt. No. 66.)

> FN11. Defendant Quinn has answered the complaint. (Dkt. No. 66.)

7. *Allegations against Defendant Travers re: bloody bowel movements*

On May 8, 2007, Plaintiff filed a sick call request regarding stomach pain, heart pain, and blood in his bowel movements. (Dkt. No. 17 at ¶ 65.) On May 9, 2007, a nurse gave Plaintiff three stool sample test cards. *Id.* On May 11, 2007, Plaintiff returned the three stool sample cards to Defendant Travers. (Dkt. No. 17 at ¶ 65.) On May 12, 13, and 14, 2007, Plaintiff filed sick call requests regarding heart pain and bloody bowel movements. *Id.* When Plaintiff asked Travers about the stool sample cards, she said that Plaintiff would soon see a nurse-practitioner because the samples had blood in them. *Id.* Travers would not give Plaintiff any pain killers. *Id.* Plaintiff filed "numerous" complaints against Nurse Travers and had blood in his bowel movements for nine months but never received care. (Dkt. No. 17 at ¶ 58, 65.)

I construe the complaint as asserting an Eighth Amendment medical care claim against Defendant Travers as a result of these events. I note that Defendants have explicitly declined to move to dismiss this cause of action. (Dkt. No. 67-4 at 21, 22 n. 4.)

8. *Allegations against Defendants McDonald, Woods and Fisher re: spitting in coffee cup, interfering with medical interview, and profane language*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*14** On May 9, 2007, Plaintiff filed a grievance against Defendant Michele McDonald [FN12] for spitting in his coffee cup, interfering with a medical interview and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I construe the complaint as asserting Eighth Amendment medical care and conditions of confinement claims against Defendant McDonald.

> FN12. The complaint refers to this defendant as "Macdonal." (Dkt. No. 17 at ¶ 62.) I have used the spelling provided in Defendants' motion to dismiss.

9. *Allegations against Defendants Woods, Anctil and Tirone re: laughing at Plaintiff's report of pain and the misbehavior report alleging threats by Plaintiff*

On May 17, 2007, Defendant Woods walked by Plaintiff's cell. (Dkt. No. 17 at ¶ 66.) Plaintiff complained about his heart and stomach pains and the blood in his bowel movements. *Id.* Woods laughed in Plaintiff's face and walked away. *Id.* That same day, Plaintiff filed a complaint with Woods, stating that he was receiving cruel and unusual punishment and that "he would not just sit and be physically assaulted ... he will start to fight back to protect hi[m]self and he will not let these defendants kill him and he do not try to take one of them with him and he will feel better to die fighting for his justice." *Id.* On May 21, 2007, Defendant Anctil issued a misbehavior report charging Plaintiff with violent conduct and threats [FN13] (Dkt. No. 17 at ¶ 68.) Defendant Tirone presided over the disciplinary hearing on June 7, 2007. (Dkt. No. 17 at ¶ 69.) Plaintiff protested that the hearing was untimely. He asked to see a copy of any extension. Tirone denied that request and Plaintiff's requests to present documentary evidence and witnesses. *Id.* Tirone found Plaintiff guilty and sentenced him to nine months' SHU confinement and nine months' loss of recreation, packages, telephone and commissary privileges. *Id.*

> FN13. To the extent that this allegation raises any due process claim against Defendant Anctil on the basis that Defendant Anctil issued a false misbehavior report, I dismiss that claim *sua*

*sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) for two reasons. First, it is clear from the face of the complaint that Plaintiff did, in fact, make threats. Thus, the report was not false. Second, as discussed at length below, even if the report were false, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997).

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment medical care and substantive due process claims against Defendant Woods; and (2) a procedural due process claim against Defendant Tirone [FN14].

> FN14. Defendant Tirone has answered the complaint. (Dkt. No. 66.)

10. *Allegations against Defendants Woods and Anctil regarding threats of physical force*

On May 19, 2007, Woods sent Defendant Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) The complaint does not describe this event in any more detail. I liberally construe the complaint as asserting the following causes of action as a result of this event: (1) Eighth Amendment and conspiracy claims against Defendant Anctil; and (2) substantive due process and conspiracy claims against Defendant Woods.

**C. Plaintiff's prayer for relief**

Plaintiff requests (1) a declaration that Defendants violated his rights under the First, Eighth and Fourteenth Amendments; (2) "compensatory damages from each one of the defendants in their individual capacity and their official capacity" of $14 million; (3) "punitive damages from each defendant in their individual capacity and official capacity in the amount of $20 million"; (4) a permanent injunction preventing Defendants "from depriving the Plaintiff of his programs he need for parole release, and the right to adequate medical care and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

right to receive his adequate rehabilitation adjustment programs and all his good time that was stolen from the Plaintiff ... and to stop deny Plaintiff his outside correspondence with acts of mail theft and stop physical assault ... and put things in his food to harm him and stop using false misbehavior reports to keep Plaintiff's false confinement and stop putting mentally ill inmates in the same cell with Plaintiff or other inmate like Charles Ramball because his child mother is his woman." (Dkt. No. 17 at A-60 [FN15].)

FN15. Page numbers refer to the handwritten page numbers in the upper right-hand corner of the complaint.

**D. Summary of Grounds in Support of Defendants' Motion**

*15 Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No 67.) Defendants argue that (1) the causes of action against Defendants Burge, Devito, Head, Hess, Labetz, Simmons and Sourwine arising out of the events of June 17-August 18, 2005, should be severed and dismissed because they are duplicative of the *Burge* action; (2) the claims against supervisory personnel in their official capacities are barred by the Eleventh Amendment; (3) Defendants Manley, Grant, Capacci and Croce have absolute immunity barring the claims regarding the denials of parole; (4) the complaint insufficiently alleges personal involvement by Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright and N. Smith; (5) the complaint does not state a cause of action against stenographers Linda Hayes, Patricia Salvage and Ashley Allen; and (6) the complaint fails to state a cause of action against Defendants Steinberg, Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Anctil or Travers. (Dkt. No. 67-4.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted."

Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN16] or (2) a challenge to the legal cognizability of the claim.[FN17]

FN16. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN17. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12[b][6] ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN18] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN19] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN20]

FN18. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

FN19. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair

notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN20. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [FN21] However, it is well established that even this liberal notice pleading standard "has its limits." [FN22] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard. [FN23]

FN21. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN22. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN23. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 FN24 (2007).FN25 Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN24. All citations to the *Bell Atlantic* decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

FN25. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

*16 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).FN26 The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is assessed generously, in light of the special solicitude normally afforded *pro se* litigants).FN27

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN26. *See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.2008)* (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.* " ) [emphasis in original].

FN27. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic-*that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [FN28] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN28. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN29] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN30] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN29. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN30. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v.*

*Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*17** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [FN31] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN32] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN33] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [FN34] In addition, an opportunity to amend is not required where "the problem" with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN35]

FN31. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN32. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN33. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN34. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN35. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008

WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN36] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN37] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN38] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN39]

FN36. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN37. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN38. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN39. *Stinson v. Sheriff's Dep't of Sullivan Cty.,*

499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

## III. ANALYSIS

### A. Allegations in Paragraphs 1-27 of the Amended Complaint

Defendants argue that any claims arising from the allegations in Paragraphs 1-27 of the complaint should be dismissed because they are duplicative of the allegations in the *Burge* case. (Dkt. No. 67-4 at 10-11.) With the exception of Paragraph 27, Defendants are correct.

As a general rule, "[w]here there are two competing lawsuits, the first suit should have priority." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989) (quoting *Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc .,* 804 F.2d 16, 19 (2d Cir.1986)) (alteration in original). This rule "embodies considerations of judicial administration and conservation of resources" by avoiding duplicative litigation ... *Id.* at 80. We have recognized only two exceptions to the first-filed rule: (1) where the "balance of convenience" favors the second-filed action, see, e.g., *Motion Picture Lab. Technicians Loc. 780,* 804 F.2d at 19; *Remington Prods. Corp. v. Am. Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir.1951), and (2) where "special circumstances" warrant giving priority to the second suit, see, e.g., *First City Nat'l Bank,* 878 F.2d at 79.

**\*18** *Employers Ins. of Wausau v. Fox Entertainment Group, Inc.,* 522 F.3d 271, 275 (2d Cir.2008). Claims are duplicative if they arise from the same nucleus of fact. *See Alden Corp. v. Eazypower Corp.,* 294 F.Supp.2d 233, 235 (D.Conn.2003).

Here, the claims in Paragraphs 1-26 of the operative complaint (Dkt. No. 17) are duplicative of Plaintiff's claims in Case No. 9:05-CV-1231 GTS/GJB because they allege precisely the same facts. Neither the balance of convenience nor any special circumstance warrants giving priority to this suit. Rather, giving priority to this suit would undermine the judicial resources that have already been devoted to the *Burge* action, which has proceeded

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

past the summary judgment stage. Therefore, I recommend that the Court dismiss the claims set forth in Paragraphs 1-26 of the operative complaint without leave to amend.

Paragraph 27, however, does not arise from the same nucleus of fact as a pending claim in the *Burge* case. Although Plaintiff alleged in that action that he had filed a grievance against officer Steinberg for mail theft, sexual harassment, and threats (*Burge* Dkt. No. 7 at ¶ 30), Plaintiff did not name Steinberg as a defendant and the Court did not construe the complaint as raising a claim against Steinberg. (*Burge* Dkt. No. 52 at 8.) Here, on the other hand, Plaintiff named Steinberg as a defendant (Dkt. No. 17 at A-7) and alleged that Steinberg violated his First Amendment rights. (Dkt. No. 17 at 56.) Therefore, I recommend that Defendants' motion to dismiss the allegations in Paragraph 27 be denied.

**B. Eleventh Amendment**

Plaintiff requests damages from Defendants "in their individual capacity and in their official capacity." (Dkt. No. 17 at A-60.) Defendants argue that Plaintiff's claims against the supervisory Defendants in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 67-4 at 11-12.) Defendants are more than correct: Plaintiff's claims against *all* of the Defendants in their official capacities are barred by the Eleventh Amendment [FN40]

FN40. The Court has the authority to dismiss the claims against the non-supervisory Defendants in their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B) and Federal Rule of Civil Procedure 12(h)(3).

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890);

*Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06 (1984).

*\*19* The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN41] All DOCS employees, not merely supervisors, are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3). Here, the face of the complaint alleges that each Defendant has an official position with DOCS or the Division of Parole. (Dkt. No. 17 at ¶ 3.) Therefore, any claims against the Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court dismiss those claims without leave to amend.

FN41. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) [citing cases].

**C. Absolute Immunity for Parole Decisions**

Plaintiff alleges that he was wrongfully denied parole twice. At Plaintiff's first parole hearing on November 8, 2005, the parole record stated that Plaintiff had pleaded guilty to three crimes. (Dkt. No. 17 at ¶ 71.) Plaintiff informed the commissioners-Defendants Vernon J. Manley, Thomas Grant, and John C. Capacci-that he had not pleaded guilty and that one of the charges had been dismissed on appeal. *Id.* Plaintiff told the commissioners that DOCS officials had imposed "numerous false disciplinary sanctions" and denied Plaintiff his programming and that Plaintiff's life was in danger if he remained in prison. (Dkt. No. 17 at ¶ 72.) Plaintiff's parole was denied. *Id.*

On November 14, 2006, Plaintiff appeared for his second parole hearing. (Dkt. No. 17 at ¶ 75.) One of the commissioners was Defendant Croce. *Id.* Plaintiff provided documentation to the commissioners that the underlying charges against him were the result of a false police report and that DOCS officials had repeatedly brought false disciplinary charges against him and denied

him access to the law library. *Id.* Parole was denied. (Dkt. No. 17 at ¶ 76.)

Plaintiff claims that Defendants Manley, Grant, and Capacci violated his rights by considering false documents when denying him parole. (Dkt. No. 17 at ¶¶ 71-74 and pp. 58-59.) He claims, further, that Defendant Croce violated his rights by serving as a parole commissioner at a time when he was "knowingly and willfully" disregarding Plaintiff's complaints about his treatment. (Dkt. No. 17 at ¶¶ 75-76 and pp. 58-59.)

Defendants Manley, Grant, Capacci, and Croce argue that they are absolutely immune from liability for damages regarding their decisions to deny parole. (Dkt. No. 67-4 at 12-13.) Defendants are correct.

**20** State actors are entitled to some degree of immunity from liability for damages for their official acts. Most actors receive qualified immunity, but a limited number are entitled to absolute immunity. *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998). Parole board officials are "absolutely immune from liability for damages when [deciding] to grant, deny, or revoke parole because this task is functionally comparable to that of a judge." *Scotto,* 143 F.3d at 111 (internal citations and punctuation omitted). A parole hearing officer is entitled to absolute immunity even if he acted erroneously or maliciously. *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999). *See also Farid v. Bouey,* 554 F.Supp.2d 301, 317-18 (N.D.N.Y.2008). Moreover, injunctive relief against parole board officials is not available unless the plaintiff demonstrates that the officials violated a federal decree or that declaratory relief is not available [FN42]. *Id.* at 318.

> FN42. Plaintiff requests injunctive relief, but it is not clear from the complaint whether or not Plaintiff is requesting injunctive relief against Defendants Manley, Grant, Capacci, and Croce. (Dkt. No. 17 at A-60.) Defendants did not address the issue of immunity from claims for injunctive relief. I raise this issue *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

Here, Plaintiff's claims against Defendants Manley, Grant,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Capacci, and Croce are premised on their decision to deny him parole. These Defendants are absolutely immune. Moreover, because Plaintiff has not alleged that these Defendants violated a federal decree or that declaratory relief is unavailable, Plaintiff has not stated a claim for injunctive relief against these Defendants. Thus, I recommend that all claims against Defendants Manley, Grant, and Capacci be dismissed and that the claims arising from the denial of parole against Defendant Croce be dismissed without leave to amend.

**D. Personal Involvement**

Defendants argue that the complaint insufficiently alleges that Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith were personally involved in any alleged constitutional violation. (Dkt. No. 67-4 at 13-15.)

The allegations against these defendants focus on their handling of Plaintiff's grievances and complaints. Plaintiff alleges both that these Defendants acted passively by "knowingly and willfully disregarding Plaintiff's complaints" (Dkt. No. 17 at ¶¶ 32, 34, 55, 59, 60-62, 64, 70) and that they actively interfered with his grievances and complaints by falsifying documents and "causing the filing of false misbehavior reports." (Dkt. No. 17 at ¶¶ 44, 57-59.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN43] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN44] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN45] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN46] Rather, supervisory personnel may be considered "personally

involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN47]

FN43. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN44. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN45. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN46. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN47. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*21** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). District Court decisions in this Circuit have established that:

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable ... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro*, No. 99 CIV. 4607, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions) [FN48]

> FN48. The undersigned will provide a copy of the *Walker v. Pataro* decision to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders*, 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Here, as discussed above, Plaintiff alleges both that the supervisory Defendants ignored his complaints and that they took action by falsifying documents. I recommend that the claims that Defendants merely ignored complaints be dismissed without leave to amend. Regarding Plaintiff's claims that the supervisory Defendants falsified documents in response to grievances, I find those allegations conclusory. The complaint does not include any facts supporting those allegations, relying instead on legal conclusions masquerading as factual conclusions. Such conclusory allegations do not state a claim. *Rolon v. Henneman*, 517 F.3d 140, 148-49 (2d Cir.2008). I therefore recommend that these claims be dismissed with leave to amend.

**E. Stenographers**

Plaintiff has named stenographers Patricia Salvage, Linda A. Hayes, and Ashley Allen as defendants. (Dkt. No. 17 at ¶¶ 33, 77-79.) In their motion to dismiss, Defendants assert that Plaintiff "does not allege that defendant stenographers altered or erred in transcribing exactly what took place at the hearings. Rather, it appears that plaintiff is alleging that they violated his rights by memorializing the purported falsity of the underlying allegations and the alleged wrongdoing of the hearing officers." (Dkt. No. 67-4 at 15.) Contrary to Defendants' assertion, the complaint does allege that the stenographers altered the transcripts. For example, Plaintiff alleges that Defendant Salvage "falsified the transcribed (*sic* ) of the Tier Three Hearing Transcript ... to contempt [an] Article 78 Procedure." (Dkt. No. 17 at ¶ 33.) He alleges that Defendant Hayes' transcript of the July 27, 2006, disciplinary hearing "is all a falsification ... in a effort to cover-up staff misconduct and this transcribed (*sic* ) .... is false information" that will "prevent the Acting Supreme Court Justice of Franklin County Court to performing a lawful duty with this falsification of the records of her transcribed information that is false." (Dkt. No. 17 at ¶ 77.) He alleges that Defendant Allen prepared a "false transcribed document in a effort to cover-up staff misconduct ... to obstruct ... the Supreme Court Justice in their function with Plaintiff Article 78 proceeding ... to prevent the court from performing a lawful duty with the true and accurate transcribed documents of this Tier Three Hearing." (Dkt. No. 17 at ¶ 78.) It appears to the undersigned that Plaintiff is, indeed, alleging that the stenographers falsified transcripts and that they did so to prevent a New York state court from reviewing Plaintiff's disciplinary sentences in Article 78 proceedings.

***22** Construed accordingly, the complaint appears to allege that the stenographers violated Plaintiff's procedural and substantive due process rights and his right of access to the courts. Defendants argue that Plaintiff has failed to state a claim against the stenographers. (Dkt. No. 67-4 at 15-16.) Defendants are correct.

*1. Procedural Due Process*

The Supreme Court has held that in the context of a prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

disciplinary hearing, procedural due process requires that (1) the inmate receive advance written notice of the disciplinary charges; (2); the inmate be allowed to call witnesses and present documentary evidence; and (3) the fact finder prepare a written statement describing the evidence relied upon and the reasons for the determination. *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974). A transcript of the disciplinary hearing is not constitutionally required. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions [FN49]. Moreover, courts have repeatedly held that, where such administrative review is conducted, the Fourteenth Amendment does not require the review of (much less the existence of) a tape recording or transcript of the disciplinary hearing [FN50]. Even where a party claims that a transcript was deliberately tampered with, there is no procedural due process violation if the state provides adequate post-deprivation remedies. *Curro v. Watson,* 884 F.Supp. 708, 717-19 (E.D.N.Y.1995) (prisoner who alleged that court reporters deliberately altered the transcript of his criminal trial did not state procedural due process claim because New York provides a procedure for challenging inaccuracies in trial transcripts). In New York, a prisoner who disputes the accuracy of the transcript of a disciplinary hearing may raise that issue in an Article 78 proceeding. N.Y. C.P.L.R. § 7804(d) (McKinney 1994).

FN49. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 563-570 (1974) (not listing right to appeal among due process requirements of disciplinary hearing), *accord, Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004); *Amato v. Ward,* 41 N.Y.2d 469, 473, 393 N.Y.S.2d 934, 937 (N.Y.1977) ("This type of administrative review [of prison disciplinary hearings pursuant to New York State regulations] is not required by the Federal Constitution.") (*citing Wolff v. McDonnell*), *accord, Giovanni v. Lynn,* 48 F.3d 908, 911 n. 7 (5th Cir.1995) ("Nor, indeed, is provision for appeal, following an [otherwise] adequate [disciplinary] hearing, required under the more stringent standards of *Wolff v. McDonnell* ....").

FN50. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) ("According to *Wolff,* the only written or audio record of a disciplinary

hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reason for the determination.... The Court therefore agrees with Defendants that any alleged defect in the tape would not rise to the level of a constitutional violation."); *Cherry v. Selsky,* 99-CV-4636, 2000 U.S. Dist. LEXIS 9451, at *15-16 (S.D.N.Y. July 7, 2000) ("This allegation [that defendant failed to review the audio tape recording of the disciplinary hearing, prior to affirming the decision of the hearing officer], without more, is insufficient to state a claim for violation of a liberty interest."); *Afrika v. Selsky,* 750 F.Supp. 595, 600, 602 (S.D.N.Y.1990) (granting defendant's motion for summary judgment because, among other reasons, plaintiff had no liberty interest in the review of an audio tape of his disciplinary hearing as part of his administrative appeal, stating that "because both the hearing and review reached the minimal standards, [defendant] did not violate [plaintiff's] liberty interest in not being confined without due process"); *Brito v. Coughlin,* No. 88-CV-8064, 1989 WL 241718, at *2 (S.D.N.Y. July 31, 1989) ("[The due process clause] does not require, however, that a transcript be made or given to an inmate after a disciplinary hearing.").

Thus, because Plaintiff was not constitutionally entitled to a transcript and because he could have challenged any deficiencies in the transcripts in his Article 78 proceeding, he has not stated a claim. I therefore recommend that the Court dismiss Plaintiff's procedural due process claims against the stenographers without leave to amend.

2. *Substantive Due Process/Access to Courts*

Construed liberally, Plaintiff's complaint raises substantive due process and First Amendment access to the courts claims against the defendant stenographers. I will analyze these claims together. The substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon v. Burch,* 494 U.S. 113, 125 (1990) (internal quotations marks and citation omitted). "Substantive due process protects

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations marks and citations omitted).

**\*23** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 123-25 (1992)). "Substantive due process embraces an individual's right of access to the courts." *Curro,* 884 F.Supp. at 719. Prisoners' right to access to the courts includes proceedings to "attack their sentences, directly or collaterally, and ... to challenge the conditions of their confinement." *Lewis v. Casey,* 518 U.S. 343, 355 (1996). "[A]n Article 78 petition that challenges an inmate's ... SHU confinement is an action for which access to the courts is constitutionally guaranteed .... [because it] relates directly to the conditions of confinement." *Collins v. Goord,* 438 F.Supp.2d 399, 417 (S.D.N .Y.2006). Plaintiff claims that the defendant stenographers thwarted his efforts to pursue Article 78 proceedings by providing false transcriptions. (Dkt. No. 17 at ¶¶ 33, 77, 78.) Thus, the constitutional right at stake is the right of access to the courts.

In order to state a claim for denial of access to the courts, Plaintiff must allege that the stenographers "hindered his efforts to pursue a legal claim." *Collins,* 438 F.Supp.2d at 416 (citing *Lewis,* 518 U.S. at 351). Similarly, in order to state a cause of action for substantive due process, a plaintiff must allege that he suffered "some tangible harm." *Curro,* 884 F.Supp. at 720. *See also Collins,* 438 F.Supp.2d at 415-16 (plaintiff alleging violation of right to access to the courts must allege an "actual injury."). Plaintiff has not alleged any tangible harm. Plaintiff does not allege that he was not successful in his Article 78 proceedings. Even if he was unsuccessful in those proceedings, he does not allege that any such failure stemmed from the transcriptions. *Compare Collins,* 438 F.Supp.2d at 417 (prisoner adequately alleged tangible harm where he alleged that his Article 78 proceeding was dismissed when prison officials failed to provide him with necessary copies of documents). Therefore, Plaintiff has not stated a substantive due process or First Amendment access to the courts claim against Defendants Salvage, Hayes, or Allen and I recommend that these claims be

dismissed with leave to amend [FN51].

> **FN51.** Defendants also argue that any claim against the stenographers is barred by the doctrine of qualified immunity. (Dkt. No. 67-4 at 15-16.) In light of my finding that Plaintiff has not stated a claim, I have not addressed this argument.

**F. Failure to state a cause of action against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald**

Defendants argue that Plaintiff has failed to state a claim against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald. (Dkt. No. 67-4 at 16-23.)

*1. Bellinger and Hess*

Defendants argue that Plaintiff has failed to state a claim against Defendants Bellinger and Hess. (Dkt. No. 67-4 at 16-17.) I disagree.

Regarding Defendants Bellinger and Hess, the surviving paragraphs of the complaint allege that on August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess. *Id.* Plaintiff had not seen Hess for two or three weeks prior to August 22. *Id.* As Plaintiff was being escorted, Defendant Bellinger told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" a July 20, 2005, misbehavior report. *Id.*

**\*24** Defendants argue that Plaintiff has failed to state a retaliation claim against Defendant Hess because (1) Plaintiff was not, in fact, deterred from filing grievances, writing letters of complaint, or filing lawsuits; and (2) the allegations regarding a possible retaliatory motive are implausible [FN52]. (Dkt. No. 67-4 at 16-17.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

FN52. Defendants also argue, cursorily and without citation to authority, that these claims should have been raised in an amended complaint in the *Burge* case.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Defendants argue that Plaintiff has not properly alleged that Hess took adverse action because the "complaint makes it clear that [Plaintiff] was not deterred, in any way from filing grievances, writing letters of complaint, o[r] filing new actions in the federal District Courts for relief of his alleged grievances." (Dkt. No. 67-4 at 17.) Defendants essentially argue that this Court should apply a *subjective* test: was Plaintiff actually deterred? However, the Second Circuit defines a " 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The issue of whether the facts "demonstrate that [a defendant's actions] would deter a reasonable inmate from pursuing grievances" should not be determined at the motion to dismiss stage. Rather, a prisoner plaintiff should be allowed "the opportunity to develop [those] facts." *Davis,* 320 F.3d at 354 (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (abrogated on other grounds by *Porter v. Nussle,* 534 U.S. 516 (2002))). Therefore, dismissal is not appropriate on this ground at this stage in the litigation.

Defendants argue that Plaintiff cannot establish a causal

connection between Plaintiff's defense of the disciplinary charge and Hess' actions because Plaintiff "admits that he had not seen defendant for two or three weeks" before the urine test. (Dkt. No. 67-4 at 16.) The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). The Second Circuit has, however, found that lapses of time far longer than two or three weeks are sufficient to support a cause of action for retaliation. *Espinal v. Goord,* 554 F.3d 216, 228 (2d Cir.2009) (the "passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers ... is sufficient to support an inference of a causal connection"); *Gorman-Bakos,* 252 F.3d at 555 (lapse of five months between protected activity and retaliation may show a causal connection); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir.1980) (lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection). As explained above, Rule 8 requires a plaintiff to provide "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Bell Atlantic,* 127 S.Ct. at 1965. Plaintiff alleges that Hess wrongfully interfered with his right to wear a colored Tsalot-Kob, that Hess issued a false misbehavior report after that incident, and that Plaintiff was found not guilty of the disciplinary charges. (Dkt. No. 17 at ¶¶ 12-14.) It is not implausible that, based on these events, Hess would have the motive to retaliate. Moreover, the "two or three" weeks that Plaintiff alleges had passed since he last saw Defendant Hess appear to be the two or three weeks between the time Plaintiff was found not guilty of the disciplinary charges on July 23, 2005 (Dkt. No. 17 at ¶ 14), and the encounter on August 22. These facts plausibly suggest that Defendant Hess took his first opportunity to retaliate [FN53]. Accordingly, Plaintiff has stated a claim for retaliation against Defendant Hess and I recommend that Defendants' motion to dismiss this claim be denied.

FN53. By finding that such an allegation is "plausible," I express no opinion on whether this allegation can be established by evidence and/or survive a more stringent inquiry.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

**\*25** Defendants argue that Plaintiff has not stated a retaliation claim against Defendant Bellinger because "insulting, disrespectful, or sarcastic comments are considered *de minimus,* and are not actionable." (Dkt. No. 67-4 at 17.) Defendants are correct that insulting comments generally do not rise to an actionable level. *Davis,* 320 F.3d at 353. If Defendant Bellinger were simply a correctional officer who had made the comment to other officers, the undersigned would be inclined to agree that the claim should be dismissed. However, the complaint alleges that Defendant Bellinger was the Deputy Superintendent of Auburn Correctional Facility. (Dkt. No. 17 at A-5.) As such, the complaint construed liberally alleges that the Deputy Superintendent of the facility ordered subordinate officers to falsify the results of a drug test. This is more than a mere insulting comment. Accordingly, I recommend that Defendants' motion to dismiss the retaliation claim against Defendant Bellinger be denied.

2. *Steinberg, B. Smith, and Clafin*

Defendants argue that Plaintiff has failed to state a cause of action against Defendants Steinberg, B. Smith, or Claflin. (Dkt. No. 67-4 at 17-18.) I find that Defendants are partially correct.

Regarding Defendants Steinberg, B. Smith and Claflin, Plaintiff alleges that while he was giving the urine sample ordered by Hess, Defendants Steinberg, Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.* On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty and sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

Construed liberally, the complaint alleges that these Defendants violated Plaintiff's First, Fourth and Fourteenth Amendment rights. Defendants have not moved to dismiss Plaintiff's allegation that these Defendants violated his First Amendment rights by throwing his religious headgear in the toilet. I find that Plaintiff's First Amendment claim is sufficient to withstand a *sua sponte* review pursuant to 28 U.S.C. § 1915(e)(2)(B). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest." The complaint sufficiently alleges, for the purposes of *sua sponte* review, that the wearing of the Tsalot-Kob is a part of Plaintiff's sincerely held Rastafarian beliefs, that throwing Plaintiff's Tsalot-Kobs in the toilet infringed that belief, and that there was no legitimate penological reason for throwing the Tsalot-Kobs in the toilet. Therefore, I recommend that Defendants be directed to answer this claim.

**\*26** Defendants argue that Plaintiff has failed to state a cause of action against Defendants B. Smith, Steinberg, and Claflin because (1) prisoners have no Fourth Amendment right of protection against unreasonable searches; and (2) prisoners have no constitutional right to be free from being falsely accused. (Dkt. No. 67-4 at 17-18 .) Defendants are correct, with the exception of the false accusation claim against Defendant Steinberg.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U .S. 602, 619 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

[citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526 (1984); *see also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N .D.N.Y. March 31, 1997) (Pooler, J., adopting Report-Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."). Therefore, Plaintiff has not stated a Fourth Amendment claim against Defendants Steinberg, B. Smith or Claflin and I recommend that this claim be dismissed without leave to amend.

Plaintiff has not stated a Fourteenth Amendment due process claim against Defendants Smith or Claflin. "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing [FN54]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. The complaint does not allege that Smith or Claflin acted in retaliation. Read extremely broadly, however, it does suggest that Steinberg had a retaliatory motive becaues it states that four days prior to the search, Plaintiff filed a grievance against Steinberg. (Dkt. No. 17 at ¶ 27.) Therefore, I recommend that the due process claims be dismissed as to Defendants Smith and Claflin with leave to amend but that Defendants' motion to dismiss the false accusation claim against Defendant Steinberg be denied.

FN54. Plaintiff alleges that he was not allowed to present a defense at the disciplinary hearing. (Dkt. No. 17 at ¶ 30.)

3. *Corrigeux, Premo, and D. Wood*

*27 The complaint alleges that on April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 3 8.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a random urine specimen. Premo said "Albany" had made the request. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered by a non-defendant correctional officer to submit a random urine specimen. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive of cocaine and cannabinoid." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood listed the date that he took the specimens as May 11 rather than May 9 so that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) As part of his defense at the ensuing disciplinary hearing, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. (Dkt. No. 17 at ¶ 40.) Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

I have construed the complaint as asserting (1) a Fourth Amendment claim, a due process claim, and a conspiracy claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants D. Wood and Corrigeux.

Defendants have not moved to dismiss the Fourth Amendment claim against Defendant Premo. I find that the claim is sufficient to withstand initial review pursuant to 28 U.S.C. § 1915(e)(2)(B). Urinalysis testing constitutes a search subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614 (1989); *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997). However, if the intrusion into one's privacy is found to be minimal, the expectation of privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate one's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Fourth Amendment rights. It is equally well-established that a prisoner's right to be free from unreasonable searches is diminished once he or she steps through the prison door. *Harris,* 962 F.Supp. at 407. Pursuant to New York Regulations, as long as the testing is not done with an intent to harass, a corrections officer may order an inmate to submit to urine testing "[w]hen correctional staff has reason to believe the inmate has used drugs ..., when correctional staff receives information from a source that the inmate is currently under the influence of or has recently used ... drugs ..., [or] as part of a computer-generated program for random testing of all inmates [or those] inmates who have been found guilty of drug ... related misconduct in the previous two-year period." *N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(a)(1), (4), (7), (8); see also Rodriguez v. Coughlin,* 795 F.Supp. 609 (W.D.N.Y.1992) (holding that two random drug tests within a twelve-month period, both producing negative results, did not constitute a constitutional violation). Here, the complaint alleges that Defendant Premo told Plaintiff that the May 7, 2006, drug test was a "random request made by Albany," but that at the disciplinary hearing Premo and Corrigeux represented that Corrigeux had requested the test. (Dkt. No. 17 at ¶¶ 36, 39.) These facts raise a sufficient inference of an intent to harass to survive initial review. The undersigned expresses no opinion about whether the evidence will support these facts or whether this allegation can withstand a more stringent inquiry.

**\*28** Defendants argue that the due process and conspiracy claims against Defendants Corrigeux, Premo, and D. Wood must be dismissed because (1) prisoners have no right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest; and (2) under the intracorporate conspiracy doctrine, DOCS officials are legally incapable of conspiring together. (Dkt. No. 67-4 at 19-20.) Defendants are correct.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it

in constitutional violations which occur at a subsequent disciplinary hearing [FN55]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at \*26 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

> FN55. The hearing was conducted by Defendant Bezio, but the complaint does not allege any facts suggesting that Defendant Bezio conducted the hearing improperly.

None of the facts alleged in the complaint plausibly suggest that Defendants Premo, Corrigeux, or D. Wood acted in retaliation for Plaintiff's exercise of a constitutional right. Therefore, I recommend that all claims against these officers regarding the filing of false reports be dismissed with leave to amend.

The complaint alleges that Defendants are all DOCS employees. (Dkt. No. 17 at 1-A9.) The intra-agency conspiracy doctrine precludes conspiracy claims "against officers, agents, or employees of a single corporate entity." *Farid v. Bouey,* 554 F.Supp.2d 301, 324 (N.D.N.Y.2008) (granting summary judgment where prisoner claimed conspiracy between Board of Parole and various BOP commissioners to deprive him of his civil rights). "The intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances." *Id.* (citing *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002)). Therefore, I recommend that all conspiracy charges be dismissed without leave to amend.

4. *Lewis*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis then said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* On June 22, 2006, Plaintiff received a misbehavior report charging him with refusing a direct order. (Dkt. No. 17 at ¶ 42.) I have construed the complaint as asserting a due process claim and a conspiracy claim against Defendant Lewis.

**\*29** Defendants move to dismiss the claims against Lewis on the same grounds as asserted regarding Defendants Corrigeux, Premo and Wood. (Dkt. No. 67-4 at 18, 20.) As with those Defendants, the complaint fails to state a due process claim against Defendant Lewis because Plaintiff has not alleged any facts plausibly suggesting that Lewis acted with a retaliatory motive. Therefore, I recommend that this claim be dismissed with leave to amend. Moreover, the complaint fails to state a claim for conspiracy because Lewis and the other officer are both DOCS employees. Therefore, I recommend that this claim be dismissed without leave to amend.

### 5. *Moore*

The complaint alleges that on June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.* I have construed the complaint as asserting an Eighth Amendment medical care claim against Defendant Moore.

Defendants argue that Plaintiff has not stated an Eighth Amendment claim against Defendant Moore because Plaintiff "did not know whether or not he swallowed glass, and he alleges no subjective facts from which to infer that he was in 'serious medical need' on June 29 or June 30, 2006 ... and thus, that Sergeant Moore ... knew of, and disregarded, an excessive risk to his health or safety." (Dkt. No. 67-4 at 21.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the

plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).* To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)(Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).*

Here, Plaintiff has not sufficiently alleged that Moore was deliberately indifferent to a serious medical need. Plaintiff has not alleged that he had a serious medical need. He alleges that while eating his food he felt a piece of glass in his mouth. He removed the glass, inspected his food, and found three more pieces of glass. (Dkt. No. 17 at ¶ 43.) He does not allege that he swallowed glass or that he was cut by the piece of glass that he placed in his mouth. Rather, he merely alleges that "he did not know if any of the glass went down his belly." *Id.* While his fear that he *may* have swallowed glass is understandable, that fear, without more, is insufficient to constitute a serious medical need for Eighth Amendment purposes because fear, in and of itself, will not produce death, degeneration, or extreme pain. Given the lack of a serious medical need, the complaint does not allege facts plausibly suggesting that Moore was deliberately indifferent. Moreover, there is no allegation that Moore placed the glass in Plaintiff's food. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (allegation that defendants contaminated prisoners' food with glass sufficiently stated an Eighth Amendment claim to withstand initial review). Therefore, I recommend that the Eighth Amendment medical care claim against Defendant Moore be dismissed with leave to amend.

### 6. *Travers*

**\*30** Plaintiff complains that Defendant Travers denied him medical care on two occasions: (1) on June 30, 2006, after he discovered glass in his food (Dkt. No. 17 at ¶ 44); and (2) in May 2007, when Plaintiff reported bloody bowel movements. (Dkt. No. 17 at ¶¶ 58, 65.) Explicitly declining to move to dismiss the claims arising from the May 2007 incident (Dkt. No. 67-4 at 22, n. 1), Defendants move to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

dismiss Plaintiff's Eighth Amendment claim regarding the June 30 glass incident. (Dkt. No. 67-4 at 21.)

Regarding that incident, the complaint alleges that on June 30, 2006, Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim against Nurse Travers because (1) Plaintiff has not alleged a serious medical need; (2) prisoners do not have a right to the treatment of their choice, and an inmate's disagreement over proper treatment does not create a constitutional claim; and (3) an allegation of medical negligence does not raise a constitutional claim. (Dkt. No. 67-4 at 21-22.)

As discussed above with regard to Defendant Moore, Plaintiff has not alleged that he suffered a serious medical need after discovering glass in his food. Therefore, I recommend that the Eighth Amendment claim against Defendant Travers arising from the events described in ¶ 44 of the complaint be dismissed with leave to amend.

### 7. *Anctil*

The complaint alleges that on May 19, 2007, Woods sent Defendant J. Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) Although this allegation is extremely unclear, I have construed the complaint as alleging that Defendant Anctil violated Plaintiff's Eighth Amendment rights and conspired with Defendant Woods.

Defendants move to dismiss Plaintiff's claims against Defendant Anctil. Defendants argue that verbal harassment, abuse and threats do not amount to violations of constitutional rights. (Dkt. No. 67-4 at 22.) Defendants are correct. "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). The complaint alleges that Anctil used "intimidation" and

"threats" and "promises" of physical force, not that Anctil actually harmed Plaintiff. Therefore, the complaint fails to state an Eighth Amendment claim against Defendant Anctil and I recommend that the claim be dismissed with leave to amend.

Further, as discussed above, it is legally impossible for DOCS employees to be found liable for conspiring together. Woods and Anctil are both DOCS employees. Therefore, the complaint fails to state a conspiracy claim against Defendant Anctil and I recommend that the claim be dismissed without leave to amend.

### 8. *McDonald*

**\*31** The complaint alleges that on April 30, 2007, Plaintiff filed a complaint with Defendant Woods stating that Defendant McDonald had used racially abusive language to Plaintiff and denied him his food tray. (Dkt. No. 17 at ¶ 63.) On May 9, 2007, Plaintiff filed a grievance against Defendant McDonald for spitting in his coffee cup, interfering with a medical interview, and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I have construed the complaint as alleging that Defendant McDonald violated Plaintiff's Eighth Amendment medical care and conditions of confinement rights.

In the Second Circuit, a prisoner's allegation that prison officials served unsanitary, spoiled or contaminated food is sufficient to state an Eighth Amendment claim, so long as he or she alleges that he or she suffered a "distinct and palpable injury". *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Harris v. Ashlaw,* No. 9:07-CV-0358, 2007 WL 4324106, at * 5 (N.D.N.Y. Dec. 5, 2007). Here, Plaintiff has not alleged that he suffered any injury as a result of being denied food or drinking the allegedly contaminated coffee. Therefore, Plaintiff has failed to state an Eighth Amendment claim against Defendant McDonald arising from this incident and I recommend that the claim be dismissed with leave to amend. [FN56]

FN56. Defendants cite two unpublished Northern District of New York cases for the proposition that "Plaintiff's conclusory allegation ... that [McDonald] spit into his coffee cup is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

insufficient to state a constitutional ... claim."
(Dkt. No. 67-4 at 23.) Neither of the cases cited
by Defendants found that a prisoner's allegation
that a correctional officer spit into his food failed
to state an Eighth Amendment claim. Rather,
both of those cases were decided on summary
judgment and the Court dismissed the claims
because the prisoner failed to *substantiate* them
with evidence. *Chavis v. Kienert,* No.
9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at
*65-66 (N.D.N.Y. Sept. 30, 2005); *Zimmerman
v. Seyfert,* No. 9:03-CV-1389, 2007 U.S. Dist.
LEXIS 52388, at *80-81 (N.D.N.Y. July 19,
2007). Defendants provided copies of the
decisions to Plaintiff in accordance with Local
Rule 7.1(a)(1). The undersigned will provide a
copy of the *Harris v. Ashlaw* opinion to Plaintiff
in light of the Second Circuit's recent decision in
Lebron v. Sanders, 557 F.3d 76, 2009 WL
399215 (2d Cir. Feb. 19, 2009).

Plaintiff's bare allegation that McDonald interfered with a
medical interview is insufficient to state an Eighth
Amendment medical care claim. As discussed above, a
plaintiff asserting such a claim must allege that he or she
suffered from a serious medical condition. Plaintiff has
made no such allegation. It is not even clear from the
complaint what type of medical interview McDonald
allegedly interfered. Therefore, I recommend that the
Eighth Amendment medical care claim against Defendant
McDonald be dismissed with leave to amend.

Regarding Plaintiff's claim that McDonald used "racial
and discrimination and indecent profane language," as
noted above, "[i]t is well established that mere threatening
language and gestures of a custodial officer do not ...
amount to constitutional violations." *Alnutt v. Cleary,* 913
F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted).
Therefore, I recommend that this claim be dismissed
without leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss
for failure to state a claim (Dkt. No. 67) be **GRANTED IN
PART AND DENIED IN PART;**

**RECOMMENDED** that the following claims be
dismissed without leave to amend: (1) all claims against
Defendants Devito, Head, Labetz, Simons, and Sourwine;
(2) the First Amendment religion claims alleged in ¶ 1-26
of the complaint against Defendant Hess, because they are
duplicative of the claims in Case No.
9:05-CV-1231(GTS/GJD); (3) all claims against
Defendant Burge; (4) all claims against Defendants in
their official capacities; (5) all claims against Defendants
Manley, Grant, and Capacci; (6) the claim against
Defendant Croce regarding his decision to deny Plaintiff
parole; (7) the claims against Defendants Goord, Burge,
Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire,
Wright, and N. Smith alleging that they ignored
complaints and grievances; (8) the procedural due process
claims against Defendants Salvage, Hayes, and Allen; (9)
the Fourth Amendment claim against Defendants
Steinberg, B. Smith, and Claflin arising from their August
22, 2005, search of Plaintiff's cell; (10) the conspiracy
claims against Defendants Premo, D. Wood, and
Corrigeux arising from the May 2006 drug tests; (11) the
conspiracy claim against Defendant Lewis arising from the
June 17, 2006, request for a urine sample; (12) the
conspiracy claim against Defendants R. Woods and Anctil
arising from Anctil's May 19, 2007, threats; and (13) the
claim that Defendant McDonald used "racial and
discrimination and indecent and profane language."

**\*32 RECOMMENDED** that the following claims be
dismissed with leave to amend: (1) the claims against
Defendants Goord, Fischer, Roy, McLaughlin, Croce,
Stewart, LeClaire, Wright, and N. Smith alleging that they
falsified documents in response to Plaintiff's grievances;
(2) the substantive due process and First Amendment
access to the courts claims against Defendants Salvage,
Hayes, and Allen; (3) the due process claim against
Defendants B. Smith and Claflin arising from the August
23, 2005, misbehavior report; (4) the due process claim
against Defendants Premo, D. Wood, and Corrigeux
arising from the May 2006 drug tests; (5) the due process
claim against Defendant Lewis arising from the June 22,
2006, misbehavior report; (6) the Eighth Amendment
medical care claims against Defendants Moore and
Travers arising from Plaintiff's discovery of glass in his
food; (7) the Eighth Amendment claims arising from
Anctil's May 19, 2007, threats; (8) the Eighth Amendment
conditions of confinement claim against Defendant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

McDonald arising from the denial of food and spitting in Plaintiff's coffee; and (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview.

**RECOMMENDED** that Defendants be directed to answer the following claims: (1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test; (2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test; (3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report; (5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and (6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.**[FN57]

FN57. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present

additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Excell v. Woods
Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Bela BORCSOK, Plaintiff,
v.
Peter D. EARLY, James Plescia, Donald Selsky, David
Miller and Glenn S. Goord, Defendants.
**No. 9:03-CV-395 (GLS/RFT).**

Aug. 23, 2007.

Bela Borcsok, Coxsackie, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General,
Douglas J. Goglia, Assistant Attorney General, of
Counsel, Albany, NY, for the Defendants.

*MEMORANDUM-DECISION AND ORDER*

GARY L. SHARPE, U.S. District Judge.

*1 After Bela Borcsok filed a § 1983 action alleging
violations of his Fourteenth Amendment rights,FN1 *see Dkt.
No. 1; see also* 42 U.S.C. § 1983, his complaint was
referred to Magistrate Judge Randolph F. Treece for
report and recommendation. *See* 28 U.S.C. §
636(b)(1)(A), (B); N.D.N.Y. R. 72.3(c); Gen. Order No.
12, § D(1)(G). Subsequently, Judge Treece issued a report
recommending that defendants' motion for summary
judgment be granted in its entirety. *See
Report-Recommendation ("R & R"), Dkt. No. 30.*FN2

> FN1. Borcsok asserts that his due process rights
> were violated during a Tier III Disciplinary
> Hearing because there was a lack of physical
> evidence to support the contents of the

misbehavior report in question, the report itself
was fabricated, and the hearing officer was
biased. *See Dkt No. 1.*

> FN2. The Clerk is directed to append Judge
> Treece's Report-Recommendation to this
> decision, and familiarity is presumed. *See Dkt.
> No. 30.*

Broadly construing the complaint, Judge Treece
concluded the following: (1) Borcsok does not maintain a
constitutional right to be free from a false misbehavior
report; (2) his procedural due process claim fails because
he has not shown an "atypical and significant" hardship;
(3) his remaining due process claim fails because "some
evidence" existed to support a finding of guilt; (4) whether
sufficient evidence existed to support the hearing officer's
decision is barred by collateral estoppel because the issue
was already addressed in an Article 78 proceeding; and (4)
no evidence exists to show bias on behalf of hearing
officer Plescia.

Borcsok has now filed objections to Judge Treece's report.
*See Dkt. No. 32.* Although timely, the objections do not
specifically address Judge Treece's factual and legal
conclusions. Instead, Borcsok has simply repeated the
facts and arguments contained in his original petition and
motion papers. His objections contain no new analysis or
arguments, nor do they cite authority in support of what
are otherwise mere conclusory claims. Specifically,
Borcsok's objects that both defendant Early and Plescia
were required to produce physical evidence to support the
hearing decision. However, this assertion ignores Judge
Treece's conclusion that "some evidence" existed to
support defendants' finding. *See Luna v. Pico,* 356 F.3d
481 (2d Cir.2004). Similarly, Borcsok's argument that the
state court did not consider the issue of physical evidence
in the Article 78 proceeding is belied by the record. *See
Borcsok v. Selsky,* 744 N.Y.S.2d 772 (N.Y.App.Div.2002)
(finding that sufficient evidence existed to find Borcsok
guilty of violating prison rules).

In sum, given the inadequacy of Borcsok's objections, he
has procedurally defaulted. *See Almonte v. N.Y. State Div.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

of Parole, 9:04-CV-484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006). Accordingly, the court has reviewed Judge Treece's report and recommendation for clear error. See Almonte, 2006 WL 149049, at *6. Having discerned none, the court adopts the report and recommendation in its entirety, and Borcsok's complaint is dismissed in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Treece's February 21, 2007 Report-Recommendation (**Dkt. No. 30**) is accepted and adopted in its entirety; defendants motion for summary judgment (Dkt. No. 23) is GRANTED, the complaint is dismissed in its entirety; and it is further

***2 ORDERED** that the Clerk enter judgment in favor of the defendants and close the case; and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION and ORDER

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Bela Borcsok brings a civil action pursuant to 42 U.S.C. § 1983, alleging violations of his due process rights pursuant to the Fourteenth Amendment regarding a prison disciplinary hearing. Dkt. No. 1, Compl. at § IV. Defendants bring a Motion for Summary Judgment. Dkt. No. 23. Plaintiff opposes the Motion. Dkt. Nos. 24-26. For the reasons to follow, it is recommended that the Defendants' Motion for Summary Judgment be **granted.**

### I. PROCEDURAL HISTORY

A brief procedural history is necessary in this case. On March 31, 2003, Plaintiff filed his Complaint. Dkt. No. 1, Compl. Instead of submitting an answer, Defendants Goord and Selsky filed a Motion to Dismiss on July 3, 2003. Dkt. No. 10, Mot. to Dismiss. At the time the Motion to Dismiss was filed, Defendants Early, Plescia, and Miller had not been served nor appeared in the action. Dkt. No. 12. Defendants Early, Plescia, and Miller were subsequently served and appeared in the action. Dkt. Nos. 9 & 14-17.

Thereafter, on March 5, 2004, this Court ruled that the Motion to Dismiss would be converted into a Rule 56 Motion for Summary Judgment since Defendants Goord and Selsky submitted matters that were outside the pleadings. Dkt. No. 20, Order, dated Mar. 5, 2004. The Court noted that although Defendants Early, Plescia, and Miller appeared in the action, they did not join in the Motion to Dismiss. *Id.* at p. 2, n. 1. In order to make this conversion, the Court provided Plaintiff and Defendants an opportunity to submit additional materials. *Id.* at p. 4. The Court further stated that once the new Motion for Summary Judgment was filed, we would deem the papers filed in support and opposition to the Motion to Dismiss incorporated into the new Motion for Summary Judgment. *Id .* We also "preserve[d] Defendants' rights to bring such Motion on behalf of all the Defendants" who appeared in this action. *Id.* at p. 4, n. 5. Accordingly, all Defendants now bring the current Motion for Summary Judgment. Dkt. No. 23, Mot. for S.J. & Notice of Mot.

### II. FACTS[FN1]

FN1. Plaintiff failed to comply with Northern District of New York Local Rule 7.1(a)(3). Plaintiff submits a Statement of Facts, however, Plaintiff did not mirror the movant's Statement of Material Facts by either admitting or denying each of the movant's assertions in matching numbered paragraphs. Dkt. No. 25. Plaintiff, after paragraph four, seems to misnumber the paragraphs and then fails to properly admit or deny statements made by Defendants. *Id.* As such, any facts not specifically controverted by Plaintiff may be deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). Nevertheless, this Court will utilize Plaintiff's Verified Complaint with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

accompanying Exhibits and Statement of Facts as well as Defendants' Statement of Material Facts with accompanying Exhibits to adduce the uncontested, material facts of the case.

During the time the events occurred relevant to this action, Plaintiff was incarcerated at the Eastern Correctional Facility. Dkt. No. 23, Defs.' 7.1 Statement at ¶ 1; Dkt. No. 25, Pl.'s 7.1 Statement at ¶ 1. Defendants Corrections Lieutenant Early, Deputy Superintendent of Administration Plescia, and Superintendent Miller, are employed at Eastern, while Selsky is the Director of the Department of Correctional Services ("DOCS") Inmate Disciplinary Program and Goord is the Commissioner of DOCS. Defs.' 7.1 Statement at ¶¶ 2-6; Pl.'s 7.1 Statement at ¶¶ 2-7.

*3 On March 26, 2001, Early issued a Misbehavior Report to Plaintiff, charging him with violations of Rules 109.10, 113.23, 116 .10, 116.11, 113.15, and 114. 10.[FN2] Defs.' 7.1 Statement at ¶¶ 7 & 8; Dkt. No. 11, Douglas J. Goglia Decl., dated June 19, 2003, Ex. 3(A), Misbehavior Report, dated Mar. 26, 2001; Pl.'s 7.1 Statement at ¶ 8. The Report stated the following as the description of the incident:

FN2. The following constitutes the substance of each Rule: 1) 109.10-inmates shall not be out of place in any area of the facility; 2) 113.23-inmates shall not be in possession of any contraband items not authorized by the Superintendent, DOCS, or facility rules; 3) 116.10-inmates shall not lose, destroy, steal, misuse, damage or waste any type of state property; 4) 116.11-inmates shall not alter, tamper with or attempt to repair any type of state or personal property without authorization; 5) 113.15-inmates shall not purchase, sell, loan, give, or exchange personally owned articles without authorization; and 6) 114.10-inmates shall not attempt to smuggle or attempt to smuggle or solicit others to smuggle any item in or out of the facility or from one area to another. Dkt. No. 23, Defs.' 7.1 Statement at ¶ 8, n. 2-7; see also N.Y. COMP.CODES R. & REGS. tit. 7, §§ 270.2(B) (10(i), (14)(v), (14) (xiii), (15)(i), (17)(i), & (17)(ii).

[a]s a result of the ongoing investigation as well as an interview [Early] conducted with Inmate Borcsok, B. [,] 82-A-3861[,] on the above date and approximate time, [Early has] concluded the following: Inmate Borcsok has, over the last several months, used a CD-Burner that was located in the Braille Area to make copies of computer software and personally owned games.... He also admitted adding a CD-ROM drive to his computer in the Fire & Safety Area in Maintenance.... He further admitted giving the games and disks to Inmate Gardella, M. 75-B-0978.... Note: Braille is not Inmate Borcsok's assigned program....

Defs.' 7.1 Statement at ¶ 9; Goglia Decl., Ex. 3(A), Misbehavior Report; Pl.'s 7.1 Statement at ¶ 8.

Plaintiff alleges that Early fabricated the Report and that subsequently, his due process rights were violated at his Tier III Disciplinary Hearing ("Hearing"). Defs.' 7.1 Statement at ¶¶ 10 & 11; Goglia Decl., Exs. 3(D), Hr'g Tr., dated Apr. 6, 2001, & 3(E), Hr'g Record, dated Apr. 8, 2001. The Hearing was conducted by Plescia, the Hearing Officer ("H.O."), over several days. Defs.' 7.1 Statement at ¶ 11; Goglia Decl., Ex. 3(D), Hr'g Tr. The Hearing commenced on March 30, 2001 and Plaintiff pled not guilty to all the Rule violations. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 1-3.

Plescia asked Plaintiff about his defenses and Plaintiff stated he did not admit to having a CD/ROM in the machine yet he claimed he got rid of it two months prior to the Report because it was "getting hot[.]" Id. at p. 4. Plaintiff stated the CD/ROM was in the machine when he received it, therefore, Plaintiff did not add it himself. Id. Plaintiff did admit to removing it after he was told to do so by Officer Cooper. Id. at pp. 4-5. The Hearing was then adjourned until April 2, 2001, when a witness, John Cosh, became available. Id. at p. 5. Cosh stated that Plaintiff visited the Braille area once or twice to ask technical questions but was not allowed to use the equipment to burn CDs. Id. at pp. 7-8. The witness also confirmed that a CD burner was installed in the computer for a period of time. Id. at pp. 11-12. Cosh further noted that to his knowledge he did not believe Plaintiff burned any CDs. Id. at pp. 12-13.

After the witness concluded, the Hearing was adjourned again until April 5, 2001. Id. at p. 13. On April 5th,

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Officer Cooper, the Fire and Safety Officer, testified that Plaintiff would on occasion assist him with the use of the computer. *Id.* at p. 14. He also stated that he did not believe that the computer Plaintiff worked on had a CD/ROM drive but Cooper noted that he and Plaintiff discussed the issue of CD/ROMs and software and that generally, if there was one on a computer, Cooper wanted to "get them out of there." *Id.* at p. 15. Cooper then proceeded to clarify his testimony and stated that he did not tell Plaintiff to remove a CD/ROM device, but only software such as games and programs that did not belong on the computers. *Id.* at p. 16. After Cooper finished testifying, Early was the next witness. *Id.* at p. 18.

**\*4** Early stated that the Report was eventually written because of an investigation, which was initiated based upon a confidential note that there was a computer with a CD/ROM drive in the "basement of FRP." *Id.* at p. 19. A search of the area produced two computers, one of which contained a CD/ROM with computer games and CDs that were burned. *Id.* After the search, Early interviewed Plaintiff regarding the use of a CD burner in the Braille area to make copies of software and games. *Id.* Early purported that Plaintiff admitted in the interview that he used a CD burner, gave some games to "Gardella[,]" and put a CD/ROM drive behind a false panel so that it would not attract attention *Id.* at pp. 19-21.

Plescia then addressed the Rule violations with Early to determine how they occurred. *Id.* at pp. 22-26. As to being out of area, Rule 109. 10, Early stated it was okay for Plaintiff to be in the Braille area for his job but not for purposes involving the CD burner. *Id.* at pp. 21-22; *see supra* note 2. As to 113.23, possession of contraband, Early stated that Plaintiff was not found in possession of the CD/ROM or other such items, but he was charged with this infraction because he admitted to possessing it in the past. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 22-24; *see supra* note 2. As to Rules 116.10 and 116.11 regarding state property, Early stated he again relied on the admissions made by Plaintiff and did not conduct any further investigations. Goglia Decl., Ex. 3(D), Hr'g Tr. at p. 23; *see supra* note 2. Early also testified that he could not specifically remember when the CD burner and/or CD/ROM were put into the Braille area and then taken out, only that it had happened within the past few months. Goglia Decl., Ex. 3(D), Hr'g Tr. at p. 24. In regards to Rule 113.15, exchange of personal articles, Plescia and

Early both stated that when Plaintiff admitted giving something to Gardella, the charge was applicable. *Id.* at p. 25; *see supra* note 2. Plaintiff then asserted that he could not have done any of the things he supposedly admitted he had done. Goglia Decl., Ex. 3(D), Hr'g Tr. at pp. 25-26. Subsequently, Plaintiff told Plescia he would like to ask more questions but that his legal papers were not with him and therefore, Plescia adjourned the Hearing for one more day.[FN3] *Id.* at pp. 26-29.

> [FN3]. It does not seem as though the violation of Rule 114.10 was specifically discussed. *See generally* Goglia Decl., Ex. 3(D), Hr'g Tr.

On April 6, 2001, the Hearing was reconvened *Id.* at p. 29. Instead of asking more questions, Plaintiff summed up his thoughts by explaining that he did not believe there was sufficient evidence to justify any of the charges brought against him. *Id.* at pp. 30-31. Plaintiff reiterated that there was no physical evidence presented, the whole Report was based upon admissions, and there was no investigation conducted after he was interviewed. *Id.* at p. 31. Plaintiff reaffirmed that he did not make any admissions. *Id.* Shortly after concluding the Hearing, Plescia made his findings. *Id.* at p. 32. Plescia found Plaintiff guilty of all charges and sentenced him to confinement in the Special Housing Unit ("SHU") for ninety (90) days along with corresponding loss of packages, commissary, and phone privileges. *Id.* at pp. 32-35; Pl.'s 7.1 Statement at ¶ 13.

**\*5** Plaintiff claims that during the Hearing:

1. [i]t was never proven that plaintiff made any admissions[;] 2 .[i]t was never proven that Plaintiff ever committed any of the alleged charges/violations[;] 3.[t]here are no witnesses, recordings, nor any signed statements to substantiate the supposed admissions or the alleged charges[;] 4. [ ] Lt. [Early] admitted he never investigated the matter[;] 5.[t]here are no dates, times, or areas listed as to when and where the alleged Physical Evidence was discovered[;] 6.[t]here was *no* Physical Evidence produced at the hearing[;] 7.[t]he Hearing Officer and the Lt. admitted they did not have evidence for the hearing[;] 8.[t]here was no proof of any Confidential Information[;] 9.[i]t was never proven that the computer in the Fire & Safety Area was in fact used

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

for non-business purposes[;] 10.[n]o times or dates are specified as to when any of the stated charges/violations supposedly occurred, yet the Hearing Officer himself stated that this occurred at "the appointed time in the past[;]" 11.[t]he Plaintiff was admittedly never found to be in Possession of any contraband[;] 12.[t]he testimony of both Mr. Cosh and Officer Cooper contradicted the Misbehavior Report as well as the Lt.'s testimony [; and] 13.[t]he finding of guilt was based on supposed admissions as well as non-existent Physical Evidence.

Defs.' 7.1 Statement at ¶ 12; FN4 Compl. at § IV.

FN4. Defendants inadvertently have two paragraphs numbered 12. The Court refers to the first paragraph numbered 12 for this statement. *See* Defs.' 7.1 Statement.

Plaintiff's other assertions regarding his Hearing are that the Report was based upon double hearsay and Early and Plescia relied on physical evidence that did not exist and was not introduced at the Hearing. Defs.' 7.1 Statement at ¶¶ 12 & 13; FN5 Compl. at § IV; Pl.'s 7.1 Statement at ¶¶ 8-10 & 12.

FN5. The Court references the second paragraph numbered 12.

After the Hearing, Plaintiff appealed the decision to Commissioner Goord on April 10, 2001, detailing the procedural and evidentiary flaws. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Appeal, dated Apr. 10, 2001; Pl.'s 7.1 Statement at ¶ 14. On April 23, 2001, Plaintiff sent an additional appeal form to Goord regarding the sentence imposed at the Hearing. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Appeal, dated Apr. 23, 2001; Pl.'s 7.1 Statement at ¶ 14. Selsky responded on behalf of Goord and affirmed the Hearing determination on May 24, 2001. Defs.' 7.1 Statement; Goglia Decl., Ex. 3(G), Selsky Mem.; Pl.'s 7.1 Statement at ¶ 15.

All in all, Plaintiff claims that Early offered conclusory testimony and therefore, displayed indifference in the matter, Plescia was biased and prejudiced in conducting

and evaluating the Hearing, Miller, as Superintendent, "is responsible for all that happens within his prison [,]" Selsky affirmed the disposition of the Hearing, and Goord "oversees all that goes on within his system ." Defs.' 7.1 Statement at ¶¶ 14-20; Compl. at § IV.

On September 10, 2001, Plaintiff commenced an Article 78 proceeding in the New York State Court, Albany County, challenging his Tier III Hearing.FN6 Defs.' 7.1 Statement at ¶ 21; Goglia Decl., Ex. 1, Article 78 Pet., dated Sept. 10, 2001; Pl.'s 7.1 Statement at ¶ 16. Plaintiff contended there was a lack of substantial evidence, the testimony of Cosh and Cooper did not support Early's testimony, and Plescia exceeded his authority by disregarding the testimony of the two witnesses. Defs.' 7.1 Statement at ¶¶ 22-23; Goglia Decl., Ex. 1, Article 78 Pet. However, because there was a challenge of whether "substantial evidence" supported the determination, the proceeding was transferred to the New York State Appellate Division, Third Department. Defs.' 7.1 Statement at ¶ 26; Goglia Decl., Exs. 2(E), Mem. and J., dated July 11, 2002, at p. 1, & 5, *Borcsok v. Selsky,* 744 N.Y.S.2d 772 (N.Y.App. Div., 3d Dep't 2002); Pl.'s 7.1 Statement at ¶ 18.

FN6. Defendants state the Petition was filed on September 25, 2001, instead of September 10, 2001, the date of the signature. Defs.' 7.1 Statement at ¶ 21. However, the Court is unaware of how Defendants arrived at this date since the Petition shows no other date.

*6 The parties briefed the issues to the Appellate Division and the court rendered its decision on July 11, 2002. Defs.' 7.1 Statement at ¶¶ 22-27; Goglia Decl., Exs. 2(A), Pl.'s Br., 2(B), Resp.'s Br., 2(C), Pl.'s Reply Br.; Pl.'s 7.1 Statement at ¶¶ 19-20. The Appellate Division stated that the Report along with Early's testimony "constituted substantial evidence supporting the administrative determination of guilt[.]" Defs.' 7.1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 772; Pl.'s 7.1 Statement at ¶ 21. The Court further stated that

[t]he author of the report testified that petitioner admitted during an interview that he had used the CD

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

burner to make copies of software and games, that he had given certain games to another inmate and had added a CD-ROM drive to his computer which he attempted to hide with masking tape. Petitioner's claim that he did not make the admissions attributed to him created a credibility issue for the Hearing Officer to resolve .... Moreover, by not raising it at the hearing, petitioner has not preserved his objection to the sufficiency of the misbehavior report .... Were we to consider it, we would not find the omission of specific dates and times fatal, since the misconduct took place over several months and was the subject of a lengthy investigation[.]

Defs.' 7.1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 773; Pl.'s 7.1 Statement at ¶ 21.

Accordingly, the Appellate Division denied the Petition. Defs.' 7 .1 Statement at ¶ 27; Goglia Decl., Ex. 5, *Borcsok v. Selsky,* 744 N.Y.S.2d at 773; Pl.'s 7.1 Statement at ¶ 21. Plaintiff appealed the decision to the New York State Court of Appeals where leave to appeal was denied. Defs.' 7.1 Statement; Goglia Decl., Ex. 6, *Borcsok v. Selsky,* 781 N.E.2d 914 (N.Y. Ct. of App.2002); Pl .'s 7.1 Statement at ¶ 22.

## III. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*7** To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Biderman,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Due Process Claims

Plaintiff claims that his Fourteenth Amendment due process rights were violated as there was a lack of sufficient evidence presented at the Hearing to support the contents of the Misbehavior Report, the Report was fabricated, and that Plescia was biased. Dkt. No. 24, Pl.'s Mem. of Law at pp. 5-9; Compl. at § IV. Defendants claim there was "some evidence" to find Plaintiff guilty of the

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

charges as required by law. Dkt. No. 12, Defs.' Mem. of Law at pp. 8-13. Defendants also assert that collateral estoppel should apply to the finding of "some evidence" by the Appellate Division, that no evidence was provided to show Plescia was biased, and Plaintiff failed to exhaust his administrative remedies. *Id.*

As to Plaintiff's claim that the Report was fabricated, the Second Circuit has held that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see Batista v. Goord,* 2005 WL 2179420, at *11 n. 75 (N.D .N.Y. Aug. 28, 2005); *Pittman v. Forte,* 2002 WL 31309183, at *5 (N.D.N.Y. July 11, 2002). Furthermore, if a prisoner is afforded the opportunity to have a hearing, "the filing of unfounded charges does not give rise to a *per se* constitutional violation actionable under § 1983." *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988) (quoting *Freeman v. Rideout,* 808 F.2d at 953). In addition, "[t]here must be more such as retaliation against the prisoner for exercising a constitutional right." *Pittman v. Forte,* 2002 WL 31309183, at *5 (citing *Franco v. Kelly,* 854 F.2d at 588-590); *see also Boddie v. Schnieder,* 105 F.3d at 862; *Batista v. Goord,* 2005 WL 2179420, at *11 n. 75.)

**\*8** Here, Plaintiff alleges that no investigation was conducted and the Report was based solely on admissions supposedly made by him. Notwithstanding, Plaintiff has no constitutional right to be free from false accusations in a misbehavior report and moreover, Plaintiff was afforded an opportunity to have a hearing based upon the report and thus there is no *per se* constitutional violation actionable under § 1983 unless Plaintiff alleged that something else resulted from his exercise of a constitutional violation, such as retaliation. In this case, Plaintiff makes no such claim. *See generally* Compl. at § IV.

Plaintiff also asserts that there was insufficient evidence presented at the Hearing to support the Report. The Fourteenth Amendment to the Constitution states that "no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of

confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). "To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky,* 37 F.Supp.2d 162, 167 (N.D.N.Y.), *vacated and remanded on other grounds by* 238 F.3d 223 (2d Cir.2001) (citing *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996)). In *Sandin,* the Supreme Court ruled that the Constitution did not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prisoner life." 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d at 225 (citing *Sandin v. Conner,* 515 U.S. at 484); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). Thus, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed such an "atypical and significant hardship." *See Sandin v. Conner,* 515 U.S. at 484.

Factors relevant to an analysis of what constitutes an atypical and significant hardship include: "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at *5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). However, "[w]here the plaintiff was confined for an intermediate duration-between 101 and 305 days-'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

*v. Richards,* 364 F.3d at 64-65 (quoting *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97-98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest."); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125-288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997).[FN7] If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

> FN7. Department of Correctional Services policies provide the conditions of confinement prisoners are subject to when confined in SHU. *See* N.Y. COMP.CODES R. & REGS. tit. 7, §§ 304.1-.14 & 305.1-.6.

*9 Here, Plaintiff must make the threshold showing of an atypical and significant hardship since a claim of denial of due process was asserted. Borcsok received 90 days in SHU along with 90 days loss of packages, commissary, and phone privileges. Goglia Decl., Ex 3(D), Hr'g Tr. at pp. 32-35. The amount of time in SHU falls below the intermediate duration. Furthermore, Plaintiff does not provide any information that his loss of privileges were in some way atypical of conditions of confinement that normally occur when a penalty is assessed for such Rule violations. *See* Compl. at § IV; Pl.'s Mem. of Law. Therefore, the Court assumes that the conditions of confinement were no more restrictive than necessary pursuant to Department of Correctional Services policies. *See supra* note 7. Since there is no dispute as to the conditions and because the period of confinement fell below the intermediate range, Plaintiff has failed to show

there was an atypical and significant hardship as to afford the protection provided by procedural due process.

Nevertheless, had Plaintiff asserted that a liberty interest was implicated, we note that the Supreme Court and Second Circuit have addressed the issue of "some evidence." The Supreme Court has stated that in identifying safeguards of due process, it has acknowledged the genuine need of prisons to ensure the safety of inmates, thus "avoiding burdensome administrative requirements that might be susceptible to manipulation, and [to] preserv[e] the disciplinary process as a means of rehabilitation." *Superintendent, Mass. Corr. Inst. at Walpole v. Hill,* 472 U.S. 445, 454-55 (1985) (citations omitted). In terms of judicial review regarding the written findings of the disciplinary proceeding as required by due process, the Supreme Court has held that:

> requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." *United States ex rel. Vajtauer v. Commissioner of Immigration,* 273 U.S. 103, 106 (1927). Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *See ibid.; United States ex rel. Tisi v. Tod,* 264 U.S. 131, 133-134 (1924); *Willis v. Ciccone,* 506 F.2d 1011, 1018 (CA8 1974). We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. *See Wolff,* 418 U.S., at 562-563, 567-569.

*10 *Id.* at 455-56.

The Second Circuit has interpreted "some evidence" to mean that there must be some "reliable evidence." *Luna v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

Pico, 356 F.3d 481, 488 (2d Cir.2004). Examples of cases when "some evidence" was not found in a disciplinary proceeding include a corrections officer making a statement that "every inmate" in a mess hall participated in a riot and an inmate was found guilty based on that statement, and an inmate being found guilty based on information provided by a confidential informant though there was no independent examination of the informant's credibility. *Id.* (citing *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir.1992) & *Taylor v. Rodriguez,* 238 F.3d 188, 194 (2d Cir.2001)).

Plaintiff purports that there was insufficient evidence at his Hearing to find him guilty of the Rule violations. Defendants state that collateral estoppel bars relitigation of this particular issue as it was decided by the New York State Appellate Division, Third Department pursuant to an Article 78 proceeding.

An inmate may be barred by the doctrine of collateral estoppel "from relitigating issues that were determined in [the Article 78] proceeding." *Robinson v. Scully,* 1993 WL 340998, at *4 (S.D.N.Y. Aug. 23, 1993). Pursuant to "the Full Faith and Credit Statute, 28 U.S.C. § 1738, federal courts must give a prior state court judgment the same preclusive effect that such a judgment would be given in the courts of the state from which the judgment emerged." *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982)). This rule applies to actions brought under section 1983. *Id.* (citing *Allen v. McCurry,* 449 U.S. 90, 103-04 (1980) (issue preclusion) & *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 84-85 (1984) (claim preclusion)). Therefore, this Court must analyze New York law in order to determine if there is preclusion based on a judgment rendered in the Article 78 proceeding. *Id.*

Under New York law, the doctrine of collateral estoppel, or issue preclusion, applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and (1) the issue "has necessarily been decided in the prior action and is decisive of the present action," and (2) there has been a "full and fair opportunity to contest the decision now said to be controlling." *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 246 N.E.2d 725

(1969); *see also Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995).

*Id.; see also LaFleur v. Whiteman,* 300 F.3d 256, 271-72 (2d Cir.2002).

Furthermore, " 'collateral estoppel may bar relitigation of an issue even against different defendants,' provided that the issue in contention was necessary to the result reached in the prior proceeding." *LaFleur v. Whiteman,* 300 F.3d at 274 (quoting *Republic Gear Co. v. Borg-Warner Corp.,* 381 F.2d 551, 555 n. 1 (2d Cir.1967)). Thus, if the parties are in privity, collateral estoppel may still be applicable. *B.N.E., Swedbank, S.A. v. Banker,* 791 F.Supp. 1002, 1006 (S.D.N.Y.1992) (citing *Blonder-Tongue Lab., Inc. v. University of Illinois Found.,* 402 U.S. 313, 329 (1971)); *see also* 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 132.04(1)(b)(i) (3d ed.2005). "The term privity signifies that the relationship between two or more persons is such that a judgment involving one of them may justly be conclusive on the others, although those others were not party to the lawsuit." 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 132.04(1)(b)(ii); *see also Staten Island Rapid Transit Operating Auth. v. I.C.C.,* 718 F.2d 533, 543 (2d Cir.1983) (noting that privity, in general, means "concurrent relationship to the same right of property; successive relationship to the same right of property; or representation of the interests of the same person." (citation omitted)).

**\*11** The burden of proving whether the issues are the same "rests squarely on the party moving for preclusion." *LaFleur v. Whiteman,* 300 F.3d at 272. However, the opposing party will have the burden "to show that it did not have a full and fair opportunity to litigate the issue in the prior proceeding." *Id.* at 274 n. 7 (citing *Ryan v. New York Tel. Co.,* 467 N.E.2d 487, 491 (N.Y. Ct. of App.1984)).

Even assuming that an Article 78 judgment satisfies "New York State law requirements for issue preclusion, as a matter of federal law a state cannot give preclusive effect in its own courts to a constitutionally infirm judgment." *Giakoumelos v. Coughlin,* 88 F.3d at 61 (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 482 (1982)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

However, the "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law." *Id.* (quoting *Kremer v. Chemical Constr. Corp.,* 456 U.S. at 481).

Here, Plaintiff presented the issue of insufficient evidence in the Article 78 proceeding. *See Borcsok v. Selsky,* 744 N.Y.S.2d at 772-73. The state court found substantial evidence existed based upon Early's testimony and Plaintiff's admissions. *Id.* The court further noted that the fact that Plaintiff claimed he did not make the admissions created a credibility issue for Plescia to decide. *Id.* at 773. Thus, the issue of sufficiency of the evidence was decided in the Article 78 Proceeding and is decisive in the current action. [FN8]

> **FN8.** The Court further notes that the other issues regarding physical evidence raised in this proceeding were duly raised to the New York State Appellate Division, Third Department. *Compare* Compl. at § IV *with* Goglia Decl., Exs. 2(A), Pl.'s Br. & (B), Pl .'s Reply Br.

In order to forestall the application of collateral estoppel, Borcsok must establish the absence of a full and fair opportunity to litigate the claims in the prior Article 78 proceeding. Here, Plaintiff has not proclaimed that he was denied a full and fair opportunity to litigate his claims. Pl.'s Mem. of Law at pp. 6-7. His only claim is that new evidence was uncovered that would defeat collateral estoppel, and this new evidence is that there are no records to prove an investigation was conducted before the Report was written. Pl.'s Mem. of Law at pp. 7 & 13-14. Plaintiff had a full and fair opportunity to litigate his issues regarding the Hearing. *See supra* note 8. In addition, Donald Selsky, a Defendant in this action, was also the "Respondent" in the prior proceeding. *See Borcsok v. Selsky,* 744 N.Y.S.2d 722. The other Defendants in this action could be seen as having the type of relationship with Selsky that privity would exist amongst them, and, therefore, a judgment involving one may justly be conclusive on the others.

Moreover, Plaintiff's citation to *Giakoumelos v. Coughlin,*

88 F.3d at 61-62, for the proposition that new evidence will defeat collateral estoppel is incorrect. The Second Circuit merely stated that the court should not give preclusive effect if there is a constitutionally infirm judgment. *Id.* There is no proof that such is the case here. The parties were fully able to brief all the issues to the Appellate Division and this Court finds that "the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause" were satisfied. Thus, this Court gives preclusive effect to the Appellate Division's decision regarding "substantial evidence." [FN9]

> **FN9.** Additionally, as to Plaintiff's claim that the Hearing was based on hearsay, the Court notes that hearsay is permissible in disciplinary hearings. *See Espinal v. Goord,* 2002 WL 1585549, at *1 (S.D.N.Y. July 17, 2002).

**\*12** As for Plaintiff's claim that Plescia was biased and exhibited prejudice, Plaintiff's assertion is wholly conclusory. Plaintiff offers no support for his allegations except that the decision of the Hearing did not go in his favor. *See* Compl. at § IV; Pl.'s Mem. of Law. Furthermore, a review of the Hearing record shows that Plescia erred on the side of caution and adjourned the Hearing on several occasions so that witnesses could be present and Plaintiff could ask his questions. *See generally* Goglia Decl., Ex. 3(D), Hr'g Tr.

Therefore, it is recommended that the Motion for Summary Judgment be **granted.** [FN10]

> **FN10.** As for Defendants' assertion that Plaintiff failed to exhaust his remedies in regard to the sufficiency of the Misbehavior Report, the Court need not address the issue since Plaintiff has failed to state a due process claim.

## C. Personal Involvement

Defendants Miller and Goord assert they were not personally involved in any alleged constitutional violation. Defs.' Mem. of Law at pp. 14-16. Plaintiff states these Defendants are liable in a supervisory capacity. Pl.'s Mem.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)
(Cite as: 2007 WL 2454196 (N.D.N.Y.))

of Law at p. 15.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (emphasis in original) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). However, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Here, Plaintiff merely claims that Miller is liable because he "is responsible for all that happens within his prison," Goord is liable because he "oversees all that goes on within his system," and Selsky could have corrected the matter when it was before him on appeal. However, as to Goord and Miller, such statements do not demonstrate personal involvement. More importantly, Plaintiff cannot establish any claims for supervisory liability as Plaintiff has failed to show that any "subordinate" Defendant committed a constitutional violation.

Thus, it is recommended that Summary Judgment be

**granted** as to Defendants Miller, Goord, and Selsky on this ground.

### III. CONCLUSION

**\*13** For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 23) be **GRANTED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2007.
Borcsok v. Early
Not Reported in F.Supp.2d, 2007 WL 2454196 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
MORTIMER EXCELL, Plaintiff,
v.
Brian FISCHER, Commissioner, DOCS, et al.,[FN1]
Defendants.

> FN1. It is noted that the plaintiff has named a
> total of forty-three (43) defendants in the
> eighty-eight (88) page complaint.

Civ. No. 9:08-CV-945 (DNH/RFT).

Sept. 24, 2009.

West KeySummary
Prisons 310 ⚷ 126

310 Prisons
    310II Prisoners and Inmates
        310II(B) Care, Custody, Confinement, and Control
            310k126 k. Protection from Violence, Assault,
or Abuse. Most Cited Cases

Sentencing and Punishment 350H ⚷ 1537

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1537 k. Protection from Violence. Most
Cited Cases
Inmate's claim of failure to protect was facially adequate
to sustain an action for violation of Eighth Amendment
rights. Inmate's complaint alleged that he put prison
officials on notice of a threat to his safety by sending three

complaint letters days before he was allegedly assaulted.
He also claimed that a prison nurse falsified his medical
records so as to cover up the alleged assault, and another
prison official participated in the conspiracy by instructing
that no photographs be taken of inmate's injuries after the
alleged assault. U.S.C.A. Const.Amend. 8.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Adam Silverman, Esq., David L. Cochran,
Esq., Assts. Attorney General, of Counsel, Albany, NY,
for State Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*16** Plaintiff, Mortimer Excell, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By
Report-Recommendation dated August 25, 2009, the
Honorable Randolph F. Treece, United States Magistrate
Judge, specifically recommended that the defendants'
motion to dismiss (Docket No. 59) be granted in part and
denied in part; that the following defendants be dismissed:
T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M.
Patnode, Lucien LeClaire, Jr., Vonda Johnson, Frenyea, R.
Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley,
Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T.
Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert
Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven
Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled
"Oltloff" on the docket), and Karen Bellamy; and that
plaintiff's motion for a preliminary injunction (Docket No.
57) be denied. To clarify his recommendations, the
Magistrate Judge specifically stated that his
recommendations leave the following claims viable: (1)
Excessive force and retaliation against defendants Tamer,
M. Orzech, T. Carter, Moak, and Labetz; (2) conspiracy
against defendant Tamer, M. Orzech, T. Carter, Moak,
Labetz, R. Rock, and H. Warner; (3) violation of plaintiff's
First Amendment right to practice religion against M.
Orzech; and (4) supervisory liability against Dale Artus

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

and Brian Fischer. The Magistrate Judge further stated that his recommendations leave defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer as remaining defendants should the Report-Recommendation be adopted. In a Clarification Order dated September 9, 2009, Magaistrate Judge Treece clarified that it is his recommendation that all of plaintiff's claims against defendant Lester Wright, M.D., be dismissed. The plaintiff has timely filed objections to the Report-Recommendation.

**\*17** It is noted that the defendant "Labetz, Lt., Clinton Correctional Facility," has never been served. The Magistrate Judge ordered that said defendant not be dismissed from the action as the other unserved defendants will be. The Magistrate Judge directed the Clerk to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of the Report-Recommendation. It appears that the summons and complaint were never issued for service. Therefore, the plaintiff will be granted thirty days from the date of this order within which to serve defendant Labetz. The plaintiff is again warned, that if this defendant is not served within thirty days, the claims against defendant Labetz will be dismissed without further order of this court.

Based upon a careful review of the entire file, including the recommendations of Magistrate Judge Treece, the Clarification Order, and the objections by plaintiff, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED, in part, and DENIED, in part;

2. Defendants T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClaire, Jr., Vonda Johnson Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway,

Benthley, Paul Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, C.O. Green, Ortloff (spelled "Oltloff" on the docket), Karen Bellamy, and Lester Wright, M.D., are DISMISSED from this action;

3. Defendants T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Dale Artus, and Brian Fischer will remain as defendants;

4. Plaintiff's motion for a Preliminary Injunction is DENIED;

5. The following claims remain in this action:

a. Excessive force and retaliation against defendants Tamer, M. Orzech, T. Carter, Moak, and Labetz;

b. Conspiracy against defendant Tamer, M. Orzech, T. Carter, Moak, Labetz, R. Rock, and H. Warner;

c. Violation of plaintiff's First Amendment right to practice religion against M. Orzech; and

d. Supervisory liability against Dale Artus and Brian Fischer.

6. The defendant Labetz is not dismissed from this action at this time. The Clerk is directed to issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service upon defendant Labetz within thirty days of the date of this Order adopting the Report-Recommendation.

7. If defendant Labetz is not served within thirty days of the date of the order, he will then be DISMISSED without further order of the court.

8. The Clerk is directed to enter judgment against the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

dismissed defendants, and to make the necessary changes on the docket to reflect the remaining defendants; and

9. The above action is referred to the Honorable Victor Bianchini, Recalled United States Magistrate Judge, for the purposes of mediation. Any further proceedings are stayed pending the completion of mediation.

**\*18** IT IS SO ORDERED.

### *REPORT-RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Mortimer Excell brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that he suffered the following constitutional violations: (1) conspiracy to violate his First, Eighth, and Fourteenth Amendment rights; (2) excessive force; (3) deliberate indifference to his serious medical needs; (4) retaliation; (5) due process violations stemming from both Disciplinary and Parole Board Hearings; (6) violation of his First Amendment rights of religious affiliation and expression; and (7) interference with his personal and legal mail.

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order and Defendants' Motion to Dismiss. Dkt. Nos. 57, 59, & 62.[FN2] In support of his Opposition to Defendants' Motion, Plaintiff has submitted two Supplemental Briefs, both of which have Exhibits attached. Dkt. Nos. 79, 82, & 84. The Court has not considered these Exhibits in considering the instant Motion to Dismiss. For the reasons that follow, it is recommended that the Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part,** and the Plaintiff's Motion for a Preliminary Injunction be **DENIED.**

> FN2. Defendants Tamer, Urzech, T. Carter, and Moak filed an Answer to the Complaint and do not join in the Motion to Dismiss. Dkt. No. 61,

Ans.; Dkt. No. 62, Defs.' Mem. of Law at p. 1 n. 2. The causes of action asserted against these Defendants are excessive force, conspiracy, retaliation, and interference with his religious practices survive this Motion. Also, Defendants C.O. Green, Labetz, Oltloff, and Karen Bellamy have not been served with process. Dkt. Nos. 17, 54, & 66 (no summons has been returned for Defendant Bellamy).

### I. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's Complaint is eighty-eight (88) pages in length and contains eighty-one (81) numbered paragraphs and five (5) "Causes of Action" which are in sum and substance summaries of the claims alleged in the preceding 81 paragraphs. *See generally* Dkt. No. 1, Compl. Given the length of the Complaint and the amount of claims stated therein, we shall provide in this section a summary of Plaintiff's claims and delve into the finer points of his allegations within our discussion of the Defendants' bases for dismissal. This summary is derived from the facts alleged in Plaintiff's Complaint, which must be accepted as true for the purposes of addressing Defendants' Motion to Dismiss brought pursuant to FED. R. CIV. P. 12(b)(6). *See infra* Part II.A.[FN3]

From July through September 4, 2007, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"), where he was allegedly denied medication for various physical ailments by Defendant Nurse Fearchild, denied recreation for a period of three days by Defendant N. Bezio, threatened and harassed by Defendant Brian Bengmann, and had his due process rights violated during a Disciplinary Hearing. Dkt. No. 1, Compl. at ¶¶ 1-7.[FN3] In September 2007, Plaintiff was sent to Great Meadow Correctional Facility ("Great Meadow") in order to attend a medical appointment at Albany Medical Hospital. *Id.* at ¶ 7. During his stay at Great Meadow, Plaintiff was denied his "medical draft bag" and therefore forced to wear the same clothes from September 2-18, denied drinking water for one twenty-four (24) hour period, threatened, and issued a false misbehavior report by Defendant Correctional Officer ("C.O") Green. *Id.* at ¶¶ 7-10.

> FN3. All citations to the Plaintiff's Complaint

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

refer to the paragraphs contained in the *"Statement of Facts"* section, starting on page twelve (12) of the Complaint.

Plaintiff alleges that on October 18, 2007, after his transfer back to Upstate, Defendant T. Ramsdell sexually assaulted him by grabbing and squeezing his penis during a body search and that Ramsdell and Defendant Rokece pushed his face against an iron rail, causing injuries to his face and forehead. *Id.* at ¶¶ 11-12 & 14. In the days that followed Plaintiff was threatened, harassed, issued a false Misbehavior Report accusing him of possessing contraband, and for a two-day period denied a bed pan and personal hygiene products. *Id.* at ¶¶ 13-19. In November 2007, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), where in December of that year, several Defendants, including S. Tyrell, R. Lawrence, Poltlos, and Frenyea, conspired to take his identification card, put him in keeplock, and improperly opened his legal mail. *Id.* at ¶¶ 22-27. During a Disciplinary Hearing held on December 24, 2007, before Hearing Officer Defendant Lieutenant ("Lt.") Miller, Plaintiff was denied the opportunity to present evidence or testimony and was not given a written disposition of the proceeding. *Id.* at ¶ 32.

**\*2** On January 15, 2008, Plaintiff had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff,[FN4] during which Plaintiff articulated his complaints about the aforementioned alleged constitutional violations. These Defendants denied Plaintiff parole. *Id.* at ¶¶ 61-62.

> [FN4.] Defendant Ortloff's name is spelled "Oltloff" on the Docket Report. Because both parties refer to this Defendant as "Ortloff," we presume his name to be spelled as such.

On May 13, 1008, Defendant C.O. M. Orzech told Plaintiff to cut his beard by May 17th or he would issue Plaintiff a misbehavior report. *Id.* at ¶ 36. That same day, Plaintiff filed a request to Department of Correctional Services ("DOCS") officials for a beard permit based on his Rastafarian religious beliefs and, on May 14th, received a receipt for said request stating that Plaintiff did not have to cut his beard during the pendency of the decision on his request. *Id.* at ¶¶ 37-39. On May 15th, Plaintiff explained to Orzech that he had submitted a

request for a beard exemption and could not be forced to cut his beard until that request was decided, however, on May 17th, Orzech denied Plaintiff recreation time and placed him in keeplock because he had not cut his beard. *Id.* at ¶¶ 3 6-43. Also, Plaintiff alleges that on May 17th, Orzech allegedly threatened to beat him up if he filed any more complaints to Defendants Commissioner Fischer and Superintendent Artus. *Id.* at ¶ 43.

On May 18, 2008, Plaintiff filed a medical services request to address his heart pain and weakness. *Id.* at ¶ 45. On May 19, 2008, Defendant C.O.'s T. Carter and Orzech arrived at Plaintiff's cell to take him to the medical unit and proceeded to cuff Plaintiff's hands behind his back, then pushed him to the floor as he was being escorted out of his cell block and punched, kicked, and beat him, as did Defendant C.O.'s Tamer and Moak. *Id.* at ¶¶ 46-47. Plaintiff was escorted to the hospital where he was punched by Moak and Defendant Lieutenant ("Lt.") Labetz, and Defendant Nurse R. Rock allegedly refused to treat him for the injuries he sustained. *Id.* at ¶¶ 48 & 63(1).[FN5] Afterwards, Plaintiff was sent to the Special Housing Unit ("SHU"), where he was denied medical care, allegedly in order to prevent evidence of the incident in his medical records. *Id.* at ¶¶ 49-50.

> [FN5.] There are two consecutive paragraphs in the Complaint numbered 63. To avoid confusion, we will refer to them as paragraphs 63(1) and 63(2), respectively.

On May 20, 2008, Orzech and Carter issued Plaintiff Misbehavior Reports alleging that Plaintiff had attacked Orzech while being escorted to the medical unit; on May 27, 2008, a Disciplinary Hearing was convened on those charges before Hearing Officer Defendant Captain D. Uhler. At the Disciplinary Hearing, Plaintiff was denied the opportunity to call witnesses and present evidence, and was improperly removed from the proceedings; in addition the Hearing was allegedly improperly extended through June 19, 2008. *Id.* at ¶¶ 52-54, 58, & 63(2)-64.

From July 2005 through July 2008, Plaintiff did not receive any mail from family or friends, and his family members did not receive outgoing mail he sent. *Id.* at ¶¶ 63(1) & 65. In addition, letters of complaint Plaintiff sent

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

to various New York State Officials and Officers were not received. Plaintiff alleges that his incoming and outgoing mail was stolen by Defendants J. Rice, Quinn, and D. Waldron, who are mail clerks at Auburn, Upstate, and Clinton Correctional Facilities, respectively. *Id.* at ¶¶ 65, & 75-80.

**\*3** Finally, on July 16, 2008, Plaintiff was transferred back to Upstate, where he was allegedly denied medical care from July 17 through August 14, 2008. *Id.* at ¶ 81.

### II. DISCUSSION

#### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern.*

*Ass'n, Local 1625, AFL-CIO v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950 (citing *Twombly* ).[FN6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* --- U.S. ---- 129 S.Ct. at 1950-51.

> FN6. By its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 562-63 (2007) (quoting *Conley,* 355 U.S. 41, 45-46, 78

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

### B. Eighth Amendment Claims

#### 1. *Medical Treatment*

**\*4** The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical needs." *Smith v. Carpenter,* 316 F.3d 178, 183 (2d Cir.2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong,* 143 F.3d at 702 & *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). The subjective element "entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d at 553 (quoting *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

In this case, Plaintiff's medical indifference claims are as follows: (1) in mid-July 2007, he suffered from heart and chest pain for a period of five days, but received only non-aspirin medication and, on July 12, 2007, was denied a blood pressure test by Defendant Nurse Fearchild; (2) in November 2002, he was prescribed "Omeprazole 20 mg caps" for his "belly pains," but was denied refills of that medication by Defendant Nurses Travers and Fearchild at

Upstate, and by Defendant Nurses Lashway, Rock, and Benthley at Clinton; and (3) Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, and falsified his medical records to cover-up the injuries he allegedly sustained on that date.[FN7] Compl. at ¶¶ 1, 48, 74 & 81.

FN7. Plaintiff also alleges that at a Disciplinary Hearing held on June 16, 2008, he told the presiding hearing officer, Defendant Uhler, about his medical problems, and that Uhler denied his requests for medical care. Compl. at ¶ 60. To the extent Plaintiff intended to raise an Eighth Amendment claim against Uhler, that claim must fail because Uhler was not responsible for Plaintiff's medical treatment.

In Plaintiff's first and second medical indifference claims, there is no allegation that he suffered from a serious medical condition. Plaintiff claims that he suffered from heart and chest pains for a period of five (5) days, and that he was denied refills for medication used to treat stomach pain. Compl. at ¶¶ 1 & 74. Such conclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"); *see also Hutchinson v. New York State Corr. Officers,* 2003 WL 22056997, at *5 (S.D.N.Y. Sept.4, 2003) (holding that a general allegation of chest pain is not sufficiently serious under the Eight Amendment) (citations omitted); *Pender v. McClellan,* 1996 WL 343253, at *4 (W.D.N.Y. Feb.5, 1996) (dismissing plaintiff's Eighth Amendment claims based on stomach pain when there was no allegation that his condition was urgent or otherwise serious). Therefore, it is recommended that those claims be **dismissed.**

**\*5** Likewise, in his third medical indifference claim alleging Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, Plaintiff fails to allege that he suffered from a constitutionally significant injury or medical condition. Plaintiff merely alleges in general terms that his

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

head and neck were hurt, he experienced head and heart pain, and that he requested x-rays for unspecified injuries to his head and body. Compl. at ¶¶ 48-49 & 81. These statements of general pain cannot sustain an Eighth Amendment claim because they do not allege that Plaintiff suffered from "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d at 702. Therefore, these claims should be **dismissed.**FN8

> FN8. Plaintiff's other claims surrounding the alleged excessive use of force on May 19th remain. *See infra* Parts II.F & IV.

2. *Conditions of Confinement*

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)).

Plaintiff alleges the following conditions of confinement claims: (1) he was denied recreation on July 12, 13, and 15, 2007, Compl. at ¶ 2; (2) while on a multi-day visit to Albany Medical Hospital he was forced to wear the same clothes from September 2 through September 18, 2007, after being denied his "medical trip draft bag," Compl. at ¶¶ 7 & 10; (3) from September 12-13, 2007, he was forced to stay in a room without drinking water, Compl. at ¶ 8; and (4) he was denied all personal hygiene items from October 19-20, 2007, Compl. at ¶ 17.

With respect to Plaintiff's claim that he did not have drinking water in his cell for a 24-hour period from September 12-13, it unclear whether he is asserting that he did not have access to running water in his cell, or that he was completely denied water for a 24-hour period. Compl. at ¶ 8. To the extent Plaintiff intended to allege the former, a lack of access to running water, without more, does not constitute an Eighth Amendment violation, *James v.*

*Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (citation omitted); to extent Plaintiff intended to allege the latter, that claim is weakened by his statement that he was provided food on that date, but refused to eat it for fear that it was drugged, Compl. at ¶ 8. Thus, Plaintiff admits that he was not deprived of sustenance, even if he refused to accept it. Also, although Plaintiff alleges he was forced to wear the same clothes from September 2 through September 18, 2007, he does not allege that he was denied the opportunity to bathe or otherwise clean himself during that period.

*6 In sum, none of these deprivations are so serious as to constitute a denial of the "minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. at 297-99 (citation omitted). Plaintiff's claims amount to assertions that he was inconvenienced and perhaps discomforted for short periods of time, and are therefore *de minimis* and not cognizable under the Eighth Amendment, which only protects inmates from conditions that violate "contemporary standards of decency." *Hudson v. McMillan,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *see also, e.g., Hamilton v. Conway,* 2008 WL 234216, at *9 (W.D.N.Y. Jan.28, 2008) (stating that "briefly denying hygienic materials does not violate contemporary standards of decency"), *Ochoa v. Connell,* 2007 WL 3049889, at * 12 (N.D.N.Y. Oct.18, 2007) (citing cases for the proposition that the denial of recreation for a few days does not implicate the Eighth Amendment). Therefore, it is recommended that these claims be **dismissed.**

3. *Threats, Harassment, Excessive Force, and Sexual Abuse*

Plaintiff makes numerous allegations that various Defendants threatened, harassed, and subjected him to verbal abuse. Specifically, Plaintiff alleges that (1) on July 12, 2007, Fearchild threatened to issue a misbehavior report against him, Compl. at ¶ 1; (2) Defendant Bengmann threatened him on August 8, 2007, Compl. at ¶ 3; (3) on September 12, 2007, Defendant Green threatened to assault him, Compl. at ¶ 8; (4) on October 19, 2007, Defendant Crossman threatened to beat him up if he did not stop talking and then verbally abused Plaintiff with profane language and gestures, Compl. at ¶ 18; (6) on December 21, 2007, Defendants Tyrell, Lawrence,

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Poltlos, Frenyea, and other unnamed officers conspired to harass and provoke Plaintiff when they took his identification card, put him on keeplock, and improperly opened his legal mail, Compl. at ¶¶ 24-27; and (7) Defendant Poltlos threatened his life, pushed his face up against a wall, and made racial epithets against Plaintiff while escorting him to the mental health unit, Compl. at ¶¶ 28-29.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003) (citing *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996)); *Petway v. City of New York,* 2005 WL 2137805, at *3 (E.D.N.Y. Sept.2, 2005); *Larocco v. N.Y. City Dep't of Corr.,* 2001 WL 1029044, at *5 (S.D.N.Y. Aug.31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck,* 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)). Therefore, the aforementioned claims of threats and harassment should be **dismissed.**

**\*7** To the extent Plaintiff intends to assert a claim of excessive force against Defendant Poltlos for allegedly pushing his face up against a wall, that action does not rise to the level of an Eighth Amendment violation, especially when, as here, Plaintiff has not alleged he was in any way injured by the Defendant's actions. *See Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (internal citations omitted); *see also Govan v. Campbell,* 289 F.Supp.2d 289, 300 (N.D.N.Y.2003) (prisoner's claim that he was pushed up against a wall, even if true, did not amount to a constitutional violation).

Plaintiff has also brought claims of sexual and physical abuse against Defendants Ramsdell and Rokece. Compl.

at ¶¶ 11-14. Specifically, Plaintiff alleges that during a search of his person for contraband, Defendant Ramsdell grabbed and squeezed his penis,[FN9] and that Rokece pushed his face up against an iron rail. *Id.* at ¶¶ 11-12 & 14. Like Plaintiff's claim against Poltlos, his claim that Rokece pushed him against a rail, even if true, is *de minimis* and therefore fails to state a claim. *See Govan v. Campbell,* 289 F.Supp.2d at 300. As per Plaintiff's claim against Ramsdell, in some cases, "[s]exual abuse may violate contemporary standards of decency" so as to implicate the Eighth Amendment. *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997). However, the Second Circuit has made clear that allegations of minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. *Id.* In this case, Plaintiff has alleged a quick, isolated incident of inappropriate touching that occurred during a search of his person for contraband. Such an incident, even if true, does not constitute an Eighth Amendment violation. *Id.* (prisoner's allegation that a corrections officer inappropriately touched his penis on one occasion did not state a valid claim), *see also Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (prisoner's allegation that a corrections officer grabbed his penis during a pat frisk did not state a valid constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 373 & 375 (S.D.N.Y.2001) (squeezing an inmate's genitalia on several occasions during pat frisks did not constitute an Eighth Amendment violation).

FN9. Plaintiff does not allege that he was in any way injured when Ramsdell allegedly squeezed his penis.

Therefore, it is recommended that Plaintiff's allegations of sexual abuse, threats, excessive force, and harassment be **dismissed** for failure to state a claim.

### C. Due Process Claims

Plaintiff alleges that he suffered due process violations during a Parole Hearing held on January 15, 2008, and Disciplinary Hearings held in 2007 and 2008.

### 1. *Parole Hearing*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

Plaintiff alleges that on January 15, 2008, he had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, all Commissioners of the New York State Division of Parole. Compl. at ¶ 61. Plaintiff states that he informed those Defendants about all of the constitutional violations he had suffered during his incarceration, but that Defendants Loomis and Ferguson prevented Plaintiff from pleading his side of the case and disregarded his suffering. *Id.* On January 16, 2008, Plaintiff was denied parole by Loomis, Ferguson, and Ortloff; Plaintiff alleges that but for such denial, he would not have been assaulted on May 19, 2008. *Id.* at ¶ 62.

**\*8** As Defendants point out, the Second Circuit has held that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999) (citations omitted). Therefore, because Defendants Loomis, Ferguson, and Ortloff were acting as quasi-judicial officers when they allegedly improperly denied Plaintiff's parole, they are entitled to absolute immunity and the claims for damages [FN10] against them should be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(I), which gives the Court authority to dismiss a claim brought by a plaintiff proceeding *in forma pauperis* "at any time" if it determines such claim to be frivolous.

> FN10. Plaintiff does not ask for any other non-pecuniary form of relief against Defendants Loomis, Ferguson, and Ortloff. *See* Compl. at pp. 77-80.

### 2. *Disciplinary Hearings*

Plaintiff makes several due process claims concerning Disciplinary Hearings held on (1) November 21, 2007; (2) December 24, 2007; and (3) May 27 through June 19, 2008. Compl. at ¶¶ 21, 32, 58-60, 63(2), & 64. Plaintiff alleges that at the Disciplinary Hearing presided over by Defendant D. Kemp on November 21, 2007, Kemp prevented Plaintiff from presenting a defense by threatening him and stating that if Plaintiff did "it her

way[,] she [would] not give [him] any time and [would] dismiss the charges against [him]." *Id.* at ¶ 21. Plaintiff alleges Kemp found him guilty of smuggling and issued him a sentence of "counsel and release." *Id.*

Plaintiff alleges that on December 24, 2007, Defendant Lieutenant Miller presided as Hearing Officer over a Disciplinary Hearing during which Plaintiff was denied the opportunity to present evidence and testimony and that he was not given a written disposition of the Hearing. [FN11] *Id.* at ¶ 32. Plaintiff alleges that he was found guilty at the Hearing and sentenced to thirty (30) days keeplock. Plaintiff states that he filed a complaint with Defendant Racette requesting a new hearing, which was denied. *Id.*

> FN11. Plaintiff also alleges that he did not receive a written disposition after a Disciplinary Hearing held in November 2007. Compl. at ¶ 20. However, that claim is alleged only against Superintendent Bukeco, who is not a named Defendant in this action, and therefore, should be **dismissed** as Plaintiff has alleged no personal involvement on the part of any Defendant.

Finally, Plaintiff alleges that on May 27, 2008, Defendant Uhler presided over a Disciplinary Hearing on charges brought by Defendants Orzech and T. Carter stemming from the May 19, 2008 incident, at which Plaintiff was denied the opportunity to present witnesses and other evidence. *Id.* at ¶ 54. Plaintiff also alleges that such Hearing was adjourned to June 3, 2008, and then again to June 9, 2008, but he did not receive a copy of an extension form in either instance and was made to wait in SHU during those adjournments. *Id.* Plaintiff alleges that the Hearing reconvened on June 16, 17, and 19, 2008 before Defendant Uhler, during which time Plaintiff was again precluded from presenting evidence and Uhler allegedly improperly led the witnesses. *Id.* at ¶¶ 58, 63(2), & 64. Plaintiff also avers that he was improperly removed from the proceedings on June 16, 2008. *Id.* at ¶ 63(2). Plaintiff does not state what the outcome of the May 27-June 19, 2008 Disciplinary Hearing was, nor if he received any form of punishment after its disposition. *Id.* at ¶¶ 54 & 58-60.

**\*9** In order to state a procedural due process claim

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In this case, Plaintiff has alleged that he was sentenced to thirty (30) days keeplock after his conviction in the Disciplinary Hearing conducted on December 24, 2007. Courts in this Circuit have held that a 30 day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec.22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant); *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan.22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept.30, 2008) (30 days in SHU, without more, did not create a liberty interest); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan.22, 2008) (30 days in SHU does not create a liberty interest).

With respect to Plaintiff's allegations regarding the Disciplinary Hearings held on November 21, 2007 and from May 27, 2008, through June 19, 2008, Plaintiff does not allege that he suffered any atypical or significant hardship as a consequence of those alleged due process violations. To the extent Plaintiff intended to allege that his confinement in SHU during the pendency of his Hearing that went from May 27 through June 19, 2008,

was a due process violation, such a short period of confinement is not atypical and significant for the reasons mentioned above. Therefore, it is recommended that his due process claims be **dismissed** because he had failed to implicate a liberty interest with respect to any of the due process violations alleged.

**D. First Amendment Claims**

1. *Interference with Personal Mail*

Plaintiff alleges that the Defendants interfered with his outgoing and incoming mail. Plaintiff states that his family members sent him numerous letters, but that he did not receive any mail from family or friends from September 2005 through July 2008. Compl. at ¶¶ 63(1) & 65. Plaintiff also states that on January 15, 2008, his mother informed Deacon Debiec [FN12] that she had not received any of Plaintiff's letters. *Id.* at ¶ 63(1). Plaintiff alleges that he sent his daughter and her mother a certified letter while in Auburn in 2005, but that he never received the return receipt; he called his daughter's mother who informed him that she never received the letter. *Id.* at ¶¶ 75-76. Plaintiff accuses the Senior Mail Clerk at Auburn, Defendant J. Rice, of stealing his mail. *Id.* Also in 2005, Plaintiff allegedly sent complaint letters to the New York Department of State Ethics Commission and, having heard no response, sent another letter to the Ethics Commission asking if they received his complaints, to which they responded they had not. *Id.* at ¶ 77. Plaintiff accuses Defendant Rice of stealing those complaints. *Id.*

> FN12. Deacon Debiec is not a named Defendant in this action.

**\*10** Plaintiff alleges that from 2005 through March 24, 2007, he sent over two hundred (200) letters to his daughter and her mother, all of which were allegedly stolen by Defendant Quinn, a mail clerk at Upstate. *Id.* at ¶ 76. In addition, Plaintiff accuses Quinn of stealing letters he sent to DOCS' Rastafarian Priest Abuna A. Foxe in 2006, as well as a complaint of criminal misconduct sent to various government officers. *Id.* at ¶ 78.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

In March 2008, Plaintiff spoke with his father who advised him that he had not received any correspondence from Plaintiff for over three years, though Plaintiff alleges he sent his parents over sixty (60) letters between 2005 and 2008. *Id.* at ¶ 79. Plaintiff accuses Defendants Rice, Quinn, and Defendant Waldron, who is a Senior Mail Supply Clerk at Clinton, of obstructing his written communications to his family. *Id.*

As Plaintiff correctly contends, the First Amendment protects an inmate's right to send and receive both legal and non-legal mail, though that right may be limited by restrictions that are " 'reasonably related to legitimate penological interests.' " *Thornburgh v. Abbott,* 490 U.S. 401, 409, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (quoting *Turner v. Safley,* 482 U.S. 78, 79, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). However, Plaintiff's sweeping accusations that his incoming and outgoing mail was obstructed for a period of over three years does not assert a plausible claim under § 1983. *See Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868. Plaintiff's conclusory accusations that Defendants Rice, Quinn, and Waldron stole his incoming and outgoing mail appears to be based on nothing more than the fact that those Defendants were DOCS employees who worked in the mailrooms at Auburn, Upstate, and Clinton, respectively. Indeed, beyond his own suspicions, Plaintiff offers no factual allegations that link these Defendants to the alleged obstruction of his mail from 2005 through 2008. Therefore, we recommend that these claims be **dismissed** as conclusory.

### 2. *False Misbehavior Reports*

Plaintiff alleges that several Defendants filed false misbehavior reports against him. Some of those allegations include the additional claim that the false reports were filed in retaliation for the exercise of his First Amendment rights, some do not. We address first the claims that do not have the retaliation rider attached.

Plaintiff alleges that on October 19, 2007, Defendant Ramsdell, in an effort to cover-up staff misconduct, issued him a false Misbehavior Report accusing Plaintiff of carrying contraband in his crotch. Compl. at ¶ 15. Plaintiff also alleges that on December 22, 2007, Defendant Tyrell

filed a false Misbehavior Report accusing Plaintiff of threats in order to cover-up Tyrell's improper opening of Plaintiff's legal mail. *Id.* at ¶ 31. However, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d at 862 (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *see also Gill v. Riddick,* 2005 WL 755745, at *7 (N.D.N.Y. Mar.31, 2005). While an inmate may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g., Gill v. Riddick,* 2005 WL 755745 at *7, Plaintiff has not established that he was engaged in constitutionally protected conduct with respect to these claims. Therefore, it is recommended that these claims be **dismissed** for failure to state a claim and pursuant to 42 U.S.C. § 1915(g). *See supra* Part II.C.1.

**\*11** We now consider Plaintiff's claims that false misbehavior reports were filed against him with retaliatory animus. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

In this case, Plaintiff alleges that (1) at some point prior to August 8, 2007, Defendant Bezio submitted a letter of complaint Plaintiff had written to Defendant Bengmann of the DOCS Inspector General's Office in retaliation for a civil rights action Plaintiff had previously initiated against several DOCS officials, Compl. at ¶ 3; (2) on August 11,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

2007, Defendant Bengmann issued Plaintiff a false Misbehavior Report in retaliation for complaints Plaintiff had filed against several DOCS and New York State officials, Compl. at ¶ 3; (3) on October 21, 2007, Defendant Crossman filed a false Misbehavior Report against Plaintiff in retaliation for his filing a civil lawsuit against numerous DOCS officials, Compl. at ¶ 19; and (4) on December 22, 2007, Defendant Lawrence filed a false Misbehavior Report against Plaintiff in retaliation and in order to cover-up staff misconduct, Compl. at ¶ 30.

With respect to the first two claims listed above, Plaintiff alleges that on August 8, 2007, he spoke with Defendant Brian Bengmann, who told Plaintiff that Bezio had forwarded him a letter written by Plaintiff that allegedly included threats against the Upstate staff. *Id.* at ¶ 3. Plaintiff states that Bengmann produced a letter of complaint Plaintiff wrote to Defendant Woods about his medical issues, assaults he had endured, and his allegedly improper SHU confinement. *Id.* Plaintiff alleges that he received a Misbehavior Report on May 21, 2008, for sending that letter to Woods, and was eventually assessed ninety (90) days in SHU on that charge. Plaintiff states that notwithstanding the punishment he had already been assessed, Defendant Bezio sent his letter to Defendant Bengmann on August 8, 2007, in retaliation for a civil rights action he filed in federal court that Plaintiff has identified as 9:07-CV-0305.[FN13] Plaintiff alleges that he received a Misbehavior Report from Bengmann on August 21, 2007, in retaliation for a complaint Plaintiff filed against Defendant Richard Roy, former-Governor Eliot Spitzer, State Commission Chairman Daniel Stewart, DOCS Commissioner Defendant Brian Fischer, and Bezio. *Id.*

FN13. The Court takes judicial notice that Plaintiff has currently pending in the Northern District of New York another § 1983 action, *Excell v. Woods et al.,* civil action number 9:07-CV-305(GTS/GHL), in which he has brought claims against many of the same Defendants listed in this action, including Bezio.

*12 With respect to Bengmann, Plaintiff's claim that he wrote a false Misbehavior Report against Plaintiff because of complaints and lawsuits Plaintiff filed against other individuals is conclusory because Plaintiff fails to allege

a plausible causal connection between his protected conduct and Bengmann's allegedly false Misbehavior Report. Plaintiff himself alleges that Bengmann was acting on Plaintiff's letter of complaint that was forwarded to him by Bezio, a letter that was alleged to contain threats against DOCS officials. As per Bezio, the only retaliatory act Plaintiff has alleged is that he submitted Plaintiff's letter of complaint to Bengmann, who then authored a Misbehavior Report against Plaintiff. Thus, Plaintiff does not allege that Bezio took any adverse action directly against him. Therefore, it is recommended that these claims be **dismissed.**

Plaintiff's third and fourth retaliation claims listed above against Defendants Crossman and Lawrence, respectively, both suffer from the same deficiency: neither describes with any degree of specificity the constitutionally protected conduct that was the basis for the alleged retaliatory acts. *See id.* at ¶¶ 19 (alleging that Crossman filed a false Misbehavior Report against him "as retaliation against the Plaintiff for his inmate civil complaints against numerous fellow [DOCS] employees") & 30 (asserting no constitutionally protected conduct whatsoever). Therefore, it is recommended that these claims be **dismissed** as conclusory and pursuant to 42 U.S.C. § 1915(g).

### 3. *Access to the Courts*

In paragraph thirty-five (35) of his Complaint, Plaintiff appears to allege that he was denied access to the law library on May 8, 2008, but he does not state that any Defendant was personally involved in that alleged constitutional deprivation. *Id.* at ¶ 35. In paragraph sixty-six (66) of his Complaint, Plaintiff alleges in conclusory fashion that Brousseau destroyed several grievances he filed. Once again, this claim appears to be based on nothing more than Plaintiff's own supposition and speculation. Therefore, it is recommended that these claims be **dismissed.**

### E. Conspiracy Claims

Plaintiff brings several conspiracy claims that are difficult to decipher and to the extent they can be logically

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

interpreted, are wholly conclusory. Plaintiff alleges that Defendant Bezio (and perhaps Uhler and Boyea as well) was involved in a conspiracy to send Plaintiff to Upstate and to have him placed in a cell next to an inmate with whom Plaintiff would likely have fights. Compl. at ¶ 22. In another conspiracy claim, Plaintiff states his belief that Bezio was the mastermind behind the alleged May 19, 2008, attack against him because Plaintiff knew Bezio from Upstate and Defendants Bezio and Uhler had a history of working together against Plaintiff. *Id.* at ¶ 58. Finally, Plaintiff alleges that Defendants Fischer, LeClaire, Bezio, Artus, and Uhler conspired to subject Plaintiff to "religious harassment and discrimination and physical assault and the prison disciplinary proceeding[s] and [to] transfer [him] back to upstate." *Id.* at ¶ 81.

**\*13** All of the aforementioned conspiracy claims appear to be based solely on Plaintiff's own beliefs and conjecture and, in the absence of factual allegations, should therefore be **dismissed** as frivolous pursuant to 42 U.S.C. § 1915(g).

### F. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. at 1948, 173 L.Ed.2d 868.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report

or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

Aside from naming them as Defendants, Plaintiff has failed to make any factual allegations whatsoever against Defendants Roy, Knapp, Lucia, and Diaz. Also, Plaintiff's only mention of Defendant LeClaire is the conclusory claim that LeClaire was somehow involved in his alleged First and Eighth Amendment violations. Compl. at ¶ 81. Therefore, it is recommended that the Complaint be **dismissed** as against those Defendants.

Furthermore, because we have recommended dismissal of Plaintiff's underlying constitutional claims concerning mail theft, retaliation, medical indifference, conditions of confinement, and due process, his claims of supervisory liability against Defendants Woods, Bezio, Racette, Uhler, Wright, Johnson, Brousseau, Patnode, and Bellamy, for failure to remedy those alleged violations should also be **dismissed.** *See* Compl. at ¶¶ 10, 21-22, 32-34, 51, 58-59, 66-67, 72-73, & 79.

Defendants have not moved to dismiss Plaintiff's claims stemming from the alleged events of May 19, 2008, however, they argue that Defendants Artus and Fischer should be dismissed for lack of personal involvement. Defs.' Mot. at pp. 16-17. Plaintiff has alleged that prior to the alleged use of excessive force that occurred on May 19, 2008, he sent complaints to Artus and Fischer about his problems with Orzech and Orzech's alleged threat to assault him, and that such complaints were either ignored or not responded to, and therefore, Artus and Fischer failed to protect him. Compl. at ¶¶ 41, 44, 57, & 68.

**\*14** In order to state a valid failure to protect claim, a prisoner must demonstrate that the prison officials "acted

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin,* 942 F.2d at 113. The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove deliberate indifference, the plaintiff must show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998).* "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836.

In this case, Plaintiff alleges that Artus and Fischer were put on notice of the threat to his safety by his letters of complaint dated May 15, 17, and 18, 2008. Based on these allegations, we find that Plaintiff has stated a facially adequate claim for failure to protect. Therefore, we recommend against dismissal of these claims against Artus and Fischer. Similarly, Plaintiff has alleged that Defendants Warner and Rock were involved in a conspiracy to cover-up the alleged May 19th assault. Although we recommended dismissal of Plaintiff's medical indifference claims against Rock in Part II.B.1, *supra,* Plaintiff also alleges that Rock falsified his medical records in furtherance of the alleged conspiracy to violate his Eighth Amendment rights. Compl. at ¶¶ 48 & 70. Warner is alleged to have participated in the conspiracy by directing Defendant Tamer not to take any close-up pictures of Plaintiff's injuries after the assault. *Id.* at ¶ 48. Considering that Plaintiff's underlying excessive force claim has not been challenged, dismissal of his conjoining conspiracy claims would be premature at this stage. Therefore, it is recommended that these claims against Warner and Rock not be dismissed.

### G. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P. 4(m).[FN14] Failure to properly serve any

defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.*

> FN14. Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

In this case, there is no indication that the Defendants C.O. Green, Labetz, Ortloff, or Karen Bellamy have been served. *See* Dkt. Nos. 17, 54, & 66. Although courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R. CIV. P. 4(m), in this case, because Plaintiff's claims against Defendants Green, Ortloff, and Bellamy lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against Green, Ortloff, and Karen Bellamy be **dismissed.** With respect to Labetz, Plaintiff has alleged that he used excessive force against Plaintiff during the May 19, 2008 incident. Compl. at ¶ 63(1). Because Defendants have not moved to dismiss Labetz for failure to state a claim, we will afford Plaintiff *one final opportunity to effectuate service of process on Defendant Labetz. Plaintiff is forewarned that a failure to do so will result in the Court's recommendation of dismissal of his claims against Labetz.* The Court will afford Plaintiff *thirty (30) days from the date this Report-Recommendation is issued* to effectuate service upon Labetz.

### III. Plaintiff's Motion for a Preliminary Injunction

**\*15** On February 23, 2009, Plaintiff submitted a Motion for a Preliminary Injunction and Temporary Restraining Order seeking an order enjoining the Defendants from: interfering with his Rastafarian religious practices, physically assaulting him, confining him in SHU under the pretext of false misbehavior reports, denying him medical care, stealing his mail, and denying him access to the law library. Dkt. No. 57 at pp. 1-6.

In the Second Circuit, the standard for granting a temporary restraining order and a preliminary injunction

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

is the same. *See* FED. R. CIV. P. 65; *see also Local 1814 Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n Inc.,* 965 F.2d 1224, 1228 (2d Cir.1992).

In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either: (a) a likelihood of success on the merits of [the case], or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in [favor of the moving party].

*D.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (internal quotation marks and citation omitted).

Irreparable harm "means an injury for which a monetary award cannot bring adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The Second Circuit has held that the alleged violation of a constitutional right triggers a finding of irreparable injury. *See Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir.1996). Therefore, in cases involving alleged constitutional violations, the issue of irreparable harm merges with the question of success on the merits. *See Metropolitan Council, Inc. v. Safir,* 99 F.Supp.2d 438, 443 (S.D.N.Y.2000) (citation omitted).

Finally, when the injunction sought "will alter, rather than maintain the *status quo,*" or will "provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success. *Beal v. Stern,* 184 F.3d 117, 122-23 (2d Cir.1999) (citation omitted).

In this case, Plaintiff has failed to demonstrate either irreparable harm or a likelihood of success on the merits of his claims. Indeed, we have already recommended for dismissal the majority of Plaintiff's claims. In addition, Plaintiff's Motion for Preliminary Injunction is presented in conclusory fashion and, for the most part, simply repeats the accusations brought in his Complaint. Therefore, it is recommended that Plaintiff's Motion be **denied.**

## IV. CONCLUSION

For the reasons stated above, it is recommended that the majority of the aforementioned claims be dismissed. To clarify, should the district court adopt this Report-Recommendation, the following claims will remain: (1) excessive force and retaliation against Defendants Tamer, Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against Defendants Tamer, Orzech, T. Carter, Moak, Labetz, R. Rock, and Warner; (3) violation of Plaintiff's First Amendment right to practice religion against Orzech; and (4) supervisory liability against Artus and Fischer.

Therefore, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 59) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED,** that the following Defendants be **DISMISSED** from this action: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClair, Jr., Vonda Johnson, Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, Green, Ortloff (spelled "Oltloff" on the Docket), Karen Bellamy; [FN15] and it is further

FN15. To clarify further, should the District Court adopt this Report-Recommendation, the following Defendants shall remain as parties in this action: T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Artus, and Fischer.

**RECOMMENDED,** that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 57) be **DENIED;** and it is further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3111711 (N.D.N.Y.)
(Cite as: 2009 WL 3111711 (N.D.N.Y.))

**ORDERED,** that should the District Court adopt this Court's recommendation that Defendant Labetz not be dismissed from the action, the Clerk shall issue a Summons and forward it, along with a copy of the Complaint, to the United States Marshal for service upon Defendant Labetz. Plaintiff is warned that failure to effectuate service upon Labetz within ***thirty (30) days of the date this Report-Recommendation is issued*** will result in this Court recommending dismissal of his claims against Labetz; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2009.
Mortimer Excell v. Fischer
Slip Copy, 2009 WL 3111711 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony SHULER, Plaintiff,
v.
BROWN, et al., Defendant.
**No. 07-CV-0937.**

March 23, 2009.

West KeySummary
**Civil Rights 78** 🗝️ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation
and Parole. Most Cited Cases
An inmate failed to state a § 1983 claim for a violation of
his right to privacy. The inmate did not allege precisely
what medical information he believed that his counselor
had revealed to a corrections officer. Thus, the court could
not determine from the face of the complaint whether the
inmate suffered from an "unusual" condition that would be
protected by his right to privacy. Moreover, the inmate did
not allege that his condition, whatever it might be, was
revealed to other inmates. 42 U.S.C.A. § 1983.

Anthony Shuler, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., of Counsel,
New York, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This matter brought pursuant to 42 U.S.C. § 1983 was
referred to the Hon. George H. Lowe, United States
Magistrate Judge, for a Report-Recommendation pursuant
to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No
objections to the February 2, 2009
Report-Recommendation have been raised. After
examining the record, this Court has determined that the
Report-Recommendation is not subject to attack for plain
error or manifest injustice. Accordingly, this Court adopts
the Report-Recommendation for the reasons stated therein.
Defendant's motion for judgment on the pleadings is
GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to
42 U.S.C. § 1983, has been referred to me for Report and
Recommendation by the Honorable Thomas J. McAvoy,
Senior United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. Plaintiff Anthony Shuler alleges
that two employees of the New York State Department of
Correctional Services ("DOCS") [FN1] violated his
constitutional rights when one revealed statements he
made during a counseling session and the other, based on
that revelation, issued a misbehavior report that resulted in
a 60-day disciplinary sentence. (Dkt. No. 1.)

FN1. Plaintiff's complaint also named DOCS as
a defendant. (Dkt. No. 1 at ¶ I(B).) The Court
dismissed DOCS as a defendant upon initial
review of the complaint. (Dkt. No. 6.)

Currently pending is Defendants' motion for judgment on
the pleadings pursuant to Federal Rule of Civil Procedure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

12(c) FN2. (Dkt. No. 16.) After Defendants filed the pending motion, Plaintiff requested a voluntary dismissal without prejudice. (Dkt. No. 19.) The Court denied that request. (Dkt. No. 21.) Plaintiff has not opposed the pending motion despite having been granted an extension of time to do so and being advised of the consequences of failing to do so. (Dkt. No. 21.) Because I find that Plaintiff's complaint fails to state a cause of action, I recommend that Defendants' motion for judgment on the pleadings be granted.

> FN2. Defendants' memorandum of law suggests that the Court find the complaint "wholly insubstantial and frivolous" and dismiss it for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). (Dkt. No. 16-2 at 4-5.) That suggestion did not appear in the notice of motion, the title page of the memorandum of law, or the introduction to the memorandum of law. Accordingly, I decline Defendants' suggestion and will address Plaintiff's complaint solely under Federal Rule of Civil Procedure 12(c).

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Liberally construed, the complaint alleges as follows:

On August 25, 2006, Plaintiff went to see his Mental Health Unit counselor, Defendant V. Brown. (Dkt. No. 1 at ¶ II(D).) Thereafter, Defendant Brown informed Defendant Sergeant R.J. Ballard that Plaintiff had behaved inappropriately toward her. (Dkt. No. 1 at 16.) On September 25, 2006, Defendant Ballard issued a misbehavior report. The report stated that when Defendant Ballard interviewed Plaintiff about Defendant Brown's allegations, Plaintiff "began yelling 'I'll do or say what I want to these females. I'm 41 years old and I'll do what I want.' " (Dkt. No. 1 at 10.) After a Tier III hearing on the misbehavior report, Plaintiff was sentenced to 60 days of keeplock along with loss of commissary, package and phone privileges. (Dkt. No. 1 at 17.)

On October 19, 2006, Plaintiff filed an inmate grievance. (Dkt. No. 1 at 8.) He complained that Defendant Brown had revealed the contents of their September 25, 2006, counseling session to Defendant Ballard. Id. He requested that Defendant Brown "take or retake a course in patient confidentiality." Id. He also asked "to have no future female as my counselor, since it makes me feel very uncomfortable to deal with the other sex on that level." Id. The grievance was denied. (Dkt. No. 1 at 16.)

*2 Plaintiff appealed his disciplinary sentence. (Dkt. No. 1 at 11-13.) On November 27, 2006, after Plaintiff had completed his keeplock sentence, DOCS reversed the disciplinary sentence. (Dkt. No. 1 at 15.)

In his complaint, Plaintiff alleges that Defendants violated his civil rights by violating his right to privacy and unlawfully detaining him in keeplock. (Dkt. No. 1 at ¶ II(D).) Liberally construed, Plaintiff's complaint raises a right-to-privacy claim against Defendant Brown and procedural and substantive due process claims against Defendant Ballard. Plaintiff requests $1 million in damages. (Dkt. No. 1 at ¶ V.)

### B. Summary of Grounds in Support of Defendants' Motion For Judgment on The Pleadings

Defendants argue that (1) Plaintiff has not stated a right-to-privacy claim because he has not alleged that he suffers from a medical condition "unusual" enough to warrant privacy protection; (2) even if Plaintiff had alleged a cognizable privacy interest, the face of the complaint reveals that Defendant Brown's disclosure was reasonably related to legitimate penological interests; (3) the complaint fails to state a due process claim because the face of the complaint reveals that Plaintiff was granted a hearing and given the opportunity to rebut the charges against him FN3; and (4) they are entitled to qualified immunity. (Dkt. No. 16-2.) Because I find that the complaint fails to state a cause of action, I will not address Defendants' argument regarding qualified immunity.

> FN3. Defendants devoted only a four-sentence footnote to their argument regarding Plaintiff's due process claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

**II. ANALYSIS**

**A. First Basis for Dismissal: Facial Merit of Defendants' Unopposed Motion**

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion for judgment on the pleadings was properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(c).[FN4]

> FN4. *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion for judgment on the pleadings. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest."[FN5] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious."[FN6]

> FN5. *See, e.g.,* Ciaprazi v. Goord, 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex*

Corp. v. Catrett, 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord,* Saunders v. Ricks, 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), Smith v. Woods, 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also* Race Safe Sys. v. Indy Racing League, 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); Wilmer v. Torian, 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

> FN6. *See, e.g.,* Hernandez v. Nash, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1 [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M .J.); Hynes v. Kirkpatrick, 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, 2007 WL 894375, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); Sledge v. Kooi, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); Kele v. Pelkey, 03-CV-0170, 2006

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336, 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

Here, I find that Defendants have met their lightened burden on their unopposed motion given Defendants' cogent, and legally supported, legal arguments set forth in their memorandum of law. (Dkt. No. 16.) I note that this Court has, on numerous occasions, granted motions to dismiss based on a similar facial analysis of a defendant's legal arguments (and a plaintiff's claims).FN7

FN7. *See, e.g., Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Local Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 96-CV-1269, 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D .N .Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.); *Munoz v. Coombe,* 95-CV-1191, 1996 U.S. Dist. LEXIS 15107, at *3 (N.D.N.Y. Aug. 21, 1996) (Hurd, M.J.), *adopted by* 95-CV-1191, 1996 U.S. Dist. LEXIS 15108, 1996 WL 589369, at *2 (N.D.N.Y. Oct. 11, 1996) (Pooler, J.) (rejecting plaintiff's objections, explaining that "Local Rule 7.1(b) permits the court to grant an unopposed motion"); *Owens v. Long,* 95-CV-0604, 1996 U.S. Dist. LEXIS 6520, at *2 (N.D.N.Y. March 11, 1996) (Hurd, M.J.), *adopted by* 95-CV-0604, 1996 U.S. Dist. LEXIS 4807 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.).

*3 For these reasons, I recommend that the Court grant Defendants' motion for judgment on the pleadings.

**B. Alternative Basis for Dismissal: Substantive Merit of Defendants' Motion**

In the alternative, I recommend dismissal based on the sort of detailed scrutiny of Defendants' legal arguments that would be appropriate on a *conteste* d motion for judgment on the pleadings.

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. .,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);FN8 or (2) a challenge to the legal cognizability of the claim.FN9

FN8. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN9. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the mere requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, 2004 WL 2613993, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, 2002 WL 313156, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN10] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and

provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN12]

FN10. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN11. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN12. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN13] However, it is well established that even this liberal notice pleading standard "has its limits."[FN14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN15]

FN13. See, e.g., Swierkiewicz, 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN14. 2 Moore's Federal Practice § 12.34[1][b] at 12-61 (3d ed.2003).

FN15. See, e.g., Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); accord, Dura Pharm., 125 S.Ct. at 1634-1635, Christopher v. Harbury, 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 234-235 (2d Cir.2004), Gmurzynska v. Hutton, 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y., No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-Swierkiewicz decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, see Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after Swierkiewicz, of certain cases from within the Second Circuit interpreting Rule 8(a)(2). See Khan v. Ashcroft, 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of Domond v. INS, 244 F.3d 81 [2d Cir.2001],

after that case was "implicitly overruled by the Supreme Court" in INS v. St. Cyr, 533 U.S. 289 [2001] ).

Most notably, in the recent decision of Bell Atlantic Corporation v. Twombly, the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN16] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the plausibility of an actionable claim. Id. at 1965-74.

FN16. The Court in Bell Atlantic further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." Bell Atlantic, 127 S.Ct. at 1969.

*4 More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. Id. at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." Id . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. Id. at 1965 [citations omitted]. What this means, on a practical level,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).FN17 The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).FN18

FN17. *See, e.g., Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir.2008)* (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki, 07-CV-2537, 2008 U.S.App. LEXIS 2241, 2008 WL 269100, at *14 (2d Cir. Feb. 1, 2008)* (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations are enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98, n. 2 (2d Cir.2007)* ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007)* (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN18. *See, e.g., Jacobs v. Mostow, 281 F. App'x 85, 87 (2d Cir. March 27, 2008)* (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a

claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp., 521 F.3d 202, 215-16 (2d Cir.2008)* (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007)* [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson, 355 U.S. 41, 47 [1957] ).* That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.FN19 There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN19. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN20] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*[FN21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN20. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN21. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

**\*5** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN26]

FN22. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia*, *Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. See *Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN23. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN24. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN25. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN26. *Cuoco,* 222 F.3d at 112 (finding that

repleading would be futile) [citation omitted]; *see also* *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See* *Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [FN27] it does not completely relieve a *pro se* plaintiff of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. FN28 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. FN29 Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended." FN30

FN27. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008)* ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN28. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN29. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to

comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN30. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

1. *Privacy*

a. *Cognizable privacy interest*

Plaintiff alleges that Defendants violated his right to privacy. (Dkt. No. 1 at ¶ II(D).) Defendants argue that Plaintiff has not stated a cause of action. (Dkt. No. 16-2 at 5-7.) Defendants are correct.

There is a constitutional right of privacy FN31 that protects the individual interest against disclosure of personal matters such as one's medical condition. *Whalen v. Roe,* 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), the Second Circuit applied *Whalen* to hold that individuals who are HIV positive "clearly possess a constitutional right to privacy regarding their condition." The Second Circuit has extended this protection to prisoners. *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). These decisions do not create an absolute right of privacy regarding a prisoner's medical condition. Rather, the prisoner's privacy interest will vary with the prisoner's medical condition. *Id.* at 111; *Doe v. City of New York,* 15 F.3d at 267. This privacy interest is at its zenith when the prisoner suffers from an "unusual"

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

condition, such as HIV or transsexualism, that is "likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell,* 175 F.3d at 111. Courts have refused to recognize a protected privacy interest where a prisoner's medical condition is not "unusual." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003). Courts have also refused to recognize a protected privacy interest where there is no evidence that a prisoner's condition was revealed to other inmates. *Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000) [FN32].

> **FN31.** The Supreme Court has ruled that "a right to privacy ... [is] derived from the Fourteenth Amendment or the 'penumbra' of other constitutional rights." *Webb v. Goldstein,* 117 F.Supp.2d 289, 296 (E.D.N.Y.2000) (citing *Whalen v. Roe,* 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)).

> **FN32.** Defendants have not cited, and the Court has not found, authority specifically addressing the standard to be applied where a prison mental health official allegedly reveals statements made by a prisoner during a counseling session. However, the logic underlying the disclosure-of-medical-condition cases-that prisoners have a reduced right to privacy that arises only in unusual situations, such as those that implicate a prisoner's safety-is applicable here.

**\*6** Here, Plaintiff has not alleged precisely what medical information he believes Defendant Brown revealed. He states that "the contents" of his August 25, 2006, session with Brown were disclosed and that "the information released was not a threat to the facility, staff or the inmate population." (Dkt. No. 1 at 8.) Thus, this Court cannot determine from the face of the complaint whether Plaintiff suffers from an "unusual" condition that would be protected by his right to privacy. Moreover, Plaintiff does not allege that his condition, whatever it may be, was revealed to other inmates. Therefore, Plaintiff has not alleged a cognizable privacy interest.

b. *Legitimate penological interest*

Even if Plaintiff had alleged a cognizable privacy interest, his right to privacy claim would be subject to dismissal for failure to state a claim because the face of the complaint reveals that Defendant Brown had a legitimate penological interest in revealing information from her counseling session with Plaintiff.

Prison officials may reveal a prisoner's medical condition, even an "unusual" medical condition that is protected by the zenith of the prisoner's right to privacy, if the disclosure is "reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112. A court can determine whether a prison official's actions were "reasonably related to legitimate penological interests" on a motion to dismiss. See e.g. *Webb v. Goldstein,* 117 F.Supp.2d 289 (E.D.N.Y.2000).

Here, the face of the complaint reveals that Defendant Brown had legitimate penological reasons for revealing information from her session with Plaintiff. During the session with Defendant Brown, Plaintiff allegedly engaged in "inappropriate sexual behavior/conduct." (Dkt. No. 1 at 10.) Reporting this incident to a correctional officer was reasonably related to the legitimate penological interest of protecting prison personnel from potential threats. See e.g. *Choice v. Coughlin,* No. 94 Civ. 8307, 1996 WL 325627 (S.D.N.Y. June 11, 1996) (prisoner's letter regarding his romantic feelings for a civilian medical employee at prison was "fundamentally inconsistent with the legitimate penological interests of the facility" because it presented "a potential threat to the safety and security of [the employee] and other prison staff.").

Therefore, it is recommended that Plaintiff's cause of action for invasion of his right to privacy be dismissed.

2. *Due Process*

Plaintiff does not explicitly allege that Defendants violated his due process rights. However, the complaint states that Defendant Ballard "wrote up a fabricated misbehavior report that led to me being sentenced to 60 days of keeplock." (Dkt. No. 1 at ¶ II(D).) Liberally construing the

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

complaint, I have deemed this to be a claim that Defendants violated Plaintiff's procedural and substantive due process rights.

a. *Procedural due process*

In order to state a claim for violation of his procedural due process rights, Plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

**\*7** As Defendants note, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, \*5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 WL 965345, at \*8 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted]. Here, Plaintiff does not claim that the misbehavior report was issued in retaliation for Plaintiff's exercise of a constitutional right. Accordingly, the complaint does not state a claim for a procedural due process violation based on the filing of an allegedly false misbehavior report.

The complaint could also be construed as stating a procedural due process claim based on the length of Plaintiff's keeplock detention. Although Defendants did not address this claim, I will do so *sua sponte* under 28 U.S.C. § 1915(e)(2). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU [FN33]." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

> FN33. Although keeplock confinement and SHU confinement are not identical detention statuses, the Second Circuit has applied the same procedural due process analytical framework to both. See e.g. *Palmer v. Richards,* 364 F.3d 60, 66-67 (2d Cir.2004).

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN34]." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64-65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

> FN34. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

**\*8** Here, Plaintiff alleges that he served 60 days in keeplock. Accordingly, a protected liberty interest is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. Plaintiff has alleged no such conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes"); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff has not sufficiently alleged that his confinement in keeplock deprived him of a protected liberty interest.

District courts in the Second Circuit are split on whether a prisoner can state a procedural due process cause of action when he alleges that he served less than 101 days in the SHU but does not allege conditions more severe than normal SHU conditions. Compare *Gonzalez-Cifuentes v. Torres,* No. 9:04-cv-1470 GLS/DRH, 2007 WL 499620, at * 3 (N.D.N.Y. Feb.13, 2007) ("The Second Circuit has held that at least where the period of confinement exceeded thirty days, refined fact-finding is required to resolve defendants' claims under *Sandin.* No such fact-finding can occur ... on a motion to dismiss") and *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions ... However, such detailed factual allegations are not necessary to withstand a motion to dismiss ... Since Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest") with *Alvarado v. Kerrigan,* 152 F.Supp.2d 350 (S.D.N.Y.2001) (granting motion for judgment on the pleadings where prisoner's allegations about the conditions of his 93-day SHU confinement failed to "elevate his confinement to the level of deprivation required under *Sandin* ); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec.2, 2004) (granting motion to dismiss with leave to amend because plaintiff's "due process claim arising out of two months' confinement in the SHU ...

cannot survive the *Sandin* test absent further allegations") *Tookes v. Artuz,* No. 00 Civ. 4969 RCC HBP, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("No such additional egregious circumstances are pled here. Indeed, the complaint is devoid of any allegations regarding the circumstances of plaintiff's confinement. Nor has [plaintiff] responded to the defendants' motion in order to provide further detail. Therefore, dismissal of plaintiff's due process claims is appropriate"); and *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at *5 (S.D.N.Y. May 17, 2000) (dismissing case with prejudice where the complaint contained "no allegations whatever regarding the conditions of [prisoner's 66-day] confinement."). The Second Circuit has never addressed this issue directly [FN35].

> **FN35.** While the Second Circuit has stated that "development of a detailed record will assist appellate review" of SHU cases and that "development of a detailed record of the conditions of the confinement relative to ordinary conditions is required," it has done so only in cases involving "intermediate" SHU confinements of 101 to 305 days. *Colon,* 215 F.3d at 232; *Palmer,* 364 F.3d at 64-65. Even in this "intermediate" context, where a detailed record is "required," the Second Circuit has not remanded a case for further development of the record absent an allegation of severe SHU conditions. For example, in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007), the plaintiff was confined to a super-restrictive housing unit for six months. He sued, arguing in part that his procedural due process rights were violated. The defendants moved to dismiss. The district court denied the motion, finding that the plaintiff had alleged the deprivation of a liberty interest. The defendants brought an interlocutory appeal. The Second Circuit affirmed, finding that "the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement, which he *sufficiently alleges* to have been severe." *Iqbal,* 490 F.3d at 163 (emphasis added).

**\*9** The undersigned agrees with the *Alvarado, Sales, Tookes,* and *Prince* courts that a motion to dismiss can be

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions. The undersigned adopts this view for two reasons. First, as discussed at length above, Rule 8 requires that a complaint include factual allegations that raise a right to relief above the speculative level to the plausible level. Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative. Second, the Second Circuit's manner of reviewing motions to dismiss in SHU confinement cases suggests that dismissal is the better course. In its cases, the Second Circuit has focused on the *content* of the prisoner's allegations regarding SHU conditions rather than establishing a bright-line rule that a determination of whether conditions were "atypical and significant" cannot be resolved on a Rule 12(b)(6) motion. For example, in *Ortiz,* the district court granted the defendants' motion to dismiss a case in which a prisoner complained of a 90-day SHU confinement. The Second Circuit reversed, not because the *Sandin* issue can never be decided at the motion to dismiss stage, but because *the prisoner had alleged the existence of "conditions in SHU far inferior to those prevailing in the prison in general."* *Ortiz,* 380 F.3d at 655 (emphasis added). Plaintiff's bare allegation that his procedural due process rights were violated by his 60-day keeplock confinement is insufficient to state a claim. Therefore, I recommend that Plaintiff's procedural due process claim be dismiss with leave to amend.

b. *Substantive due process*

Given the special solicitude due to *pro se* civil rights plaintiffs, I have deemed the complaint to include a substantive due process claim and will address it *sua sponte* under 28 U.S.C. § 1915(e)(2). Defendants have not addressed any possible substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin,* 515 U .S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a prisoner from disciplinary confinement may violate the prisoner's right to substantive due process. *Johnson v. Coughlin,* No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

*10 Plaintiff's complaint does not allege facts plausibly suggesting that Defendants' actions were arbitrary, conscience-shocking or oppressive in the constitutional sense. As discussed above, the complaint does not indicate that Plaintiff was held in unusual keeplock conditions. Moreover, Plaintiff does not allege that Defendants refused to obey a state court order to release him from disciplinary confinement. Therefore, the complaint fails to state a claim for violation of Plaintiff's right to substantive due process and I recommend that the claim be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 16) be *GRANTED* with leave to amend.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790973 (N.D.N.Y.)
(Cite as: 2009 WL 790973 (N.D.N.Y.))

been, but was not, presented to the Magistrate Judge in the first instance. [FN36]

FN36. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Shuler v. Brown
Slip Copy, 2009 WL 790973 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
No. 07-CV-2634 (JFB)(ARL).

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A**  2547.1

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)3 Proceedings
    170Ak2547 Hearing and Determination
     170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A**  25

170A Federal Civil Procedure
 170AI In General
  170AI(B) Rules of Court in General
   170AI(B)1 In General
    170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A**  2547.1

170A Federal Civil Procedure
 170AXVII Judgment
  170AXVII(C) Summary Judgment
   170AXVII(C)3 Proceedings
    170Ak2547 Hearing and Determination
     170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[4] Federal Civil Procedure 170A** ☞ **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

**[5] Attorney and Client 45** ☞ **62**

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **657.5(1)**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

**Federal Civil Procedure 170A** ☞ **2546**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

**[6] Civil Rights 78** ☞ **1304**

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

**[7] Prisons 310** ☞ **317**

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[8] Prisons 310** ☞ **313**

310 Prisons

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
310II(H) Proceedings
310k307 Actions and Litigation
310k313 k. Trial. Most Cited Cases

Whether administrative remedy was available to prisoner in a particular prison or prison system, and whether such remedy was applicable to grievance underlying prisoner's suit, for purpose of PLRA's exhaustion requirement, are not questions of fact; rather, such issues either are, or inevitably contain, questions of law. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[9] Civil Rights 78 ☞ 1319**

78 Civil Rights
78III Federal Remedies in General
78k1314 Adequacy, Availability, and Exhaustion of State or Local Remedies
78k1319 k. Criminal law enforcement; prisons. Most Cited Cases

Sheriff and prison medical staff provided no evidence that an administrative remedy was available to inmate who suffered from end state renal disease, and who sought, but did not receive, medical testing to determine if he was a candidate for kidney transplant, and thus inmate's § 1983 action alleging violations of Eighth Amendment would not be dismissed for his failure to exhaust administrative remedies under PLRA; defendants failed to establish procedural framework for grievance resolution at the prison or the availability of any administrative remedies for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

**[10] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Test for determining whether prison official's actions or omissions rise to level of "deliberate indifference" in violation of the Eighth Amendment, as will allow recovery by prisoner in federal civil rights action, is twofold: first, prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and second, prisoner must demonstrate that defendant prison officials possessed sufficient culpable intent. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[11] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1533 k. Deliberate indifference in general. Most Cited Cases

Second prong of test for determining whether prison officials acted with deliberate indifference to rights of prisoners in violation of the Eighth Amendment, that of "culpable intent," in turn involves two-tier inquiry; specifically, prison official has sufficient culpable intent if he has knowledge that inmate faces substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate harm. U.S.C.A. Const.Amend. 8.

**[12] Sentencing and Punishment 350H ☞ 1546**

350H Sentencing and Punishment
350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical care and treatment. Most Cited Cases

Mere fact that an inmate's underlying disease is a "serious medical condition" does not mean that prison staff's allegedly incorrect treatment of that condition automatically poses an "objectively serious health risk," in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[13] Prisons 310 ☞ 192**

310 Prisons
310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In general. Most Cited Cases

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H**  🗝   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310**  🗝   **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H**  🗝   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H**  🗝   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310**  🗝   **192**

310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H**  🗝   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A**  🗝   **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H ☞ 1546

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 ☞ 1355

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 ☞ 1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A ☞ 2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 ⌐══   1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A ⌐══   2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
***347** Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

***348** MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

I. FACTS

[1][2][3] The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also* *Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving **349 at the NCCC,**[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.
(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352 an opposition to the motion on August 3 and August 11, 2009. [FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Reiseck v. Universal Commc'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. See Huminski v. Corsones, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir.2004); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, the "mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.1984) (quoting SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir.1996) (quoting Research Automation Corp., 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding pro se, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." Weixel v. Bd. of Educ. of the City of N.Y., 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir.2000)). Though a pro se litigant's pleadings and other submissions are afforded wide latitude, a pro se party's conclusory assertions, completely unsupported *353 by evidence, are not sufficient to defeat a motion for summary judgment. Shah v. Kuwait Airways Corp., 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a pro se party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting Auguste v. N.Y. Presbyterian Med. Ctr., 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under 42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has a bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception. Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also Espinal,* 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." *See Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." *Id.* at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.FN12 Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. *See id.* at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that *Abney,* 380 F.3d 663, was decided before *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- *Woodford.* However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** *Hayes,* 84 F.3d at 620 (internal citation omitted); *see also* *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In *Salahuddin v. Goord,* the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); *see also* *Jones v. Westchester County Dep't of Corr. Medical Dep't,* 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

2. Application

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

a. Medication Dosage

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription **359 of medication for plaintiff's renal disease.

i. Objective Prong

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardener,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle,* 429 U.S. at 107, 97 S.Ct. 285)); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

### b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

### i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. *See Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); *Hathaway v. Coughlin,* 37 F.3d 63, 67 (2d Cir.1994); *see also Sereika v. Patel,* 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

### ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (*see* Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective. [FN19] (*See, e.g.,* Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (*See* Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (*See* Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s **364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five hours-in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003)* ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly, 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009)* ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to **366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all

reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright, 386 F.3d 432, 437-38 (2d Cir.2004)* ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna, 386 F.3d at 437* (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright, No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007)* ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna, 386 F.3d at 437*)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

## V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

**REPORT-RECOMMENDATION** [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

**I. INTRODUCTION**

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

**II. BACKGROUND**

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

**III. FACTS** [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir.1994).* The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e); see Smythe v. American Red Cross Blood Services Northeastern New York Region, 797 F.Supp. 147, 151 (N.D.N.Y.1992).*

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); Haines v. Kerner, 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972).* Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990).* With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994).* Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (quoting Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).*

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d (1976).* Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (quoting *Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)* (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (quoting *Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).*

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins, 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988).* By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle, 429 U.S. at 103, 97 S.Ct. at 290.* The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See *Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See *Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

*6 WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

 Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, et al., Defendants.
**Civil Action No. 9:05-CV-01479 (NAM/DEP).**

Aug. 11, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services ("DOCS"), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and

subjected to a lengthy period of disciplinary special housing unit ("SHU") confinement as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment. As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor on any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

*I. BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those discrepancies will be noted.

At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ___."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See* Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

**\*2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call out passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line and, when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting

stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17. After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

**\*3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) .[FN2] *See* Amended Complaint (Dkt. No. 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS.[FN3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

FN2. Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended

Complaint (Dkt. No. 19), at ¶ 4.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

**\*4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits.[FN4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

> FN4. Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee ("TAC"). See *Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at *3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. See generally *Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); see also *Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at *2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N .Y. Civil Practice Law and Rules further challenging that disciplinary determination.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006.[FN5] See Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection.[FN6,FN7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

> FN5. From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

> FN6. The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. See Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. See *Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

> FN7. In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. See, e.g., *Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint.[FN8] *See generally* Plaintiff's Motion (Dkt. No. 56).

> FN8. Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

**\*5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

III. *DISCUSSION*

*A. Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

B. *Excessive Force*

**\*6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and

wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

**\*7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. *See Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at \*9 (N.D.N.Y.2007) (McAvoy, S.J.).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up".[FN9]

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[FN10] *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (same); *see also Panetta v. Crowley,* 460 F.3d 388, 394 (2d Cir.2006) (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

FN9. While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D .N.Y.2003). As one court has noted,

Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).

*Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

FN10. The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer, again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

*C. Deliberate Indifference*

**\*8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, "sufficiently serious." " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

**\*9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [FN11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death. [FN12] Even crediting plaintiff's claims concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N .Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D .N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

FN11. In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See,*

*e.g., Caidor,* 2007 WL 2847229, at *8.

FN12. In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's allegedly serious medical needs.

*10 In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

D. *False Misbehavior Report*

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased.[FN13] Those involved in this cause of action include defendants Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

FN13. Plaintiff also argues that the hearing did

not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedova v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

**\*11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 24, 1993) (Hurd, M.J) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris, 1993 WL 328199, at *6* (citing

*Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses.[FN14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

> [FN14]. In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

**\*12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995)) (hearing officer need not make independent evaluation of the basis for refusal to testify)). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast* *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

**\*13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See* *Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See* *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must only be sufficiently impartial as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honesty and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See* *Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky.[FN15]

FN15. In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

### F. *Equal Protection*

In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

**\*14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

### G. *Conspiracy*

Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

### IV. *SUMMARY AND RECOMMENDATION*

The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff has not alleged or proven the existence of a serious medical need

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law.[FN16] Accordingly, it is hereby

FN16. In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

*15 RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Alvin PETERSON, Plaintiff,
v.
Sheryl MILLER, Nurse Practitioner; and Nurse Admin.
Tousignant, Nurse Administrator, Defendants.
**No. 9:04-CV-797.**

July 13, 2007.

Alvin Peterson, East Elmhurst, NY, pro se.

Stephen M. Kerwin, Esq, Michael G. McCartin, Esq.,
Assts. Attorney General, of Counsel, Hon. Eliot Spitzer,
Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Department of Law, Albany, NY, for
Defendants.

**DECISION and ORDER**

DAVID N. HURD, United States District Judge.

**\*1** Plaintiff brought this civil rights action pursuant to 42
U.S.C. § 1983. By Report-Recommendation dated April
27, 2007, the Honorable David E. Peebles, United States
Magistrate Judge, recommended that the defendants'
motion for summary judgment be granted and that
plaintiff's complaint be dismissed in all respects. No
objections to the Report-Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Treece, the
Report-Recommendation is accepted and adopted in
whole. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is
GRANTED; and

2. Plaintiff's complaint is DISMISSED in all respects.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Alvin Peterson, a former New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. § 1983
complaining of the deprivation of his constitutional rights.
Plaintiff asserts that while incarcerated, he was denied
adequate medical treatment by the defendants, both of
whom were nurses at the facility in which he was confined
at the relevant times, for kidney pain and a foot rash, and
denied the migraine medication of his choice, in violation
of his Eighth Amendment right to be free of cruel and
unusual punishment.

Currently pending before the court is a motion by the
defendants for summary judgment dismissing plaintiff's
complaint, both on the merits and based upon qualified
immunity. Having carefully considered the record in light
of defendants' motion and finding that it presents no
genuine issue of material fact for trial, I recommend that
defendants' motion, which plaintiff has not opposed, be
granted.

I. *BACKGROUND*[FN1]

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

FN1. In light of the procedural posture of this case, the following facts are presented in a light most favorable to the plaintiff, the non-moving party. *See Samuels v. Mockry,* 77 F.3d 34, 35 (2d Cir.1996). In this instance, the court's findings of fact are also informed by defendants' statement pursuant to Northern District of New York Local Rule 7.1(a)(3), the contents of which are assumed to be true as a result of plaintiff's failure to oppose defendants' motion. *See* pp. 9-11, *post.*

At the times relevant to his complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and confined within the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Plaintiff was released from DOCS custody on July 7, 2004.

While at Clinton, plaintiff was treated over time for a variety of medical ailments including, *inter alia,* complaints of pain in the area of his kidney, a foot rash condition which has on occasion been described as athlete's foot, and migraine headaches. Among the medical personnel at Clinton who have acted as plaintiff's care providers are defendants Sheryl Miller, a nurse practitioner, and Amy Tousignant, who at the relevant times served as a nurse administrator.[FN2]

FN2. Defendant Tousignant, a registered nurse, is currently employed by the DOCS as Supervisor of Utilization Management and Quality Improvement. Tousignant Decl. (Dkt. No. 25) ¶ 1.

A. *Kidney Pain*

According to his medical records, plaintiff complained to prison medical personnel of pain, the origin of which is not disclosed, in his right flank or kidney area on eleven separate occasions between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. On November 30, 2001, plaintiff lodged his fourth such complaint, describing his symptoms as including a "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128. Plaintiff was seen by a prison doctor several times for evaluation of his complaints of kidney pain, and was provided with Motrin to address his discomfort. *See, e.g., id.* at pp. 128, 133, 144, 171. X-rays taken in or about July of 2002 were reviewed by a consulting radiologist, Dr. M. Browman, M.D., D.A.B.R., who concluded that plaintiff had "no suspicious calcifications" and a normal bowel gas pattern. *Id.* at p. 92. Plaintiff's x-rays were characterized by Dr. Browman as "normal abdominal radiographs." *Id.*

B. *Foot Rash*

**\*2** The record, including plaintiff's complaint, reveals that Peterson suffered from a chronic foot rash condition over at least the last two and one-half years of his incarceration as a New York State inmate. *See, e.g.,* Complaint (Dkt. No. 1) ¶ 7. Early on, plaintiff's foot rash condition was treated principally with Hydrocortisone cream, administered on a minimum of fifteen occasions between August 9, 2001 and January 30, 2004. Miller Decl. (Dkt. No. 25) ¶ 8 and Exh. A at pp. 138-40, 155, 158. Plaintiff was also provided with Vitamin E lotion for his condition at least eight times during 2003 and 2004. *See, e.g., id.,* Exh. A at pp. 160-62, 166.

In addition to these nonprescription remedies, plaintiff was prescribed at least four different types of medication to help combat his foot condition. Miller Decl. (Dkt. No. 25) ¶ 9. On July 5, 2002, defendant Miller initially prescribed Selenium Sulfide (2.5% strength), a prescription medication used to treat tinea versicolor, a type of fungal infection of the skin. *Id.* ¶ 9. Plaintiff reported on August 29, 2002 that the Selenium Sulfide had completely relieved his itch, although he continued to experience a rash on his feet. Miller Decl. (Dkt. No. 25) Exh. A at p. 144. Three other prescription medications were subsequently administered in an effort to control plaintiff's foot condition, including 1) Temovate, a medication designed to relieve skin itching and inflammation of moderate to severe degrees; 2) Itraconazole, a drug utilized to combat fungal infections including aspergillosis, blastomycosis, histoplasmosis, and fungal infection localized to the toenails and fingernails (onychomycosis); and 3) Lamisil, another anti-fungal prescription medication used to combat foot conditions. *Id.* ¶ 10 and Exh. A at pp. 186, 193.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

C. *Migraine Headache Medication*

The third element of plaintiff's deliberate medical indifference claim relates to the discontinuance of Fioricet, described as a strong, non-narcotic pain reliever used for relief of tension headache symptoms caused by muscle contractions in the head, neck and shoulder area. Miller Decl. (Dkt. No. 25) ¶ 12. The drug Fioricet contains butalbital, a sedative barbiturate, and acetaminophen, a non-aspirin pain reliever, as well as caffeine. *Id.*

Prison officials, including defendant Miller, prescribed Fioricet to the plaintiff on several occasions prior to March 29, 2004. *See, e.g.,* Miller Decl. (Dkt. No. 25) Exh. A at pp. 146, 153, 186. After learning on March 29, 2004 that plaintiff had accumulated four tablets of Fioricet on his person, while asking medical personnel for yet another two tablets of the same medication, and, upon further investigation, learning that another inmate locked in the same area as plaintiff had thirty Fioricet tablets stockpiled in his cell, security staff at Clinton requested that medical personnel discontinue providing the drug to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 13. Defendant Miller and other medical personnel complied, substituting instead a prescription for Motrin 600 mg, a pain reliever much more potent than the over-the-counter medication known by the same name, to address plaintiff's headaches. *Id.* ¶ 14 and Exh. A. at p. 191.

**\*3** A month later, on May 4, 2004, defendant Miller prescribed Naproxen, a non-steroidal anti-inflammatory drug utilized for the management of moderate pain, fever, and inflammation through reduction of levels of prostaglandins, for plaintiff's migraine headaches. Miller Decl. (Dkt. No. 25) ¶ 15. Following complaints by the plaintiff that the Naproxen was not working well to control his migraine headaches, defendant Miller replaced that drug with Inderal, a medication specifically designed for the treatment of migraine headaches, among other ailments. *Id.* ¶ 16 and Exh. A at p. 193. Plaintiff continued on the Inderal migraine medication until shortly before leaving DOCS custody. *Id.* at ¶ 16 and Exh. A at p. 197.

One of plaintiff's complaints concerns the failure of prison officials to resume his Fioricet as recommended by a cardiac consultant following its discontinuance. That portion of plaintiff's complaint relates to a consultation which occurred on June 2, 2004, at defendant Miller's recommendation, resulting in a report that the cardiologist "would [discontinue] Inderal & resume Norvasc 5 QD & Fioricet." FN3 Miller Decl. (Dkt. No. 25) Exh. A at p. 87. That recommendation was not followed in light of the finding of security personnel at the facility regarding plaintiff's "saving" of Fioricet tablets for later use and suspected conveyance of Fioricet tablets to a fellow inmate. Miller Decl. (Dkt. No. 25) ¶ 18 and Exh. A at p. 187.

> FN3. Norvasc is a medication used to treat high blood pressure and angina. Miller Decl. (Dkt. No. 25) ¶ 17.

II. *PROCEDURAL HISTORY*

After exhausting available administrative remedies, plaintiff commenced this action on July 8, 2004. Dkt. No. 1. Plaintiff's complaint asserts three separate causes of action, all of which relate to defendants' alleged failure to provide him with proper medical treatment for his various medical conditions. Named as defendants in the action are Nurse Practitioner Sheryl Miller, and Nurse Administrator Amy Tousignant. *Id.* ¶ 3. As relief, plaintiff seeks recovery of $750,000 in compensatory damages and $1,500,000 in punitive damages. *Id.*

On March 27, 2006, following the close of discovery, defendants moved seeking the entry of summary judgment dismissing plaintiff's complaint. Dkt. No. 25. In their motion, defendants argue that 1) plaintiff's deliberate indifference claim is legally deficient, based both on the lack of a showing that he suffered from a serious medical condition and his failure to establish that either of the defendants was deliberately indifferent to any such condition; 2) plaintiff has failed to demonstrate the personal involvement of defendant Tousignant in the matters complained of; and 3) in any event, both defendants are entitled to qualified immunity. *Id.* Defendants' motion, which plaintiff has not opposed, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).FN4

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

FN4. A prior action brought by the plaintiff in this court pursuant to 42 U.S.C. § 1983 against various DOCS employees at Clinton, *Peterson v. Lacy, at al.,* 9:03-CV-1226 (DNH/RFT) (N.D.N.Y., filed 2003), was dismissed, on recommendation of United States Magistrate Judge Randolph F. Treece, on February 27, 2006, based upon plaintiff's failure to comply with the requirement that he notify the court of any change of address. 9:03-CV-1226, Dkt. Nos. 52, 54; *see also* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b). In this case, plaintiff similarly has failed to notify the court of any change of address since his apparent release from DOCS custody. Based upon information received in connection with 9:03-CV-1226, the court has nonetheless adjusted its records to reflect a current address for the plaintiff in East Elmhurst, New York. It appears from correspondence forwarded in the *Peterson v. Lacy* case to the plaintiff at that address but returned as undeliverable, *see* 9:03-CV-1226, Dkt. No. 63, however, that plaintiff may have again moved without notifying the court and defendants' counsel of his change of circumstances, thereby making it impossible for the court to communicate with him regarding his action and, if true, providing an independent basis for dismissal of his complaint. *See* Northern District of New York Local Rules 10.1(b)(2) and 41.2(b).

III. *DISCUSSION*

A. *Failure to Respond*

**\*4** The first issue to be addressed is the legal significance, if any, of plaintiff's failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal based upon their motion.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown. N.D.N.Y.L.R. 7.1(b)(3).

While recognizing that *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, *see Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N .Y.1997)* (McAvoy, C.J.), courts in this district have found it appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3) based upon a pro se plaintiff's failure to respond. *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, D.J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, D.J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, D.J. & Hurd, M.J.). Before such an unopposed motion can be granted, however, the court must review the motion to determine whether it is facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2001) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

While a party's failure to properly oppose an adversary's dispositive motion thus does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By opting not to submit papers in opposition to the motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statement unchallenged. Courts in this district have uniformly enforced Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), by deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[FN5] *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

> FN5. Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

B. *Summary Judgment Standard*

**\*5** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing Anderson). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (stating that summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

C. *Eighth Amendment Claims*

Plaintiff asserts three causes of action in his complaint. First, plaintiff avers that defendants violated his Eighth Amendment rights when "they failed to provide adequate medical attention and treatment for two and one half years for his complaints of pain in his left kidney area, and rashes on his feet." Complaint (Dkt. No. 1) ¶ 7. Plaintiff next contends that defendants violated his Eighth Amendment rights by discontinuing his Fioricet migraine medication and failing to prescribe a beneficial medication. *Id.* Finally, the plaintiff claims that the defendants violated his Eighth Amendment rights by disregarding the order of the cardiologist to re-prescribe the Fioricet migraine medication. *Id.*

**\*6** Plaintiff's medical indifference claims are properly analyzed against the backdrop of a body of well-established Eighth Amendment jurisprudence. The Eighth Amendment prohibits the imposition of cruel and unusual punishments, including those that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102-03, 97 S.Ct. 285, 290-91 (1976) (quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

A claim alleging that prison officials have violated the Eighth Amendment by their failure to provide adequate medical care must satisfy both an objective and a subjective requirement-the medical need must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, D.J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at * 2 (same).

*1. Serious Medical Need*

To establish a constitutionally cognizable claim of deliberate medical indifference under the Eighth Amendment, a plaintiff must initially allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors in making this determination include injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citations omitted); *LaFave v. Clinton County,* No. 00CV744, 2002 WL 31309244, at

*2-3 (N.D.N.Y. Apr. 3, 2002)* (Sharpe, M.J.), *adopted,* No. 00-CV-744, Dkt. No. 27 (N.D.N.Y. June 20, 2002) (Hurd, D.J.).

a. *Kidney Pain*

**7** According to his medical records, plaintiff complained to prison officials of pain in his kidney area over a period of two and one half years. Those records show that Peterson communicated those complaints to the medical staff, and as a result was seen on eleven occasions. Miller Decl. (Dkt. No. 25) ¶¶ 4, 6. Plaintiff described this pain as "dull pain." Miller Decl. (Dkt. No. 25) Exh. A at p. 128.

Having carefully reviewed plaintiff's medical records, I find that no reasonable factfinder could conclude that his complaints of back or kidney pain arose to a level of constitutional significance, demonstrating the requisite level of "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66; *see also Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at * 10 (N.D.N.Y. Sept. 29, 2006) (Kahn, D.J. and Lowe, M.J.) (back pain that requires treatment with pain relievers and physical therapy was not a sufficiently serious medical need for purposes of the Eighth Amendment). Since at no time did plaintiff describe his pain in terms which would equate to "urgent," "debilitating," or "extreme," no reasonable factfinder could conclude that the condition constituted a sufficiently serious medical need to trigger the protections of the Eighth Amendment.

b. *Foot Rash*

Plaintiff alleges, and his medical records bear out, that over a lengthy period of time he registered multiple complaints regarding a foot rash condition. Those records, however, fail to suggest that the rash increased in severity over time or that because of it, plaintiff suffered from a condition capable of producing "death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. Indeed, plaintiff's records reflect that while the rash persisted, the itch associated with it was relieved by medication provided to the plaintiff. Miller Decl. (Dkt. No. 25) ¶ 9 and Exh. A at p. 144. Under these circumstances, once again, no reasonable factfinder could conclude that during the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

relevant period, plaintiff's foot condition rose to a level of constitutional significance. *See Smith v. Nash*, No. 04-CV-0074, 2006 WL 2806464, at \*4-5 (N.D.N.Y. Sept. 28, 2006) (Kahn, D.J. and Homer, M.J.) (arthritis pain for which plaintiff was being treated with medication, and of which plaintiff did not complain of any pain, was not a sufficiently serious medical need).

c. *Migraine Headaches*

Plaintiff's complaint also claims a failure on the part of the defendants to properly medicate and otherwise treat his migraine headaches, causing him to needlessly suffer. Neither plaintiff's complaint nor his medical records are particularly informative as to the specifics regarding his migraine headaches, including their severity, duration, and degree. At most, plaintiff's medical records reveal that in March of 2004, plaintiff noted he "generally" suffered from headaches twice a week, and in April of 2004, his headaches were "bad" and generally started late at night. Miller Decl. (Dkt. No. 25) Exh. A at pp. 186, 189. While the court is therefore disadvantaged on this score, this particular issue is not appropriately resolved on summary judgment, since such a condition has, on occasion, been found by other courts to represent a sufficiently serious potential medical need as to survive a motion for summary judgment attacking the sufficiency of a plaintiff's showing in this regard. [FN6] *See, e.g., Moriarity v. Neubould*, No. 02CV1662, 2004 WL 288807, at \*2 n. 2 (D.Conn. Feb. 10, 2004) (suggesting that plaintiff's migraine headaches constituted a sufficiently serious condition to warrant Eighth Amendment protection since they can be "extremely painful and debilitating"); *O'Bryan v. Sedgwick County*, No. 98-3308, 2000 WL 882516, at \*5 (D. Kan. June 12, 2000) (assuming plaintiff's migraine headaches, for which he was prescribed medication, comprised a sufficiently serious medical need under the Eighth Amendment); *Medcalf v. State of Kansas*, 626 F.Supp. 1179, 1183 (D.Kan.1986) (finding that deceased prisoner, who consistently complained of severe headaches, nausea and vomiting, exhibited sufficiently severe medical symptoms for the court to conclude that administrator of prisoner's estate had stated a claim for relief under section 1983 and the Eighth Amendment).

FN6. Defendants have not argued that plaintiff's migraine headaches do not constitute a sufficiently serious medical condition to warrant the Eighth Amendment protections, and I have therefore not assumed otherwise.

2. *Deliberate Indifference*

**\*8** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979; *Leach*, 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo*, 1998 WL 713809, at \*2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06, 97 S.Ct. at 291-92; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 293; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F.Supp.2d 261, 264 (W.D.N.Y.1998); *see also Perez v. Hawk*, 302 F.Supp.2d 9, 21 (E.D.N.Y.2004) (noting that "treatment of a prisoner's medication condition generally defeats a claim of deliberate indifference") (quotations omitted).

a. *Kidney Pain*

Plaintiff's medical records show that he complained of pain in the area of his kidney eleven times between July 16, 2001 and October 28, 2003. Miller Decl. (Dkt. No. 25) ¶ 3. Defendant was given Motrin to alleviate his discomfort, *see, e.g., id.,* Exh. A at pp. 128, 133, 144, 171, and was seen by a medical doctor on several of those occasions. Miller Decl. (Dkt. No. 25) ¶ 3 and Exh. A at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

pp. 133, 144, 171. As a general matter, the record fails to disclose any failure on the part of medical officials at Clinton to respond to his pain complaints.

Focusing on the involvement of defendant Miller, the record supports a finding that she was made aware of the plaintiff's kidney pain through plaintiff's complaints to her on July 5, 2002-a fact which she readily acknowledges. On that one and only occasion when defendant Miller saw the plaintiff regarding his pain complaints, she arranged for an outside radiologist to review x-rays of the plaintiff's back. Miller Decl. (Dkt. No. 25) ¶¶ 4, 5. Those x-rays were determined to be negative. *Id.* at ¶ 5. After the x-rays were taken, defendant Miller had no contact with the plaintiff regarding the condition. The record therefore fails to disclose any evidence from which a reasonable factfinder could conclude that defendant Miller was aware of but deliberately indifferent to plaintiff's kidney condition.

While the record discloses at least some minimal involvement on the part of defendant Miller in the treatment of plaintiff's kidney pain, there is no evidence from the record currently before the court of any involvement on the part of defendant Tousignant in connection with care or treatment for that complaint. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*9** Although plaintiff's complaint is silent on this issue, it may be that plaintiff asserts claims against defendant Tousignant in her administrative capacity as a nurse administrator. A supervisor, however, cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the

supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). Even under this test the record fails to disclose any basis for finding defendant Tousignant liable with regard to plaintiff's kidney condition. Accordingly, I recommend that the portion of plaintiff's deliberate indifference claim against defendant Tousignant, related to the treatment of his kidney pain, be dismissed on this basis.

b. *Foot Rash*

The record reflects that both defendants were subjectively aware of plaintiff's foot rash. Plaintiff was seen on February 11, 2004 by defendant Tousignant, complaining of a rash on his feet. Tousignant Decl. (Dkt. No. 25) ¶ 4; Miller Decl. (Dkt. No. 25) Exh. A at p. 180. Defendant Tousignant reports that on that date she discussed with another nurse at the facility the care and treatment of plaintiff's foot condition, and was of the opinion that the treatment was appropriate. Tousignant Dec. (Dkt. No. 25) ¶ 4. While defendant Tousignant was aware of the plaintiff's foot rash condition, there was no evidence in the record demonstrating her deliberate indifference to that condition. I therefore recommend dismissal of plaintiff's foot rash indifference claim as against defendant Tousignant.

The record also reflects that defendant Miller was aware of, and indeed had a more active role in caring for, plaintiff's foot condition. The medical records associated with defendant Miller's care and treatment for that condition reflect significant efforts on her part, through administering of various prescription and non-prescription medications, to control plaintiff's condition and to relieve the itch associated with it. While plaintiff's quarrel appears to stem from his frustration over the inability to cure his rash condition, this without more fails to establish a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

constitutional violation. *See, e.g., Armour v. Herman,* No. 1:05CV295, 2005 WL 2977761, at *3 (N.D.Ind. Nov. 4, 2005) ("The Eighth Amendment does not require medical success ...."); *Ramos v. Artuz,* No. 00 Civ. 0149, 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (indicating that an unsuccessful course of treatment does not support a finding of deliberate indifference); *see also Moolenaar v. Champagne,* No. 03-CV-1464, 2006 WL 2795339, at *7 (N.D.N.Y. Sept. 26, 2006) (Kahn, D.J. and Peebles, M.J.) (plaintiff's complaints of pain resulting from degenerative disc disease, a chronic ailment sustained by many individuals and treated with exercise, pain medication, and physical therapy, with which plaintiff was treated, did not give rise to a valid deliberate indifference claim). Based upon my review of the records associated with that defendant Miller's treatment, I am unable to discern any basis upon which a reasonable factfinder could conclude that defendant Miller was inattentive and deliberately indifferent to plaintiff's foot rash condition.

c. *Migraine Headaches*

The treatment administered by medical personnel with respect to plaintiff's migraines similarly belies any claim of deliberate indifference to his medical needs. It is true that both defendants were aware of plaintiff's prescription of Fioricet and his desire to continue with that medication. *See, e.g.,* Miller Decl. (Dkt. No. 25) ¶ 13; Tousignant Decl. (Dkt. No. 25) ¶ 5. Plaintiff's complaint in this regard stems from the failure to continue prescribing his pain medication of choice; that decision, however, was not made by the defendants, who instead were merely following directives from security personnel at the facility to discontinue the prescription drug in light of plaintiff's stockpiling and at least the suspected potential for having sold or given the drugs to fellow inmates. Such legitimate security concerns can provide a basis for discontinuing or denying a treatment, especially when, as in this case, adequate alternative measures are taken. *See, e.g., Kosilek v. Maloney,* 221 F.Supp.2d 156, 161 (D.Mass.2002) (stating that the duty of prison officials to protect the safety of both inmates and prison staff "is a factor that may properly be considered in prescribing medical care"); *Hawley v. Evans,* 716 F.Supp. 601, 604 (N.D.Ga.1989) (noting that as long as prison system abides by reasonable medical practices, whether to permit a prisoner to be treated with experimental drugs

is within the discretion of the state officials, as "jail authorities have a legitimate security concern in limiting the exposure of inmates to drugs").

**\*10** In this instance, alternative efforts were taken by prison medical officials to address plaintiff's pain complaints. After termination of the Fioricet in or about late March, 2004, plaintiff was written a prescription for Motrin 600 mg, a strong pain reliever. Miller Decl. (Dkt. No. 25) ¶ 14 and Exh. A at p. 191. That was followed with a prescription on May 4, 2004 for Naproxen, another non-steroidal anti-inflammatory drug. Following a determination that the Naproxen was not working well enough to treat plaintiff's headaches, defendant Miller prescribed Inderal, a medication specifically designed for such purposes. Miller Decl. (Dkt. No. 25) ¶ 16 and Exh. A at p. 193.

In sum, plaintiff's medical records reflect that his migraine headaches were treated with three different prescription pain reliever medications. "[T]reatment of a prisoner's medical condition 'generally defeats a claim of deliberate indifference.' " *Perez,* 302 F.Supp.2d at 21 (quoting *Wells v. Franzen,* 777 F.2d 1258, 1264 (7th Cir.1985)). In this instance plaintiff's complaint represents nothing more than a disagreement with prison officials' choice of treatments, a matter which does not arise to a level of medical deliberate indifference. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 291-92; *see also Chance,* 143 F.3d at 703. Accordingly, I find that plaintiff has not established medical deliberate indifference on the part of either of the defendants to his migraine medical condition.[FN7]

FN7. The evidence reflects that defendant Tousignant did have at least minimal awareness of an involvement in the decision to discontinue his Fioricet medication and of plaintiff's quarrel with that determination. *See e.g.,* Tousignant Decl. (Dkt. No. 25) ¶ 5. I therefore recommend against dismissal of plaintiff's migraine headache claim as against defendant Tousignant on the independent basis of lack of personal involvement.

IV. *SUMMARY AND RECOMMENDATION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)
(Cite as: 2007 WL 2071743 (N.D.N.Y.))

Plaintiff's complaint claims deliberate indifference on the part of defendants to three separate conditions, including pain in the region of his kidney, a foot rash, and migraine headaches. Because the first two of those three conditions are insufficiently serious, either separately or in combination, to trigger the Eighth Amendment's cruel and unusual punishment protections, I recommend dismissal of those claims on this basis. Additionally, having carefully reviewed the available records associated with plaintiff's medical treatment while an inmate at Clinton, I find no evidence from which a reasonable factfinder could conclude that either of the defendants was deliberately indifferent to plaintiff's medical conditions even assuming, *arguendo,* that they were sufficiently serious to implicate the Eighth Amendment. Finally, in light of my recommendations on the merits, I find it unnecessary to address defendants' additional argument that they are entitled to qualified immunity.[FN8]

> FN8. The first step in the qualified immunity analysis requires a threshold determination of whether plaintiff has facially established a constitutional violation. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). Only if the answer to that inquiry is in the affirmative must the court then turn its focus to whether the right in issue was clearly established at the time of the alleged violation, and if so whether it was objectively reasonable for the defendant to believe that his or her actions did not violate any such clearly established right. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002).

Based upon the foregoing, it is hereby,

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 25) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS

REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*11** It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with the court's local rules.

N.D.N.Y.,2007.
Peterson v. Miller
Not Reported in F.Supp.2d, 2007 WL 2071743 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Rasool SALAAM, Plaintiff,
v.
D. ADAMS, Facility Nurse; Susan A. Walsh, Facility
Nurse; R.A. Girdich, Superintendent, Defendants.
**No. 9:03-CV-0517 (LEK/GHL).**

Sept. 29, 2006.

Rasool Salaam, Auburn, NY, pro se.

Hon. Eliot L. Spitzer, Attorney General for the State of
New York, Risa L. Viglucci, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

*1 This matter comes before the Court following a
Report-Recommendation filed on August 18, 2006, by the
Honorable George H. Lowe, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the
Northern District of New York. Report-Rec. (Dkt. No.
44). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including the
objections by Plaintiff Rasool Salaam, which were filed on
September 11, 2006. Objections (Dkt. No. 45).

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings

or recommendations made by the magistrate judge." Id.
This Court has considered the objections and has
undertaken a de novo review of the record and has
determined that the Report-Recommendation should be
approved for the reasons stated therein.

Accordingly, it is hereby

ORDERED, that the Report-Recommendation (Dkt. No.
44) is APPROVED and ADOPTED in its ENTIRETY;
and it is further

ORDERED, that Defendants' motion for summary
judgment (Dkt. No. 33) is GRANTED and the case is
DISMISSED IN ITS ENTIRETY; and it is further

ORDERED, that the Clerk serve a copy of this Order on
all parties.

IT IS SO ORDERED.
GEORGE H. LOWE, United States Magistrate Judge.

### REPORT-RECOMMENDATION

This matter has been referred to me for Report and
Recommendation by the Honorable Lawrence E. Kahn,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule N.D.N.Y. 72.3(c). This is a pro se
civil rights action under 42 U.S.C. § 1983 by Inmate
Rasool Salaam ("Plaintiff") against three employees of
Upstate Correctional Facility ("Upstate C.F.")-Facility
Nurse Debra J. Adams, Facility Nurse Susan A. Walsh,
and Superintendent R.A. Girdich ("Defendants").
Generally, Plaintiff alleges that Defendants violated his
First and Eighth Amendment rights between September of
2001 and May of 2003 by retaliating against him for filing
grievances and for practicing his religion, and by being
deliberately indifferent to his serious medical needs. (Dkt.
No. 6 [Am. Compl.].) Currently before the Court is
Defendants' motion for summary judgment. (Dkt. No. 33.)
For the reasons discussed below, I recommend that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

Defendants' motion for summary judgment be granted.

## I. BACKGROUND

### A. Plaintiff's Amended Complaint

Plaintiff's Amended Complaint alleges the following set of events. On September 25 and 26, 2001, Plaintiff was assaulted at Upstate C .F. As a result, he sustained "off and on back pains." Plaintiff complained about the back pains. Defendants Adams and Walsh provided Plaintiff with pain killers and an "exercise sheet" for his back problem. Despite taking the pain killers and using the exercise sheet, Plaintiff continued to experience pains in his lower back. Plaintiff complained of his continuing back pain, and asked to see a doctor. However, Defendants Adams and Walsh refused to let Plaintiff see a doctor.

**\*2** Over the course of the next year, Plaintiff regularly signed up for sick call to complain about his pain. However, Defendants Adams and Walsh continued to refuse to let Plaintiff see a doctor. In addition, in approximately May of 2002, Plaintiff started experiencing, and complaining about, gastrointestinal problems and resulting stomach pains. Defendant Adams denied Plaintiff adequate medical treatment for these problems. Plaintiff filed grievances alleging a denial of adequate medical care. The grievances were denied. They were then appealed to the office of Defendant Girdich.

Finally, on October 2, 2002, Plaintiff was seen by a doctor for his back problem. The doctor referred Plaintiff to a physical therapist. However, after approximately three therapy sessions, certain "infirmary escorts" stopped taking Plaintiff to his physical therapist. Plaintiff grieved his denial of physical therapy. In retaliation for making these grievances, Plaintiff was, at some point, taken off the "physical therapy list." In addition, Plaintiff's grievances were "taken out of [a] mail box" so that Plaintiff could not appeal the denial of those grievances to the Department of Correctional Services' Central Office Review Committee. Plaintiff grieved this "mail box" issue as well, bringing that grievance to the attention of (among others) the First Deputy Superintendent. However, Plaintiff continued to be retaliated against.

For example, in February of 2003, Defendants Adams and Walsh threatened Plaintiff with a misbehavior report if he continued to sign up for sick call on a daily basis. In addition, earlier, on January 28, 2003, Plaintiff was issued a false misbehavior report for allegedly calling Defendant Walsh a degrading name the day before. Similarly, on February 5, 2003, Plaintiff was issued a second false misbehavior report for allegedly breaking an "inhaler" the day before. As a result of these two false misbehavior reports, Plaintiff was placed on a restricted diet for 28 days.

Finally, Plaintiff was retaliated against based on his religion. Specifically, during the time in question, Plaintiff was practicing the religion of Islam. He was also a mental health patient, who had been taking Wellbutrin which had been prescribed to "control his rage and/or emotions." From early November of 2002 to early December of 2002-the holy month of Ramadan-Plaintiff sincerely believed that he was prohibited by his religion from taking his medications from sunrise to sunset. As a result, he consulted with his psychologist, who informed him that she would direct the medical staff to give Plaintiff his medication before sunrise, at 6:00 a.m. However, during the month of Ramadan, Defendant Adams refused to comply with the order of Plaintiff's psychologist. In addition, Defendant Adams ordered the other nurses (including Defendant Walsh) not to comply with the order of Plaintiff's psychologist. Indeed, at some point during Ramadan, Defendants stopped Plaintiff from receiving his medication altogether. Plaintiff resumed receiving his medication at the end of Ramadan. However, at various times, including on March 23, 2003, and March 24, 2003, Defendants Adams and Walsh wrongfully denied Plaintiff the medication Neurontin, which he had been prescribed. (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

**\*3** Liberally construing Plaintiff's *pro se* civil rights allegations, as I must, I construe Plaintiff's Amended Complaint as asserting the following claims:

**(1)** a First Amendment **free-exercise-of-religion** claim against Defendants **Adams** and **Walsh** based on their alleged failure to change Upstate C.F.'s regular

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

medication-delivery schedule for Plaintiff during the holy month of Ramadan in 2002 so that he could receive his medication either before sunrise or after sunset;

four First Amendment **retaliation** claims:

**(a)** one claim against Defendants **Adams** and **Walsh** based on their allegedly taking Plaintiff off the so-called "physical therapy list" in response to his grieving his denial of physical therapy;

**(b)** one claim against Defendants **Adams** and **Walsh** based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; FN1

> FN1. (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

**(c)** one claim against Defendants **Adams** and **Walsh** based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and presumably complaining of various medical conditions) on a daily basis; and

**(c)** the final claim against Defendant **Girdich** based on his alleged failure to resolve Plaintiff's "mail box" complaint in response to his grieving his denial of physical therapy; and

**(3)** two Eighth Amendment claims for **deliberate indifference** to a serious medical need:
**(a)** the first claim against Defendants **Adams** and **Walsh** based on their allegedly refusing to let him see a doctor for his back pain between September of 2001 and October of 2002, denying him adequate treatment for his gastrointestinal problem and stomach pain starting in May of 2002, taking him off the "physical therapy list" for his back problem in the fall of 2002,

depriving him of the medication Wellburtin during the holy month of Ramadan in 2002, and denying him the medication Neurontin in March of 2003; and

**(b)** the second claim against Defendant **Girdich** based on his alleged failure to resolve, in Plaintiff's favor, Plaintiff's grievances regarding his lack of access to a doctor for his back pain, his lack of adequate treatment for his stomach pain, and his "mail box" issue.

**B. Defendant's Motion**

Generally, Defendants base their motion for summary judgment on three grounds. First, they argue that Plaintiff has failed to establish a free-exercise claim under the First Amendment because (1) Plaintiff has not established that his psychologist ever in fact directed Defendants Adams and Walsh to give Plaintiff his medication before sunrise, (2) Plaintiff has not established that he ever complained to Defendants Adams or Walsh that the facility's normal medication schedule violated Ramadan, and (3) Plaintiff has not established that Ramadan prohibits the taking of medication between sunrise and sunset.

**\*4** Second, Defendants argue that Plaintiff has failed to establish an Eighth Amendment claim for deliberate indifference to a serious medical need because (1) he has failed to establish that his alleged medical condition (consisting of an alleged back problem, gastrointestinal disorder and psychological condition) constitutes a "serious medical need" for purposes of the Eighth Amendment, and (2) in any event, Plaintiff has failed to establish that Defendants manifested the sort of intentional or reckless state of mind necessary to incur liability under the Eighth Amendment.

Third, Defendants argue that Plaintiff has failed to establish the personal involvement of Defendant Girdich in any of the alleged constitutional deprivations since supervisors such as Defendant Girdich can be personally involved in only certain circumstances, none of which are present under the facts established by the current record. (Dkt. No. 37 [Defs.' Mem. of Law].)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

## II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN3]

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

> FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[FN4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."[FN5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[FN6]

> FN4. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986).

> FN5. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

> FN6. *Ross v. McGinnis,* 00 Civ. 0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004)

[internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court generally views a *pro se* civil rights plaintiff's papers.[FN7] For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, generally the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.[FN8] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ."[FN9]

> FN7. *See Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

> FN8. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

> FN9. *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

### III. STATEMENT OF MATERIAL FACTS

Generally, the facts set forth in a movant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN10] and are not specifically controverted by the non-movant.[FN11] Thus, where the non-movant fails to respond to the movant's Rule 7.1 Statement of Material Facts, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN12]

FN10. See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN11. *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*").

FN12. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *accord, Lee v.*

*Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

**\*5** Here, Plaintiff has not responded to Defendants' Rule 7.1 Statement.[FN13] The closest he comes to responding to Defendants' Rule 7.1 Statement is through his submission of a document entitled "Affirmation of Opposition." [FN14] However, there are four problems with this document.

FN13. (Dkt. No. 36.)

FN14. (Dkt. No. 39.)

First, the document fails to "mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs," as required by Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court.[FN15] Second, the document fails to "set forth a specific citation to the record where [any] factual issue[s] arise[ ]," as also required by Local Rule 7.1(a)(3).[FN16] Third, the document contains impermissible legal argument in violation of Local Rule 7.1(a)(3) (providing that the Rule 7.1 Response shall contain facts only). [FN17] (*See also* N.D.N.Y. L.R. 7.1(a)(2) (providing that "[a]n affidavit must not contain legal arguments.") Fourth, portions of the so-called "affirmation" are not even based on personal knowledge, as required by Rule 56(e) of the Federal Rules of Civil Procedure.[FN18]

FN15. Specifically, the document does not "affirm" or "deny" any of Defendants' factual assertions; nor do the document's paragraphs match Defendants' paragraphs. (*Compare* Dkt. No. 36 [Defs.' Rule 7.1 Statement, containing

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

thirteen paragraphs] *with* Dkt. No. 39 [Plf.'s "Affirmation in Opposition," containing six paragraphs].)

FN16. (*See* Dkt. No. 39, ¶¶ 1, 2, 5, 6, 7 [Plf.'s "Affirmation in Opposition," containing absolutely no record citations], ¶ 3 [vaguely referring to Plaintiff's "complaint file" and "grievance file], ¶ 4 [vaguely referring to Plaintiff's "medical files"; and referring to affidavit of Defendant Adams but not citing in support of any dispute of fact].)

FN17. (*See, e.g.,* Dkt. No. 39, ¶¶ 5, 6 [Plf.'s "Affirmation in Opposition," citing case law].)

FN18. (*See, e.g.,* Dkt. No. 39, ¶ 3.B. [Plf.'s "Affirmation in Opposition," asserting that Defendant Girdich "had first hand knowledge of the problems" in question but not citing any evidence in support of Plaintiff's inference that Defendant Girdich read any of Plaintiff's complaints].)

These deficiencies in Plaintiff's response papers are especially conspicuous considering that Defendants specifically notified Plaintiff of the consequences of his failure to properly contradict the facts asserted by Defendants' in their motion.[FN19]

FN19. (Dkt. No. 34 [Defs.' Rule 56.2 Notice].)

Under the circumstances, I decline to perform an independent review of the record to find proof of a factual dispute-although I take notice of any such proof of factual disputes that I discover during my necessary review of the record (e.g., my review of the record to confirm that Defendants' factual assertions in their Rule 7.1 Statement are supported by the record).

However, I note that, as indicated above, to be sufficient to create a factual issue, an affidavit must, among other things, be based "on personal knowledge." [FN20] An

affidavit is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN21] In addition, such an affidavit must not be conclusory.[FN22] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN23] Moreover, "[a]n affidavit must not present legal arguments." [FN24] Finally, even where an affidavit is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN25]

FN20. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995)* [citations omitted], *cert. denied sub nom, Ferrante v. U.S., 516 U.S. 806 (1995).*

FN21. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN22. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN23. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN24. N.D.N.Y. L.R. 7.1(a)(2).

FN25. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

## IV. ANALYSIS

## A. Whether Plaintiff Has Failed to Establish a First Amendment Claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

**1. Free-Exercise Claim Against Defendants Adams and Walsh**

"Prisoners retain their right to religious freedom [under the First Amendment] even when incarcerated ... [and are] therefore entitled to a reasonable accommodation of [their] religious beliefs." [FN26] "To assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the [prisoner's] scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." [FN27] The reason for the third consideration is the fact that the right of a prisoner to exercise his religion is balanced against "the interest of prison officials charged with the complex duties arising from administration of the penal system." [FN28]

FN26. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999).

FN27. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988); *see also, Ford v. McGinnis,* 352 F.3d 582, 588-596 (2d Cir.2003) (not deciding question of whether "substantial burden" requirement is contained among elements of First Amendment free-exercise claim); accord, *McEachin v. McGinnis,* 357 F.3d 197, 203 (2d Cir.2004); *Shakur v. Selsky,* 319 F.3d 106, 120 (2d Cir.2004).

FN28. *Ford,* 352 F.3d at 588; *Burgess v. Friedmann,* 05-CV-0379, 2005 U.S. Dist. LEXIS 38423, at *7-8 (N.D.N.Y. Dec. 22, 2005) (Mordue, J.); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987); *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995); *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir.1995); *Young v.. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989); *Farid,* 850 F.2d at 925.

**\*6** Here, I will assume for the sake of argument that (1) Plaintiff was a sincere believer in Islam, and (2) not taking medication during the day was a practice that was religious in nature in Plaintiff's "scheme of beliefs." [FN29] The problem with Plaintiff's claim, as Defendants correctly point out, has to do with the extent to which the practice has infringed on Plaintiff's religious belief and the extent to which the practice furthers some legitimate penological objective.

FN29. I note that I assume these two facts despite my suspicions of their veracity. For example, I question Plaintiff's claimed belief that the Ramadan fasting requirement contains an exception only for those who are threatened with death, as opposed to those who are merely "ill." *See The Quran,* 2:184-185 (making exceptions for those who are "ill or traveling").

Specifically, I find that the practice in question-which consisted of not making an exception to Upstate C.F.'s regular medication-delivery schedule-did not *infringe* on Plaintiff's religious beliefs under the circumstances. The sole medication of which Plaintiff was deprived during Ramadan, according to the evidence and his own allegations, consisted of one drug (Wellbutrin) . [FN30] Plaintiff does not adduce any evidence (or even assert an allegation) that his not taking Wellbutrin actually caused him to suffer any physical or psychological consequences, much less any consequences that were of such a magnitude as to *interfere* with his observance of Ramadan.[FN31] Moreover, the evidence shows, and Plaintiff appears to acknowledge, that he was *offered* Wellbutrin during the regular medication-delivery runs on the days in question (which generally occurred between approximately 6:20 a.m. and 7:25 a . m.) but that he *refused* to accept that medication.[FN32]

FN30. (*See* Dkt. No. 6, ¶¶ 37-38 [Plf.'s Am. Compl.]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/2/02, 11/3/02, 11/6/02, 11/10/02, 11/30/02 and his "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that the only drug that Plf. was refusing was Wellbutrin].)

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

FN31. (*See generally* Dkt. No. 6, ¶¶ 34-47 [Plf.'s Am. Compl., alleging that he "practic[ed] the religion of Islam during the month of Ramadan in 2002, and not alleging that he was prevented from practicing that religion]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Records" from 11/1/02 to 11/30/02, indicating that Plf. was experiencing only gas and skin rash during time in question].)

FN32. (*See* Dkt. No. 6, ¶¶ 39, 41, 42, 45 [Plf.'s Am. Compl.]; Dkt. No. 35, Exs. A-B [Affirm. of Risa L. Viglucci, attaching (1) Plf.'s "Ambulatory Health Records" dated 11/2/02 indicating refusal at 7:00 a.m., 11/3/02 indicating refusal at 7:25 a.m., 11/6/02 indicating refusal at 6:20 a.m., 11/10/02 indicating refusal at some point in the morning, 11/22/02 indicating refusal at 6:35 a.m., 11/27/02 indicating refusal at 6:25 a.m., 11/30/02 indicating refusal at 7:00 a.m., and 12/14/05 indicating that plaintiff "has been refusing meds for some time," (2) Plf.'s "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02 indicating that he refused Wellburton offered to him at 7:00 a.m. on those dates, and (3) CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, stating that its investigation indicates that Plf.' refused his medication from 12/1/02 to 12/16/02].)

Even if the practice in question somehow infringed on Plaintiff's religious beliefs, I find that Upstate C.F. had a *legitimate penological interest* in maintaining its regular medication-delivery schedule under the circumstances. Upstate C.F. is a maximum-security prison housing approximately 1,500 inmates, with limited resources. I believe that it would be unreasonable and impractical to require a prison to deliver medications to its inmates on an "on-demand" basis, absent a showing of a *medical* need for such special treatment. I note, by the way, that the sole evidence in the record that I have found suggesting that someone from a psychiatric unit directed anyone to give Plaintiff Wellbutrin during the time in question consists of an ambiguous notation in a single medical record indicating a telephone conversation between someone at "psych" and someone in the Upstate C.F. medical

department concerning the continuation of Plaintiff's twice-per-day Wellbutrin medication for the month of November in 2002.FN33 However, this isolated medical record does not indicate whether a psychiatrist had directed that the Wellbutrin *must* be dispensed at 6:00 a.m. and 8:00 p.m. (for medical reasons) or whether those times were merely the *approximate* times on a standard morning and evening delivery schedule. Nor does the record mention the words "sunrise," "sunset," or "Ramadan." Thus, I believe that it would be unreasonable to interpret that notation as either indicating a medical need for a special medication-delivery schedule or constituting a medical order for such special delivery.FN34

FN33. (Dkt. No. 35, Ex. 1 [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Ambulatory Health Record" dated 11/1/02]; *see also* Dkt. No. 6, ¶¶ 43, 44 [Plf .'s Am. Compl., implicitly assuming, conclusorily, that such an order had been issued and communicated to Defendants Adams and Walsh].)

FN34. (Dkt. No. 35, Ex. B, Adams Affid., ¶¶ 6-7 [stating, "I was not aware, nor did a review of plaintiff's medical records disclose any doctor's order requiring that plaintiff's medication be provided before sunup during Ramadan.... Further, I have reviewed plaintiff's medical records, and find no such order is contained in his records."].)

**\*7** Federal court cases arising from such circumstances appear to be rare. Indeed, I have found only one reported decision that addressed analogous circumstances, involving a Muslim prison inmate not wanting to receive medical treatment during the daytime hours of Ramadan, and requesting instead to receive that treatment before sunrise or after sunset.FN35 As the court found in that case, I believe that no rational fact-finder could conclude, based on the record, that such circumstances constitute a violation of the inmate's First Amendment right to freely exercise his religion.FN36

FN35. *See Ballard v. Woodard,* 641 F.Supp. 432, 436-437 (W.D.N.C .1986) (First

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

Amendment free-exercise claim by Muslim inmate against prison officials based on their refusal, during Ramadan, to alter prison's tuberculosis-testing schedule, which involved injecting antigens into inmate's arm during the daytime, even though inmate had informed prison officials that he would be willing to receive the injection after sundown).

FN36. *See Ballard,* 641 F.Supp. at 436-437 (granting summary judgment to prison officials with respect to inmate's free-exercise claim).

Finally, even if the practice in question somehow infringed on Plaintiff's religious beliefs, and Upstate C.F. did not have a legitimate penological interest in maintaining its regular medication-delivery schedule under the circumstances, I would find that Plaintiff has not established that it was Defendants Adams and Walsh (and not someone else) who *caused* the constitutional deprivation in question. For example, in Plaintiff's grievance about the deprivation of medication, he alleged that it was a *male* nurse who had denied Plaintiff his medication.[FN37] Furthermore, he alleged that this male nurse worked the 2:00 p.m. to 10:00 p.m. shift at Upstate C.F.[FN38] In addition, the name of this male nurse apparently started with the letter "L."[FN39] However, both Defendants Adams and Walsh are *female* nurses whose name do not start with the letter "L." Moreover, Defendant Adams did not work the evening shift (but the morning shift) during the time in question. [FN40]

FN37. (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "I asked the nurse for my med's [sic]. *He* said Salaam your [sic] not getting shit anymore."] [emphasis added].)

FN38. (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02, which alleged that "The 2-10 shift nurse has refused to give me my medication 3 time [sic] in a row."].)

FN39. (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching CORC's appellate decision of Plf.'s Grievance No. UST-14199-02, referring to the nurse of whom Plaintiff complains as "Nurse L ..."].)

FN40. (Dkt. No. 35, Ex. B, Adams Affid., ¶ 8 [stating, "In that my shift is from 6:00 a.m. to 2:00 p.m. I would only have been involved with providing his 6:00 a.m. medication."].)

I note that, to the extent Plaintiff is not basing his free-exercise claim on events that occurred during the nursing staff's evening shift in December of 2002, but on events that occurred during the nursing staff's morning shift in November of 2002, he has failed to exhaust his administrative remedies, since his grievance complained about only the former events.

As a result, I recommend that the Court dismiss Plaintiff's First Amendment free-exercise claim against Defendants Adams and Walsh.

**2. Retaliation Claims Against Defendants Adams and Walsh**

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment.[FN41] Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights.[FN42] Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. [FN43] As the Second Circuit has noted,

FN41. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004).

FN42. *See Gill,* 389 F.3d at 381-383.

FN43. *See Flaherty v. Coughlin,* 713 F.2d 10, 13

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

(2d Cir.1983).

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.[FN44]

FN44. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

*8 To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech or conduct and the adverse action-in other words, that the protected speech or conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[FN45] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[FN46]

FN45. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U . S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

FN46. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

Here, as described above in Part I.A. of this

Report-Recommendation, Plaintiff has asserted three distinct First Amendment retaliation claims against Defendants Adams and Walsh: (1) a claim based on their allegedly taking him off the physical therapy list in response to his grieving his denial of physical therapy; (2) a claim based on their alleged cessation of Plaintiff's medication delivery altogether during the holy month of Ramadan in 2002 in response to (i) his practicing of his religion and/or (ii) his filing of grievances alleging inadequate medical care; [FN47] and (3) a claim based on their allegedly filing false misbehavior reports in response to his signing up for sick call (and complaining of various medical conditions) on a daily basis.

FN47. (*See* Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., alleging, "The medication then stoped [sic] being given to me, until I was interviewed by the psychologist."].)

I will assume for the sake of argument that Plaintiff was engaging in *protected speech or conduct* during the time of the events giving rise to Plaintiff's first and second claims. I will make that assumption, like the others, out of recognition of Plaintiff's special status as a pro se civil rights litigant, and in the interest of brevity.

The problem with Plaintiff's first and second claims has to do with the fact that (1) there is no evidence in the record that (1) Defendants Adams and Walsh (as opposed to some other correctional employee) took *adverse action* against Plaintiff or (2) even if there was evidence of such adverse action, there is no evidence in the record that there was a *causal connection* between Plaintiff's protected speech or conduct and the adverse action (i.e., there is no evidence that the adverse action was not taken for proper reasons).

For example, I find no evidence that Plaintiff was ever prematurely taken off a "physical therapy list" in the fall of 2002, or that any such premature removal of Plaintiff's name from such a list was effected by Defendants Adams or Walsh.[FN48] Rather, it appears that Plaintiff's physical therapy was discontinued on January 17, 2003, by his physical therapist.[FN49] Indeed, Plaintiff does not even specifically allege that Defendants Adams or Walsh *caused* his name to be removed from the "therapy list";

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

rather, he alleges that, "[a]fter about three weeks of therapy, the infirmary escorts started to deprive the plaintiff of his therapy." [FN50] Moreover, Plaintiff's allegation that the removal of his name from the "therapy list" was in retaliation for his having filed grievances is, in addition to being entirely conclusory, not based on personal knowledge. Specifically, Plaintiff alleges, "Upon information and belief, [he] was taken of [sic] the physical therapy list, because of and/or out of retaliation of [sic] the grievances and complaints about being deprived of his physical therapy." [FN51]

FN48. (See generally Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records dated 10/1/02 to 1/1/03, not containing or referring to such a physical therapy list]; see also Dkt. No. 6, ¶ 13 [Plf.'s Am. Compl., indicating that his allegation that he was placed on an actual "physical therapy waiting list" was based "upon information and belief"].)

FN49. (Dkt. No. 35, Ex. B, Smith Aff., ¶ 9.)

FN50. (Dkt. No. 6, ¶ 15 [Plf.'s Am. Compl.].)

FN51. (Dkt. No. 6, ¶ 16 [Plf.'s Am. Compl.].)

*9 Similarly, I find no evidence in Plaintiff's medical records that the Upstate C.F. medical staff stopped trying to give Plaintiff Wellbutrin during the holy month of Ramadan in 2002; indeed, the record evidence is to the contrary. [FN52] Nor have I found any evidence that any such cessation was effected by Defendants Adams or Walsh. Even if there was evidence of such a denial of Wellbutrin by Defendants Adams or Walsh, I find no evidence that it was the practice of Plaintiff's religion-and not his refusal to accept medication during the prison's regular delivery runs-that caused him to be taken off the medication-delivery list. Similarly devoid of evidence is Plaintiff's allegation that the alleged denial of medication was caused by his having previously filed grievances. [FN53]

FN52. (See Dkt. No. 6, ¶ 45 [Plf.'s Am. Compl., asserting conclusorily that the medication

stopped coming at some point during the month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s "Ambulatory Health Record" dated 11/30/02 indicating that he refused Wellbutrin on that date, which was near the end of the holy month of Ramadan]; Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s "Refusal of Medical Examination and/or Treatment" forms dated 11/4/02, 11/11/02, 11/12/02, indicating that prison treated such refusals by Plaintiff as limited to only a day-by-day basis].)

FN53. Setting aside the lack of evidentiary support for this allegation, I note that this allegation appears inconsistent with Plaintiff's grievance about the issue, in which he alleged not that this denial of medication was a form of retaliation based on Plaintiff's prior grievances but that this denial was a form of retaliation based merely on "a personal hate." (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Plf.'s Grievance No. UST-14199-02, dated 12/2/02].)

Finally, with respect to Plaintiff's third claim, I find that Plaintiff has no First Amendment right to sign up for sick call, much less to sign up for sick call on a daily basis for needless reasons. [FN54] Even if he had such a First Amendment right, I find no evidence that any misbehavior reports filed against him in January and/or February of 2003 were false, or that there was any causal connection between the filing of those misbehavior reports and Plaintiff's engaging in protected conduct or speech.

FN54. See Rahman v. Stephenson, 626 F.Supp. 886, 887-888 (W.D.Tenn.1986) (inmate did not have a First Amendment right to have his name placed on a prison sick call roster even where the prison's refusal to place the inmate's name on the roster was due to the prison's refusal to acknowledge the "name" that the inmate was attempting to use, which was the inmate's adopted religious name).

As a result, I recommend that the Court dismiss Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

First Amendment retaliation claims against Defendants Adams and Walsh. I note that, although Defendants do not specifically address, in their memorandum of law, Plaintiff's retaliation claims (presumably due to the fact that those claims are difficult to discern as articulated by Plaintiff), the Court can, and should, *sua sponte* dismiss those claims as without merit. *See* 28 U.S.C. § 1915(e)(2)(B)(ii), (iii) ("[T]he court shall dismiss the case at any time if the court determines that ... the action ... is frivolous ... [or] fails to state a claim on which relief may be granted...."); Fed.R.Civ.P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action.").

**3. Retaliation Claim Against Defendant Girdich**

Plaintiff's retaliation claim against Defendant Girdich stems from his failure to resolve, in Plaintiff's favor, his "mail box" complaint in response to Plaintiff's prior grievances regarding a denial of physical therapy. Based on the current record, I find that Plaintiff has adduced no evidence that (1) there was any adverse action taken against him by anyone much less Defendant Girdich (i.e., through a knowing and reckless refusal to resolve the "mail box" issue and the alleged interference with Plaintiff's right to file grievances), or (2) even if there was such adverse action, there was a causal connection between Plaintiff's filing of previous grievances regarding a denial of physical therapy and the alleged adverse action taken by Defendant Girdich. Indeed, Plaintiff's allegation that the removal of his grievances in his mail box was caused by his filing of grievances (rather than being caused simply by a mistake or negligence) is, in addition to being entirely conclusory, not even based on personal knowledge.[FN55]

FN55. (Dkt. No. 6, ¶ 18 [Plf.'s Am. Compl.].)

**\*10** As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claims against Defendant Girdich.

**B. Whether Plaintiff Has Failed to Establish an Eighth Amendment Claim of Deliberate Indifference to a**

**Serious Medical Need**

Defendants recite the correct legal standard that governs Plaintiff's claim of inadequate medical care under the Eighth Amendment. (Dkt. No. 37 at 3-5 [Defs.' Mem. of Law].) Generally, to prevail on such a claim, Plaintiff must show two things: (1) that Plaintiff had a sufficiently serious medical need; and (2) that Defendant was deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**1. Serious Medical Need**

Here, I find that Plaintiff has adduced no evidence of a medical need that was sufficiently serious under the Eighth Amendment. Plaintiff has alleged that, during the relevant time period, he suffered from one or more of the following ailments: (1) an injury to his lower back, which caused intermittent back pain requiring pain relievers and physical therapy; (2) a gastrointestinal problem that caused stomach pains; and (3) a psychological problem requiring Wellbutrin and/or Neurontin.[FN56] However, there is no evidence that, even when considered together, these conditions were sufficiently serious for purposes of the Eighth Amendment.

FN56. (*See generally* Dkt. No. 6 [Plf.'s Am. Compl.].)

For example, Plaintiff's medical records indicate that, during the days and weeks following the alleged assault on him on September 25, 2001, Plaintiff did not exhibit any signs of injury (such as bruising, marks, distress, diminution in range of motion, x-rays indicating a fracture, etc.); moreover, any complaints of pain communicated by Plaintiff to medical staff were sporadic and moderate or mild in nature (i.e., not characterized by Plaintiff as "severe," "extreme," "agonizing," "excruciating," etc.).[FN57]

FN57. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 9/25/01, 9/26/01, 9/27/01, 9/28/01,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

9/29/01, 10/4/01, 106/01, 10/8/01, 10/9/01, 10/14/01, 10/16/01, 10/24/01, 10/28/01, 10/29/01,11/2/01, 11/3/01, 11/7/01, etc.].)

Moreover, while Plaintiff's medical records do indicate that, in approximately May of 2002, Plaintiff complained about gastrointestinal problems apparently associated with a previous high-fiber diet that Plaintiff had been following (e.g., "gas," "spitting up," and "vomiting"), the records indicate that the complaints were, again, sporadic in nature and not of such severity as to be "urgent." [FN58] *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (standard contemplates "a condition of urgency, one that may produce death, degeneration or extreme pain") [citation omitted].

FN58. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.].)

Under the current record, I find that no reasonable fact-finder could conclude that Plaintiff was, during the relevant time period, afflicted with a medical condition that was so serious as to implicate the Eighth Amendment.

**2. Deliberate Indifference**

Even if Plaintiff had adduced evidence of a sufficiently serious medical need, he has adduced no evidence that Defendants Adams, Walsh and Girdich acted with the sort of *criminal recklessness* necessary to impose on them liability under 42 U.S.C. § 1983.[FN59] Indeed, the available evidence is to the contrary. The evidence indicates that the medical staff at Upstate C.F. adequately treated Plaintiff for his injuries.[FN60] Even if the medical staff at Upstate C.F. did not adequately treat Plaintiff, there is no evidence that either Defendant Adams or Defendant Walsh had anything to do with such inadequate treatment, since those two Defendants did not work the cell block in which Plaintiff was housed during the time in question.[FN61]

FN59. *See Farmer v. Brennan,* 511 U.S. 825, 827 (1994) ( "[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a claim of deliberate indifference to a serious medical need under the Eighth Amendment is] equivalent to criminal recklessness...."); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness....").

FN60. For example, the evidence indicates that, in approximately May of 2002, when Plaintiff complained about gastrointestinal problems (e.g., gas), Plaintiff received nearly constant medical attention for that condition. (Dkt. No. 35, Ex. A [Affirm. of Risa L. Viglucci, attaching Plf.'s medical records, specifically Plf.'s Ambulatory Health Records dated 45/10/02, 5/14/02, 5/20/02, 5/22/02, 5/23/02, 5/24/02, 5/26/02, 5/27/02, 5/29/02, etc.]; *see also* Dkt. No. 35, Ex. B, Smith Aff., ¶¶ 5-8 [generally describing medical staff's treatment of Plaintiff].)

FN61. (Dkt. No. 35, Ex. B, Affid. of Def. Adams, ¶ 5.)

**\*11** At most, Plaintiff is alleging there may have been a difference of opinion between the medical staff at Upstate C.F. and Plaintiff,[FN62] or *conceivably* a hint of negligence on the part of someone on the medical staff at Upstate C.F. However, neither a difference of opinion or negligence would be enough to make any staff member (much less Defendants Adams or Walsh) liable to Plaintiff under the Eighth Amendment [FN63] As the Second Circuit has explained,

FN62. (*See, e.g.,* Dkt. No. 6, ¶¶ 7, 50-51 [Plf.'s Am. Compl., indicating a disagreement between Plf. and Defs. Adams and Walsh regarding their

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

treatment of his back problem, and a disagreement with Def. Adams regarding whether mental health medication goes "out of stock"; Dkt. No. 39, ¶ 4.A. [Plf.'s Affirm. of Opp., stating, "The exams conducted by medical staff are only personal opinions of medical staff.... The exams was [sic] not professional...."].)

FN63. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks.... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves.... The essential test is one of medical necessity and not one simply of desirability. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim for deliberate indifference to a serious medical need.

**C. Whether Plaintiff Has Established the Personal Involvement of Defendant Girdich in any of the Alleged Constitutional Deprivations**

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Here, Plaintiff acknowledges that "Defendant Superintendent Girdich did not have any direct part in the infraction[s]" at issue. (Dkt. No. 39, ¶ 3.A. [Plf.'s "Affirmation of Opposition"].) Rather, argues Plaintiff, Defendant Girdich was involved in the infractions because he was the "over seer of the prison." (*Id.*) As a result, reasons Plaintiff, "[w]hen complaints get sent to his office it is his job to review the complaint, investigate the complaint and try to rectify the complaint." (*Id*.) Here, argues Plaintiff, although several complaints and grievances were sent by Plaintiff to Defendant Girdich's office, those complaints and grievances were never "rectified" by Defendant Girdich. (*Id.*)

**\*12** In this way, Plaintiff alleges and/or argues that Defendant Girdich is personally involved in the alleged constitutional deprivations through the *second* and *fifth* forms of personal involvement described above, namely that Defendant Girdich "failed to remedy [the] violation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)
(Cite as: 2006 WL 2827687 (N.D.N.Y.))

after learning of it through a report or appeal," and/or that he "exhibited deliberate indifference to the rights of [Plaintiff] by failing to act on information indicating that the violation was occurring."

Several problems exist with Plaintiff's theory of liability against Defendant Girdich. First, Plaintiff has adduced no evidence that he ever sent any complaint letters directly to Defendant Girdich.[FN64] Second, even if Plaintiff had adduced evidence that he sent complaint letters directly to Defendant Girdich, Plaintiff has adduced no evidence indicating that Defendant Girdich ever read any of the complaint letters.[FN65] Third, the only grievance contained in the record (Grievance No. UST-14199-02) was decided by Upstate C.F.'s First Deputy Superintendent, not by Defendant Girdich .[FN66] Indeed, Plaintiff appears to acknowledge the lack of involvement by Defendant Girdich when he alleges that his grievance about his "mail box" issue was brought to the attention of the First Deputy Superintendent (rather than alleging that it was brought to the attention of Defendant Girdich).[FN67]

> FN64. I note that, although Plaintiff's Amended Complaint refers to an "inclosed [sic] affidavit of support to and froms [sic] to IGRC and the Superintendent telling them to appeal all grievances to C.O.R.C. and responce [sic] also grievances and appeals [sic]," I can find no such attachment to Plaintiff's Amended Complaint (or any such affidavit or "enclosure" in the docket). (Dkt. No. 6, ¶ 12 [Plf.'s Am. Compl.].) Moreover, although Plaintiff's "Affirmation of Opposition" asserts that Plaintiff sent complaints to Defendant Girdich, that vague assertion is devoid of such details as the dates on which the communications were sent, a description of the issues raised in the communications, or even a description of the precise nature of the communication (e.g., whether it was a letter, grievance appeal, etc.). (Dkt. No. 39, ¶ 3.B. [Plf.'s Affirm. of Opp.].) As a result, Plaintiff's assertion is entirely conclusory and insufficient to create a dispute of material fact sufficient to defeat a motion for summary judgment. (*See, supra,* Part III of this Report-Recommendation.).

> FN65. (*See, e.g.,* Dkt. No. 6, ¶ 15 [Plf.'s Am.

Compl., assuming, without indicating any personal knowledge, that Def. Girdich read Plaintiff's complaints].)

> FN66. (Dkt. No. 35, Ex. B [Affirm. of Risa L. Viglucci, attaching Superintendent's Decision of Plf.'s Grievance No. UST-14199-02, dated 12/24/02, signed by Deputy Superintendent].)

> FN67. (Dkt. No. 6, ¶ 19 [Plf.'s Am. Compl.].)

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Girdich due to his lack of personal involvement in the alleged constitutional deprivations.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 33) be *GRANTED*.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Salaam v. Adams
Not Reported in F.Supp.2d, 2006 WL 2827687 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Corey FORD, Plaintiff,
v.
William E. PHILLIPS, Superintendent of Green Haven
Correctional Facility; Guiney, Deputy Superintendent;
Matthew Miller, Corrections Officer; Franklin W.
Middleton, Corrections Officer; S. Phillip, Corrections
Officer; D. McClenning, Corrections Officer, J. Erns,
Corrections Officer; D. Huttel, Corrections Officer; C.
Austin, Corrections Officer; L. Czyzewski, Corrections
Officer; R. Myers, Sergeant; D. Carey, Sergeant; John
Doe # 1, Corrections Officer; John Doe # 2, Corrections
Officer; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; John Maly, Deputy
Superintendent; Bipin Bhavsar, Medical Doctor;
Kimbler, Sergeant; Jewett, Sergeant; Alfred Vacca,
Inspector General, individually and in their official
capacities, Defendants.[FN1]

> [FN1.] This caption reflects the caption in
> plaintiff's Complaint. Defendants did not provide
> the Court with a full, corrected caption.

No. 05 Civ. 6646(NRB).

March 27, 2007.

Corey Ford, Walkill, NY, Plaintiff, pro se.

Efthimios Parasidis, Assistant Attorney General, Office of
the Attorney General, State of New York, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

BUCHWALD, J.

**\*1** *Pro se* plaintiff Corey Ford ("Ford"), who is currently
incarcerated, brings this action against employees of the
Department of Correctional Services ("DOCS"), pursuant
to 42 U.S.C. § 1983, alleging: (1) excessive force; (2)
denial of recreation, showers, special meals and property;
(3) deliberate indifference to a serious medical need; and
(4) mail interference, all in violation of his constitutional
rights. Ford moved for summary judgment on July 24,
2006 and defendants cross-moved for summary judgment
on December 22, 2006.[FN2] For the reasons stated below,
we deny Ford's motion for summary judgment and grant
defendants' motion for summary judgment in part.

> [FN2.] Although the title of Ford's motion is
> "Motion for Partial Summary Judgment", his
> papers clearly argue for judgment on all of the
> claims raised in his Complaint. Defendants'
> motion for summary judgment expressly applies
> to Ford's entire Complaint.

*BACKGROUND* [FN3]

> [FN3.] Unless otherwise noted, the following facts
> are not in controversy.

A. Ford's Attack on Officer Miller

Plaintiff's Complaint arises from events at the Green
Haven and Shawangunk correctional facilities in April and
May of 2004.[FN4] In the early afternoon of April 14, 2004,
at approximately 12:30 p.m., Ford exited his cell without
permission when a corrections officer unlocked the door
for Ford's cellmate.[FN5] After leaving his cell, Ford headed
directly for Officer Miller, who was writing passes for
inmates.[FN6] As Ford later admitted,[FN7] Ford then threw hot
oil on Officer Miller, burning his face, head, eye, neck,
shoulders and chest, and repeatedly stabbed Officer Miller
with a homemade shank measuring approximately nine
inches in length. As he was attacked by Ford, Officer
Miller repeatedly screamed, "Get him off me!" [FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN4. Plaintiff is currently incarcerated and serving a sentence of twelve and one-half to twenty-five years, having plead guilty to attempted murder, kidnapping and a weapons violation. *See* Declaration of Efthimios Parasidis ("Parasidis Decl."), dated December 22, 2006.

FN5. *See* Parasidis Decl., Ex. B, FORD 42. Earlier that day, Officer McClenning observed Ford yelling from his cell gate and generally being disrespectful. *Id.* at FORD 39.

FN6. *See id.* at FORD 1, 15, 17-18, 27, 34, 40, 42, 44, 66.

FN7. *Id.,* Ex. E., FORD IG 26-29, 290-295.

FN8. *Id.,* Ex B., April 14, 2004 Statement of Officer J. Erns ("I heard officer Miller begin to scream.... I saw Officer Miller being attacked by an inmate and Officer Miller screaming 'Get him off me Get him off me' ").

Officers Phillips, Middleton and Todriff responded to Officer Miller's call, attempting to restrain Ford.[FN9] After slipping in the oil and falling with Ford to the ground, the officers pried the shank out of Ford's hand, placed him in mechanical restraints, stood him up, and faced him against a wall.[FN10] Once the officers had Ford under control, an ambulance rushed Officer Miller to St. Francis Hospital in Poughkeepsie, New York, where he remained over night.[FN11] Officers Todriff and Middleton were also treated at the St. Francis emergency room for injuries sustained while restraining Ford.[FN12] Ford was later convicted by a jury for his assault on Officer Miller and is currently awaiting sentencing.[FN13]

FN9. *Id.*

FN10. *Id.* at FORD 1, 10-12, 16, 27, 29, 42, 77, 80.

FN11. *Id.* at FORD 45-46.

FN12. *Id.* at FORD 1-2, 21-22, 43.

FN13. *See id.,* Ex. F, FORD 130-131. *See also* Supreme & County Courts of the State of New York, Dutchess County, Certificate of Disposition Indictment (certifying that Ford was convicted of one count of first degree attempted assault, two counts of second degree assault, two counts of third degree criminal possession of a weapon, and one count of promoting prison contraband in the first degree).

In his Complaint, Ford provides a somewhat different version of the events of April 14, 2004. Specifically, Ford asserts that Officer Miller denied him recreation, an alternative meal, and showers on April 5, 12, 13 and 14 of 2004[FN14] and that, on the morning of April 14, 2004, prior to his attack on Officer Miller, Officers Miller, Erns, and McClenning kicked and punched Ford in the face, head, chest and back without provocation.[FN15] Ford further asserts that later, at 12:30 p.m., approximately the time of Ford's assault on Officer Miller, Officers Miller, Erns, Middleton and Phillips used excessive force against him.[FN16]

FN14. Ford Complaint, received June 20, 2005 at the S.D.N.Y. Pro Se Office, at 6. Ford contends that he is entitled to non-meat meals.

FN15. *Id.* (alleging cruel and unusual punishment, harassment, excessive force, deprivation of outside exercise, threats of bodily harm, and other grievances). As discussed *infra,* these claims are contradicted by statements made and signed by Ford shortly after the putative attack.

FN16. *Id.* at 7.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

Thus, Ford does not directly challenge the facts provided above, but adds that Officer Miller deprived him of certain entitlements over four days, that Officers Miller, Erns and McClenning used excessive force against him on the morning of April 14, 2004, and that Officers Miller, Erns, Middleton and Phillips used excessive force against him again when he attacked Officer Miller.

**B. Ford's Escort to Special Housing**

**\*2** After Ford attacked Officer Miller, Officers Huttel, Czyzewski, Myers and Austin escorted Ford to Special Housing (also known as "SHU"). During the escort, defendants contend that plaintiff was combative and uncooperative, kicking Officer Huttel and attempting to kick the other officers.[FN17] As is evident from a videotape showing parts of Ford's transfer to Special Housing, Ford fell twice during his escort and was picked up by the officers each time.[FN18] Ford claims that he was again the victim of excessive force during this transfer, calling the officers' conduct "unwarranty malicious sadistic and unprovoked" and alleging that his head was repeatedly rammed into a wall and steel bars, and that he was punched and kicked in the face and back.[FN19]

> FN17. Parasidis Decl., Ex. B, FORD 2, 42, 48, 52, 60-63; Ex. H (videotape of officers escorting Ford to Special Housing).

> FN18. *Id.*

> FN19. Compl. at 6-10. Apparently quoting the report from his medical examination, Ford asserts that he sustained "extreme and numerous abriasions (sic), with bleeding Lt temple (sic), redenes abriasion (sic) on both right and left sides of plaintiff face. 2 redden abriasions areas (sic) RT upper chest, superficial scratches on RT upper back" from the April 14 attacks.

**C. Ford's Post-Incident Medical Treatment**

Upon his arrival at Special Housing, Ford was examined

by medical staff, which found him to have a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back.[FN20] The staff found no other injuries and the medical records indicate that Ford did not suggest that he had any other injuries at that time.[FN21]

> FN20. Parasidis Decl., Ex. B, FORD 2, 8-9 (April 14, 2004 Physical Examination of Corey Ford), 51-53.

> FN21. *See id.,* Ex. C, FORD GRIEVANCE 43-46 (SHU Entrance Exam, stating "Use of force exam done.").

During the next few weeks, Ford received additional medical attention. On the morning of April 16, for instance, Ford was examined by a triage nurse and complained the he was urinating and spitting up blood.[FN22] The nurse scheduled an appointment for Ford to meet with a doctor and he was examined by Dr. Bipin Bhavsar that afternoon.[FN23] After examining Ford, Dr. Bhavsar ordered a urine analysis [FN24] and prescribed Tylenol.[FN25] Dr. Bhavsar also treated Ford on April 21, 2004, as Ford again complained of blood in his urine, and ordered a second urine analysis.[FN26] Both urine analyses found evidence of blood.[FN27]

> FN22. *Id.,* Ex. B, 47; Ex. D, FORD MEDICAL 26.

> FN23. *Id.*

> FN24. *Id.;* Ex. G (Bhavsar Decl.) at 1.

> FN25. *Id.*

> FN26. *Id.* at FORD MEDICAL 25; Ex. G at 2.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN27. *Id.*

On April 29, 2004, medical staff examined Ford because Ford complained of pain in his wrists.[FN28] The staff determined that Ford had "no obvious loss of dexterity."[FN29] The next day, on April 30, 2004, Dr. Bhavsar reexamined Ford, observing that Ford's ribs and abdomen had no tenderness, that his glands were not enlarged, that his abrasions were healed, and that his wrist was not swollen or restricted in movement.[FN30] As Ford still complained of blood in his urine, Dr. Bhavsar ordered a third urine analysis and ordered that x-rays be taken of Ford's hands as a precaution.[FN31] The x-rays were taken on May 3, 2004 and revealed no "fracture, dislocation or arthritic change."[FN32]

FN28. *Id.*

FN29. *Id.*

FN30. *Id.* at FORD MEDICAL 24; Ex. G at 9.

FN31. *Id.* at FORD MEDICAL 37.

FN32. *Id.* at FORD MEDICAL 41.

Finally, since Ford continued to complain of pain and other problems, and since the urine tests persisted in revealing blood at level "3+", Dr. Bhavsar ordered that Ford undergo a CAT-scan of his abdomen and kidneys on May 7, 2004.[FN33] The CAT-scan results were negative.[FN34] In addition to this and the other treatments he received, Ford had daily opportunities for medical assistance from the Special Housing nurse who, in accordance with DOCS policy, made regular rounds of the entire Special Housing unit.[FN35]

FN33. *Id.* at FORD MEDICAL 22-3, 69; Ex. G at 2.

FN34. *Id.* (Ford's "renal parenchyma and

collecting system [were] normal on all series" and there was "no evidence of renal stone, filling defect, or mass lesion". Ford's liver, adrenals, pancreas, spleen and bowels were also found to be "unremarkable". No free fluid or air was detected and, more generally, there was no evidence of any medical abnormality).

FN35. *Id.,* Ex. C, FORD GRIEVANCE 34.

**\*3** Notwithstanding the medical attention he received, Ford contends that he was denied necessary medical treatment during April and May of 2004.[FN36] Specifically, he asserts that he "was denied medical treatment on arrival to [Special Housing]" and, despite numerous complaints made to Sgt. Jewett, Sgt. Kimbler and others that he was in excruciating pain, "never received medical attention".[FN37] Ford claims that, to this day, he suffers from a weak bladder and leaks blood from his penis on occasion.[FN38]

FN36. *See e.g.* Ford' Motion for Partial Summary Judgment, dated July 24, 2006, at 18.

FN37. *Id.*

FN38. *Id.*

D. Post-Incident Restrictions on Ford

Ford was placed under certain restrictions upon his admission to Special Housing. According to defendants, Ford was under a restraint order as a result of his assault on the staff at Green Haven and, accordingly, was not permitted out-of-cell activities.[FN39] As well, Ford was initially denied certain property because of the danger he posed to himself and to others.[FN40] The order restraining Ford remained in effect until May 3, 2004, and the order regarding Special Housing property remained in effect until April 25, 2004.[FN41] Ford was permitted to leave his cell on April 20, 2004 to retrieve his personal property and, according to defendants' affidavits, was permitted out of his cell to shower on a regular basis starting on April

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

23, 2004.[FN42]

> FN39. Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57.

> FN40. *Id.*

> FN41. *Id.*

> FN42. *Id.*

Ford offers a slightly different, if only more specific, version of these restrictions. Ford repeatedly claims that, in violation of his rights, his cell was covered with plexi-glass and he was denied bed sheets, a pillow case, a towel, a wash cloth, soap, toothpaste, a toothbrush, pens and writing paper.[FN43] He also claims that he was not permitted to shower or to have outside recreation for fourteen days.[FN44] Ford states that he complained of these deprivations to Sgts. Kimbler and Jewett on April 15, 2004, the day after his attack on Officer Miller and before some of the deprivations allegedly occurred, but that the Sergeants ignored his complaints.[FN45]

> FN43. *See e.g.* Complaint at 10.

> FN44. *Id.*

> FN45. *Id.* at 10-11.

E. Ford's Mail Watch

Following his attack on Officer Miller, Shawangunk officials also implemented a mail watch for Ford pursuant to DOCS policy.[FN46] During the mail watch, DOCS employees discovered a letter from Ford in which he boasts about his attack on Officer Miller: "I had to let one of those crazy ass pink boys have a balance kit of steel & an hot oil treatment." [FN47] The mail watch also revealed a letter in which Ford apparently tried to convince his girlfriend and others to improperly influence a witness in his trial for that attack: "I'm trying to establish a way to try & beat this case, some way so (sic) how we have to make Mr. Hill do what we want him to do not what he wants to do." [FN48]

> FN46. Parasidis Decl., Ex. B, 126, 128-129, 131-137; Ex. J, FORD MAIL 1-12.

> FN47. *Id.,* Ex. E, FORD IG 316-324.

> FN48. *Id.,* at FORD IG 316, 325-333.

In his Complaint, Ford contends that Superintendent Joseph T. Smith authorized a mail watch on his personal and legal mail, which prevented Ford's girlfriend from receiving Ford's mail and prevented Ford from receiving mail from his girlfriend.[FN49] Ford further claims that DOCS employees and others conspired to deprive him of his privacy and to hamper his access to the courts by confiscating his incoming and outgoing legal mail, stating that incoming legal documents were taken and never returned to him.[FN50]

> FN49. Compl. at 13-14.

> FN50. *Id.* at 15.

*DISCUSSION*

A. Legal Standard

**\*4** Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 55(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Gallo v. Prudential Residential Srvcs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). The moving party bears the initial burden of "informing the district court of the basis for its motion"

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and of identifying the matter that "it believes demonstrates the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323.* In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P. 56(e).*

When, as here, both parties seek summary judgment, the Court must consider each party's motion on its own merits, "taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Educ., 667 F.2d 305, 314 (2d Cir.1981); accord Abrams v. United States, 797 F.2d 100, 103 (2d Cir.1986).* However, the submissions of a *pro se* plaintiff are held to a less stringent standard than those drafted by an attorney and must be liberally construed for the benefit of the plaintiff. *Estelle v. Gamble, 429 U.S. 97 (1976); Patrick v. LeFevre, 745 F.2d 153, 160 (2d Cir.1984).*

B. Analysis

1. Eleventh Amendment

As a preliminary matter, defendants note that they are sued for damages in their official as well as individual capacities and argue that Ford may only sue defendants for damages in their individual capacities. Defendants are correct. *See Al- Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065 (2d Cir.1989)* ("[S]ection 1983 claim for damages against a state official can only be asserted against that official in his or her individual capacity"); *accord Davis v. New York, 316 F.3d 93 (2d Cir.2002); see also Kentucky v. Graham, 473 U.S. 159 (1985)* (a claim for damages against state officials in their official capacity is considered to be a claim against the state and is therefore barred by the Eleventh Amendment); *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984)* (agencies and departments of the state are entitled to assert the state's Eleventh Amendment immunity); *Santiago v. New York State Dep't of Corr. Servs., 945 F.2d 25, 28 n. 1 (2d Cir.1991)* (department that is an agency of the state

is entitled to assert Eleventh Amendment immunity); *cf. Hafer v. Melo, 502 U.S. 21, 27-31 (1991)* (Eleventh Amendment does not bar actions for damages against state officials sued in their personal or individual capacities). Accordingly, Ford's claims for damages against defendants in their official capacities are dismissed.

2. Excessive Force

**\*5** Regarding his claims for excessive force, Ford describes three instances of abuse in his Complaint, which he alleges occurred: (1) on the morning of April 14, 2004; (2) after his assault on Officer Miller; and (3) during his transfer to Special Housing. Defendants argue that Ford was not the victim of excessive force and that any force used against him was appropriate given his attack on Officer Miller and his combative behavior following that attack.

To prevail on a claim for excessive force constituting cruel and unusual punishment under the Eighth Amendment, a plaintiff must show the unnecessary and wanton infliction of pain. *Hudson v. McMillian et al., 503 U.S. 1 (1992)* (citing *Whitley v. Albers, 475 U.S. 312 (1986)*). Whether an infliction of pain is unnecessary and wanton depends on the context in which force is used. *Whitley, 475 U.S. at 320.* Where prison officials use force to quell a prison disturbance, the question is whether force was applied in a good faith effort to maintain or restore discipline or, instead, if it was applied maliciously and sadistically for the purpose of causing harm. *Id. at 320-21; Hudson, 503 U.S. at 7* (prison officials must act quickly when responding to a prison disturbance, balancing the need to "maintain and restore discipline" against "the risk of injury to inmates."). When an individual attacks with a deadly weapon, for instance, corrections officers may respond with commensurate force. *Diggs v. New York Police Dep't et al., 2005 U.S. Dist. LEXIS 38244, \*1 (E.D.N.Y.2005)* (citing *Tennessee v. Garner, 471 U.S. 1, 11-12 (1985)* and *Estate of Kenneth Jackson v. Rochester, 705 F.Supp. 779, 783 (W.D.N.Y.1989)*).

a. The Morning of April 14, 2004

Ford alleges that Officers Miller, Erns and McClenning,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

without provocation, kicked and punched him in the face, head, chest and back, while using racial epithets, on the morning of April 14, 2004. Defendants respond that Ford was abusive and disruptive on the morning of April 14, 2004 and that corrections officers "verbally counseled" Ford without using any force.[FN51]

FN51. *See e.g.* Parasidis Decl., Ex. E., FORD IG 303.

Having reviewed the parties' submissions and the evidence presented to the Court, we hold that no reasonable jury could find in favor of Ford on this claim. First, Ford's evidence is very weak and primarily suggests only a *de minimus* use of force. Ford offers no direct medical evidence supporting his claim [FN52] and his documentary evidence is limited to affidavits from other inmates, which contradict one another and are otherwise problematic. [FN53] The only affidavit submitted by Ford that offers any specific allegations of potentially excessive force is signed by inmate Eric Tolliver. That affidavit states, somewhat ambiguously, that Tolliver saw Officers Miller and McClenning attack Ford with "solid fist and kicks" after 9:40 a.m. on April 14, 2004.[FN54] However, in addition to being ambiguous in its description of the morning's events, Tolliver's affidavit suffers from the following problems: (1) it contradicts statements in the other affidavits submitted by Ford, including inmate Shaun Harris's sworn recollection of what Ford told Harris about that morning; (2) it makes no mention of Officer Erns, in contrast to the version of the events offered in Ford's Complaint; and (3) it was signed and dated by Tolliver on September 12, 2006, more than two years after the incident allegedly took place.

FN52. Ford could have sustained any and all of the medical injuries evidenced in the record during his attack on Officer Miller or during his transfer to Special Housing.

FN53. Specifically: the May 19, 2004 affidavit of Shaun Harris offers no personal knowledge of the alleged attack, stating only that Ford told Harris that Officer Miller had pushed Ford into his cell after yelling at Ford; the July 22, 2004 affidavit of Jermaine Page offers personal

knowledge of Ford being "up on the wall" on April 14, 2004, but says nothing about a push or any other violence; the September 14, 2004 affidavit of Jesse Guess states that Mr. Guess saw Officer Miller push Ford into his cell, consistent with what Harris claims Ford told Harris, but inconsistent with Jermaine Page's statement; the April 28, 2004 affidavit of Ralph Nieves only alleges general harassment of Ford by Officer Miller; and the August 24, 2004 affidavit of Allen Griffin generally alleges that he saw Officer Miller "verbally, mentally, emotionally, and physically" assault Ford on April 14, 2004, but does not specify whether the assault occurred in the morning or in the afternoon on April 14 and does not specify what kind of physical assault took place. The Court found these affidavits amidst a stack of disorganized papers in the case file kept by the clerk's office.

FN54. Paragraph 8 of the Tolliver affidavit states exactly as follows: "On April 14, 2004 I was out of my cell as usual to clean up after keeplock recreation went out approx. 9:30 AM, I was talking to the dubble (sic) bunk cell above 143, 4 company, for about 10 minutes, The cell on 4-company 143 opened up around 9:40 AM I locked in and called the guy whom I heard his name was "C" which I found out was actually Corey Ford, I told him to watch himself I seen C.O. Miller use the exact tactics that I warned [him] about yesterday, the Guy Corey Ford was called over to the [B] post first and the gate to 4-company was then locked, I seen solid fist and kicks being thrown by officer M. Miller and c.o. McClenning connecting against the inmate Corey ford FACE and body, The inmate was yelling for help, I witness the whole excessive force incident."

**\*6** Second, defendants offer evidence that Ford faced no excessive force on the morning of April 14, 2004, having submitted a number of sworn affidavits to this effect,[FN55] and Ford's own statements, made shortly after the alleged abuse, confirm this position. In a statement signed on April 14, 2004, and in another statement signed on April 15, 2004 ("Ford's Post-Incident Statements"), Ford does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

not accuse Officers Miller, McClenning and Erns of punching and kicking him during the morning of April 14, 2004. On the contrary, Ford makes no mention of any force used by Officers McClenning and Erns and only alleges that Officer Miller used a *de minimus* amount of force against him: "At this point, Miller slapped me on each side of my face ..." [FN56] *Candelaria v. Coughlin*, 787 F .Supp. 368, 374 (S.D.N.Y.1992) (use of force *de minimus* when officer "pushed his fist against [plaintiff's] neck so that [he] couldn't move and was losing [his] breath"), *aff'd* 979 F.2d 845 (2d Cir.1992).

FN55. *See supra* note 51.

FN56. Parasidis Decl., Ex. E, FORD IG 26-28 (quoting Ford's April 14, 2004 statement); *see also id.* at FORD IG 290-93 ("This is where he yells at me and slap me (sic) across my face"), dated April 15, 2004 at 9:00 a.m.

Third, given the different versions of the April 14 events offered by Ford and the inconsistencies between the affidavits submitted by Ford to support his Complaint, no reasonable jury could credit Ford's latest allegations. *See e.g. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir.1991) (plaintiff may not "create a material issue of fact by submitting ... affidavit[s] disputing his own prior sworn testimony" in order to defeat defendants' summary judgment motion) (quoting *Mack v. United States*, 814 F.2d 120, 124 (1987)); *Jeffreys v. City of New York*, 426 F.3d 549, 553 (affirming district court's grant of summary judgment for defendants in section 1983 case brought by *pro se* prisoner-where plaintiff relied almost exclusively on his own testimony, district court could make assessments about whether a reasonable jury could credit plaintiff's testimony); *Shabazz v. Pico*, 994 F.Supp. 460, 470 (S .D.N.Y.1998) (Sotomayor, J.) (granting summary judgment for defendants where "plaintiffs allegations of the events at issue [were] replete with inconsistent and contradictory statements" and "plaintiff's version of the events ... [had] undergone at least one significant revision"). Ford has offered no fewer than four versions of what happened on the morning of April 14, 2004 through his submissions to the Court, at least three of which allege only a *de minimus* use of force and many of which, as discussed, are inconsistent with one another.[FN57] Moreover, Ford's signed

and personal version of the events, without any explanation from Ford, has undergone at least one significant and self-serving revision, changing from a story about a *de minimus* use of force to one about a brutal, unprovoked beating.

FN57. *See supra* note 53. Versions of the events offered in Ford's submissions include: (1) Ford was pushed into his cell; (2) Ford was held up on a wall; (3) Ford was slapped in the face by Officer Miller; (4) Ford was punched and kicked by Officers Miller, McClenning and Erns; and (5) Ford was punched and kicked by Officers Miller and McClenning.

In sum, given the sheer lack of evidence to support Ford's new version of the April 14 morning events, the substantial evidence against that version, and the fact that Ford's initial, signed statements contradict the allegations in his Complaint and confirm defendants' position, no reasonable jury could find in favor of Ford on this claim. Accordingly, we deny Ford's motion for summary judgment and grant summary judgment in favor of defendants.

b. Attack on Officer Miller

**\*7** Regarding the afternoon of April 14, 2004, Ford alleges that Officers Miller, Erns, Middleton and Phillips kicked and punched him, and that Sgt. Carey watched this happen without taking action. Having reviewed the parties' submissions, we hold that, even accepting Ford's allegations as true, no reasonable jury could find that defendants responded with excessive force when attempting to save Officer Miller.

The genesis of Ford's claim is his own brutal attack on Officer Miller. As Ford admits, he rushed Officer Miller, threw hot oil on his face and then stabbed him repeatedly with a nine inch shank. Given this use of potentially lethal force, and given that defendants had to react quickly to save Officer Miller, defendants were legally authorized to respond to Ford with significant force of their own, perhaps including deadly force. *See e.g. Tennessee*, 471 U.S. at 11-12; *see also Diggs v. New York Police Dep't et*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

*al.,* 2005 U.S. Dist. LEXIS 38244, *1 (E.D.N.Y.2005). Most significantly, Ford does not allege that defendants used force even commensurate with the force that he used against Officer Miller. Instead, he only alleges that the officers punched and kicked him as they got him under control.[FN58] No reasonable jury could deem this force to have been wanton, unnecessary or otherwise excessive under the circumstances. Accordingly, we deny summary judgment for Ford and grant it for defendants.[FN59]

> FN58. *See e.g.* Parasidis Decl., Ex. B, FORD 1-2, 22, 43.

> FN59. Additionally, the officers are protected by the doctrine of qualified immunity for this allegation of excessive force as it would be objectively reasonable to respond to Ford's apparent attempt to seriously injure or kill Officer Miller with force much greater than that alleged by Ford. *See e.g. Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir.2001) (officers entitled to qualified immunity as it was objectively reasonable for them to believe that their actions were lawful at the time of the challenged act).

c. Transfer to Special Housing

Regarding his transfer to Special Housing, immediately following his attack on Officer Miller, Ford alleges that he was kicked and punched by the officers escorting him, that Sgt. Myers punched him in the right side of his face, that the officers tried to break his wrist while he was on the elevator to Special Housing, that the officers repeatedly rammed his head into the steel bars at the entrance to Special Housing, and that the officers rammed his head into the wall of the strip/frisk room.[FN60] Defendants respond that they did not use excessive force against Ford and that Ford was uncooperative and violent throughout the transfer to Special Housing.

> FN60. Compl. at 9.

We deny Ford's motion for summary judgment on this claim. Ford offers no meaningful evidence, other than his own version of the events, to support the putative attacks during his transfer to Special Housing, and the medical evidence submitted by defendants tends to contradict Ford's claims. For instance, Ford asserts that his face and head were repeatedly rammed into steel bars, that the officers tried to break his wrist, and that Ford was otherwise beaten severely throughout the transfer-beatings that ostensibly followed Ford's alleged beating that morning at the hands of Officers Miller, Erns and McClenning as well as Ford's alleged beating during his attack on Officer Miller. Yet, the medical record of Ford's injuries upon his entrance to Special Housing reveals only the minor abrasions and scratches discussed *supra,* and the subsequent CAT-scan and x-rays revealed no injuries to Ford's abdomen or wrist. Moreover, Ford's transfer to Special Housing came immediately after, and because of, his assault on Officer Miller, making it objectively reasonable for the officers to use some amount of force to keep him under control.

**\*8** Despite the apparent weakness of Ford's evidence regarding this claim, we also deny defendants' motion for summary judgment. Defendants offer the medical evidence, which tends to contradict Ford's story, their sworn affidavits that Ford was not beaten during the transfer, their claims that Ford was combative throughout the transfer, and a video tape of the transfer that shows no violence being committed against Ford (but also does not show Ford being noticeably combative). Nevertheless, this evidence is not sufficient to preclude a reasonable jury from finding in Ford's favor. First, Ford offers his own sworn statement of the events in his Complaint, which describes a malicious, unprovoked beating accomplished while using racial epithets and, unlike his version of the morning attack, this version is consistent with Ford's Post-Incident Statements.[FN61]

> FN61. Ford makes no mention of abuse during his transfer to Special Housing in his April 14, 2004 statement. However, in his April 15, 2004 statement, Ford notes, "I also want to tell you about how I was assaulted in the elevator on my way to SHU. I was slammed in to the wall and taken to the floor a number of times. I did not resist. They had my hands cuffed behind my back and my pants were falling down. I had a hard time standing up-so I fell to the floor. When this happened they punched me in the balls. I think I

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

got the bump on my head when they threw me into the wall....".

Second, although the Court might find the low level of injuries in Ford's medical reports to strongly contradict Ford's claims, we cannot rely on that evidence alone to enter summary judgment against him. *See e.g. Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999) (genuine issues of material fact existed concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him; district court mistakenly concluded that because appellant's injuries were not severe, appellant's claim failed as a matter of law); *Estelle,* 429 U.S. at 102-105 ("inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials").[FN62]

FN62. As well, the evidence that Ford had blood in his urine tends to support his allegation that he was punched and kicked in the back. If defendants needlessly punched Ford in the back causing him to have internal bleeding, they violated his Eighth Amendment rights.

Finally, although the video tape shows Ford being escorted to and from the elevator to Special Housing and shows him entering the strip/frisk room and being stripped and frisked without apparent incident, the video has periodic breaks and interruptions. Whereas a complete video might dispel all issues of fact regarding Ford's transfer, an incomplete video cannot.[FN63] Accordingly, summary judgment is denied for defendants as well as for Ford on this claim.[FN64]

FN63. Ford insists that defendants intentionally beat him when the cameras were off and during transitions between cameras. *See* Ford's Motion for Partial Summary Judgment at 8.

FN64. Defendants claim that they are entitled to qualified immunity on all claims raised by Ford. However, the doctrine of qualified immunity, which protects officers in the reasonable exercise of their duties, clearly would not cover a malicious beating as alleged by Ford during his

transfer to Special Housing. *See supra* note 59.

d. Due Process

Liberally construed, Ford's Complaint also alleges that the aforementioned uses of excessive force violated his due process rights under the Fourteenth Amendment. For prisoners, however, the Eighth Amendment "serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." *Whitley v. Albers,* 475 U.S. 312, 327 (1986). "Any protection that 'substantive due process' affords convicted prisoners against excessive force is, [the Supreme Court] has held, at best redundant of that provided by the Eighth Amendment." *Graham v. Connor,* 490 U.S. 386, 395 (1989). Accordingly, Ford is only entitled to pursue his claims for excessive force under the Eighth Amendment. *Cf. Rodriguez v. Phillips,* 66 F.3d 470, 477 (2d Cir.1995) (in the non-prisoner, non-seizure context, the due process right to be free from excessive force is alive and well). Thus, we grant summary judgment for defendants on this claim.

3. Deprivations

*9 Ford also alleges that he suffered a number of deprivations upon being transferred to Special Housing and that these deprivations amounted to cruel and unusual punishment under the Eighth Amendment and to a violation of his due process rights under the Fourteenth Amendment. Defendants argue that Ford has failed to offer sufficient support for these claims.

a. Cruel and Unusual Punishment

"The constitutional prohibition against cruel and unusual punishments is intended to protect inmates from serious deprivations of basic human needs such as adequate food, clothing, shelter and medical care." *Malsh v. Garcia,* 971 F.Supp. 131, 138 (S.D.N.Y.1997). An Eighth Amendment claim challenging prison deprivations requires proof of subjective and objective components. Subjectively, the prison officials must have acted with deliberate indifference toward an inmate's health or safety and,

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

objectively, the inmate's deprivation must have been sufficiently serious to have denied that inmate "the minimal civilized measure of life's necessities." *Branham v. Meachum,* 77 F.3d 626 (2d Cir.1996) (citing *Wilson v. Seiter,* 501 U.S. 294, 297-98 (1997) and *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied* 513 U.S. 1154 (1995)). The "minimal civilized measures of life's necessities" is not a low standard. Indeed, "conditions that are restrictive and even harsh are part of the penalty that criminal offenders pay for their offenses against society." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985) (internal quotations omitted).

To support his Eighth Amendment claim, Ford alleges a number of deprivations. He complains that, on April 5, 12, 13, and 14, he was denied special meals, outside exercise and showers by Officer Miller and that, upon his arrival at Special Housing and until April 28, he was forced to have a plexi-glass shield on his cell, was denied recreation, was denied showers, did not trust the food given to him on one or two occasions, and was denied various personal items.

Defendants respond that Special Housing prisoners are limited in the number of belongings they may possess, that they are further limited in their recreation and shower privileges, and that these limitations may be extended if members of DOCS staff determine that the inmate poses a threat to himself or to others.[FN65] Defendants further state that Ford's vicious attack on Officer Miller precipitated his placement in Special Housing, that DOCS staff placed the restrictions on Ford expressly in response to that attack, and in response to the danger that Ford posed to himself and to others, and that the restrictions, which were temporary in nature and made in accordance with DOCS policy, did not amount to a constitutional violation.

> FN65. See Defendants' Mem. of Law at 10-13.

We agree with defendants that Ford's deprivation claims do not begin to demonstrate deliberate indifference toward Ford's need for the minimal necessities of life. Ford does not allege or explain why the temporary placement of a plexi-glass shield threatens his minimum needs and, as a matter of law, minor and temporary deprivations of property, showers and recreation do not violate the Eighth

Amendment. *See e.g. Chapple v. Coughlin,* 1996 U.S. Dist. LEXIS 12960, *1 (S.D.N.Y 1996) (temporary deprivations of shower, recreation and legal papers "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment") (citing *Majid v. Scully,* No. 83 Civ. 7409, 1985 WL 1408 *6 (S.D.N.Y. May 21, 1985) (unpublished)); *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (prisoners must receive nutritiously adequate food that does not endanger their health and safety); *Cruz v. Jackson,* 1997 U.S. Dist. LEXIS 1093 (S.D.N.Y. Feb. 5, 1997) (two weeks without showers, cold food for four weeks and unspecified incidents of receiving rusty drinking water did not violate Eighth Amendment rights) (citing *Williams v. Greifinger,* 918 F.Supp. 91, 95 n. 3 (S.D.N.Y.1996)).

**\*10** Moreover, defendants have provided evidence that the deprivations were not a result of malice or of deliberate indifference to Ford's health or safety but, instead, served legitimate security and safety needs following Ford's attack on Officer Miller and were imposed during a period of time when Ford received food and medical care.[FN66] Accordingly, Ford's motion for summary judgment on his Eighth Amendment claim is denied and summary judgment is granted for defendants.

> FN66. *See e.g.* Parasidis Decl., Ex. C, FORD GRIEVANCE 34-35, 50-57; Ex. I, FORD ORDERS 1-8.

b. Due Process

Ford also suggests that his confinement to Special Housing, given the deprivations discussed above, violated his right to due process under the Fourteenth Amendment. We construe Ford's Complaint as asserting his liberty interest to be free from confinement involving atypical and significant hardships without due process of law.

A prisoner's confinement to Special Housing in a New York prison may implicate that prisoner's legally recognized interest in being free from restraints imposing atypical and significant hardships relative to the ordinary incidents of prison life. *Sandin v. Connor,* 515 U.S. 472

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

(1995) (thirty days in Special Housing does not, by itself, violate prisoner's due process rights); *Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996)* (prisoner failed to demonstrate a significant deprivation of a liberty interest where he spent approximately twelve days in Special Housing and was denied "certain privileges that prisoners in the general population enjoy"); *Lee v. Coughlin, 26 F.Supp.2d 615 (S.D.N.Y.1996)* (Sotomayor, J.) (376 days in Special Housing implicated liberty interest recognized by the State of New York). However, to prevail under section 1983, a plaintiff must allege not only that his confinement to Special Housing implicated a recognized liberty interest, but also that the liberty interest was infringed without due process of law. *See e.g. Cespedes v. Coughlin, 956 F .Supp. 454, 469 (S.D.N.Y.1997).*

Regarding Ford's claim that he was denied recreation, showers, and a special meal on four occasions before and on April 14, 2004, we deny summary judgment for Ford and grant it in favor of defendants. These minor and temporary denials clearly do not constitute significant hardships implicating a constitutionally protected liberty interest. *See e.g. Frazier, 81 F.3d at 317.* We also deny summary judgment for Ford and grant it for defendants on Ford's claim arising from his confinement in Special Housing.

There are three significant problems with Ford's due process claim based on his confinement in Special Housing. First, it is far from clear that the alleged confinement, even if accurately depicted by Ford, implicates a protected liberty interest given the temporary nature of the deprivations. *See e.g. Frazier, 81 F.3d at 317.* Second, Ford has failed to allege that he was denied due process of law in connection with this ostensible liberty interest. Ford does not allege that he was denied a hearing or that his hearing officer was not objective, and he does not allege that defendants did not explain to him why he faced the deprivations he did. *Cf. Sandin, 515 U.S. at 487-88* (summary judgment granted for defendants where plaintiff claimed violation of due process because defendants "refus[ed] to allow him to present witnesses at his hearing, and [sentenced] him to disciplinary segregation for thirty days.").

**\*11** Third, although Ford does allege that defendants deprived him of privileges and Special Housing property

in violation of DOCS directive 4933, this allegation fails to state a violation of due process. For one, the text of Directive 4933 shows that Ford was not necessarily entitled to the claimed property and privileges under the circumstances of his confinement: "An order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or State property exists". Moreover, defendants offer a mass of evidence demonstrating that they followed Directive 4933 with respect to Ford and that Ford received full consideration and a hearing in connection with Directive 4933. A "Deprivation Order", dated April 14, 2004 and authorized by Sgt. Maly, for example, states:

In accordance with 7 NYCRR Section 305.2, you are being deprived of the following specific item(s), privilege(s), or service(s): All out of cell activities (including showers) because it is determined that a threat to the safety or security of staff, inmates or State property exists and for the following specific reason(s): You seriously assaulted a corrections officer. [FN67]

> **FN67.** Parasidis Decl., Ex E., FORD GRIEVANCE 50. *See also id.* at FORD GRIEVANCE 50-58, 109, 118-20, 126, 128, 129, 131, 132, 133, 134, 135-37, 143; Ex. I, FORD ORDERS 1-8.

A lengthy statement reviewing Ford's April 19, 2004 grievance regarding his Special Housing confinement further provides: "Upon full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied with clarification to the extent that the matter was investigated and the issue of the complaint has been found to be without merit." [FN68]

> **FN68.** *Id.* at FORD GRIEVANCE 30.

Since Ford has failed to allege any cognizable violation of due process of law relating to his Special Housing confinement, and since defendants have provided the Court with ample, uncontroverted evidence that Ford received such process, summary judgment is denied for Ford and granted for defendants on this claim. [FN69]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN69. We note further that the reasons and bases for Ford's confinement and deprivations in Special Housing should have been obvious to Ford immediately upon his transfer to Special Housing given that they arose immediately after his vicious attack on Officer Miller. Not only would such an attack make guards fearful for themselves and other prisoners should Ford be taken out of his Special Housing cell, but guards would also be fearful that Ford would use any property he obtained to hurt himself or others. In fact, this is the explanation provided in the deprivation orders and related documents submitted by defendants. *See supra* note 67.

4. Deliberate Indifference to a Serious Medical Need

Ford argues that defendants Joseph Smith, John Maly, Sgt. Kimbler and Dr. Bhavsar violated his constitutional rights by failing to provide adequate medical care for the injuries to his face, head, back, kidneys, groin area and penis during April of 2004. Defendants respond that Ford's pleadings are not sufficient to support a claim for constitutionally deficient medical care.

To maintain a claim for deliberate medical indifference, Ford must prove "deliberate indifference to [his] serious medical needs." *Hathaway,* 37 F.3d at 63 (quoting *Estelle,* 429 U.S. at 102 (medical indifference claim brought by prisoner pursuant to section 1983 alleging violation of Eighth Amendment as applied to the states via Fourteenth Amendment)). This standard requires proof of objective and subjective prongs. *Id.*

The objective prong of the deliberate indifference standard requires proof of a medical deprivation "sufficiently serious" to create a condition of urgency that might produce death, degeneration or extreme pain. *Id.; see e.g.* *Williams v. Vincent,* 508 F.2d 541 (2d Cir.1974) (easier and less efficacious treatment of throwing away prisoner's ear and stitching the stump may be deliberate indifference); *cf. Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (cut finger with "skin ripped off" is insufficiently serious);

*Bonner v. N.Y. City Police Dep't,* No. 99 Civ. 3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (inability to close hand due to swelling insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713 at *16 (S.D.N.Y. November 6, 1998) (back pain and discomfort not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (S.D.N.Y. November 28, 1984) (deliberate indifference claim dismissed where plaintiff challenged treatment for bruises on head and body).

*12 The subjective prong of the deliberate indifference standard requires proof that the accused defendant knew of and disregarded "an excessive risk to inmate health or safety." *Hathaway,* 37 F .3d at 66 ("The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference."). Specifically, the plaintiff must prove that the accused defendant acted, or declined to act, with a state of mind equivalent to criminal recklessness. *See Boomer v. Lanigan,* 2002 WL 31413804, *1 (S.D.N.Y.2002) (Cote, J.) (unreported) (citing *Hathaway,* 99 F.3d at 553); *Cunningham v. City of New York,* 2006 U.S. Dist. LEXIS 35607 at *6 (S.D.N.Y. June 1, 2006) (mere disagreement between treating physician and patient about course of treatment does not give rise to a constitutional claim).

Having reviewed the pleadings and evidence submitted with the motions for summary judgment, we agree with defendants that Ford cannot prevail on his claim for deliberate medical indifference stemming from his treatment during April and May of 2004. First, most of the injuries asserted by Ford were not sufficiently serious to satisfy the objective prong of the deliberate indifference standard. Ford claims, and the prison's medical reports confirm, that Ford suffered from a minor bruise on his forehead; reddened abrasions with a slight amount of bleeding on his left temple; reddened abrasions on his right upper chest, abdomen, and right underarm; and superficial scratches on his right upper back when he was admitted to Special Housing. Abrasions, a minor bruise, slight bleeding and scratches are not injuries that may produce death, degeneration or extreme pain, and no reasonable jury could find to the contrary. *See e.g. Jones,* 1984 U.S. Dist. LEXIS 21694 at *3-4 (allegations of bruises about head and body do not shock the conscience

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

and are inadequate to state claim for deliberate medical indifference in section 1983 suit). [FN70]

> FN70. The remaining injuries claimed by Ford, which might have appeared to be serious upon his initial complaints, also proved not to be serious. Ford complained that he found blood in his urine, that he vomited blood, that he suffered from persistent abdominal and groin pain, that his wrists hurt and that he had headaches and dizzy spells. Within a few weeks, however, Ford ceased to have blood in his urine; his bruises and abrasions were healed or healing normally; x-rays showed no damage to his wrist; and a CAT-scan revealed no injuries to the organs inside his abdomen or to his abdomen generally, confirming Dr. Bhavsar's finding that Ford had no tenderness in his ribs or abdomen. As well, Ford has not alleged that his vomiting, dizzy spells or headaches, for which there is no objective evidence to begin with, persisted or led to more serious problems, and though Ford claims that he now has a weak bladder, he has not alleged that it is degenerative or causes him extreme pain. *See generally* Parasidis Decl., Ex. G, Bhavsar Decl.

Second, in light of the evidence submitted by defendants, Ford also cannot satisfy the subjective prong of the deliberate indifference standard. Various medical forms submitted by defendants reveal that Ford was evaluated on no fewer than eight occasions between April 14, 2004 and early May of 2004, including examinations by a triage nurse and visits with Dr. Bhavsar, and not including the regular opportunities Ford had to speak with a Special Housing nurse. As Ford admits, Dr. Bhavsar, in addition to examining Ford personally, ordered three different urine analyses, a set of x-rays, and a CAT-scan, calling for the latter two procedures even though Ford's wrist and abdomen showed no apparent signs of problems. Dr. Bhavsar's records further reveal that he explained to Ford the proper course of treatment for his various injuries, that he prescribed Tylenol for his minor injuries, and that he continued to monitor Ford's possible internal injuries, such as the blood in his urine, until those symptoms subsided. [FN71]

> FN71. *Id.*

**\*13** As such, no reasonable jury could find that the medical staff demonstrated deliberate indifference to Ford's medical condition and certainly Ford has not offered any evidence to suggest that the medical care he received amounted to criminal recklessness. On the contrary, a reasonable jury would readily find that Ford, in receiving x-rays for a non-swollen wrist with full movement, a CAT-scan for an abdomen showing no tenderness, and three urine tests for a problem that shortly resolved itself, obtained more thorough medical attention while incarcerated than he would have outside of prison. For these reasons, we deny Ford's motion for summary judgment and grant defendants' motion for summary judgment on Ford's medical indifference claim. [FN72]

> FN72. Even if one or more officers ignored Ford's complaints on one or more specific occasions, which Ford alleges without offering additional support, the fact that Ford actually received extensive and repeated medical attention demonstrates that those instances of indifference did not deny Ford adequate medical attention. Moreover, to prevail on the subjective element against those officers, Ford would have to demonstrate that the officers knew that Ford actually had a serious injury-as opposed to simply hearing Ford complain of such an injury-and nevertheless ignored it. Ford has not offered any evidence to this effect, beyond that he complained more than once that he suffered from severe pain. He does not, for instance, allege that the officers saw him bleeding or otherwise suffering some clearly serious injury.

5. Mail Interference

Ford further complains that the DOCS staff instituted a mail-watch on his personal mail and confiscated some of his mail in violation of his constitutional rights, denying him access to the courts and preventing him from communicating with his girlfriend. Defendants admit that they instituted a mail watch on Ford following his attack on Officer Miller and argue that Ford has not sufficiently alleged any constitutional violation based on mail

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

interference.

a. Denial of Access to the Courts

In order to state a constitutional claim for denial of access to the courts, a plaintiff must show deliberate and malicious action resulting in an actual injury, such as the dismissal of an otherwise meritorious claim. *Cancel v. Goord,* 2001 U.S. Dist. LEXIS 3440, *16 (S.D.N.Y. Mar. 29, 2001) (plaintiff must show frustration of non-frivolous claim as a result of official action) (citing *Washington v. Jones,* 782 F.2d 1134, 1138 (2d Cir.1986)); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997). Actions causing mere delay in a prisoner's ability to work on a legal action or to communicate with the courts do not rise to the level of a constitutional violation. *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)).

We agree with defendants that Ford cannot prevail on his denial of access claim. Ford's only allegations that defendants' interference with his mail caused him an actual legal injury are his vague statements that the interference made him lose papers that were "very important" to his motion to set aside the verdict in his criminal trial and that the interference hurt his preparation for sentencing.[73] Ford has not alleged that he missed any deadlines or faced any other, specific legal injuries as a result of the alleged interference, and the mere suggestion, without any supporting argument or evidence, that Ford would have succeeded on his motion to set aside the verdict or that he would have received a lighter sentence but-for defendants' mail-watch clearly does not state that Ford lost an otherwise meritorious claim.[74] This is especially true in light of Ford's conviction for the offense charged, the substantial evidence supporting that conviction discussed *supra,* the fact that Ford has not yet been sentenced for his attack on Officer Miller, and the fact that Ford, far from proceeding *pro se,* has been represented by counsel throughout his criminal trial and post-trial proceedings.[75] Thus, we deny Ford's motion for summary judgment on this claim and grant summary judgment in favor of defendants.

FN73. *See* Ford Brief at 22-23; *see also*

Complaint at 25.

FN74. Ford also generally alleges that he was denied the right to appear before a grand jury. However, Ford does not explain how interference with his mail caused this denial and he has also submitted documents to the Court suggesting that he did not intend to appear before the grand jury in his criminal case. *See infra* note 75 at 3-4.

FN75. *See* March 16, 2006 Order of Judge Hayes at 2-3 (Ford was initially represented by Assistant Public Defender James Hill and was later represented by Assistant Public Defenders George Hazel and David Martin. Kenneth J. Roden, Esq. represented Ford in connection with his CPL §§ 330.30 and 440.10 motions).

b. First Amendment

*14 Ford's Complaint does not expressly assert a First Amendment claim based on interference with his non-legal mail, but a liberal reading of that document suggests that Ford intended to do so since he complains that DOCS staff took mail going to and coming from his girlfriend.[76] In order to state a First Amendment claim based on mail interference, a prisoner must show that the interference either did not further one or more substantial government interests, such as security, order and rehabilitation, or that the interference was greater than necessary to the protection of that interest. *Davis,* 2003 U.S.App. LEXIS 13030 at *8-10 (citing *Washington v. James,* 782 F.2d 1134 (2d Cir.1986)); *U.S. v. Felipe et al.,* 148 F.3d 101 (2d Cir.1998) (interception of prison correspondence does not violate First Amendment if prison officials had "good or reasonable cause" for inspection) (citing *U.S. v. Workman,* 80 F.3d 688, 699 (2d Cir.1996) ("We think it clear that-at least where prison officials have reasonable cause for suspicion-surveillance of inmate mail is unobjectionable; investigation and prevention of illegal activity among inmates is "a legitimate penological interest, which has a logical connection to the decision to impose a mail watch on a prisoner").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

FN76. At times in Ford's submissions, he also complains of losing mail to his spouse. It is not entirely clear whether the spouse and girlfriend to whom Ford refers are the same person, but the pleadings, taken together, strongly suggest that this is the case.

We agree with defendants that no reasonable jury could find for Ford on his First Amendment claim. To the extent that Ford complains about a mail watch, it is evident from defense submissions and from the facts discussed *supra* that defendants had legitimate reasons for monitoring Ford's mail, namely: (1) to investigate Ford's assault on Officer Miller; (2) to prevent Ford from instigating further violence following that assault; and (3) to monitor efforts by Ford to improperly influence his trial for that assault.FN77 In fact, the mail watch revealed one letter in which Ford admits to stabbing and throwing hot oil on Officer Miller, which proved to be useful to the prison's investigation of that attack, and at least one letter wherein Ford discusses and recommends efforts to improperly influence a witness in his trial. FN78

FN77. *See* Parasidis Decl., Ex. C, FORD GRIEVANCE 126, 128-29, 131-37; Ex. J, FORD MAIL 1-12; Ex. E, FORD IG 316-24.

FN78. *Id.*

Moreover, although destroying Ford's incoming and outgoing mail would likely go beyond the measures necessary to protect the prison's interests in security and in investigating Ford's assault, Ford has failed to plead any instance of mail interference wherein defendants improperly confiscated his mail. Ford generally alleges that defendants took mail going to and from his girlfriend, but he does not allege any specific occurrence of confiscation and does not specify whether DOCS staff confiscated just the two letters discussed above or whether they took other letters as well. Clearly, if defendants only confiscated the letters admitting to the assault on Officer Miller and attempting to improperly influence Ford's trial for that assault, the confiscation did not go beyond what was necessary to protect the prison's legitimate penological interests. Without any specific allegation regarding some other confiscation by DOCS staff, without

any evidence offered to support such an allegation, and given defendants' affidavits and documents stating that defendants merely implemented an appropriate mail watch in accordance with DOCS policies and procedures,FN79 no reasonable jury could find that defendants violated Ford's constitutional rights by improperly interfering with his non-legal mail.

FN79. *See e.g.* Parasidis Decl., Ex C., FORD GRIEVANCE 128-29, 131-37; Ex. J, FORD MAIL 1-12.

*15 Accordingly, Ford has not sufficiently alleged any violation of his rights regarding the mail to state a constitutional claim. Ford's summary judgment motion for his mail claims is denied and summary judgment is granted in favor of defendants.

6. Responsibility of Individual Defendants

Defendants' Memorandum of Law concludes by arguing that Ford fails to allege that certain defendants were personally involved in or responsible for the constitutional violations he alleges, entitling those defendants to judgment as a matter of law. Specifically, defendants argue that Ford fails to allege: (1) that Sgt. Carey, Superintendent Phillips and Sgt. Guiney used any force against him; (2) that Inspector Vacca violated his constitutional rights by ordering a mail watch; and (3) that Sgt. Kimbler and Sgt. Jewett are responsible to him for any deliberate indifference to his medical needs. Defendants are correct that Ford must allege and support personal involvement in the constitutional violations to prevail against these defendants. *See e.g. Woods v. Goord,* 2002 U.S. Dist. LEXIS 7157, *23 (S.D.N.Y.2002) (Section 1983 plaintiff must allege personal involvement of each defendant); *see also Montero v. Travis,* 171 F.3d 757, 761-62 (2d Cir.1999) (requiring allegation of direct personal involvement against supervisory official to state section 1983 claim) (citing *Sealey v.. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)).

Having reviewed Ford's submissions, we agree that Sgt. Carey, Superintendent Phillips and Superintendent Guiney are entitled to summary judgment. Ford does not accuse

Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)
(Cite as: 2007 WL 946703 (S.D.N.Y.))

these defendants of using excessive force against him. We also agree that Inspector Vacca is entitled to summary judgment given that we grant defendants' motion for summary judgment on Ford's mail interference claims, and that Sgts. Kimbler and Jewett are entitled to summary judgment on Ford's claims for medical indifference and for lack of due process.

*CONCLUSION*

For the reasons stated above, we deny all aspects of Ford's motion for summary judgment and grant summary judgment for defendants on all of Ford's claims except for his excessive force claim arising from his transfer to Special Housing on April 14, 2004 .[FN80] Thus, Ford may pursue his claim for excessive force against defendants C.O. Huttel, C.O. Austin, C.O. Czyzewski and Sgt. Myers,[FN81] but his Complaint is dismissed as to the following defendants: Superintendent Phillips, Deputy Superintendent Guiney, C .O. Miller, C.O. Middleton, C.O. McClenning, C.O. Erns, Sgt. Carey, Superintendent Smith, Deputy Superintendent Maly, Dr. Bhavsar, Sgt. Kimbler, Sgt. Jewett and Inspector General Vacca.

FN80. Ford raises what purports to be an equal protection argument, for the first time, in his Motion for Partial Summary Judgment, dated July 24, 2006, at 26-27. The argument offers only minimal facts and conclusions of law, without providing any reason or argument as to why those facts support a violation of Ford's right to equal protection. To the extent that Ford seeks summary judgment on an equal protection claim, summary judgment is denied.

FN81. Although we do not grant summary judgment for defendants on Ford's one remaining claim, we note that our reluctance to do so should *not* be taken to reflect any view that Ford will prevail on that claim. On the contrary, Ford has only limited evidence to support the claim and defendants have considerable evidence against it. Moreover, for the plaintiff's edification, even if a jury were to find in his favor on that claim, it would be entitled to award Ford only nominal damages-as low as $1-if it

found that Ford deserved nothing more.

IT IS SO ORDERED.

S.D.N.Y.,2007.
Ford v. Phillips
Not Reported in F.Supp.2d, 2007 WL 946703 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis BONNER, Plaintiff,
v.
NEW YORK CITY POLICE DEPT.; Michael
Orlowski, 5577; New York City Department of
Corrections; Jame Sanchex, 5769, Defendants.
**No. 99 Civ. 3207(AGS).**

Aug. 17, 2000.

Michael D. Hess, Corporation Counsel of the City of New
York, by Lisa J. Black, for Defendants.

*OPINION AND ORDER*

SCHWARTZ, J.

**\*1** Plaintiff Dennis Bonner, appearing *pro se,* brings this
action pursuant to 42 U.S.C. § 1983 against defendants
New York City Police Department ("NYPD"), New York
City Department of Corrections ("DOC"), Michael
Orlowski ("Orlowski"), and Jame Sanchex ("Sanchex")
(collectively: "defendants"). Before the Court is
defendants' motion to dismiss the complaint pursuant to
Federal Rule of Civil Procedure ("Fed. R. Civ.P.")
12(b)(6). For the reasons stated below, defendants' motion
is GRANTED.

FACTUAL BACKGROUND [FN1]

FN1. On a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(6), the Court is required to
accept as true the allegations stated by the
non-moving party. *SeeGant v. Wallingford
Board of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

Further, in deciding the motion under 12(b)(6),
the court may consider "facts stated on the face
of the complaint and in documents appended to
the complaint or incorporated in the complaint
by reference, as well as [ ] matters of which
judicial notice may be taken." *Automated
Salvage Transport, Inc. v. Wheelabrator
Environmental Systems, Inc.,* 155 F.3d 59, 67
(2d Cir.1998) (citation omitted). Accordingly,
the facts discussed herein are accepted as true for
the purposes of this motion and are drawn from
the allegations of the complaint or are otherwise
reflected in the record.

Plaintiff alleges that, on March 12, 1997, while in police
custody at the 46th Precinct in the Bronx, he requested
medical treatment "for [a] hand that was extremely
swolle[n]". (Complaint at 3, section IV.) Allegedly,
plaintiff was denied medical treatment for a period of
time. (Complaint at 3, section IV.) Plaintiff further alleges
that, on April 4, 1997, a bus conveying plaintiff was
involved in an accident and plaintiff's head and back were
injured. (Complaint at 4, section IV.) The bus was
allegedly operated by the DOC. (Complaint at 4, section
IV.) Plaintiff asserts that he was "given pain killer" but
still suffers discomfort. (Complaint at 4, section IV-A.) He
further asserts that he is still in need of medical
attention because a finger on his right hand "does not close".
(Complaint at 4, section IV-A.)

On May 4, 1999, plaintiff filed this action seeking
approximately five million dollars in damages. Plaintiff
brings this action pursuant to 42 U.S.C. § 1983 ("section
1983"), alleging that, by denying him adequate medical
treatment and by deliberately disregarding his safety,
defendants violated his Eighth Amendment right to be free
from cruel and unusual punishment. (Plaintiff's
Memorandum in Opposition to Defendants' Motion to
Dismiss ("Pl's.Mem.Law") at 1, 6.) In addition, the
complaint is construed to assert a pendent claim for
negligence under New York common law. Defendants
filed the instant motion to dismiss, which was fully
submitted on May 17, 2000.[FN2]

FN2. Defendants filed the instant motion to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

dismiss on January 5, 2000. By letter dated January 6, 2000, defendants apprised the Court that although they had filed their own papers, plaintiff's opposition papers had been rejected by the Clerk of the Court for failure to set forth the correct docket number. Plaintiff, who is incarcerated, was ultimately successful in filing his opposition papers to the instant motion on May 17, 2000.

DISCUSSION

I. LEGAL STANDARD GOVERNING DISMISSAL PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). On such a motion, the court is required to accept the material facts alleged in the complaint as true and to construe all reasonable inferences in plaintiff's favor. See *Grandon v. Merril Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998); *Caspar v. Lew Lieberbaum & Co., Inc.,* No. 97 Civ. 3016(JGK), 1998 WL 150993,*1 (S.D.N.Y. Mar. 31, 1998). Further, the court's function on a motion to dismiss "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Caspar,* 1998 WL 150993,*1 (citation omitted). Therefore, a defendant's motion should be granted only if the court determines that "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 35 U.S. 41, 45-46 (1957)). Where, as here, the plaintiff is proceeding *pro se,* courts must apply a "more flexible standard in determining the sufficiency of [the] complaint than they would in reviewing a pleading submitted by counsel." *Platsky v. CIA,* 953 F.3d 26, 28 (2d Cir.1991) (*per curiam* ) ; see *Haines v. Kernier,* 404 U.S. 519, 520-21 (1972).

*2 However, "while *Conley* permits a pleader to enjoy all favorable inferences from facts that have been pleaded, it does not permit conclusory statements to substitute for minimally sufficient factual allegations". *Electronics*

*Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129 F.3d 240, 243 (2d Cir.1997) (citation omitted). The Court is not required to uphold the validity of a claim supported only by conclusory allegations. *See Gant,* 69 F.3d at 673 ("It is well settled in this Circuit that a complaint consisting of nothing more than naked assertions, and setting forth no facts upon which a court could find a violation ... fails to state a claim under Rule 12(b)(6).").

II. CLAIM PURSUANT TO SECTION 1983

Plaintiff asserts a claim under section 1983, alleging that his Eighth Amendment right to be protected from cruel and unusual punishment was violated by inadequate medical care and defendants' deliberate disregard for his safety. Defendants contend that the section 1983 claim must be dismissed because: (i) defendants NYPD and DOC are not suable entities; (ii) plaintiff has failed to allege facts upon which a court could find that defendants Orlowski and Sanchez were personally involved in the alleged misconduct; and (iii) plaintiff has failed to allege facts upon which a court could find that a constitutional violation had occurred.

A. *Section 1983 claim as against the NYPD and the DOC is barred*

Defendants argue that the section 1983 claim as asserted against defendants NYPD and DOC must be dismissed because these defendants are not suable entities. Chapter 17 § 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not that of any agency, except where otherwise provided by law." The NYPD and the DOC are agencies of the City of New York and, consequently, may not be sued independently. *See Baird v. Perez,* No. 98 Civ. 3762(SAS), 1999 WL 386746,*4 (S.D.N.Y. Jun. 10, 1999) (recognizing that the NYPD is an agency and pursuant to § 396 may not be sued independently); *Adams v. Galletta,* 996 F.Supp. 210, 212 (S.D.N.Y.1997) (recognizing that the DOC is an agency and pursuant to § 396 may not be sued independently) (collecting cases). Accordingly, plaintiff's section 1983 claim as asserted against the NYPD and the DOC must be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

dismissed. *See* Perez, 1999 WL 386746,\*4 (dismissing section 1983 claim as against the NYPD pursuant to § 396); *Adams,* 966 F.Supp. at 212 (dismissing section 1983 claim as against the DOC pursuant to § 396).

**B.** *Section 1983 claim as against defendants Orlowski and Sanchex is barred*

Defendants argue that the section 1983 claims as asserted against defendants Orlowski and Sanchex must be dismissed because plaintiff has failed to allege that these defendants were personally involved in the allegedly unconstitutional activity. It is well established in the Second Circuit that to state a claim under section 1983 a plaintiff must allege facts showing that the defendant was directly and personally involved in the alleged constitutional deprivations. *See* McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977) (cited by Ella v. Jackson, No. 95 Civ. 2314(AGS), 1996 WL 673819,\*2 (S.D.N.Y. Nov. 20, 1996) (Schwartz, J.); *cf.* Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986) (holding that doctrine of *respondeat superior* cannot be applied to impute liability to a supervisor under section 1983). The only circumstances under which allegations of direct participation may not be necessary arise when a supervisory official has had "actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act." Ella, 1996 WL 673819,\*2 (quoting *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989) (citation omitted)).

**\*3** Here, under the most liberal construction of the complaint, plaintiff merely alleges that Orlowski and Sanchex were supervisors. This allegation is inadequate to establish personal involvement. *See* Pritchett v. Artuz, No. 99 Civ. 3957(SAS), 2000 WL 4157,\*6-7 (S.D.N.Y. Jan. 3, 2000) (finding that plaintiff had failed to establish personal involvement where "plaintiff has simply alleged that [defendant] should be held liable because he is in charge"). Plaintiff's complaint is entirely devoid of allegations that defendants Orlowski and Sanchex (i) were directly involved in the alleged violation of plaintiff's civil rights; or (ii) were supervisors who had actual or constructive notice of unconstitutional practices and had demonstrated gross negligence or deliberate indifference in failing to act. Accordingly, plaintiff's claims against

Orlowski and Sanchex must be dismissed. *See* Ella, 1996 WL 673819,\*2 (dismissing section 1983 claim for failure to state a claim where complaint was "entirely devoid of allegations of any personal involvement" by individual defendants and "there [wa]s no evidence of actual or constructive notice of unconstitutional practices demonstrating gross negligence or deliberate indifference in the failure to act"); *see also* Simmons v. Artuz, No. 98 Civ. 777(SAS), 1999 WL 287366,\*5 (S.D.N.Y. May 6, 1999) (dismissing section 1983 claim for failure to allege each defendant's personal involvement in the alleged constitutional deprivation).

**C.** *Plaintiff has failed to allege facts upon which a court could find that plaintiff's Eighth Amendment rights have been violated*

Even were the complaint amended to name the City of New York as a defendant and to allege personal involvement by Orlowski and Sanchex, plaintiff's section 1983 claim would be dismissed for failure to allege facts showing a constitutional violation. Neither *Monell v. Department of Soc. Serv.,* 436 U.S. 658, 690-91 (1978), nor its progeny "authorize the award of damages against a municipal corporation based on the actions of one of its officers when in fact ... the officer inflicted no constitutional harm." City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); *see* Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir.1994). In order to assert a claim pursuant to section 1983, a plaintiff must allege that a constitutional violation has occurred. *See* Paul v. Davis, 424 U.S. 693 (1976); Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir.1983). Here the constitutional violation alleged is that defendants violated the Eighth Amendment both by providing inadequate medical care and by deliberately disregarding plaintiff's safety.

**1.** *Inadequate Medical Care*

In order to state an Eighth Amendment claim arising out of inadequate medical treatment, a prisoner must set forth facts showing "deliberate indifference to [his] serious medical needs." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (brackets in original). This standard includes an objective and a subjective component. The objective

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

component, a "serious medical need", involves "a condition of urgency, one that may produce death, degeneration, or extreme pain". See *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The subjective component, the defendant's "deliberate indifference", requires that the defendant "knows [of] and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994) (cited by *Henderson v. Doe,* No. 98 Civ. 5011(WHP), 1999 WL 378333,*4 (Jun. 10, 1999)). "Negligence, even if it constitutes medical malpractice, does not without more, engender a constitutional claim" *Chance,* 143 F.3d at 703; *see also Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

*4 Here, however liberally this Court construes plaintiff's allegations, the complaint falls short of meeting these pleading requirements. First, plaintiff has not alleged facts that show that there was a sufficiently serious medical need. Plaintiff's asserts that, as a result of allegedly inadequate treatment of his swollen hand, one of his fingers "does not close" and he "still suffers discomfort." These assertions do not set forth facts upon which the Court could conclude plaintiff suffered or suffers from a condition that may produce death, degeneration, or extreme pain. Cf. *Henderson,* 1999 WL 378333,*4 (finding that broken right pinky finger was not a medical condition that might "produce death, degeneration, or extreme suffering"); *Rivera v. Johnson,* 1996 WL 549336,*2 (W.D.N.Y. Sept. 20, 1996) ("A broken finger without more, simply does not present a condition of urgency of the type that may produce death, degeneration or extreme pain which correspondingly merits constitutional protection.").[FN3]

> FN3. Plaintiff further alleges that he "suffered a back and head injury" as a consequence of a motor vehicle accident. Given the liberal reading of the pleadings required on a motion to dismiss, the Court liberally construes this to be an additional allegation intending to establish the inadequacy of the medical care plaintiff has received. However, the terse allegation that

plaintiff was injured, bereft of any facts that would indicate incipient death, degeneration, or extreme pain, likewise fails to support the existence of a "serious medical need".

Second, even were the Court to conclude that plaintiff had alleged a serious medical need existed, plaintiff has failed to plead facts that establish "deliberate indifference." Plaintiff entirely fails to set forth facts showing that defendants had been "aware of the facts from which the inference could be drawn [that serious harm existed]", had, in fact, "drawn the inference," and had, nevertheless, disregarded such harm. *Chance,* 143 F.3d at 703. Consequently, plaintiff has failed to allege facts upon which the Court could find that a constitutional violation arising out of inadequate medical care has occurred.

2. *Deliberate disregard for safety of plaintiff*

In order to state a claim for violation of the Eighth Amendment arising out of disregard for prisoner safety, a plaintiff must allege facts showing that the defendants acted toward him with "deliberate indifference." *Rangolan v. County of Nassau,* No. 99 Civ. 9343, 2000 WL 827312,*2 (2d Cir. Jun. 26, 2000) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)). Under that standard, plaintiff must show, *inter alia,* that defendants must have known of and disregarded an excessive risk to plaintiff's health and safety. *See Branham v. Meachum,* 77 F.3d 626, 631 (2d Cir.1996); *Pritchett v. Artuz,* No. 99 Civ. 3957(SAS), 2000 WL 4157,*2 (S.D.N.Y. Jan. 3, 2000) ("Similarly, with respect to a prisoner's safety, a prison official may be held liable if the official: (1) knows that the inmate faces a substantial risk of serious harm; and (2) disregards that risk by failing to take reasonable measures to abate it.").

Here, plaintiff fails to allege any facts demonstrating that defendants knew of and disregarded an excessive risk to plaintiff's safety. The sole reference to disregard for plaintiff's safety in the complaint is the terse allegation that the DOC motor vehicle conveying plaintiff was involved in an accident. This brief assertion that a motor vehicle accident occurred does not set forth facts showing deliberate indifference. Cf. *Stewart v. McMickens,* 677 F.Supp. 226 (S.D.N.Y.1988) (finding that plaintiff had

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)
(Cite as: 2000 WL 1171150 (S.D.N.Y.))

*failed* to state a claim pursuant to section 1983 alleging deliberate disregard for safety in violation of the Eighth Amendment where plaintiff had not only alleged that the DOC bus conveying him had been involved in a motor vehicle accident, but also had alleged that his back had been injured as a result of "excessive speeding, no screws in the seat cushions, and a general lack of concern by the correction officers operating the vehicle").

**\*5** In fact, in the only reference to the claim of deliberate disregard for plaintiff's safety that appears in plaintiff's motion papers, plaintiff himself asserts that the operation of the vehicle was merely negligent. (Pl's. Mem. Law at 6.) Negligence is not actionable under section 1983. *See Rucco v. Howard,* No. 91 Civ. 6762(RPP), 1993 WL 299296,*3 (S.D.N.Y. Aug. 4, 1993) (citing *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)) ("Mere negligence on the part of the prison guard will not give rise to a claim under section 1983."). Consequently, plaintiff has failed to allege facts upon which a court could find that a constitutional violation arising out of deliberate disregard for plaintiff's safety has occurred.

Having failed to allege facts showing that a constitutional violation has occurred, plaintiff has failed to state a claim pursuant to section 1983. Accordingly, even had plaintiff named the City of New York as a defendant and alleged facts showing Orlowski's and Sanchex's personal involvement, plaintiff's section 1983 claim would be dismissed.

III. CLAIM FOR NEGLIGENCE UNDER NEW YORK COMMON LAW

Given the liberal reading of the pleadings required on a motion to dismiss, particularly where a plaintiff is proceeding *pro se,* the Court construes the complaint to assert a claim for negligence, arising out of the alleged inadequacy of medical treatment defendant received or the alleged motor vehicle accident. However, insofar as the complaint may be construed to assert a pendent claim under New York law for negligence, such claim must be dismissed. Pursuant to 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction over a state claim where "the district court has dismissed all claims over which it has original jurisdiction." 28

U.S.C. C. § 1367(c)(3). The Court, having dismissed plaintiff's federal claim, declines to exercise supplemental jurisdiction over plaintiff's state claim. *See Polar International Brokerage Corp. v. Reeve,* No. 98 Civ. 6915(SAS), 2000 WL 827667,*18 (S.D.N.Y. Jun. 27, 2000) (declining to exercise supplemental jurisdiction over state claims where no federal claims remained) (citing *Martinez v. Simonetti,* 202 F.3d 625, 636 (2d Cir.2000)).

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is GRANTED. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

S.D.N.Y.,2000.
Bonner v. New York City Police Dept.
Not Reported in F.Supp.2d, 2000 WL 1171150 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:08-cv-00001-DNH-DEP   Document 69   Filed 08/23/10   Page 311 of 467

Page 1
1998 U.S. Dist. LEXIS 17713, *



LEXSEE 1998 US DIST LEXIS 17713

**Adolfo Gomez, Plaintiff, - against - Larry Zwillinger, R.H.S.A., James Manion, M.D., Medical Director, D. Jeanty, M.D., and Mrs. Beckles, M.D., Defendants.**

**94 Civ. 8739 (LLS) (RLE)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1998 U.S. Dist. LEXIS 17713*

**November 6, 1998, Decided**

**DISPOSITION:** [*1] Court's original recommendation affirmed and recommended that action dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff inmate filed an action against defendants prison officials and doctors that alleged he was deprived proper medical attention and exposed to constant pain and harassment. The court issued a report and recommendation that the action be dismissed in its entirety. The matter was before the court on the inmate's request for reconsideration of that report and recommendation.

**OVERVIEW:** The inmate specifically alleged that third party medical providers had recommended surgery on his injured back, but that prison officials had refused to perform such surgery. The court held that the inmate's medical records, the affidavits of the prison medical professionals, and the deposition transcripts of the third-party medical providers revealed that the inmate was given prompt medical treatment over a substantial period of time and that defendants neither denied nor delayed treatment for his medical condition. Although the inmate claimed that his medical condition required surgical intervention, the medical evidence did not support that contention. The inmate failed to allege personal involvement of two of defendants. While the inmate

asserted that his condition resulted in pain and discomfort, there was no evidence that an urgent condition existed or that he was in danger of death or serious physical injury. Therefore, his claim did not rise to the level of a Constitutional violation. Defendants' actions were protected by qualified immunity, as they did not violate any of the inmate's s statutory or constitutional rights.

**OUTCOME:** The court reaffirmed its prior recommendation that all of the inmate's claims be dismissed.

**LexisNexis(R) Headnotes**

*Civil Rights Law > Section 1983 Actions > Scope*
[HN1] A showing of personal involvement in an alleged constitutional deprivation, is a prerequisite to establishing a claim for damages under *42 U.S.C.S. § 1983.*

*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*
*Criminal Law & Procedure > Sentencing > Cruel & Unusual Punishment*
*Criminal Law & Procedure > Postconviction*

*Proceedings > Imprisonment*

[HN2] To state a claim under *42 U.S.C.S. § 1983*, the plaintiff must allege that a right secured by the United States Constitution or by other federal law had been violated and that the deprivation was committed by a person acting under color of state law. The *Eighth Amendment's* prohibition against cruel and unusual punishment establishes an obligation for the state to provide medical care to prisoners. A prisoner asserting a claim under *§ 1983* for inadequate medical care must meet a "deliberate indifference" standard. Deliberate indifference may be manifested either by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Cruel & Unusual Punishment*

[HN3] On a motion for summary judgment, judgment should not be granted where there is any evidence that might lead a finder of fact to hold that treatment or lack thereof constituted deliberate indifference. The deliberate indifference standard embodies both an objective and a subjective prong. Objectively, the alleged deprivation must be "sufficiently serious," in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists. Subjectively, the charged official must act with a sufficiently culpable state of mind. The subjective element of deliberate indifference entails something more than mere negligence but something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. However, determining the difference between malpractice and deliberate indifference is a factual issue that cannot properly be decided at the summary judgment stage.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*
*Governments > State & Territorial Governments > Claims By & Against*

[HN4] Qualified immunity protects government officials from civil suits arising out of the performance of their discretionary functions. This shield does not extend to acts that violate clearly established statutory or constitutional rights of which a reasonable person would have known.

**COUNSEL:** ADOLFO GOMEZ, plaintiff, Pro se, Stormville, NY.

For ADOLFO GOMEZ, plaintiff: Christopher F. Graham, Thacher Proffitt & Wood, New York, NY.

For LARRY ZWILLINGER, R.H.S.A., JAMES MANION, D. JEANTY, MRS. BECKLES, defendants: Walton Sutherland.

For LARRY ZWILLINGER, R.H.S.A., JAMES MANION, D. JEANTY, MRS. BECKLES, defendants: Tanya M. Fairclough, Dennis C. Vacco, Attorney General of the State of N.Y., New York, NY.

**JUDGES:** The Honorable Ronald L. Ellis, United States Magistrate Judge.

**OPINION BY:** Ronald L. Ellis

**OPINION**

**REPORT AND RECOMMENDATION**

**To the HONORABLE LOUIS L. STANTON, U.S.D.J.:**

This matter is before the court on reconsideration of its Report and Recommendation filed March 3, 1997, recommending that the action be dismissed in its entirety. For the reasons which follow, the court's original recommendation is hereby affirmed and the court recommends that the action be dismissed.

**I. BACKGROUND**

The facts of this case are more fully set forth in the court's original Report and Recommendation of March 3, 1997. They are briefly outlined here. Plaintiff filed his complaint [*2] on October 13, 1994, in the Western District of New York. The case was transferred to this district on December 5, 1994. Plaintiff alleged a broad array of Constitutional violations, but his complaint centered around an allegation that defendants had deprived him of "proper medical attention and exposed [him] to constant pain and harassment." Complaint at 2. Specifically, plaintiff alleged that third party medical providers had recommended surgery on his injured back, but that prison officials had refused to perform such surgery. He alleged that this "deliberate indifference" to his serious medical needs violated the *Eighth Amendment of the Constitution* and thus formed the basis for his claim under *42 U.S.C. § 1983*.

Defendants moved for summary judgment on the following grounds: (1) lack of personal involvement of defendants Zwillinger and Manion; (2) plaintiff's failure to present sufficient facts to satisfy the burden for deliberate indifference; and (3) qualified immunity. The Court issued its Report and Recommendation to the Honorable Louis Stanton, recommending the grant of

summary judgment on all claims. The Report and Recommendation noted that plaintiff's motion for the [*3] appointment of counsel had been granted, but that no counsel had appeared on his behalf. However, following the Report and Recommendation to Judge Stanton, counsel did appear on behalf of plaintiff and filed an affidavit seeking to supplement the record and requesting that Judge Stanton refer the case back for further review. Thereupon, in July 1997 Judge Stanton granted the request and referred the case for reconsideration of defendants' motion for summary judgment.

## II. PROCEEDINGS ON RECONSIDERATION

Counsel for the parties appeared before the court on January 6, 1998, to discuss possible supplementation of the record. Defendants asserted that additional discovery was unnecessary because plaintiff would still not be able to show deliberate indifference to his medical needs. They asserted that the extensive interviews and evaluations conducted within the correctional institution demonstrated that there was no deliberate indifference to plaintiff's medical needs. Plaintiff's counsel nevertheless argued that the additional discovery would allow the plaintiff to demonstrate that:

a) he was denied medical attention and follow up care for his ventral hernia;

b) he may [*4] have been recommended for gall bladder surgery which he was denied;

c) he was also physically and verbally abused while in custody.

Specifically, counsel asserted that plaintiff claimed that doctors at Albany Medical Center and St. Agnes Hospital had assessed plaintiff's condition and had recommended corrective surgery. Counsel sought to supplement the record with this evidence to show that officials at the correctional facility had ignored this medical advice and had allowed plaintiff to suffer needlessly.

The court questioned whether this additional information, even if true, was relevant where the record reflected that medical personnel at the correctional facility had independently examined the plaintiff and evaluated his medical condition. The court asked counsel whether a recommendation from outside medical authorities would be sufficient under these circumstances to satisfy plaintiff's burden of showing "deliberate indifference."

Plaintiff's counsel argued that plaintiff had indicated that the defendants had lied about the treatment they provided and had hidden the fact that surgery had been

recommended. Counsel, therefore, asked the court to allow him to conduct [*5] limited discovery to determine whether there is enough evidence to support Mr. Gomez's allegations. Counsel conceded that, in the absence of a recommendation of surgery, the claim would probably not be pursued. Counsel asked the court to allow discovery in two stages. First, depositions would be allowed of St. Agnes Hospital and Albany Medical Center personnel. Then, if there was evidence to substantiate Gomez' assertions that a specific course of treatment had been recommended, then plaintiff would be allowed to depose defendants.

After reviewing the affidavits which had been submitted by defendants in their motion, the court permitted plaintiff to conduct the first stage of the requested discovery, that is, depositions limited to the third party medical providers. Plaintiff took the depositions of Dr. Holder, an orthopedist who examined and cared for plaintiff when he first presented at St. Agnes Hospital; Dr. Singh, a neurology specialist consulted by Dr. Holder; Dr. Biddle, who examined plaintiff in July 1994; and Dr. Rifkinson-Mann, who consulted with plaintiff in 1996.

Relying on the transcripts of these depositions, counsel for plaintiff wrote the court on July 31, 1998, asserting [*6] that the testimony of these third party providers made it clear that there was a substantial basis for plaintiff's complaints and seeking the second phase of the requested discovery. The court disagrees.

A. Treatment by Third-Party Medical Providers

When plaintiff first presented at St. Agnes, he apparently suffered from "a sudden compression of the spinal cord conus at the level of T12-L1." Singh dep. at 19. Counsel argues that "this condition seems to have been caused by a herniated disc, which required surgical intervention for treatment." Letter from plaintiff's counsel to court, dated July 31, 1998, at 1. Because plaintiff never received surgical intervention, counsel concludes that plaintiff did not receive proper medical care.

Plaintiff's argument fails on two counts. First of all, there was never a confirmation of the existence of a herniated disk. Based on his examination, Dr. Holder believed plaintiff was suffering from "a possible herniated nucleated pulposus." Holder dep. at 22. "What the exact diagnosis was, I was presuming at this point." **Id**.[1] Dr. Holder referred plaintiff to Dr. Singh. Dr. Singh indicated that there was "a possible compression [*7] of the lower end of the spinal cord" which he "thought could be due to a herniated intervertebral disk at that level." Singh dep. at 19 (emphasis added). Indeed his notes indicate that further study was needed to "rule out herniated intervertebral disk at that level." **Id**. at 19.

1   Dr. Holder did conclude that upon discharge,

"we felt this was a herniated disk." Holder dep. at 48.

However, even if plaintiff definitely had a herniated disk, none of the doctors who consulted with plaintiff actually recommended surgery. Dr. Holder's testified that there was no specific treatment plan for herniated disks. Holder dep. at 53. He indicated that the course of treatment would be affected by the patient's disk level, the patient's symptoms and the doctor's preferences. **Id**. at 53-54. Because plaintiff's condition was stable, Dr. Holder believed that it was premature to recommend surgery. [2]

> 2   "My thoughts were, as I had written in the chart, was that he was in a stable condition at this stage, and that further testing was necessary to determine if surgery would benefit his condition or not, and also to ascertain any permanent or partial neurological loss." Holder dep. at 57.

[*8]   Similarly, Dr. Singh believed that other treatment should be attempted before recommending surgery. He indicated that if "it is just a herniated disk, then, initially, conservative treatment can be given with bed rest. If that fails, then the patient will go for surgery with resection of the disk." Singh dep. at 30. Even more telling, it appears that Dr. Singh believed plaintiff's injury was of a less serious variety because the tests showed no displacement:

> I don't think this pertains to this case, because there was no displacement seen on the CAT scan or the myelogram, but in another person who might have a displacement, it will depend upon when you find displacement, and if the patient responds to conservative treatment with certain braces, let the spine heal in that position which relieves pain, then you don't have to go any further.
>
> But if the pain persists after a fair trial, maybe three months, four months, the patient should be considered for surgery.

Singh dep. at 29 (emphasis added).

B. Treatment by Defendants

The record shows that defendants examined, diagnosed and treated plaintiff on a continuing basis. In addition, they ordered consults with other [*9] doctors in attempts to respond to plaintiff's complaints. **See, e.g.**, Jeanty Aff. P 4; Beckles-Denis Aff. P 3. For example, Dr. Jeanty, who treated plaintiff form December 1, 1993 through January 2, 1994, wrote consults for physiatry,

urology, neurology and psychiatry. Similarly, Dr. Beckles-Denis, who treated plaintiff during the period January 3, 1994 through August 10, 1994, requested consultations for, among other things, gastroenterology, cardiology, neurology, podiatry, physiatry, and radiology. Both doctors also ordered diagnostic tests in an effort to treat plaintiff's complaints. The following excerpts from Dr. Beckles-Denis' affidavit are indicative of the treatment afforded plaintiff:

> 8. On January 11, 1994, I noted that plaintiff complains of stomach pains and acid reflux. Progress Note, dated January 11, 1994. I noted to check on the requests by physiatry, to obtain a urology consult if urinalysis is abnormal, obtain upper gastrointestinal series to assess plaintiff for reflux and/or ulcer.

> 16. On February 3, 1994, I requested a consultation with physiatry. Request and Report of Consultation to physiatry, dated February 3, 1994. I noted that plaintiff [*10] was tested with an Electro-Millogram ("EMG") -- a test for muscle functioning -- and given a neurological evaluation, but could not give plaintiff an MRI due to his large size.

> 17. On February 4, 1994, I requested a consultation with radiology and noted that plaintiff was evaluated by neurology, who recommended that a myelogram -- test for compression of spinal chord [sic] and nerve roots -- be performed on plaintiff.

> 20. On February 9, 1994, plaintiff complains of pain in lungs when he takes a deep breath. Lungs are clear to ascultation [sic] -- listening with a stethescope [sic] -- and there were no audible wheezes or rhonchi. I ordered a chest x-ray of both the posterior-anterior and lateral side of the chest. I noted that I would attempt to have plaintiff transferred to an outside hospital for complete medical workup.

> 24. On February 23, 1994, I noted that the results of the Myelogram were within normal limits; cerebral spinal fluid ("CSF") analysis is pending to rule out multiple sclerosis; the chest x-ray reveals an abnormality, a density in the left apical region (upper part of lung); I will request another chest x-ray. Progress Note, dated February 23, [*11] 1994. I note that the patient is at an outside hospital today to

have an MRI done.

30. On March 8, 1994, physiatry notes that plaintiff is "very obese, he has no voluntary movement in both legs (he doesn't move on command)" Physiatry also noted that "clinical findings are inconsistent with test results." Physiatry recommends neurosurgical follow-up, continuation of physical therapy, and evaluate plaintiff for wheel chair. Report of Consultation, dated March 8, 1994 (bottom).

(citations omitted). Far from evidencing deliberate indifference, the affidavits of Drs. Jeanty and Beckles-Denis indicate continuous attention to plaintiff's condition by defendants.

Counsel for plaintiff seeks to detract from this course of treatment by claiming that defendants were guilty of deliberate indifference because, rather than focusing on plaintiff's serious neurological problems, they sent him to a psychiatrist. July 31, 1998, letter at 3. This allegation is apparently based on the defendant doctors' belief that the plaintiff was exaggerating the extent of his infirmity. *See, e.g.*, affidavit of Dr. Jeanty P 12. Even if counsel were right that the defendant doctors mistakenly [*12] believed that the source of plaintiff's problems were psychological and not neurological, this would not assist plaintiff in his claim of deliberate indifference. As discussed below, this is not a malpractice case. Plaintiff's burden is significantly higher. He must show more than that errors in medical diagnoses were made.

In any case, this diagnosis was consistent with the medical opinions of the outside professionals. Dr. Holder, for example, noted that plaintiff's complaints were more serious than the medical evidence indicated:

Q. Doctor, at some point in your testimony, I can't point to a specific area or document, but it appeared that the physical exam of Adolfo Gomez did not match the MRI findings. Do you remember testifying to that?

A. Yes.

Q. What significance, Doctor, do you place on that?

A. That his subjective complaints were far exaggerating his clinical findings on testing as well as examination?

Q. Yes.

A. It appeared his examination

changed from day to day between doctors.

Q. What did that indicate to you, Doctor, if anything?

A. That he was exaggerating his complaints, and that he was not an honest person.

Holder dep. at 74-75. Dr. Holder described [*13] a patient who was "highly manipulative," had "dependent personality traits," and was "exaggerating his complaints." **Id**. at 34-39. Dr. Holder concluded that he might not be able to help plaintiff:

A. I felt that this was not an orthopedic case that I could handle and maybe psychiatric, maybe neurologic, maybe weight management, but it was not an orthopedic case any further.

*Id*. at 33.

C. Summary

Plaintiff's medical records, the affidavits of the defendant medical professionals and the deposition transcripts of the third-party medical providers reveal that plaintiff was administered prompt medical treatment over a substantial period of time, and that defendants neither denied nor delayed treatment for plaintiff's medical condition. Although plaintiff claims that his medical condition required surgical intervention, the medical evidence does not support this contention.

IV. ANALYSIS

A. Defendants Zwilinger and Manion

In its original Report and Recommendation, the court found that plaintiff had failed to allege any personal involvement by defendants Zwillinger and Manion. [HN1] A showing of personal involvement in an alleged constitutional deprivation, [*14] is a prerequisite to establishing a claim for damages under *§ 1983*. ***Colon v. Coughlin**, 58 F.3d 865, 873 (2d Cir. 1995)*. This deficiency has not been cured by plaintiff's supplemental submissions.

B. Claim of Deliberate Indifference

[HN2] To state a claim under *42 U.S.C. § 1983*, the plaintiff must allege that a right secured by the United States Constitution or by other federal law had been violated and that the deprivation was committed by a person acting under color of state law. ***West v. Atkins**, 487 U.S. 42, 48, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988)*. The Supreme Court has held that the *Eighth*

*Amendment's* prohibition against cruel and unusual punishment establishes an obligation for the state to provide medical care to prisoners. *See Estelle v. Gamble, 429 U.S. 97, 102-03, 50 L. Ed. 2d 251, 97 S. Ct. 285*. A prisoner asserting a claim under *§ 1983* for inadequate medical care must meet a "deliberate indifference" standard. *Id. at 104-05*. Deliberate indifference may be manifested either "by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally [*15] interfering with the treatment once prescribed." *Id*.

[HN3] On a motion for summary judgment, judgment should not be granted "where there is any evidence that might lead a finder of fact to hold that treatment or lack thereof constituted deliberate indifference." *Kaminsky v. Rosenblum, 737 F. Supp. 1309, 1317 (S.D.N.Y. 1990)*. "The deliberate indifference standard embodies both an objective and a subjective prong. Objectively, the alleged deprivation must be 'sufficiently serious,' in the sense that 'a condition of urgency, one that may produce death, degeneration, or extreme pain' exists." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)* (citations omitted). "Subjectively, the charged official must act with a sufficiently culpable state of mind." *Id*. "The subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id*. (quoting *Farmer v. Brennan, 511 U.S. 825, 835, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994))*. However, "determining the difference between malpractice and deliberate [*16] indifference is a factual issue which cannot properly be decided at the summary judgment stage." *Kaminsky v. Rosenblum, 737 F. Supp. at 1317*.

Plaintiff fails to meet either the objective or the subjective prong of the test for deliberate indifference. While plaintiff asserts that his condition results in pain and discomfort, there is no evidence that an urgent condition existed or that plaintiff was in danger of death or serious physical injury. Plaintiff attempts to overcome this deficiency by claiming that his condition was sufficiently serious to warrant surgery. The records submitted by plaintiff do not support this claim. No doctor has determined that surgery was the appropriate treatment for plaintiff. Even assuming that plaintiff is correct in his assertion that a surgical procedure could alleviate some of his pain and paralysis, prisoner patients do not dictate their course of care. To meet the deliberate indifference standard required of prisoner medical care claims, there must be some evidence that defendants' decisions not to recommend surgery constituted at least medical negligence or that plaintiff was prescribed surgery and that defendants failed to provide [*17] it for him. Moreover, there is no evidence that defendants

intentionally denied or delayed access to medical care, or intentionally interfered with treatment once it was prescribed. Indeed the available evidence establishes the opposite. Plaintiff does not present any evidence indicating that surgery was medically necessary or that it, or any other particular treatment, was prescribed. Therefore, his claim cannot rise to the level of a Constitutional violation.

## C. Qualified Immunity for Defendants

Defendants claim qualified immunity for their actions concerning plaintiff. [HN4] Qualified immunity protects government officials from civil suits arising out of the performance of their discretionary functions. *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)*. This shield does not extend to acts which "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. Defendants' actions in this case are protected by qualified immunity as they did not violate any of plaintiff's statutory or constitutional rights. The medical records demonstrate that defendants provided plaintiff with continuous [*18] medical consultation and treatment and afforded him expedient and proper care. Plaintiff's alleged dissatisfaction with the results of his medical care or treatment does not mean malpractice or negligence, which are not cognizable claims for an *Eighth Amendment* violation. *Estelle v. Gamble, 429 U.S. at 106*. It certainly does not meet the higher standard required to establish deliberate indifference. The fact that plaintiff's symptoms persisted did not mean his condition was worsening, as plaintiff suggests. Rather, plaintiff simply had a chronic condition that was difficult to treat, but was not life-threatening.

## IV. CONCLUSION

This case was referred back after counsel for plaintiff indicated that additional discovery would allow plaintiff to establish that the defendants failed to perform surgery for plaintiff after independent medical personnel had recommended such surgery. The court having afforded plaintiff an opportunity to conduct such discovery and plaintiff having failed to uncover any supporting evidence concerning recommended surgical intervention, the court hereby reaffirms its prior recommendation that all of plaintiff's claims be dismissed.

Pursuant [*19] to *Rule 72, Federal Rules of Civil Procedure*, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Louis L. Stanton, 500 Pearl Street, Room 2250, and to

the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985)*; *Small v. Secretary of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989)* (*per curiam*); *28 U.S.C. § 636(b)(1) (West Supp. 1995)*; *Fed. R. Civ. P. 72, 6(a), 6(e)*.

**DATED: November 6, 1998**

    **New York, New York**

    [*20]  **Respectfully Submitted**,

**The Honorable Ronald L. Ellis**

    **United States Magistrate Judge**

1984 U.S. Dist. LEXIS 21694, *



LEXSEE 1984 U.S. DIST. LEXIS 21694

**ROBERT L. JONES, Plaintiff, against NEW YORK CITY HEALTH AND HOSPITAL CORP., et al. Defendants.**

**No. 84 Civ. 5372 (MJL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1984 U.S. Dist. LEXIS 21694*

**November 28, 1984**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff prisoner brought suit pursuant to *42 U.S.C.S. § 1983*, alleging that he was beaten by officers of defendant corrections department and that he was denied proper medical treatment by defendant hospital for the injuries suffered as a result of the incident. The prisoner filed a motion for summary judgment. Defendants filed a cross-motion for an order to dismiss the complaint on the ground that it failed to state a cause of action.

**OVERVIEW:** In granting defendants' motion to dismiss, the court noted that, in order to state a claim against a corrections department under *42 U.S.C.S. § 1983*, the plaintiff must allege that a policy of custom of the department caused the deprivation of his constitutional rights. The court found that the prisoner had failed to allege any fact indicating the existence of an official policy or custom by the department that encouraged or allowed corrections officers to use excessive force in dealing with prisoners. With respect to the prisoner's claim against the hospital alleging that he was denied proper medical treatment, the court found that the hospital did not provide medical services for prisoners within prison facilities and, as such, was not a proper party to the prisoner's action. While an amendment of the complaint to name the proper defendant would typically have been granted, the court found that, even assuming the facts most favorable to the prisoner, the prisoner did not plead a valid claim of denial of medical treatment under *§ 1983* because he did not allege conduct that shocked the conscience.

**OUTCOME:** The court granted defendants' motion to dismiss the complaint and denied the prisoner's motion for summary judgment.

**LexisNexis(R) Headnotes**

*Civil Rights Law > Section 1983 Actions > Elements > Protected Parties*
*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection*
*Governments > Local Governments > Claims By & Against*
[HN1] In order to state a claim against a city corrections department under *42 U.S.C.S. § 1983*, the plaintiff must allege that a policy or custom of the department caused the deprivation of his constitutional rights. Moreover, more than an allegation of a single incident of illegality such as a first arrest without probable cause or with excessive use of force, is required to suggest that such a

1984 U.S. Dist. LEXIS 21694, *

policy is in force.

*Civil Rights Law > Prisoner Rights > Medical Treatment*
[HN2] A complaint under *42 U.S.C.S. § 1983* based on inadequate medical treatment is actionable only if the conduct alleged shocks the conscience.

**OPINION BY:** [*1] LOWE

**OPINION**

MEMORANDUM OPINION AND ORDER

MARY JOHNSON LOWE, D.J.

Plaintiff, presently a prisoner at Riker's Island, commenced this action, *pro se,* pursuant to *42 U.S.C. § 1983,* alleging that he was beaten by corrections officers while being transported from Riker's Island to Manhattan Supreme Court. Plaintiff alleges that the incident occured at the Brooklyn House of Detention for Men ("Brooklyn HDM"). Plaintiff further alleges that while he remained at the Brooklyn HDM, he was denied proper medical treatment for alleged injuries suffered as a result of the incident. Plaintiff moves for summary judgment pursuant to *Fed.R.Civ.P. 56.* Defendants cross-move for an order to dismiss the complaint on the ground that it fails to state a cause of action upon which relief can be granted, pursuant to *Fed.R.Civ.P. 12(b)(6),* or in the alternative, for summary judgment. [1]

1 Since the Court has not looked beyond the pleadings in this action, will address defendants' motion as one to dismiss the complaint. Accordingly, for purposes of this motion, the complaint is construed in the light most favorable to plaintiff, and its allegations taken as true.

Plaintiff filed pleading which he called a *Rule 12(b) (6)* motion, a close reading of plaintiff's pleading however, leads this Court to believe that plaintiff intended to reply to defendants' 12(b)(6), and treats it accordingly.

Plaintiff also filed a pleading that is labeled as a "Notice of Application for Joinder". A careful inspection of these papers indicates that plaintiff's application simply repeats his arguments against defendants' motion to dismiss.

[*2]   [HN1] In order to state a claim against defendant New York City Department of Corrections ("Department") under *§ 1983,* plaintiff must allege that a policy or custom of the Department caused the

deprivation of his constitutional rights. *See Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690 (1978); Bates v. Westervelt, 502 F.Supp. 94, 96 (S.D.N.Y. 1980).* Moreover, more than an allegation of a "single incident of illegality such as a first arrest with probable cause or with excessive use of force", is required to suggest that such a policy is in force. *Turplin v. Maillet, 619 F.2d 196, 202 (2d Cir. 1980) cert denied, 449 U.S. 1016; Bates, 502 F. Supp. at. 96.* In the case at bar, plaintiff has failed to allege any facts which indicate the existence of an official policy or custom by the Department, that encourages or permits corrections officers to use excessive force in dealing with prisoners. Plaintiff's claim against the Department is therefore dismissed.

Plaintiff's claim that he was denied proper medical treatment at the Brooklyn HDM, appears to be solely addressed to defendant New York City Health [*3] and Hospitals Corporation ("HHC"). However, the HHC does not provide medical services for prisoners within prison facilities, and as such is not a proper party to the present action. [2] Plaintiff's claim against the HHC is also dismissed.

2   The New York City Department of Health is responsible for providing medical services for the inmates of prisons maintained and operated by the City of New York. N.Y. City Charter, Chapter 22, § 556(k).

[HN2] A complaint under *§ 1983* based on inadequate medical treatment is actionable only if the conduct alleged shocks the conscience. This plaintiff has not pleaded such deliberate indifference to serious medical needs. *Williams v. Vincent, 508 F.2d 541, 543-44 (2d Cir. 1974).*

Plaintiff alleges he received bruises about the head and body and was treated at the Brooklyn HDM apparently by a Dr. Klimas (Compl. para. IVA).

Although this Court would grant plaintiff the right to amend his complaint to name the proper party defendant rather than dismiss his claim, in this case, assuming the facts most favorable to plaintiff, plaintiff does not plead a valid claim of denial of medical treatment under *§ 1983, Estelle* [*4] *v. Gamble, 429 U.S. 97, 104 (1976).*

The Court grants defendants' motion to dismiss the complaint pursuant to *Fed.R.Civ.P. 12(b)(6);* and plaintiff's motion for summary judgment is denied.

It Is So Ordered.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied,513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that* there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jamal KEARSEY, Plaintiff,
v.
Adeyemi WILLIAMS, Defendant.
**No. 99 Civ. 8646 DAB.**

Sept. 1, 2005.

*MEMORANDUM & ORDER*

BATTS, J.

**\*1** Plaintiff Jamal Kearsey, proceeding *prose,* has filed the above-captioned case against Defendant Dr. Adeyemi Williams ("Dr.Williams") pursuant to 42 U.S.C. § 1983 alleging that Dr. Williams violated Plaintiff's Eighth Amendment rights by being deliberately indifferent to Plaintiff's serious medical needs. Defendant has moved to dismiss the Complaint for failure to exhaust administrative remedies, for failure to state a claim, and because Defendant is shielded by qualified immunity.[FN1] For the reasons stated herein, Defendant's Motion to Dismiss is DENIED.

> FN1. This Court granted Defendant's Motion to Dismiss for failure to exhaust administrative remedies in its June 6, 2002 Order but vacated that Order on September 20, 2004 upon Plaintiff's motion pursuant to Fed.R.Civ.P. 60(b). *See Kearsey v. Williams,* No. 99 Civ. 8646, 2004 WL 2093548 (S.D.N.Y. Sept. 20, 2004).

I. BACKGROUND

In his Complaint, Plaintiff alleges that while he was incarcerated at Rikers Island Correctional Facility ("Rikers"), Defendant, a doctor at Rikers, violated Plaintiff's Eighth Amendment rights by refusing to provide him with an asthma pump when Plaintiff experienced breathing difficulties. Specifically, on April 4, 1999, Plaintiff requested to speak with a doctor because the heat in his cell was aggravating his asthma. (Compl. at 3-4.) When Dr. Williams went to Plaintiff's cell, Plaintiff stated that his chest had "tighten[ed] up" and that he "couldn't breath[e]," and requested that Dr. Williams take him "downstairs" to get an asthma pump. (Id. at 4.) Dr. Williams declined to take Plaintiff downstairs but said that he would send a pump to Plaintiff's cell that evening. (Id.) After a period of time, a corrections officer called Dr. Williams and he also informed him of Plaintiff's medical condition. (Id.) Dr. Williams told the officer that he would bring the asthma pump. (Id.) Plaintiff alleges that Dr. Williams forgot to bring the pump. (Id.)

Plaintiff complained for a third time to Dr. Williams of his inability to breathe and stated that he was experiencing chest pain. (Id.) Once again, Dr. Williams responded by promising to send an asthma pump that evening. (Id.) Plaintiff subsequently asked for Defendant's name, to which Dr. Williams allegedly responded, "I won't send you anything now!" (Id.) Dr. Williams then handed Plaintiff a note with his name. (Id. at 5.) No pump was given to Plaintiff. Shortly after Dr. Williams left, Plaintiff borrowed an asthma pump from a fellow minute, although that pump was different from the one Plaintiff was used to. (Id.) Plaintiff complained of chest pains and breathing difficulties for the rest of the day. (Id.) On April 6, 1999, Plaintiff was having blood work done and spoke with a nurse about his medical condition. (Id.) The nurse ordered an emergency pump that arrived later in the day. (Id.)

On June 24, 1999, Plaintiff filed a Complaint pursuant to 42 U.S.C. § 1983 alleging that Defendant exhibited deliberate indifference to his serious medical needs in violation of Plaintiff's Eighth Amendment rights. Defendant has filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust administrative

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), and, in particular, the exhaustion procedure established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, that Plaintiff failed to state a cause of action for which relief can be granted, and that Defendant is shielded from liability based on the doctrine of qualified immunity. (Def.'s Mem. Law at 1, 3, 20.) On June 6, 2002, this Court issued an Order granting Defendant's Motion to Dismiss on the ground that Plaintiff failed to comply with the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Kearsey v. Williams,* No. 99 Civ. 8646, 2002 WL 1268014, at *2 (S.D.N.Y. June 6, 2002).

**\*2** Plaintiff filed a Motion for Relief from Judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[FN2] Plaintiff argued that the Court had erred in holding that he was required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7, because those procedures are required only of inmates at state-run facilities, whereas Rikers, as a municipally-run facility, has different grievance procedures. *Kearsey,* No. 99 Civ. 8646, 2004 WL 2093548, at *2 (S.D.N.Y. Sept. 20, 2004). In its September 20, 2004 Order, the Court vacated its dismissal Order, finding Plaintiff was not required to exhaust the grievance procedures established by N.Y. Comp.Codes R & Regs., tit. 7, § 701.7. *Id.* at *4.

FN2. Plaintiff was represented by counsel when he filed the 60(b) Motion.

Because the Court's June 6, 2002 Order did not reach the additional grounds in Defendant's Motion to Dismiss, the remaining motions were *subjudice.* In this Order, the Court considers Defendant's remaining arguments: that Plaintiff has failed to state a cause of action and that Defendant is entitled to qualified immunity.

## II. DISCUSSION

### A. Rule 12(b)(6) Standard

In a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (citations omitted). "The district court should grant such a motion only if, after viewing [the] plaintiff's allegations in this favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court's review of such a motion is limited and "the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Burnheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In fact, it may appear to the court that "a recovery is very remote and unlikely but that is not the test." *Branham v. Meachum,* 72 F.3d 626, 628 (2d Cir.1996).

These liberal pleading standards "appl[y] with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *prose." Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). It is well-settled that *prose* complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 521 (1972).

### B. Eighth Amendment

Defendant moves to dismiss the Complaint on the grounds that Plaintiff has failed to state a cause of action under 42 U.S.C. § 1983.

### 1. Standard for § 1983 deliberate indifference claim

Section 1983 of Title 42, United States Code, enables a plaintiff to bring a cause of action against a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Thus, a plaintiff bringing a § 1983 action must

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

demonstrate that "the conduct complained of was committed by a person acting under color of state law ... [and that] this conduct deprived a person of rights ... secured by the Constitution or laws of the United States." *Greenwich Citizens Committee, Inc. v. Counties of Warren and Washington Indus. Development Agency,* 77 F.3d 26, 29-30 (2d Cir.1996) (quoting *Parratt v. Taylor,* 451 U.S. 527, 535 (1981)) (internal quotations omitted). Section 1983 is not in itself "a source of substantive rights," but instead "provides a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

**\*3** One such source of federal rights is the Eighth Amendment of the Constitution, which states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Estelle v. Gamble,* the Supreme Court held that prison employees' "deliberate indifference [to an inmate's] serious medical needs" violates the inmate's Eighth Amendment rights and is actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). A plaintiff pursuing a § 1983 claim for deliberate indifference to serious medical needs must meet a two-prong standard by demonstrating a serious medical need (the objective prong) and by showing that the defendant employee possessed the requisite culpable mental state (the subjective prong). See *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

2. Serious medical need

The objective prong of the deliberate indifference standard requires a showing of a "sufficiently serious" medical need. *Hathaway,* 99 F.3d at 553 (internal quotations and citations omitted). While "it is a far easier task to identify a few exemplars of conditions so plainly trivial and insignificant as to be outside the domain of Eighth Amendment concern than it is to articulate a workable standard for determining 'seriousness' at the pleading stage," several factors are helpful in determining the seriousness of a medical condition. *Chance,* 143 F.3d at 702-03 (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 (7th Cir.1997)).

A serious medical need is generally characterized by "a condition of urgency that may result in degeneration or extreme pain" or "the unnecessary and wanton infliction of pain." *Chance,* 143 F.3d at 702 (citation omitted). Whether "a reasonable doctor or patient would find [the condition] important and worthy of comment or treatment" reflects on the seriousness of the medical need, as does the effect of the condition on the inmate's "daily activities" and the extent to which the condition causes "chronic and substantial pain." *Id.* (citation omitted). The refusal to treat a patient suffering from what ordinarily would not be considered a serious medical condition also raises Eighth Amendment concerns if the condition is easily treatable and degenerative. See *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000) (holding that "the refusal to treat an inmate's tooth cavity unless the inmate consents to extraction of another diseased tooth constitutes a violation of the Eighth Amendment"). The constitutional implications of a decision not to treat an inmate's medical condition depend on the specific facts of the case-"a prisoner with a hang-nail has no constitutional right to treatment, but ... prison officials [who] deliberately ignore an infected gash ... might well violate the Eighth Amendment." *Id.* at 137-37 (internal quotations and citations omitted).

**\*4** While the failure to treat an inmate's generalized asthmatic condition may not implicate the Eighth Amendment, "an actual asthma attack, depending on the severity, may be a serious medical condition." *Scott v. DelSignore,* No. 02 Civ. 029F, 2005 WL 425473, at \*9 (W.D.N.Y. Feb. 18, 2005); see also *Patterson v. Lilley,* No. 02 Civ. 6056, 2003 WL 21507345, at \*3-4 (S.D.N.Y. June 30, 2003). Indeed, "it is common knowledge that a respiratory ailment, such as asthma, can be serious and life-threatening." *Whitley v. Westchester County,* No. 97 Civ. 0420, 1997 WL 659100, at \*4 (S.D.N.Y. Oct. 22, 1997). An acute asthma attack is inarguably a "condition of urgency" that may cause "substantial pain" and that "reasonable doctor[s] or patient[s] would find important and worthy of comment or treatment." *Chance,* 143 F.3d at 702 (citation omitted); see *Whitley,* No. 97 Civ. 0420(SS), 1997 WL 659100, at \*4.

Plaintiff has alleged that on three separate occasions, he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

informed Defendant that he was unable to breathe. (Compl. at 4-5.) He also complained that his chest had "tighten[ed] up," and, later, that he was experiencing "chest pains." (Id.) Plaintiff resorted to using a fellow inmate's inhaler when Defendant refused to provide him with one, which suggests the seriousness of his need. (Id. at 5.) Moreover, by alleging in his Complaint that his asthma "started to act up," Plaintiff describes a time-specific incident more in line with an asthma attack than with a generalized asthmatic condition. (Id. at 4.)

Defendant cites _Reyes v. Corrections Officer Bay,_ No. 97 Civ. 6419, 1999 WL 681490 (S.D.N.Y. Sept. 1, 1999), as a case similar to this one where the court found that the plaintiff did not allege a sufficiently serious medical condition. However, unlike the plaintiff in _Reyes,_ who went ahead with his scheduled visit with his family after complaining of an asthma attack, Plaintiff continued to complain to officers of his condition. Plaintiff resorted to self-medication, by borrowing an asthma pump from a fellow inmate in order to alleviate his condition. In light of these facts, it can hardly be said that Plaintiff was merely suffering from "discomfort."

Accordingly, the Court finds that in his Complaint, Plaintiff alleges facts that he experienced an asthma attack, serious enough to constitute a sufficiently serious medical need for purposes of an Eighth Amendment claim.

3. Deliberate indifference

To satisfy the subjective prong of the deliberate indifference standard, Plaintiff must prove that the prison official was aware of, and consciously disregarded, the prisoner's medical condition. _Chance,_ 143 F.3d at 703; _see also Farmer,_ 511 U.S. at 837. The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." _Chance,_ 143 F.3d at 702 (quoting _Farmer,_ 511 U.S. at 837). While purposefully refusing to treat a serious medical condition constitutes deliberate indifference, it need not be the official's purpose to harm the inmate; "a state of mind that is the equivalent of criminal recklessness" is sufficient. _Hathaway,_ 37 F.3d at 553.

**\*5** A physician's mere negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. _Estelle,_ 429 U.S. at 105-06; _Chance,_ 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." _Estelle,_ 429 U.S. at 106. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. _Harrison,_ 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under § 1983 if the treatment provided is "adequate." _Chance,_ 143 F.3d at 703. However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. _Harrison,_ 219 F.3d at 138.

In the instant case, Plaintiff informed Defendant on a number of occasions that he was unable to breathe and that he was experiencing chest pains. (Compl. at 4.) While Defendant's initial decision not to take Plaintiff downstairs for immediate treatment is the sort of prisoner-physician dispute regarding the particularities of medical care that is outside the scope of the Eighth Amendment, the unmistakable inference to be drawn from Plaintiff's allegation that Defendant refused to provide an asthma pump when Plaintiff asked for Defendant's name is that Defendant withheld medical care as retaliation or punishment for Plaintiff's conduct. (Id.) Because consciously delaying treatment in order to punish or retaliate against an inmate meets the subjective standard for deliberate indifference, the Court finds that the Complaint adequately alleges that Defendant acted with the requisite culpable mental state in refusing to treat Plaintiff's asthma attack.

C. Qualified Immunity

Defendant's final argument for dismissal is that, as a government official, Dr. Williams is entitled to qualified immunity.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

At the outset, the Court notes that while a defendant may assert a qualified immunity defense on a Rule 12(b)(6) motion, "that defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). This is because "[n]ot only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Id.* (internal quotations and citations omitted). The plaintiff thus benefits from all reasonable inferences against the defendant's qualified immunity defense on a Rule 12(b)(6) motion. *Id.*

The defense of qualified immunity protects public officers, including prison physicians, from civil actions related to their conduct while they are acting in an official capacity so long as they do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003). Such a defense "serves important interests in our political system. It protects government officials from liability they might otherwise incur due to unforeseeable changes in the law governing their conduct." *Sound Aircraft Services, Inc. v. Town of East,* 192 F.3d 329, 334 (2d Cir.1999). Qualified immunity also serves the important public interest of "protecting public officials from the costs associated with the defense of damages action ... [including] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from accepting public positions." *Crawford-El v. Britton,* 523 U.S. 574, 590 at fn. 12 (1998).

**\*6** Qualified immunity shields a defendant from liability "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Englarged Sch. Dist.,* 293 F.3d 246, 250 (2d Cir.2001); *Brosseau v. Haugen,* 125 S.Ct. 596, 599 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted"); *see*

*alsoHarlow,* 457 U.S. at 818-19.

"[A] court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne,* 526 U.S. 603, 609 (1999); *see also Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993). Determining the constitutional question first serves two purposes: it spares the defendant of unwarranted demands and liability "customarily imposed upon those defending a long drawn-out lawsuit" and determining the constitutional question first "promotes clarity in the legal standards for official conduct, for the benefit of both the officers and the general public ." *Id.*

If a deprivation of a constitutional right has been alleged, a court must determine whether the constitutional right was clearly established by determining: (1) if the law was defined with reasonable clarity, (2) if the Supreme Court or the law of the Second Circuit affirmed the rule, and (3) whether a reasonable defendant would have understood from existing law that the conduct was lawful. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998). "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 634, 640 (1987).

As the Supreme Court made clear in *Saucier,* determining whether the right in question was clearly established requires particularized, case-specific analysis. *Id.* at 201-02. The case-specific nature of the inquiry does not mean that official conduct is protected by qualified immunity whenever "courts had not agreed on one verbal formulation of the controlling standard." *Id* . at 202-03. A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct" even if courts have not ruled on the constitutionality of the specific act in question, and previously decided cases with comparable but not identical facts influence the clarity of the right in question. *Hope v. Pelzer,* 536 U.S. 730 at 741 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). The fundamental question is whether "the state of the law" at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)
(Cite as: 2005 WL 2125874 (S.D.N.Y.))

the time of the alleged violation gave the defendant "fair warning" that his conduct was unconstitutional. *Id.*

**\*7** Even if the right is clearly established, "defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established protection." *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998). "[R]easonableness is judged against the backdrop of the law at the time of the conduct.... [T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau,* 125 S.Ct. at 599.

In the present matter, the Court has already determined that Plaintiff's allegations, taken as true, indicate that Defendant violated Plaintiff's Eighth Amendment rights by refusing to treat Plaintiff's asthma attack in retaliation for Plaintiff's request for Defendant's name. *See supra* at 10-13.

With regard to whether the right allegedly violated was clearly established at the time of the violation, neither the Supreme Court nor the Second Circuit has held that an asthma attack constitutes a serious medical condition for purposes of a deliberate indifference claim. In considering whether Defendant nonetheless had fair warning of the unconstitutionality of the conduct he is alleged to have engaged in, the Court notes that the Second Circuit has repeatedly held as unlawful denials of treatment that "cause or perpetuate pain" falling short of torture and not resulting in death. *Brock v. Wright,* 315 F.3d 158, 163 (2d Cir.2003). Among the conditions the Second Circuit has deemed serious for Eighth Amendment purposes are a tooth cavity, *Harrison,* 219 F.3d at 137; a degenerative hip condition, *Hathaway,* 99 F.3d 550, 551-52; a painful tissue growth, *Brock,* 315 F.3d at 161; a ruptured Achilles tendon that caused pain and swelling, *Hemmings v. Gorczyk,* 134 F.3d 104, 106-07 (2d Cir.1998); and an eye condition that led to blindness in one eye, *Koehl v. Dalsheim,* 85 F.3d 86, 87 (2d Cir.1996). These various conditions, held to be sufficiently serious, are not life-threatening, although they are painful. An asthma attack, however, can be both painful and fatal. Given the state of the law in the Second Circuit, Defendant had ample warning that the law prohibits a prison doctor from

consciously withholding medical care from an inmate with a painful and potentially fatal medical condition.

The Court finds that at this early stage of litigation, Defendant has not shown that he is entitled to qualified immunity.

III. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is DENIED.

Defendant shall file an Answer to the Complaint within thirty (30) days of this Order.

SO ORDERED.

S.D.N.Y.,2005.
Kearsey v. Williams
Not Reported in F.Supp.2d, 2005 WL 2125874 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

*RULING ON MOTION FOR SUMMARY JUDGEMENT*

ALVIN W. THOMPSON, District Judge.

**\*1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

handcuffs for the return trip to Osborn.

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

**\*2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

## II. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir.1994)*. When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir.1987)*. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo, 22 F.3d at 1224*.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248* (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248*. Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir.1990)*.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000)*(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir.1990)*). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University, 131 F.3d 305, 315 (2d Cir.1997)* (quoting *Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir.1990)*). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson, 477 U.S. at 252*.

**\*3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994)*. Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)*.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

## III. Discussion

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

> **FN1.** Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

## A. Constitutional Violation: Conditions of Confinement

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at *16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

**\*4** The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009) (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,*

387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

*5 Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004) ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003) (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998) (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997) (lack of a working toilet in prison cell for approximately 10

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1286800 (D.Conn.)
(Cite as: 2010 WL 1286800 (D.Conn.))

hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

**\*6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003)("[I]n the usual case in which all federal-law claims are eliminated

before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

⚐ Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court, D. New Jersey.
Julio ALVAREZ, Jr., Plaintiff,
v.
COUNTY OF CUMBERLAND, et al, Defendants.
**Civil No. 07-346 (RBK).**

March 18, 2009.

West KeySummary
**Federal Civil Procedure 170A** 🗝 **2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issues of material fact existed as to the conditions of an inmate's confinement in an isolation unit at a county jail. Therefore, summary judgment was precluded in an action for an Eighth Amendment conditions of confinement claim. The inmate spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. The inmate also pointed to evidence that he contracted methicillin-resistant staphylococcus aureus (MRSA) while in isolation to show that he lived and slept exposed to feces in his cell. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Richard A. Stoloff, Law Offices of Richard A. Stoloff, Linwood, NJ, for Plaintiff.

Steven L. Rothman, Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, Vineland, NJ, Nancy L. Siegel, White & Williams, LLP, Cherry Hill, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, District Judge.

**\*1** This matter comes before the Court on a motion by Defendants County of Cumberland, Cumberland County Board of Chosen Freeholders, Cumberland County Department of Corrections, Cumberland County Sheriff's Department, Kenneth Lamcken, Michael Palau, Glenn Saunders, and Lewis Walker (collectively, "the County Defendants") for partial summary judgment on the Complaint of Plaintiff Julio Alvarez, Jr. ("Plaintiff") and on a motion by Defendant Prison Health Services, Inc. ("PHS") for summary judgment on Plaintiff's Complaint. Plaintiff's Complaint includes allegations that the County Defendants and PHS acted negligently and violated Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985(3). The County Defendants only move for summary judgment on Plaintiff's civil rights claims against them. For the reasons expressed below, the Court will grant in part and deny in part the County Defendants' motion and grant Prison Health Services' motion.

**I. BACKGROUND**

The allegations in Plaintiff's Complaint arise from events that occurred while he was an inmate at the Cumberland County Correctional Facility ("Cumberland County Jail"). Plaintiff was placed in an isolation unit at the Cumberland County Jail on or about January 28, 2005, and released from isolation on or about February 2, 2005. Plaintiff's isolation cell measured six feet by eight feet and was the middle cell in a group of three adjacent isolation cells in the unit. The cells on either side of Plaintiff's had working toilets and sinks. However, the parties agree that the toilet and sink in Plaintiff's original cell was in a state of disrepair at the time of his placement in isolation. Other inmates occupied the adjacent isolations cells, which contained working toilets and sinks. For the purposes of summary judgment, the parties agree that Plaintiff's toilet in isolation was not only non-functional, but also filled to the point of overflowing with urine, feces, and trash.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

While in his original isolation cell, Plaintiff urinated in a Styrofoam cup which he then emptied into the broken sink so as not to cause the toilet to overflow onto the floor. Plaintiff defecated in the toilet, only after removing from it pieces of plastic and cardboard, which he placed on the floor of the cell. Plaintiff used the toilet by squatting over it, attempting to avoid touching the toilet seat.

Plaintiff was not provided with cleaning products with which to clean the isolation cell himself, nor was it cleaned by someone else while Plaintiff occupied it. Plaintiff was not provided equipment to use to empty the toilet or sink. At one time during his stay, a corrections officer did attempt to fix the toilet but was unsuccessful. Plaintiff did not ask to use a toilet outside his cell. Plaintiff alleges, and the County Defendants refute, that he did not ask because there was not a guard available to whom Plaintiff could have made such a request. Plaintiff was allowed to shower twice during his time in the original cell. The County Defendants argue that Plaintiff had frequent access to corrections officer, including at the time of his showers.

*2 Plaintiff contends that on February 1, 2005, one day before he was released from isolation, he transferred himself, with the permission of the guards, to an adjacent isolation cell with working plumbing. Plaintiff further contends that he could not have moved to an adjacent cell until February 1 because both adjacent cells were occupied from the time of Plaintiff's arrival in the isolation unit until that date. The County Defendants do not agree to the date of Plaintiff's self-transfer, but agree that he did so at some point during the time he was in isolation.

Plaintiff was released from isolation on February 2, 2005, at which time he was seen by a nurse to be treated for boils. He was seen by a doctor on February 4, 2005, at which time he had developed 10 lesions over his buttocks, legs, and penis. Plaintiff was placed in a medical isolation cell with other prisoners until February 9, 2005 when he was sent to the hospital to be treated for his lesions. Plaintiff stayed at the hospital eight days and underwent surgery. Plaintiff's medical expert reports that Plaintiff was infected with methicillin-resistant staphylococcus aureus ("MRSA") at least in part due to his exposure to waste

matter in his isolation cell and his inability to wash after touching contaminated surfaces. (Pl.Opp.Ex. B.)

Plaintiff and the County Defendants agree that in 2005, the Cumberland County Jail was overcrowded. Further, Plaintiff presents the deposition testimony of Defendant Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken, but that inmates were placed in cells with broken toilets. He further testified that those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U .S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

*3 Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

### III. ANALYSIS

### A. The County Defendants' Motion

The County Defendants move for partial summary judgment on Plaintiff's constitutional claims against the County Defendants in Count IV of the Complaint.

### 1. Plaintiff's Fifth Amendment Claim

Plaintiff's Fifth Amendment claim does not present a genuine issue for trial and will be dismissed. The County Defendants move for summary judgment on Plaintiff's claim that they violated his constitutional rights guaranteed under the Fifth Amendment, contending that there is no genuine issue of material fact regarding a Fifth Amendment violation because Plaintiff has no evidence to support such a claim. Plaintiff has provided no argument to refute the motion on this point and thus presents no evidence to satisfy his burden. *See* Fed.R.Civ.P. 56(e). Finding no genuine issue of material fact, the Court will grant summary judgment for the County Defendants on Plaintiff's Fifth Amendment claim.

### 2. Plaintiff's Eighth Amendment Claim

The County Defendants move for summary judgment on Plaintiff's claim that they violated his Eighth Amendment rights. There are genuine issues of fact regarding the conditions of Plaintiff's confinement at the Cumberland County Jail, so Plaintiff's Eighth Amendment claims will survive summary judgment.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff

must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Prisoners have a protected right in being incarcerated at a place of confinement conforming to the standards set forth by the Eighth Amendment. The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In its prohibition of "cruel and unusual punishments, the Eighth Amendment ... imposes duties on [prison] officials, who must provide humane reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); see *Helling,* 509 U.S. at 31-32; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. *Rhodes,* 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

**\*4** To state a claim under the Eighth Amendment, an inmate's allegation must include both an objective and a subjective component. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities' ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Helling,* 509 U.S. at 32 (quoting *Rhodes,* 452 U .S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The subjective component requires that the state actor have acted with "deliberate

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

indifference," a state of mind equivalent to a reckless disregard of a known risk of harm. *Farmer v. Brennan, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Wilson, 501 U.S. at 303.*

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety. *See Rhodes,* 452 U.S. at 347-48; *Young v. Quinlan, 960 F.2d 351, 364 (3d Cir.1992).* To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society. *See Rhodes,* 452 at 347. An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety." *Ingalls v. Florio, 968 F.Supp. 193, 198 (D.N.J.1997).* An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

In *Young,* the Third Circuit reversed the district court, which granted summary judgment for the defendant on plaintiff's claims regarding the conditions of his confinement. *See Young, 960 F.2d at 353.* In that case, Young was a federal prisoner who allegedly suffered continuous physical and psychological abuse by his cellmates. *Id.* at 353-54. In response to threats from one cellmate, Young stopped up his cell toilet, consequently flooding the cell. *Id.* at 355. As punishment, Young was placed in a dry cell, one without a toilet or running water, for ninety-six hours. *Id.* In addition, Young was not provided with toilet paper. *Id.* During the first twenty-nine hours of his confinement in the dry cell, Young asked repeatedly for a urinal and for permission to leave his cell to defecate. *Id.* Not receiving same, Young relieved himself in his cell. *Id.* Young was finally provided with a urinal and allowed to leave his cell to defecate, only after having been confined in the dry cell for twenty-nine hours. *Id.* The following day, Young again requested permission to leave his cell to defecate, but his requests were ignored or rejected. *Id.*

**\*5** When the Third Circuit considered whether Young had raised a genuine question of fact regarding the constitutionality of his confinement, it applied the standard described *supra. Id.* at 360. Specifically, the court noted that "inhumane prison conditions, including prolonged isolation in dehumanizing conditions ... and unsanitary conditions have ... been found to be cruel and unusual under contemporary standards of decency." *Id.* at 363. Further, the court explained that "segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." *Id.* at 364 (citing *Smith v. Coughlin, 748 F.2d 783, 787 (2d Cir.1984); Ford v. Board of Managers of New Jersey State Prison, 407 F.2d 937, 940 (3d Cir.1969); Mims v. Shapp, 399 F.Supp. 818, 822 (W.D.Pa.1975)*). Noting that "the touchstone [of the constitutional analysis] is the health of the inmate," the court determined that the conditions of Young's confinement worked a deprivation of the basic necessities of human existence and thus were sufficient to satisfy the objective prong of the analysis. *Young, 960 F.2d at 364.* Indeed, the court opined that "it would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." *Id.* at 365. Turning to the subjective prong of the Eighth Amendment analysis, the court found that among other questions, it was a genuine issue whether or not "prison officials were deliberately indifferent to Young's requests for a minimal amount of relief," and so summary judgment by the district court had been inappropriately granted. *Id.*

The facts of the instant case appear similar to Young's allegations regarding the toilet facilities in his dry cell.[FN1] As to the objective component of the analysis in Alvarez's case, the conditions of his confinement in isolation were similar to Young's. Plaintiff spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. Although the Plaintiff in this case does not claim, as Young did, that he explicitly was denied access to alternate toilet facilities, he does contend that the guards generally were unavailable to respond to his request for alternate facilities. In support of his contention, Plaintiff points to his own deposition testimony in response to the question, "Did you ever ask the guard to go someplace to use the bathroom?" Plaintiff's answer was, "They wouldn't come back there. What they are saying is all a lie." (Pl.Opp.Ex. A.) Plaintiff further points to evidence that he contracted MRSA, specifically boils in his groin area,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

while in isolation to show that he lived and slept exposed to feces in his cell.

> FN1. To be sure, Young made numerous other allegations regarding his treatment in isolation, although for the purposes of this Court's analysis, we will consider the parallels to Young's and Alvarez's claims regarding toilet facilities.

The County Defendants contest Plaintiff's version of events, alleging that Plaintiff never asked to use alternate toilet facilities and was allowed to shower at least twice (which Plaintiff admits, but the County Defendants contend provided Plaintiff an opportunity to ask for alternate toilet facilities). The Court finds the facts of this case sufficiently similar to those in *Young* to find that the objective prong of the Eighth Amendment analysis is satisfied. So too, are there genuine issues of material fact as to the knowledge and response of prison officials. Summary judgment would thus be inappropriate on the Eighth Amendment claims.

**3. Plaintiff's Fourteenth Amendment Claim**

**\*6** Plaintiff's Fourteenth Amendment claim, insofar as it supports Plaintiff's Eighth Amendment claim, will remain before the Court, although summary judgment is appropriate as to any other Fourteenth Amendment claim. The County Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim on two grounds: (1) that the County Defendants did not violate Plaintiff's due process rights and (2) that Plaintiff's Fourteenth Amendment claim cannot stand on its own without Plaintiff's Fifth and Eighth Amendment claims. In response, Plaintiff contends that because there are genuine issues of material fact regarding the alleged violation of his Eighth Amendment rights, his Fourteenth Amendment claim must remain.

The County Defendants motion must fail in part because Plaintiff has pointed out that there is a genuine issue as to whether or not his Fourteenth Amendment rights were violated so long as Plaintiff's claim rests on the Eighth Amendment's prohibition against cruel and unusual punishment. The Court will deny summary judgment as to

Plaintiff's Eighth Amendment claim made pursuant to the Fourteenth Amendment, because Plaintiff's Eighth Amendment claim remains, *see supra,* and the Eighth Amendment is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Plaintiff, having failed to provide any argument to refute the County Defendants' motion with respect to a Fourteenth Amendment due process claim in and of itself, does not meet his burden on that possible claim. *See* Fed.R.Civ.P. 56(e). Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's Fourteenth Amendment claim as it stands alone.

**4. Plaintiff's § 1983 Claim**

The County Defendants move for summary judgment on all of Plaintiff's claims made pursuant to 42 U.S.C. § 1983. They contend that Plaintiff's constitutional rights have not been violated, nor is there evidence of a policy or custom of such violation.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As discussed *supra,* there is a genuine issue of fact as to the possible Eighth Amendment rights violations which may form the basis of a § 1983 claim against the County Defendants. The Court finds that prison officials employed by Cumberland County qualify as state actors, so Plaintiff's § 1983 claims against the individual County Defendants remain.

To hold the entity County Defendants liable under § 1983, Plaintiff must first demonstrate the underlying constitutional violation, about which there is a genuine issue of material fact, as discussed. Under § 1983, however, a local government entity such as a county "cannot be held liable solely because it employs a tortfeasor." *Monell v. New York City Dept. of Social*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. To the extent that Plaintiff also makes allegations against those of the County Defendants which are entities, the Court undertakes a *Monell* analysis.

**\*7** The County Defendants contend that Plaintiff has no evidence of a policy of refusing working clean toilets to inmates in Cumberland County. So too, they contend that Plaintif has presented no evidence of similar incidents involving other inmates. Further, the County Defendants point to the undisputed material fact that the two isolation units next to Plaintiff's had working toilets to support its contention that no policy exists to satisfy the *Monell* standard. Plaintiff's responsive submission to the Court points to the deposition testimony of Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken and inmates were nonetheless placed in a cell with a broken toilet, where those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief. Accordingly, the Court finds that there is a genuine issue of material fact with respect to whether there is a policy or custom in the Cumberland County Jail which deprives inmates' constitutional right to be free from cruel and unusual punishment. As Plaintiff's Eighth Amendment claims against the individual County Defendants remain, and there appears to be a genuine issue regarding a policy or custom of Eighth Amendment rights deprivations, the Court finds no reason to grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1983.

**5. Plaintiff's § 1985 Claim**

The County Defendants move for summary judgment on Plaintiff's claim made pursuant to 42 U.S.C. § 1985(3). They argue that Plaintiff has not shown evidence sufficient to make out such a claim, in particular providing no evidence of a conspiracy whatsoever, particularly not a conspiracy intended to inhibit Plaintiff's equal protection

rights.[FN2] Plaintiff contends that there is a genuine issue as to whether or not a conspiracy existed that prevented him from enjoying his civil rights, as evidenced by his placement in the isolation cell without a functioning toilet. Plaintiff avers that the conspiratorial aspect of his treatment arises out of a policy of placing other inmates in the same or similar conditions.

> FN2. Although the County Defendants also point out that there is no evidence of a conspiracy to deprive Plaintiff of his voting rights, Plaintiff makes clear in his opposition brief that his right to vote is not the basis of this claim.

To state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege, among other things, a conspiracy motivated by a racial or class based discriminatory animus designed to deprive him of equal protection of the laws. Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997) (citing Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Plaintiff has provided no specific allegations of such discrimination, nor any evidence to support such a claim. He has simply not alleged any class or race-based motive which would support a § 1985(3) claim. Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's claims made pursuant § 1985(3).

*B. Prison Health Services' Motion*[FN3]

> FN3. Plaintiff previously agreed to dismiss Defendant Betty Gambrell from this matter; Gambrell was a health services administrator at Cumberland County Jail.

**\*8** PHS was contracted to provide health care management and staffing for the Cumberland County Jail at the time of the events alleged in Plaintiff's Complaint. PHS contends that it did not employ nurses to provide direct care to inmates, but rather that any nurses who did so were employed by Cumberland County. (PHS Br. at 1.) The Agreement between Cumberland County and the regional office of PHS reflects that PHS provided "physician and administrative personnel" at the Cumberland County Jail; there is no mention of PHS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

providing nurses. (PHS Exs. B, C.)

**1. Plaintiff's § 1983 Claim**

PHS moves for summary judgment on Plaintiff's Eighth Amendment claims against it filed pursuant to 42 U.S.C. § 1983.[FN4] PHS grounds its motion on Plaintiff's lack of evidence that PHS violated his constitutional rights and upon the legal argument that 42 U.S.C. § 1983 does not permit a claim based solely upon vicarious liability. Plaintiff did not oppose the instant motion.

> **FN4.** The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's Eighth Amendment claims. It appears to the Court, however, that PHS has not addressed Plaintiff's Fifth and Fourteenth Amendment claims, nor for that matter Plaintiff's § 1985 claims, in the instant motion. Accordingly, the Court only considers PHS's motion with respect to Plaintiff's Eighth Amendment claims made pursuant to § 1983.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West, 487 U.S. at 48. Because a physician under contract with a state prison acts under the color of state law when he treats an inmate, the Court finds that PHS was also acting under the color of state law when it provided medical personnel to treat inmates at the Cumberland County Jail Id. Plaintiff may establish liability by showing that PHS had a policy or custom that caused the civil rights violations he alleges. Monell, 436 U.S. at 694. Thus, there can be no entity liability unless there is an underlying constitutional violation.

Where § 1983 claims are grounded on claims that medical treatment fell below constitutional standards, an inmate must show that the defendant was deliberately indifferent to his serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; Rouse, 182 F.3d at 197. "Deliberate indifference" exists "where [a] prison

official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197. Further, claims of negligence or malpractice are not sufficient to establish "deliberate indifference." Id.

PHS contends that Plaintiff's only evidence regarding its treatment of Plaintiff comes in the form of an expert report by Dr. John Kirby. PHS notes that Dr. Kirby, Plaintiff's own expert, mentions PHS employees when it says that, "Once detected, Mr. Alvarez's wounds were treated appropriately by his physicians," although "wound care was neglected by the prison nurses." (PHS Ex. E at 7.)[FN5] The report further states that when Plaintiff discovered the boils on his abdomen and upper legs, "the prison physician lanced [the] boils." (PHS Ex. E at 3; PHS Ex. F at 3.) PHS also argues that there is no evidence that PHS was responsible for the cleaning and sanitation of the inmates' housing, a focus of both of Dr. Kirby's reports.

> **FN5.** The Court has taken into consideration both versions of the Kirby report submitted by PHS in support of its motion.

**\*9** The Court finds that PHS has met its burden, that Plaintiff's own expert report shows that PHS' physicians did not act with deliberate indifference to Plaintiff's serious medical need and that there is no evidence that PHS is responsible for Cumberland County Jail's failure to adequately prevent infection. PHS' contract with Cumberland County reinforces the notion that cell cleaning and sanitation were not its responsibility. There is thus no evidence before the Court which shows a genuine issue of material fact as to PHS' alleged Eighth Amendment violations. Plaintiff, having not opposed the instant motion, has not met his burden to show that there is a genuine issue for trial. Accordingly, the Court will grant summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983.

**2. Plaintiff's Negligence Claim**

PHS also moves for summary judgment on Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 750200 (D.N.J.)
(Cite as: 2009 WL 750200 (D.N.J.))

negligence claims [FN6], arguing that Dr. Kirby's report concludes that the medical care provided to Plaintiff was appropriate. Plaintiff's medical malpractice claim fails and must be dismissed.

> FN6. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's medical malpractice claims of negligence. It appears to the Court, however, that PHS has not addressed in the instant motion Plaintiff's claims that PHS was negligent in other respects. Accordingly, the Court only considers PHS's motion as to Plaintiff's medical malpractice claims.

Plaintiff's negligence claim against PHS is, in part, a medical malpractice claim requiring expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation caused the injury. *See Teilhaber v. Greene*, 320 N.J.Super. 453, 727 A.2d 518 (N.J.Super.Ct.App.Div.1999). The facts of this case, as presented to the Court, do not show that there is a genuine issue as to Plaintiff's treatment by PHS. The physicians who treated him at the Cumberland County Jail provided medical care that, according to Plaintiff's own expert, was appropriate. Because Plaintiff has not responded, and there are no facts currently before the Court to support the bare allegations of medical malpractice in the Complaint, PHS is entitled to summary judgment Plaintiff's medical malpractice claims against it.

**IV. CONCLUSION**

Based upon the foregoing, the Court will GRANT summary judgment for the County Defendants on Plaintiff's Fifth Amendment claims, Plaintiff's claims made pursuant § 1985(3), and Plaintiff's Fourteenth Amendment claim to the extent that it alleges a violation of Plaintiff's Fourteenth Amendment right to due process. Further, the Court will DENY summary judgment for the County Defendants on Plaintiff's Eighth Amendment claims made pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The Court will GRANT summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983 and on Plaintiff's medical malpractice claims

against PHS. The accompanying Order shall issue today.

D.N.J.,2009.
Alvarez v. County of Cumberland
Slip Copy, 2009 WL 750200 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.
**No. 9:08-CV-0009 (TJM/DRH).**

March 26, 2009.

West KeySummary
**Civil Rights 78** 🔑 **1395(7)**

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
An inmate's § 1983 claims of deliberate indifference to his serious medical needs were so fantastic or incredible that they were dismissed as factually frivolous. The inmate alleged that prison officials gave him a "medical resource drink" that contained blood and feces, intentionally infected him with Hepatitis A and H. Pylori and denied testing and treatment. The inmate also alleged that the prison officials were working with Spanish inmates to contaminate his food tray with blood, urine, semen, and chemicals. Further, the inmate failed to allege a tangible connection between the acts of any of the prison officials and any injuries he suffered. 42 U.S.C.A. § 1983.

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, Richard Lombardo, Esq., Assistant Attorney General, of Counsel, for Represented Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

**\*1** Plaintiff Frank Brown commenced this action *pro se* pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging that Defendants violated his rights under the United States Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims that Defendants conspired and retaliated against him for filing grievances; denied him access to the courts by interfering with his legal mail; were deliberately indifferent to his serious medical needs; failed to protect him from known harm; subjected him to excessive force; conspired against Plaintiff; and denied him due process, all in violation of his rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

Presently before the Court is Defendants' Motion to Dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in opposition to the Motion. Dkt. No. 65. For the following reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); [FN1] *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (recognizing that the Supreme Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

allegations in those contexts where such amplification is needed to render the claim *plausible.*" ). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). The court must accept the material facts alleged in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

> FN1. The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"-and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07-CV-687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

### III. Facts

*2 The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

### A. First Cause of Action

On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA-BINE-YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11-12. Plaintiff's mail was tampered with "to prevent [Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

### B. Second Cause of Action

On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33-34.

### C. Third Cause of Action

On January 1, 2005 Defendants Nurse Smith [FN2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13-14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

> FN2. Nurse Smith has not been served and has not appeared in this action.

**D. Fourth Cause of Action**

Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

**E. Fifth Cause of Action**

On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action, to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

**F. Sixth Cause of Action**

**\*3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections." [FN3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being

exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

> FN3. Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

**G. Seventh Cause of Action**

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

**H. Eighth Cause of Action**

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

**I. Ninth Cause of Action**

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of the Eighth Amendment. Comp. at 38.

**J. Tenth Cause of Action**

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18-19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

**K. Eleventh Cause of Action**

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19-20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

**L. Thirteenth Cause of Action**[FN4]

> [FN4.](#) Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39-40.

*4 On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called [Hepatitis A](#)" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

**M. Fourteenth Cause of Action**

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge,

"being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40-41.

**N. Fifteenth Cause of Action**

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of [Hepatitis A](#), Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

**O. Sixteenth Cause of Action**

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

[t]his massive conspiracy is from prison to prison with massive criminal acts of food tampering, mail tampering, property destruction, assaults, conspiracy to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

**\*5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

**P. Seventeenth and Eighteenth Causes of Action**

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27-28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44-46.

**Q. Nineteenth Cause of Action**

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28-29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

**R. Twentieth Cause of Action**

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29-30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48-49.

**S. Twenty-first Cause of Action**

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

**T. Twenty-second Cause of Action**

Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." FN5 Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

> FN5. Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

**IV. Defendants' motion to dismiss**

Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S.C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

**V. Discussion**

**A. Statute of limitations**

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citing *Owens v. Okure,* 488 U.S. 235, 250-51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)).

*6 Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50-2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his pleading is deemed "filed" when it is delivered to prison officials. *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993); *Pritchard v. Kelly,* 9:98-CV-0349, 2000 WL 33743378, at *2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. *Mingues v. Nelson,* 96-CV-5397, 2004 WL 324898, at *3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 17, 2004 continuing **until March 8, 2005.** Comp. at 11-13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred.[FN6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

FN6. The sufficiency of Plaintiff's allegations will be discussed below.

**B. Personal Involvement**

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

*7 Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11-12); Burge, Goord, and LeClaire did nothing to stop "the spanish inmates" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

of all infections and did nothing at all" (Comp. at 15-16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants-Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy-were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice.**[FN7]

FN7. As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

**C. Failure to State a Claim**

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

*8 A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32-33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325-28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

**1. Eighth Amendment**

The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

**\*9** Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

**a. Medical claims**

Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290-91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth

Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817-18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

**\*10** Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

**b. Food contamination**

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

**c. Excessive force**

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [FN8]

> FN8. To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27-28. Since Plaintiff has not named any of the officers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

**2. Retaliation**

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988).* Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003)* (quoting *Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001),* overruled on other grounds by *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).*

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis, 320 F.3d at 352* (quoting *Dawes, 239 F.3d at 492).* "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).*

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir.1996); Franco, 854 F.2d at 590.*

**\*12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged-which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family-are so outrageous and unbelievable as be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

**3. Denial of access to the courts**

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), modified on other grounds, Lewis v. Casey, 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); see also Bourdon v. Loughren, 386 F.3d 88, 92 (2d Cir.2004)* (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord, 438 F.Supp.2d 399, 415 (S.D.N.Y.2006)* (quoting *Lewis, 518 U.S. at 351).* As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis, 518 U.S. at 353; Renelique v. Duncan, 03-CV1256, 2007 WL 1110913, at \*9 (N.D.N.Y. Apr.12, 2007)* (Strom, J.) (same) (citing *Howard v. Leonardo, 845 F.Supp. 943, 946 (N.D.N.Y.1994)).*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19-20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

**4. Conspiracy claims under Sections 1983 and 1985**

To survive a motion to dismiss, a conspiracy claim under § 42 U.S .C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002); *see also Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss).[FN9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363-64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

FN9. The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

*13 Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

" '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087-88 [ ( 2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271-72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal

interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04-CV-9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01-CV-1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

*14 In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice.**

**5. Due process**

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22-23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g.* Torres v. Mazzuca, 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does *not* give rise to a claim under Section 1983. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

**6. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50-2, Memorandum of Law at 24-25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

**\*15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ---U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be

regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

**VI. Conclusion**

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA-BINE-YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8-15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety.[FN10]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

> FN10. Since the Complaint has been found to be factually frivolous, it "is exactly the sort of case that the PLRA now requires that a district court dismiss 'before docketing, if feasible' ... [since a]llowing these frivolous suits to proceed would subject the prospective defendants to the type of inconvenience and expense that concerned the Supreme Court in *Neitzke....*" *Jones v. City of New York,* Nos. Civ.A. 99-8281 and Civ.A. CV-00-370, 2000 WL 516889, at *3 (E.D.N.Y. Mar.15, 2000). Moreover, because the problem with Plaintiff's complaint is substantive, such that a better pleading will not cure it, leave to re-plead is denied as futile. *See Cuocco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 50) is **GRANTED** and Plaintiff's claims and all Defendants are **dismissed in their entirety without prejudice;**[FN11] and it is further

> FN11. While Defendants Correctional Officer Smith, W. Robinson, and Nurse Smith have not been served or appeared, because all of Plaintiff's claims have been dismissed in their entirety, this action is dismissed as to the unserved Defendants as well.

**\*16** ORDERED that the Clerk shall serve a copy of this Memorandum-Decision and Order upon the parties in accordance with the Local Rules.

N.D.N.Y.,2009.
Brown v. Eagen
Slip Copy, 2009 WL 815724 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head
Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O.
Bouyea, Defendants.

> FN1. Defendant John Doe has not been
> identified and therefore has not been served with
> the Amended Complaint or otherwise appeared
> in this action. *See* Dkt No 12.

> FN2. Plaintiff mistakenly spells Defendant
> Bennett's name as "Bennet." *See* Dkt. No. 23,
> Answer at n. 1. The Court will refer to this
> Defendant by the proper spelling.

No. 9:03-CV-1128 (NAM/RFT).

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York,
Senta B. Siuda, Esq., Assistant Attorney General,
Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

**\*1** Presently before this Court is defendants' motion (Dkt.

No. 105) for summary judgment dismissing the complaint
in this civil rights action pursuant to 42 U.S.C. § 1983. In
his amended complaint (Dkt. No. 8), plaintiff, an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), alleges deliberate
indifference towards his health and safety in violation of
the Eighth Amendment, interference with mail and access
to the law library in violation of the First Amendment,
inadequate visitation, and harassment.

Defendants' motion was referred to United States
Magistrate Judge Randolph F. Treece for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c). In a thorough Report and
Recommendation (Dkt. No. 110), Magistrate Judge Treece
recommends that the Court grant the motion for summary
judgment. Plaintiff objects (Dkt. No. 112). After the Court
extended time for plaintiff to file additional objections to
the Report-Recommendation (Dkt. No. 113), plaintiff filed
a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts
a *de novo* review of those parts of a magistrate judge's
Report and Recommendation to which a party specifically
objects. Where only general objections are filed, the Court
reviews for clear error. *See Brown v. Peters,* 1997 WL
599355,\*2-\* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d
1007 (2d Cir.1999). Failure to object to any portion of a
Report and Recommendation waives further judicial
review of the matters therein. *See Roldan v. Racette,* 984
F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A
number of them revisit issues which are the subject of the
Report and Recommendation. They do not, however,
demonstrate the existence of material questions of fact
which would warrant denial of summary judgment. Other
allegations concern events allegedly occurring subsequent
to the filing of the amended complaint herein; these are
not properly the subject of this action. Upon thorough *de
novo* review, the Court accepts and adopts the Report and
Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.

RANDOLPH F. TREECE, Magistrate Judge.

### REPORT-RECOMMENDATION and ORDER

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

### I. FACTS[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of

Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

**\*2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.*, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.*, Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.*, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.*, Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.*, Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.*, Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May

2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

**\*3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ....," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.*, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .*, Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.*, Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.*, Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

> [FN8.] Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

**\*4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books

were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

> [FN9.] Jean Botta is not named as Defendant in this action.

> [FN10.] "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

**\*5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

### C. Exhaustion of Remedies

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care;[FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

**\*6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 [FN12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7,

§ 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

**\*7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.*, Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

**\*8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures are 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies are available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

**D. Eighth Amendment Claims**

*\*9* Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and

wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner's not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor

he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

**\*11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September "2003, Defendants Spinner and Streeter served Midalgo "moldy cheese, bread, spoiled milk and rotten fruits ." *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however

some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he "wouldn't starve or get sick" and that as a result he received psychological harm which include "anxiety, nightmares about being poisoned, delusions and dizziness." *Id.* at p. 50; Am. Compl. at ¶ 54.

**\*12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

**E. First Amendment Claims**

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest

involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

**\*13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

[he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

**\*14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different

magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

> [FN14.] The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents simply were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds*). However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

**\*15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...,"

Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

**\*16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

*Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological

interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

*17 Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has

not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

**\*18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten
(10) days within which to file written objections to the
foregoing report. Such objections shall be filed with the
Clerk of the Court. ***FAILURE TO OBJECT TO THIS
REPORT WITHIN TEN (10) DAYS WILL PRECLUDE
APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85,
89 (2d Cir.1993) (citing *Small v. Sec'y of Health and
Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28
U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332
(N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Herman CRUZ, Plaintiff,
v.
M. CHURCH, Corr. Officer, et al., Defendants.
**No. 9:05-CV-1067 (GTS/DEP).**

Nov. 10, 2008.

Herman Cruz, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General State of New York, Stephen M. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

***MEMORANDUM-DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Plaintiff Herman Cruz, a New York State prison inmate, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, against six correctional officials employed by the New York State Department of Corrections. Generally, in his Complaint, Plaintiff alleges that Defendants violated his rights under the Constitution when, between approximately June and July of 2005, at Upstate Correctional Facility, they (1) used excessive force against him, (2) issued a retaliatory misbehavior report against him, and (3) denied him meals on isolated occasions. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].) Currently before the Court is Defendants' motion for summary judgment, and a Report-Recommendation that the motion be granted in part and denied in part. For the reasons set forth below, the Report-Recommendation is adopted in its entirety.

## I. BACKGROUND

On April 23, 2007, Defendants moved for summary judgment with regard to Plaintiff's entire Complaint. (Dkt. No. 53.) The motion was referred to Magistrate Judge David E. Peebles for a Report-Recommendation. On June 17, 2008, Magistrate Judge Peebles issued a Report-Recommendation that the Court grant Defendants' motion with regard to Plaintiff's retaliation and food-deprivation claims, but that the Court otherwise deny the motion. (Dkt. No. 80.) On June 27, 2007, Plaintiff filed what he characterized as a "response," but "not [an] objection," to the Report-Recommendation. (Dkt. No. 83.) In that submission, Plaintiff takes issue with certain findings of fact made by Magistrate Judge Peebles with regard to Plaintiff's fooddeprivation and his excessive-force claims. (*Id.*) On July 7, 2008, Defendants filed an objection to the Report-Recommendation with regard to Plaintiff's excessive force claim. (Dkt. No. 85.)

## II. STANDARD OF REVIEW

When specific objections to a Report-Recommendation are made, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). When only general objections are made, the Court reviews for clear error or manifest injustice. *Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at \*2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd,* 175 F.3d 1007 (2d Cir.1999). Similarly, when no objection is made, the Court reviews for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

## III. ANALYSIS

### A. Plaintiff's Retaliation Claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

Since neither party filed an objection to Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim, the Court reviews that portion of the Report-Recommendation for clear error or manifest injustice. After careful review, the Court concludes that the Magistrate Judge Peebles' Report-Recommendation with regard to Plaintiff's retaliation claim is well-reasoned and not clearly erroneous. Magistrate Judge Peebles employed the proper legal standard, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court adopts that portion of the Report-Recommendation.

**B. Plaintiff's Food-Deprivation Claim**

**\*2** As stated above, in his "response" to Magistrate Judge Peebles' Report-Recommendation, Plaintiff takes issue with certain findings of fact made with regard to his food-deprivation claim. (Dkt. No. 83.) Regardless of whether the Court construes Plaintiff's response as a specific objection or a general objection, the Court finds no error (clear or otherwise) in Magistrate Judge Peebles' findings of fact and reasoning regarding Plaintiff's food-deprivation claim. Plaintiff simply has not adduced record evidence establishing that Defendants subjected him to food deprivations that were sufficiently serious to rise to the level of an Eighth Amendment violation. (*See* Dkt. No. 80, at 19-20 [Report-Recommendation, citing cases] .) *See also Cagle v. Perry,* 04-CV-1151, 2007 WL 3124806, at \*14 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting on *de novo* review Report-Recommendation) (two meal deprivations not sufficiently numerous, prolonged or severe to rise to level of Eighth Amendment violation). As a result, the Court adopts this portion of the Report-Recommendation.

**C. Plaintiff's Excessive Force Claim**

Defendants make two objections to Magistrate Judge Peebles' recommendation with respect to Plaintiff's excessive force claim. First, Defendants argue that Magistrate Judge Peebles should not have disregarded Plaintiff's failure to comply with Local Rule 7.1(a)(3)'s requirement that a party opposing a motion for summary

judgment file a response to the movant's Statement of Material Facts that admits or denies each of the movant's assertions in matching numbered paragraphs, supporting each denial with a specific citation to the record. (Dkt. No. 85, Part 1, at 1-5.) Second, Defendants argue that Magistrate Judge Peebles should have followed the established precedent in this Circuit holding that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements, some of which are consistent with the opposing party's version of events. (*Id.* at 5-6.)

**1. Plaintiff's Failure to Comply with Local Rule 7.1(a)(3)**

As an initial matter, it is questionable whether Defendants' purported "Notice Under Local Rule 56.2" satisfies the requirements of Local Rule 56.2. Local Rule 56.2 provides, in pertinent part: "When moving for summary judgment against a *pro se* litigant, the moving party shall inform the *pro se* litigant of the consequences of failing to respond to the summary judgment motion." N.D.N.Y. L.R. 56.2. While Local Rule 56.2 does not state in detail what the substance of the defendant's Rule 56.2 Notice shall be, it does state that "[a] sample notice can be obtained from the Court's webpage at 'www.nynd.uscourts.gov.' " *Id.* That sample notice provides, in pertinent part: "Pursuant to Local Rule 7.1 ..., you are required to submit the following papers in opposition to this motion: ... a short and concise statement of material facts as to which you claim there are genuine issues in dispute.... *If you do not submit a short and concise statement of material facts as to which you claim there are genuine issues in dispute,* all material facts set forth in the statement filed and served by the defendant(s) shall be deemed admitted." *See* N.D.N.Y. R u l e   5 6 . 2   N o t i f i c a t i o n ,   h t t p : / / www.nynd.uscourts.gov/pdf/ftasumjd.pdf [last visited Oct. 20, 2008] [emphasis deleted and added].

**\*3** Here, Defendants' purported "Notice Under Local Rule 56.2" did not specifically notify Plaintiff that, *if he did not submit a response to Defendants' Statement of Material Facts,* all material facts set forth in Defendants' Statement of Material Facts would be deemed admitted. (Dkt. No. 53, Part 5.) Rather, Defendants' notice advised Plaintiff that "if you do not respond to the motion for summary judgment on time *with affidavits or documentary evidence*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

contradicting the facts asserted by the defendants, the court may accept the defendants' factual assertions as true." (*Id.* at 2 [emphasis added]). Defendants' warning is, of course, true. However, it is not complete in that it neglects to advise Plaintiff that he must also submit a written response to Defendants' Statement of Material Facts. Simply stated, such a notice potentially leaves a *pro se* plaintiff with the misimpression that it is permissible to not submit a written response to a defendant's statement of material facts so long as he submits affidavits or documentary evidence, because the Court will necessarily conduct a *sua sponte* review of those affidavits or documentary evidence for evidence contradicting the facts asserted by the defendants. This misimpression is only exacerbated by the fact that Defendants' notice also states that "[a]n affidavit is a sworn statement of fact ..." (Dkt. No. 53, Part 5, at 1.) This statement is true but (under the circumstances) potentially leaves a *pro se* plaintiff with the misimpression that an affidavit and a response to a Statement of Material Facts are the same thing. *Compare* N.D.N.Y. L.R. 7.1(a)(2) (describing an "affidavit") *with* N.D.N.Y. L.R. 7.1(a)(3) (describing a "response to the Statement of Material Facts" as distinct from an "affidavit[ ]").[FN1]

> FN1. In addition to appearing to fall short of the requirements of Local Rule 56.2, it would appear that Defendants' notice falls short of the notice requirements contemplated by the Second Circuit in *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (finding a notice provided by the New York State Attorney General's Office adequate because, in part, it "expressly warned [the *pro se* plaintiff] that ... if he did not provide the court with a short statement of any material facts as to which he contended there existed a genuine issue, the court would accept the assertions of the State's ... statement [of material facts] as true....").

In any event, the Court need not hold that Defendants' notice fails to comply with Local Rule 56.2. This is because, even assuming Defendants' notice were adequate (and Plaintiff's Rule 7.1 Response were not adequate), "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules [including the a local rule requiring a response to a statement of material facts]." *Holtz v. Rockefeller & Co.,*

*Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (affirming district court's exercise of discretion to overlook *pro se* civil rights plaintiff's failure to comply with local rule requiring response to statement of material facts on defendant's motion for summary judgment) [citations omitted]. While Defendants cite numerous cases in which this Court has exercised this discretion by refusing to overlook a violation of Local Rule 7.1(a)(3),[FN2] other cases exist in which this Court has exercised this discretion by overlooking such a violation.[FN3] The reason for these differing decisions is that it is within the Court's broad discretion (based on the circumstances) whether or not to shoulder the burden of performing an independent review of the record to find proof of a factual dispute.[FN4]

> FN2. It is worth noting that, in none of the cases cited by Defendants did this Court hold that, by requiring that a non-movant file a response to the movant's Statement of Material Facts, Local Rule 7.1(a)(3) confers upon the movant some sort of absolute right to have its factual assertions deemed admitted. This is because the primary purpose of requiring a *response* to a Statement of Material Facts (which can be followed by only a brief reply by the movant under the Local Rules) is to aid *the Court* in determining whether a question of material fact exists based on the record evidence before it. *See Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001); *Kilmer v. Flocar, Inc.,* 212 F.R.D. 66, 69 (N.D.N.Y.2002) (Munson, J.); *Washington v. Niagara Mohawk Power Corp.,* 103 F.Supp.2d 517, 520 (N.D.N.Y.2000) (Kahn, J.).

> FN3. *See, e.g., Johnson v. Tedford,* 04-CV-0632, 2007 WL 4118284, at *2 (N.D.N.Y. Nov.16, 2007) (Sharpe, J., adopting Report-Recommendation); *Bost v. Bockelmann,* 04-CV-0246, 2007 WL 527320, at *2 (N.D.N.Y. Feb.20, 2007) (Sharpe, J., adopting Report-Recommendation); *Colida v. Sony Corp.,* 93-CV-0573, 1994 WL 806088, at *2, n. 4 (N.D.N.Y. Dec.16, 1994) (Cholakis, J.), *vacated in part on other grounds,* No. 95-1375, 70 F.3d 130 (Fed.Cir. Nov. 16, 1995).

> FN4. *See Monahan v. City of N.Y. Dept. of*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

*Corr.*, 214 F.3d 275, 292 (2d Cir.2000) ("[T]he trial court has discretion to conduct an assiduous review of the record [despite the filing of a faulty statement of material facts required by a local rule] in an effort to weigh the propriety of granting a summary judgment motion ....") [citations omitted]; *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *9 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting, on *de novo* review, Report-Recommendation) ("[T]he Court certainly retains the discretion to conduct ... an independent review [of the record to find proof of a factual dispute .") , *accord, Dawkins v. Williams,* 511 F.Supp.2d 248, 255 (N.D.N.Y.2007) (Kahn, J., adopting, in pertinent part, Report-Recommendation) [citations omitted]; *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs,* 03-CV-4034, 2004 WL 912599, at *4, n. 4 (S.D.N.Y. Aug.29, 2004) ("In deciding a motion for summary judgment, a district court is not constrained to rely on assertions made in a Local Rule 56.1 statement but may instead, at its discretion, perform an independent review of the record to determine how the motion for summary judgment should be decided.") [citations omitted].

**\*4** Here, the Court finds no error in Magistrate Judge Peebles' decision to conduct such a review. As Magistrate Judge Peebles alluded to in his thorough Report-Recommendation, Plaintiff filed what he intended to be a response to Defendants' Statement of Material Facts. (Dkt. No. 80, at 9, n. 6.) The problem with that response was that it did not comply with Local Rule 7.1(a)(3) in that it did not (1) mirror each of the thirteen paragraphs of Defendants' Statement of Material Facts, (2) expressly admit or deny each of Defendants' factual assertions, and (3) support each denial with a specific citation to the record. (Dkt. No. 55, Part 1, at 3-6 [Plf.'s "Statement of Facts," containing twelve paragraphs, only seven of which were supported by citations to the record].) However, the record evidence adduced by Plaintiff was not particularly copious, consisting of some thirty-eight (38) pages of exhibits and affidavit testimony. (Dkt. No. 55, Part 1, at 7-21; Dkt. No. 55, Part 3, at 1-5; Dkt. No. 55, Part 3, at 6-24.) Moreover, before he filed his papers in opposition to Defendants' motion in this action on May 4, 2007, Plaintiff was not so experienced at federal court litigation that the special leniency normally afforded to

*pro se* litigants because of their experience should have been diminished.[FN5]

FN5. In particular, before May 4, 2007, Plaintiff had filed five other federal court actions. *See Cruz v. Senkowski,* 90-CV-0289 (W.D.N.Y.) (habeas corpus proceeding); *Cruz v. Wead,* 97-CV-0846 (W.D.N.Y.) (prisoner civil rights action); *Cruz v. Hillman,* 01-CV-4169 (S.D.N.Y.) (prisoner civil rights action); *Cruz v. Thompson,* 04-CV-1497 (N.D.N.Y.) (prisoner civil rights action); *Cruz v. Lashway,* 06-CV-0867 (N.D.N.Y.) (prisoner civil rights action). It appears that, as of May 4, 2007, he had filed only one response to a motion for summary judgment in federal court, and it is unclear whether that response included response to a Statement of Material Facts. *See Cruz v. Wead,* 97-CV-0846 (W.D.N.Y.) (Plaintiff filed a "response" to defendants' motion for summary judgment on June 20, 2001).

For these reasons, the Court is not persuaded by Defendants' argument that Magistrate Judge Peebles erred by excusing Plaintiff's failure to comply with Local Rule 7.1(a)(3).

## 2. Plaintiff's Inconsistent Statements as to the Source of His Injury

In support of their argument that it is the established precedent in this Circuit that issues of credibility may be resolved by the Court on a motion for summary judgment when one of the parties has offered conflicting statements and some of those statements are consistent with the opposing party's version of events, Defendants cite *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005). (Dkt. No. 85, Part 1, at 5-6.) Defendants need to appreciate the narrowness of the exception discussed in *Jeffreys,* and the circumstances necessary to trigger that narrow exception.

It is well established that issues of credibility are *almost never* to be resolved by a court on a motion for summary judgment.[FN6] Granted, there is a *narrow exception* to this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

well-established rule. *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y. March 29, 2007). In *Jeffrey,* the Second Circuit explained that this narrow exception is for testimony by a non-movant that possesses the following two characteristics: (1) it constitutes almost the exclusive basis for a disputed issue of fact in the case (or, expressed differently, it is largely unsubstantiated by any other direct evidence); and (2) it is so lacking in credibility (because the testimony is incomplete and/or replete with inconsistencies and improbabilities) that, even after drawing all inferences in the light most favorable to the non-movant, no reasonable jury could find for the non-movant.[FN7] Again, it must be remembered that the circumstances giving rise to this exception are "rare." [FN8]

FN6. *See Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 174 (2d Cir.2006) ("[C]redibility, in the ordinary course of things, is for a fact-finder to evaluate."); *Stichting v. Schreiber,* 407 F.3d 34, 55 (2d Cir.2005) ("[T]o resolve at the summary judgment stage, and before Mead testifies, the question of whether a reasonable jury might believe Mead would, we think, amount to a credibility determination that we are not entitled to make."); *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996) (at the summary judgment stage, the court "is ... to eschew credibility assessments"); *accord, Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *accord, Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *see also Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("In applying [the summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."); *accord, U.S. v. Rem,* 38 F.3d 634, 644 (2d Cir.1994).

FN7. *See Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine

whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *cf. Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42-46 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612-15 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

FN8. *Jeffreys,* 426 F.3d at 554; *Caraballo v. City of New York,* 05-CV-8011, 2007 WL 1584202, at *6 (S.D.N.Y. May 31, 2007); *Blake,* 487 F.Supp.2d at 202; *Dove v. City of New York,* 03-CV-5052, 2007 U.S. Dist. LEXIS 18341, at *16, 2007 WL 805786 (E.D.N.Y. March 15, 2007); *Chapel Park Villa, Ltd. v. The Travelers*

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

*Ins. Co., Inc.,* 02-CV-0407, 2006 WL 2827867, at *7 (W.D.N.Y. Sept.29, 2006); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *2 (S.D.N.Y. Feb.15, 2006).

**\*5** Here, Defendants argue that Magistrate Judge Peebles should have discredited Plaintiff's statement (made on June 16, 2005) that his physical injuries had been caused by an assault by Defendants (on June 5, 2005), because that statement was inconsistent with his earlier statement to a health care provider (made on June 5, 2005) that his physically injuries had been caused by a fall in a shower. (Dkt. No. 85, Part 1, at 5.) Defendants are correct that the two statements are inconsistent. However, it is not true that the statement of June 16, 2005, constitutes the exclusive, or almost the exclusive, basis for a disputed issue of fact in the case. Magistrate Judge Peebles correctly observed that the statement of June 16, 2005, was corroborated by (1) Plaintiff's later sworn statements to the same effect (*see* Dkt. No. 1, ¶¶ 6 [6]-6[8] [Plf.'s Verified Compl.]; Dkt. No. 1, at 15, ¶¶ 12-13 [Plf.'s Decl. in Support of his Compl.]; Dkt. No. 55, Part 3, ¶¶ 13, 15, 26 [Plf.'s Decl.] ), and (2) a modicum of medical evidence substantiating that, at or about the time of the alleged assault, Plaintiff suffered physical injuries that are plausibly consistent with his claim (*see* Dkt. No. 53, Part 11 [Ex. E to Viglucci Affid., attaching Plf.'s medical records]; Dkt. No. 55, Part 3, at 12-19 [Exs. 6-13 to Plf.'s Decl., attaching Plf.'s medical records].) *See Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *20 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting, on *de novo* review, Report-Recommendation) (finding that the plaintiff's affidavit testimony was not so unsubstantiated as to be incredible under exception created by *Jeffreys v. City of New York,* 426 F.3d 549 [2d Cir.2005] ).

It should be noted that, contrary to Defendants' argument, Magistrate Judge Peebles did not "discount[ ]" Plaintiff's statement of June 5, 2005, "in favor of" his statement of June 16, 2006. (Dkt. No. 85, Part 1, at 6.) Magistrate Judge Peebles merely recognized that Plaintiff's statement of June 16, 2006, was not so unsubstantiated by other evidence as to trigger the narrow exception discussed in *Jeffreys.* Defendants remain free to use Plaintiff's statement of June 5, 2005, to try to persuade a jury that no assault occurred. It should also be noted that conspicuously missing from Defendants' motion papers are affidavits from Defendants Church and Vann denying their

involvement in the alleged assault on Plaintiff. (*See generally* Dkt. No. 53.)

Because the Court finds that the first prong of the two-part test set forth by *Jeffreys* has not been satisfied, there is no need to proceed to the second prong of that test (e.g., examining the statements' inconsistencies and improbabilities). The Court notes that, even if it were to proceed to that prong, it would be have difficulty concluding that Plaintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by Defendants. (Dkt. No. 1, ¶ 6[8] [Plf.'s Verified Compl.]; Dkt. No. 55, Part 1, ¶ 5 [Plf.'s "Statement of Facts"].) *See Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112 (2d Cir.1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.") [emphasis added]. As a result, the Court adopts this portion of the Report-recommendation.

**\*6 ACCORDINGLY,** it is

**ORDERED** that the Report-Recommendation (Dkt. No. 80) is hereby ***ADOPTED*** in its ***ENTIRETY;*** and it is further

**ORDERED** that Defendants' First Motion for Summary Judgment (Dkt. No. 53) is ***GRANTED IN PART*** in that the Second and Third Causes of Action of Plaintiff's Complaint (Dkt. No. 1), asserting claims of retaliation and food deprivation, are ***DISMISSED*** **with prejudice;** and it is further

**ORDERED** that First Motion for Summary Judgment (Dkt. No. 53) is otherwise ***DENIED,*** and that the First Cause of Action of Plaintiff's Complaint (Dkt. No. 1), asserting a claim of excessive force, shall be ***SET DOWN FOR TRIAL.***

*REPORT AND RECOMMENDATION*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Herman Cruz, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against various corrections officials employed by the New York State Department of Correctional Services ("DOCS"), complaining of the alleged deprivation of his civil rights occurring during the period of his incarceration. In his complaint, plaintiff claims that he was assaulted by the six named defendants, was denied meals on isolated occasions, and was issued a misbehavior report in retaliation for having filed a grievance complaining of actions on the part of certain corrections officials. As relief, plaintiff seeks recovery of compensatory and punitive damages.

Currently pending before the court is a motion by defendants seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. In their motion, defendants urge the court to reject the plaintiff's version of the relevant events as facially incredible and determine that no reasonable factfinder could find in his favor on the three claims asserted.

Having carefully reviewed the record now before the court, informed by the arguments raised by the defendants, I conclude that dismissal of plaintiff's excessive force claims is precluded by the existence of genuine, triable issues of material fact, but that defendants are entitled to dismissal of plaintiff's retaliation and food deprivation claims, and therefore recommend that defendants' motion be granted, in part, but otherwise denied.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007)

(citations omitted). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a prison inmate entrusted to the custody of the DOCS. Complaint (Dkt. No. 1) at p. 1. At the times relevant to his claims plaintiff was designated to the Upstate Correctional Facility, located Malone, New York.[FN2] *Id.*

> FN2. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).*

On June 5, 2005, while confined within the special housing unit ("SHU") at Upstate, plaintiff intentionally started a fire in his cell. Complaint (Dkt. No. 1) at p. 6. The avowed purpose for setting the fire was plaintiff's desire to either commit suicide or be transferred out of the Upstate SHU. *Id.; see also* Cruz Decl. (Dkt. No. 55-3) ¶ 16. Once the fire was extinguished by prison officials, Cruz was transferred into the facility's mental health unit and placed on special watch. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) Exh. 4-A. At approximately 6:30 pm on that date plaintiff was examined for physical injuries; during that inspection no injuries were discerned, and plaintiff denied having suffered any. Viglucci Aff. (Dkt. No. 53-6) Exh. E; *see also* Cruz Aff. (Dkt. No. 553) Exh. 4-A.

*7 It is at this point that the parties' versions of the relevant events diverge. Plaintiff maintains that after his admission into the mental health unit and ensuing medical examination, defendants Baker, Russell, Patterson, Gill, Church and Vann came into his room and assaulted him, punching and kicking him and causing him to suffer a broken rib. Complaint (Dkt. No. 1) at p. 6; *see also* Cruz Decl. (Dkt. No. 55-3) ¶ 13. Defendants Baker, Gill, Patterson and Russell, by contrast, have submitted affidavits in which they deny having assaulted the plaintiff.[FN3] *See* Baker Aff. (Dkt. No. 53-12) ¶¶ 8-9; Gill Aff. (Dkt. No. 53-13) ¶ 6; Patterson Aff. (Dkt. No. 53-14)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

at ¶¶ 6-7; Russell Aff. (Dkt. No. 53-15) ¶¶ 3-5.

> FN3. Conspicuously absent from among defendants' motion submission are affidavits from the remaining two defendants, including Corrections Officer Church and Corrections Officer Vann, denying their involvement in any alleged assault of the plaintiff.

Plaintiff's ambulatory health record entries for the relevant period reflect complaints of back and rib pain registered by the plaintiff at 7:30 pm on June 5, 2005, one hour after having been initially examined for injuries resulting from the fire; during the course of that examination, plaintiff attributed his injuries to having slipped and fallen in the shower. Viglucci Aff. (Dkt. No. 53-6) Exh. E., repeated at (Dkt. No. 55-3) Exhs. 6A12A. X-rays taken on June 6, 2005 confirmed that at some point plaintiff suffered a rib fracture. Viglucci Aff. (Dkt. No. 53-6) Exh. E. Plaintiff's health records reveal that plaintiff's injuries were treated during the ensuing days with analgesics. *See id.*

On June 16, 2005, for the first time, plaintiff reported that he was attacked by prison officials on June 5, 2005, at that point blaming his injuries, including the rib fracture, upon the assault rather than a fall in the shower, as previously reported. Viglucci Aff. (Dkt. No. 53-6) Exh. E; Cruz Decl. (Dkt. No. 55-3) Exh. 12-A. An examination conducted on that date disclosed the existence of a "baseball size" bruise on plaintiff's right lower back, though no marks were found on his face.[FN4] *Id.* Plaintiff maintains that he initially made a false report regarding the cause of his injuries out of fear of retribution. *See, e.g.,* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) ¶ 5.

> FN4. As will be seen, defendants claim that plaintiff's broken rib and subsequent inquiries were self-inflicted, based upon reports that upon his entry into the mental health unit on June 5, 2006 plaintiff was seen standing on his bunk and jumping onto the floor, throwing himself on his back and flailing. *See* Plaintiff's Response to Defendants' Summary Judgment Motion (Dkt. No. 55) Exh. D.

Plaintiff was issued a misbehavior report on June 5, 2005 by defendant Megan Church, a corrections officer, accusing Cruz of arson, in violation of disciplinary rule 118.10, based upon the fire which occurred on that date in his cell. Viglucci Aff. (Dkt. No. 53-6) Exh. D. A second misbehavior report was issued as a result of the incident, also on that same date, by Corrections Officer J. Kissane, charging plaintiff with destruction or loss of property, in violation of disciplinary rule 116.10. A Tier III disciplinary hearing was conducted on June 16, 2005 in connection with those charges, resulting in a finding of guilt on both counts, and the imposition of a penalty which included one hundred eighty days of disciplinary confinement in the facility's SHU, with a corresponding loss of package, commissary and telephone privileges and an order that plaintiff pay restitution in the amount of $241.00, with an additional recommended loss of good time credits.[FN5] *Id.*

> FN5. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

**\*8** Plaintiff was issued yet another misbehavior report on June 5, 2005, charging him with harassment (Rule 107.11), making threats to staff (Rule 102.10), and violating facility correspondence regulations (Rule 180.11). Viglucci Aff. (Dkt. No. 53-6) Exh. C. Those charges stemmed from a letter allegedly sent by the plaintiff to Corrections Officer Church, containing derogatory statements concerning her. *See id.* Following a Tier III hearing in connection with that misbehavior report, plaintiff was found guilty of two of the three charges, but acquitted of making threats. *Id.* As a consequence, disciplinary confinement, with corresponding lack of package, commissary and telephone privileges, was imposed for a period of ninety days, with

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

an additional recommended loss of good time credits. *Id.*

In addition to complaining of the June 5, 2005 alleged staff assault, plaintiff's complaint also makes allegations, although bereft of specifics, to the effect that in response to his filing of a grievance on July 11, 2005, regarding the assault and actions taken by defendant Church toward him, Cruz was issued another misbehavior report. Complaint (Dkt. No. 1) at p. 10. Neither plaintiff's complaint, the accompanying supporting affidavit, nor his papers in opposition to the defendants' summary judgment motion provide elaboration regarding this claim, including to identify the issuing officer, recite the infraction charged, or provide information regarding its disposition.

Similarly, in his complaint plaintiff alleges having been denied "chow" on numerous occasions. Complaint (Dkt. No. 1) Third Cause of Action at p. 12; Cruz Decl. (Dkt. No. 55-3) ¶ 10. Plaintiff does not indicate the dates, or on how many occasions, his meals were not served, nor once again does he identify the individuals to whom that deprivation is attributable.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 25, 2005. Dkt. No. 1. As defendants, plaintiff's complaint names six DOCS employees, including Corrections Officers M. Church, A. Baker, Patterson, and R. Russell, as well as Corrections Sergeant R. Gill and Corrections Lieutenant Vann, all of whom are employed at Upstate. *Id.* Plaintiff's complaint contains three causes of action, asserting the use of excessive force, unlawful retaliation, and cruel and unusual punishment based upon the alleged deprivation of meals. Issue has since been joined by the defendants' filing of an answer in which they deny the bulk of the material allegations of plaintiff's complaint and set forth various affirmative defenses. *See* Dkt. Nos. 23, 73.

On April 23, 2007, following the close of discovery, defendants filed a motion for summary judgment. Dkt. No. 53. In their motion, defendants argue that no reasonable factfinder could credit plaintiff's version of the relevant events and find liability on the part of any of the defendants with respect to plaintiff's three separate claims.

*Id.* Plaintiff has since responded in opposition to defendants' motion by the filing on May 4, 2007 of several documents, including an affidavit.[FN6] *See* Dkt. No. 55. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c); *see also* Fed.R.Civ.P. 72(b).

FN6. Plaintiff's submission does not include a statement formally responding to defendants' Local Rule 7.1(a)(3) statement of material facts not in issue. While the plaintiff's failure to include such a responsive statement among his opposition papers has significant potential adverse consequences, *see* N.D.N.Y.L.R. 7.1(a)(3); *see also* Elgamil v. Syracuse Univ., No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); Monahan v. New York City Dep't of Corr., 214 F.3d 275, 292 (2d Cir.2000), and the importance of this requirement should not be trivialized, I have chosen to overlook this procedural deficiency in light of the plaintiff's other submissions in opposition to the motion and in deference to his *pro se* status. See The Travelers Indemnity Co. of Ill. V. Hunter Fan Co., No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan.28, 2002) (citing Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir.2001) (indicating that a court has broad discretion whether to overlook a party's failure to comply with its local rules).

III. *DISCUSSION*

A. *Summary Judgment Standard*

**\*9** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* Celotex Corp. v. Catrett, 477 U.S.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

*B. Excessive Force*

**\*10** The centerpiece of plaintiff's complaint in this action is his contention that he was assaulted by the defendants following his transfer into the Upstate mental health unit on June 5, 2005, causing him to suffer injuries which included a broken rib. Despite plaintiff's sworn statements to the effect that the assault occurred, with some modicum of potential corroboration provided by medical records substantiating that at or about that time plaintiff did in fact suffer injuries which are plausibly consistent with his claim, defendants nonetheless request that the court find plaintiff's version of the events to be incredible as a matter of law, and thus conclude that no reasonable factfinder could find in his favor with regard to that cause of action.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

This is not the typical excessive force case, in which defendants argue that while force may have been exerted by corrections officials against an inmate, it was proportionate to the need to further legitimate penological interests and protect the safety and integrity of the facility, or that when utilizing force they did not act with a sufficiently culpable state of mind. In this instance, defendants assert that the assault, as claimed by the plaintiff, simply did not occur. Ordinarily, such a disparity between the parties' versions of the relevant events would present a classic example of an issue of material fact of the type which would preclude the entry of summary judgment. Despite this defendants nonetheless argue that plaintiff's version of the events is simply not supportable,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

inviting the court to make the required credibility assessment and find, as a matter of law, that no reasonable factfinder could conclude he was subjected to excessive force at the hands of the defendants.

While resolution of genuine issues of material fact are ordinarily best left for resolution by a jury, in certain rare circumstances where conflicting versions of the relevant events are presented in the record a court may nonetheless resolve the inconsistencies and grant summary judgment, particularly where a plaintiff relies exclusively on his or her version of the relevant events, without corroboration, and in circumstances where there are inconsistencies, contradictions or incompleteness in the plaintiff's version. See *Jeffreys,* 426 F.3d at 554-55; *see also Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998); *see also Dove v. City of New York,* No. 03-CV-5052, 2007 WL 805786, at *5 (E.D.N.Y. Mar. 15, 2007). This, however, is not one of those cases.

**\*11** Despite defendants' protestations to the contrary, plaintiff's version of the relevant events is not necessarily inconsistent with the evidence in the record, including that concerning his medical injuries. Plaintiff's health records reveal that at 6:30 pm on June 5, 2005, following a fire in his cell, he was examined, with no signs of injury. Cruz Decl. (Dkt. No. 55-3) at Exh. 6A. One hour later, Cruz was again examined, after reportedly having slipped and fallen in the shower, with complaints of rib and back pain. *Id.* While at that time there did not appear to be any visible signs of injury, x-rays ordered on June 6, 2005 revealed the existence of a broken rib. *Id.; see also* Viglucci Aff. (Dkt. No. 53-6) Exh. E. While defendants theorize that the broken rib was self-inflicted as a result of plaintiff's antics, observed by prison officials on June 5, 2005-and there is considerable potential plausibility to that theory-only a jury, having heard all of the evidence, can make that pivotal credibility determination and resolve the issues of fact surrounding whether the assault incident occurred, as claimed by the plaintiff.

In sum, while at different points in time the plaintiff has undeniably offered conflicting versions of the relevant events of June 5, 2005, he has also provided an explanation for having done so, and his claim of having sustained injury on that date as a result of an assault is potentially somewhat corroborated by the existence of a

visible bruise and x-rays revealing a broken rib. Under these circumstances I recommend against invoking the *Jeffreys* exception, and in favor of denying the portion of defendants' motion challenging the sufficiency of plaintiff's excessive force claims.

C. *Retaliation*

In his complaint plaintiff also asserts a claim of retaliation, based principally upon his filing of a grievance on July 1, 2005, allegedly resulting in the subsequent issuance of a misbehavior report. Complaint (Dkt. No. 1) at p. 10. Observing that such claims are "prone to abuse", see *Flaherty v. Cohen,* 713 F.2d 10, 13 (2d Cir.1983), and that the record is lacking in specifics regarding the grievance and ensuing misbehavior report, defendants seek dismissal of this claim as well.[FN7]

FN7. Plaintiff's complaint, generously construed, could be interpreted as also alleging that defendants Gill and Church retaliated against him for filing grievances and complaints against him by their issuance of false misbehavior reports on June 5, 2005. While the mere filing of false misbehavior reports, without more, is not actionable, *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)), such conduct, if committed in retaliation for an inmate having engaged in protected activity, is potentially actionable under the First Amendment. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). In this case, however, plaintiff is not well-positioned to argue that the misbehavior reports contained false allegations since Tier III hearings conducted in connection with both misbehavior reports issued on June 5, 2005 resulted in at least partial findings of guilt.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds,* *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*12** As can be seen, evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims generally revolve around both the engaging in protected conduct, and establishment of a nexus between that conduct and adverse action later taken. In this instance plaintiff's retaliation claims have been alleged in only conclusory form, and are not supported by evidence in the record establishing a nexus between protected activity and the adverse actions complained of. The specific instance cited, for example, fails to disclose the temporal relationship between the July 11, 2005 grievance and the ensuing misbehavior report, nor does it identify the corrections official who issued the report.[FN8] Since, in response to defendants' motion, plaintiff has not come forward with evidence to support his retaliation claim, I recommend that it be dismissed as a matter of law.

FN8. Since personal involvement in conduct resulting in a constitutional violation is a pre-requisite to a finding of liability, plaintiff's failure to allege their participation in the issuance of a misbehavior report could provide a separate, independent basis for dismissal of plaintiff's retaliation claims against the six named defendants. *See* *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)).

D. *Food Deprivation*

In his third and final cause of action plaintiff alleges, once again in wholly conclusory form, that he was denied food by the defendants while at Upstate. Defendants seek dismissal of this claim based upon plaintiff's failure to demonstrate the facts from which a reasonable jury could conclude that his Eighth Amendment rights were violated.

Undeniably, the Eighth Amendment requires that prisoners receive food that is adequate to maintain health; it need not, however, be either tasty or aesthetically pleasing. *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir.1993) (citing *Cunningham v. Jones,* 567 F.2d 653, 659-60 (6th Cir.1977)). When corrections officials deny a prison inmate the measure of food necessary to maintain health, the Eighth Amendment's prohibition against cruel and unusual punishment is implicated. *Robles v. Coughlin,* 725 F.2d 12, 15-16 (2d Cir.1983). If, on the other hand, meals are withheld from a prisoner on an isolated basis, such conduct, though not necessarily to be condoned, does not typically rise to a level of constitutional significance. *See* *Cunningham,* 567 F.2d at 659-60 (remanding case for a determination of nutritional adequacy where complaint alleging that prisoners were served only one meal per day had been dismissed); *Moss v. Ward,* 450 F.Supp. 591, 596-97 (W.D.N.Y.1978) (indicating that "being deprived of one or two meals might not be cruel and unusual punishment", but finding in this case that deprivation of food for four consecutive days was an unconstitutionally disproportionate punishment for violation of a disciplinary rule).

In the face of defendants' pending motion for summary judgment, plaintiff has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials, nor has he identified the prison officials involved and the frequency with which the deprivation occurred. Indeed, as defendants assert, the only specifics alleged in plaintiff's third cause of action in connection with his third cause of action is that Cruz filed a grievance asserting that he was told by another corrections officer that defendant Church would not feed him. *See* Complaint (Dkt. No. 1) at p. 6. Plaintiff does not follow that

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

allegation with any claim that defendant Church actually denied him any meals, nor does he identify the persons responsible for withholding the other meals to which he makes reference in connection with that claim.[FN9]

> FN9. The parties' versions regarding the denial of food are to a degree in conflict. Plaintiff asserts, as one of the reasons why he opted to light a fire in his cell, that he was not being fed. *See, e.g.,* Complaint (Dkt. No. 1) at p. 15. Defendants counter that the fact that plaintiff may not have received certain meals stems from plaintiff's refusal to obey an order to retreat to the back of his cell in order to be served his food. *See, e.g.,* Viglucci Aff. (Dkt. No. 53-6) Exh. C, 6/5/05 recommendation from Lt. Martin to Sgt. Gill. This fact dispute is not material, however, since in response to defendants' motion the plaintiff has failed to allege food deprivation of sufficient proportions to support an Eighth Amendment claim. *See, e.g., Robles* ("While no court has explicitly said that denial of food is a per se violation of a prisoner's Eighth Amendment rights, under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (citations omitted); *Moss, 450 F.Supp. at 596-97.*

**\*13** Under these circumstances I conclude that no reasonable factfinder could determine that defendants have violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment by denying him meals.

IV. *SUMMARY AND RECOMMENDATION*

Having carefully reviewed the record in light of defendants' arguments, I find that there are genuine issues of material fact which must be resolved by a jury before plaintiff's excessive force claim against the six named defendants can be adjudicated, and therefore recommend against dismissal of that claim at this procedural juncture. I further recommend, however, that the remaining portions of defendants' summary judgment motion be granted and that plaintiff's second and third causes of action, alleging retaliation and food deprivation, respectively, be

dismissed as a matter of law.[FN10] Based upon the foregoing, it is hereby

> FN10. Large segments of plaintiff's complaint and submissions to the court in opposition to defendants' summary judgment focus upon allegations of verbal harassment of the plaintiff by the six named defendants and other corrections employees at Upstate. Such allegations, without more, do not rise to the level of constitutional significance required to support a claim under 42 U.S .C. § 1983. *See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Beckles v. Bennett,* No. 05 Civ.2000, 2008 WL 821827, at *23 (S.D.N.Y. Mar. 26, 2008).

RECOMMENDED, that defendants' motion for summary judgment (Dkt. No. 53) be GRANTED, in part, and that plaintiff's second and third causes of action be DISMISSED, but that defendants' motion otherwise be DENIED, and that plaintiff's excessive force claim be set down for trial.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

The clerk is directed to promptly forward a copy of this order to the plaintiff by regular mail and defendant via electronic means.

N.D.N.Y.,2008.
Cruz v. Church
Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4891165 (N.D.N.Y.)
(Cite as: 2008 WL 4891165 (N.D.N.Y.))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))



Only the Westlaw citation is currently available.


United States District Court,
S.D. New York.
George LUNNEY, Plaintiff,
v.
Lieutenant BRURETON, et al., Defendants.
**No. 04 Civ. 2438(LAK)(GWG).**


May 29, 2007.


George Lunney, Elmira, NY, pro se.


Benjamin Lee, Assistant Attorney General, New York, NY, for
Defendants.


### REPORT AND RECOMMENDATION


GABRIEL W. GORENSTEIN, United States Magistrate
Judge.


*TABLE OF CONTENTS*

| | | | |
|---|---|---|---|
| I. | | *BACKGROUND* .................. | 2 |
| | A. | *Facts* ..................... | 2 |
| | B. | *Procedural History* ............... | 5 |
| | | | |
| II. | | *APPLICABLE LAW* ............... | 8 |
| | A. | *Standard of Review on Summary Judgment Motions* ............... | 8 |
| | B. | *Exhaustion* ................. | 10 |
| | | 1. | *PLRA* ............... | 10 |
| | | 2. | New York's Inmate Grievance Program% i .......... | 11 |

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

| | | | | |
|---|---|---|---|---|
| III. | | *DISCUSSION* ................... | | 12 |
| | A. | *Eighth Amendment Claim Relating to Food in the SHU* ............... | | 12 |
| | B. | *Eighth Amendment Claim of Excessive Force* ........ | | 16 |
| | | 1. | *Exhaustion* .................. | 16 |
| | | 2. | *Merits* .................... | 21 |
| | C. | *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items* ...................... | | 26 |
| | | 1. | *Laundry Services* ............... | 2 7 |
| | | 2. | *Plumbing Problems and Failure to Provide Personal Hygiene Items* ..... | 28 |
| | | 3. | *Personal Involvement* .................. | 30 |
| | D. | *First Amendment Retaliation Claims* .............. | | 30 |
| | | 1. | *Law Governing First Amendment Retaliation* ............ | 31 |
| | | 2. | *Claims against Fischer* ............... | 32 |
| | | 3. | *Claims against Blot* ............... | 34 |
| | | | a. | Exhaustion of Claims Against Blot% i .......... | 34 |
| | | | b. | *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation* ............ | 37 |
| | | | | i. | Adverse Action. | 38 |
| | | | | ii. | Causal Connection. | 40 |
| | | | c. | *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report* ............... | 41 |
| | | | d. | *The Merits of Lunney's Allegation that Blot Threatened Physical Violence* .............. | 43 |
| | | | e. | *The Merits of Lunney's Allegation of Retaliatory Assault* ..... | 45 |
| | | 4. | *First Amendment Claim Against Frazier* .......... | 47 |
| | | 5. | *First Amendment Claim Against Brereton* ........ | 47 |
| | E. | *Unfiled Grievances* ............... | | 4 8 |
| | F. | *Fourteenth Amendment Due Process Claims* .......... | | 50 |
| | | 1. | *Law Governing Disciplinary Proceedings* .......... | 50 |
| | | 2. | *Written Disposition of Disciplinary Hearing* .......... | 51 |

Conclusion ......................... 55

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

I. *BACKGROUND*

The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24, 2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under Fed.R.Civ.P. 56(e).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

**\*2** Lunney received a "Tier III" misbehavior report on May 22,

2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton,[FN1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

FN1. This officer is identified as Lieutenant "Brureton" in the complaint.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See* Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

**\*3** Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that, on one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brureton,* 2005 WL 121720, at \*16 (S.D.N.Y. Jan.21, 2005) ( " *Lunney I* " ), *adopted by,* 2005 WL 433285, at \*1 (S.D.N.Y. Feb.23, 2005). Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at \*16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous sub-standard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.*; (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims. [FN2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

FN2. *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket #

73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement, filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

## II. *APPLICABLE LAW*

### A. *Standard of Review on Summary Judgment Motions*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

genuine issue for trial,' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,* 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

B. *Exhaustion*

1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"-that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function

effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

2. *New York's Inmate Grievance Program*

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See Hemphill,* 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases).

III. *DISCUSSION*

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

A. *Eighth Amendment Claim Relating to Food in the SHU*

Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable, inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on one occasion he and other inmates "became ill after eating," *see id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id.* at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted, Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what are supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or that posed an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in correcting the problems with the food" and that

he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer, 2004 WL 766433, at *6 (S.D.N.Y. Apr.12, 2004)* ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies.") (citing *Hernandez v. Coffey, 2003 WL 22241431, at *3 n. 4 (S.D.N.Y. Sept.29, 2003)* (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov.1, 2005) ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

**\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside agencies and D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

B. *Eighth Amendment Claim of Excessive Force*

Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32.[FN3]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

FN3. Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

1. *Exhaustion*

Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as Ziemba v. Wezner, 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see* Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

**\*9** The first question is whether administrative remedies were in fact "available" to Lunney. Brownell, 446 F.3d at 311 (citing Hemphill, 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." Booth, 532 U.S. at 738; *accord* Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see* Hemphill,

380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing Davis v. Goord, 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See* Hemphill, 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See* Hemphill, e.g., 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

living hell"); *McCullough v. Burroughs,* 2005 WL 3164248, at *4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at *4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

**\*10** Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ]" this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining" about such force. Each merely noted that there have been some such documentation. For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer had told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question.[FN4]

> **FN4.** Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g., Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also Dukes v. Doe,* 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf. Pauling v. Sec'y of Dep't of Interior,* 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See Jones v. Bock,* --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

2. *Merits*

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e)(1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised" where Frazier had grabbed" him and that he had a "couple [of] black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry

under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at \*5 (S.D.N.Y. June 20, 2006) (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind.").

**\*12** In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated to any 'good-faith effort to maintain or restore discipline.' ")

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

(citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.' " *See id.* Both these circumstances are present in Lunney's case, however.

**\*13** In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face

turn red. 2001 WL 476070, at *13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or "nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at *1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at *1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where (1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *Johnson v. City of New York,* 2006 WL 2354815, at *5 (S.D.N.Y. Aug.14, 2006) (citing cases).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items*

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. *See* Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, *see* Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

1. *Laundry Services*

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. *See* Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." *See Lunney I,* 2005 WL 121720, at \*8 (citing *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent)); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001) (availability of sinks and laundry

detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part,* 343 F.3d 35 (2d Cir.2003). The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." *See Lunney I,* 2005 WL 121720, at \*8. Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. *See generally Benjamin,* 161 F.Supp.2d at 178-79. That Lunney asserts he was without soap for eight days and had a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

2. *Plumbing Problems and Failure to Provide Personal Hygiene Items*

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." *See* Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." *See id.* (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." *See Id.* ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." *See id.*

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting *Farmer,* 511 U.S. at 837) (alterations in original); *Fernandez v. Armstrong,* 2005 WL 733664, at \*5-6 (D.Conn. Mar.30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at *4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.' " *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on

Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at *11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S. officials in Albany,

New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

**\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25. [FN5]

> FN5. Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally Davidson v. Donnelly,* 2004 WL 1941349, at \*3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no evidence on reason for transfer and prison officials gave reasons).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶ ¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

a. *Exhaustion of Claims Against Blot*

As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you

complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g). More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

> **\*19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill,* 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases).[FN6]

> **FN6.** The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. See, e.g., Hepworth v. Suffolk County, 2006 WL 2844408, at *4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); Larry v. Byno, 2006 WL 1313344, at *4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); McCullough, 2005 WL 3164248, at *3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20** Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be

brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[ ] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"* ); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004)* (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006)* (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004)* (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law.[FN7]

FN7. While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that upon arrival to the SHU, he immediately complained about the conditions in his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances.[FN8]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

FN8. Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003-approximately six months after he left the SHU-"stemmed from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges.<sup>FN9</sup> *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

FN9. This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23** Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h),

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare* Hepworth, 2006 WL 2844408, at *8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); Brown v. Coughlin, 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); Thaddeus-X, 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with* Bartley v. Collins, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit", do not rise to the level of adverse action); Alicea v. Howell, 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); Cruz v. Hillman, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24** Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write grievances. In other

words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

### e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible evidence supporting [his] claim" on this point. Feurtado v. City of New York, 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted).[FN10]

FN10. Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See* Smith v. Woods, 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd,* 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); Gill v. Riddick, 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); Gaston v. Coughlin, 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); Malik'El v. New York State Dept. of Corr. Servs., 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see* Garrido v. Coughlin, 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

> [d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot then proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim.[FN11]

FN11. Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

4. *First Amendment Claim Against Frazier*

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold

for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus, defendants must be denied summary judgment as to the claim against Frazier.

5. *First Amendment Claim Against Brereton*

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See* Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

U.S.C. § 1983. *See Cancel,* 2001 WL 303713, at *3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); *Fernandez,* 2005 WL 733664, at *9; *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)).

**\*26** It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. *Green v. Phillips,* 2006 WL 846272, at *11-12 (S.D.N.Y. Mar.31, 2006) (quoting *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar.29, 2001)); *accord Rivera v. Pataki,* 2005 WL 407710, at *17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g., Brownell,* 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

F. *Fourteenth Amendment Due Process Claims*

As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one

the Court dismissed on the merits in its original ruling, *see Lunney I,* 2005 WL 121720, at *14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim.[FN12]

> **FN12.** The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

1. *Law Governing Disciplinary Proceedings*

A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz,* 380 F.3d at 654 (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

**\*27** There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin*. It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

hearing was scheduled.

2. *Written Disposition of Disciplinary Hearing*

As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition. In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23.[FN13]

FN13. Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act a[s] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape. Nor does he allege that the written decision contained any information that was not on the tape.

**\*28** In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at \*13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at \*2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at \*6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at \*13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at \*11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any failure to provide Lunney with a written disposition of the result of his disciplinary hearing in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)
(Cite as: 2007 WL 1544629 (S.D.N.Y.))

a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at 23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus, defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

**\*29** Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

*Conclusion*

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a)

against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [FN14]

> [FN14.] Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

S.D.N.Y.,2007.
Lunney v. Brureton
Not Reported in F.Supp.2d, 2007 WL 1544629 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Frank G. MOWRY, Plaintiff(s),
v.
Robert F. NOONE, In his Individual and Official
Capacity and Douglas Dickenson, Individually and in
his Official Capacity as an employee/agent of the
County of Seneca, Defendant(s).
**No. 02-CV-6257FE.**

Sept. 30, 2004.

Frank G. Mowry, Gowanda, NY, pro se.

Thomas J. Lynch, Esq., Law Offices of Thomas J. Lynch,
Syracuse, NY, Thomas Desimon, Esq., Harris Beach LLP,
Pittsford, NY, for Defendants.

DECISION AND ORDER

*Preliminary Statement*

FELDMAN, Magistrate J.

**\*1** Plaintiff Frank G. Mowry ("Mowry" or "plaintiff"),
proceeding *pro se,* brings this action pursuant to 42 U.S.C.
§ 1983. Plaintiff alleges that (1) defendant Robert F.
Noone, Jr. ("Noone") used excessive force to effectuate
his arrest, in violation of his rights under the Fourth
Amendment of the Constitution, (2) defendant Douglas
Dickenson ("Dickenson") failed to intervene to stop
Noone from using excessive force, and (3) both Noone
and Dickenson deliberately denied him medical care in
violation of his rights under the Fourteenth Amendment of
the Constitution. Defendants now move for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure (Docket # 70). In accordance with the
provisions of 28 U.S.C. § 636(c), the parties have
consented to the jurisdiction of this Court for all
dispositive matters, including trial. (Docket # 11). For the
reasons set forth herein, defendants' motion for summary
judgment is granted.

*Factual Background*

Mowry alleges that on July 22, 1999 he was stopped at a
traffic light in the left turn only lane at the Ovid Street
bridge in Seneca Falls, New York. Mowry continued
straight ahead onto Cayuga Street when the light turned
green. Defendant Officer Robert F. Noone, Jr. of the
Seneca Falls Police Department, observed Mowry disobey
the traffic sign, activated the emergency lights on his
vehicle and began following Mowry. (Mowry Dep. Trans.
p. 17, 17-18 [FN1]). Mowry knew that he was driving
illegally but did not pull over. (Mowry Dep. Trans. p. 18,
12). Noone continued to follow Mowry for several miles.
(Mowry Dep. Trans. p. 20, 8). When Mowry turned onto
Route 318, Deputy Douglas Dickenson of the Seneca
County Sheriff's Department, joined the pursuit and
activated his emergency lights. (Mowry Dep. Trans. p. 22,
5-6, p. 24, 3). Mowry continued driving even though he
knew he was the subject of pursuit. (Mowry Dep. Trans.
p. 25, 7). Mowry lead defendants on a highspeed chase
that reached speeds of over 75 mph and narrowly avoided
several head-on collisions as he attempted to pass vehicles
on the two-lane road. (Mowry Dep. Trans. p. 21, 12-13,
22). Mowry turned onto Birdsey Road and continued
driving until a construction road closure forced him to stop
his car. (Mowry Dep. Trans. p. 28, 9-22).

FN1. Deposition references are to the page and
line number of transcript of the May 27, 2003
deposition of plaintiff Frank. G. Mowry.

Mowry exited his car and when he saw Dickenson,
followed by Noone, turn onto Birdsey Road he began to
flee. (Dep. Trans. p. 38, 9-13; p. 39, 3). Dickenson ran
after Mowry yelling at him to stop. (Mowry Dep. Trans. p.
39, 8). Once Mowry saw that he was about to be overtaken

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

by Dickenson, he stopped and Dickenson brought him to the ground. (Mowry Dep. Trans. p. 34, 20). Mowry landed with his hands and knees on the gravel. (Mowry Dep. Trans. p. 37, 2; p. 40, 20-21). Dickenson asked Mowry if he was alright, and Mowry responded yes. (Mowry Dep. Trans. p. 42, 15-20).

Dickenson gave Mowry 30 seconds to catch his breath on his hands and knees, then pulled Mowry's right arm behind his back to handcuff him. (Mowry Dep. Trans. p. 42, 12-13, p. 39, 21-22). At the same time, Mowry heard a car door slam and saw Noone running towards them. (Mowry Dep. Trans. p. 72, 19-21). Mowry testified that when he saw Noone running towards them he only had time to turn his head away. (Mowry Dep. Trans. p. 46, 6-8). Mowry testified that Noone was running too fast and overran Mowry and Dickenson. (Mowry Dep. Trans. p. 46, 18-19). As Noone jumped over the top of Mowry's head, the toe of Noone's boot hit the side of Mowry's head. (Mowry Dep. Trans. p. 49, 4-5). Noone landed on one foot before regaining his balance. (Mowry Dep. Trans. p. 48, 21-23). Noone and Dickenson pulled Mowry off the ground and placed him in Noone's car. (Mowry Dep. Trans. p. 49, 13-14). Mowry claims to have lost consciousness until he was placed in the back of the patrol car. (Mowry Dep. Trans. 50, 9-14). Mowry denies telling anyone that he was injured until after he got to the police station and was formally "booked in" at the county jail. (Mowry Dep. Trans. 55, 7-13). Mowry concedes that he did not ask for any medical attention at that time. (Mowry Dep. Trans. 55, 17-22, 68, 10-15).

**\*2** Mowry was taken to the Seneca Falls Police Station where he was charged with Driving While Intoxicated, Aggravated Unlicensed Operation of a Motor Vehicle in the First Degree, and Reckless Endangerment.[FN2] Within 24 hours of his arrest, Mowry was examined by medical personnel at the county jail and was treated for neck pain. (Mowry Dep. Trans. p. 68, 19; p. 58, 3-4).

FN2. Mowry later admitted guilt to all three charges. (Mowry Dep. Trans. p. 63, 8-20).

Mowry alleges that he was later diagnosed with a fractured left cheekbone. (Mowry Dep. Trans. p. 65, 5-9). He also asserts that as a result of this injury he experiences blurred

vision and migraine headaches. (Mowry Dep. Trans. p. 65, 6-9). According to Mowry, the results of an MRI taken while he was in prison were "normal." (Mowry Dep. Trans. p. 82, 18-19).

*Discussion*

*Summary Judgment Standard:* Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if it has some affect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Catanazaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998).

The burden of showing the absence of any genuine issue of material fact rests on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a court is confronted with facts that permit different conclusions, all ambiguities and inferences that may reasonably be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996). Rule 56(e), however, also provides that in order to defeat a motion for summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial. Such an issue is not created by a mere allegation in the pleadings [citations omitted], nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir.1982) (per curium). "Affidavits submitted in opposition to a motion for summary judgment must set forth such facts as would be admissible in evidence." *Franklin v. Krueger Int'l,* 1997 WL 691424 at \*3 (S.D.N.Y. November 5, 1997) (citing *Raskin v. The Wyatt Co.,* 125 F.3d 55 (2d Cir.1997) ("only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment").

In addition, *pro se* submissions, particularly those alleging civil rights violations, are construed liberally and are

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

treated as raising the strongest arguments that they might suggest. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). *See also Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (because plaintiff's "complaint alleges civil rights violations and he proceeded *pro se* in the District Court, we must construe his complaint with particular generosity") (citations omitted).

**\*3** *I. Excessive Force Claim:* The Supreme Court has held that claims against police officers for excessive force must be examined under the Fourth Amendment's reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Determining whether the force used was reasonable requires a balancing of the intrusion on the individual's Fourth Amendment rights against the interests of the government. *Id.* at 396. The reasonableness of a particular use of force must be judged objectively from the perspective of a reasonable officer at the scene of the arrest. *Graham,* 490 U.S. at 397. In evaluating the officer's actions, courts should consider the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. It is well established that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion. *Id. See Mickle v. Morin,* 297 F.3d 114, 120 (2nd Cir.2002)(in the context of excessive force used during an arrest, "not every push or shove" is excessive.)(internal citations omitted).

In this case, the record is clear that the officers were faced with an extremely dangerous situation as Mowry drove erratically down narrow roads to avoid capture. Indeed, Mowry's actions repeatedly put the lives of other motorists in imminent danger. Applying the *Graham* balancing test to these circumstances, there is no question that the officers acted appropriately in stopping and arresting Mowry. *See Washington v. City of Riverside Illinois,* 2003 WL 1193347, *5 (N.D.Ill. March 13, 2003) (summary judgment granted when driver's decision to flee justified officer's subsequent use of force to arrest.). Simply put, Mowry has produced no evidence upon which a reasonable jury could find that the defendants used excessive force during his take down and arrest.

As for Mowry's allegation that Noone applied excessive

force by "kicking him in the head," this Court will not credit Mowry's attempt to change his deposition testimony with the affidavit he submits in opposition to defendants' motions. Rather, this Court relies on Mowry's deposition testimony which clearly establishes the accidental nature of any injury caused by Noone. *See Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."); *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

The undisputed facts here are that after Mowry was taken down by Dickenson, Noone exited his vehicle, ran toward Mowry with such speed that he overran Mowry and Dickenson, and tripped over Mowry. In light of the prolonged chase, the officers had a reasonable basis for believing that Mowry posed a serious threat, especially since he continued to run and evade arrest after he exited his vehicle. Under these circumstances, this Court finds that it was objectively reasonable for Noone to approach Mowry at a high rate of speed in his effort to assist Dickenson in subduing Mowry, and that his actions can not constitute excessive force.

**\*4** *II. Failure to Intervene Claim:* Mowry also makes a claim for failure to intervene. It is well established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by others. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994); *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used. *Anderson,* 17 F.3d at 557. In order to be held liable, the law enforcement official must have had a realistic opportunity to intervene in order to prevent the harm from occurring. *Id.* at 557.

Here, based on the facts as presented by Mowry, Dickenson did not have the opportunity to intercede before Noone tripped over Mowry, and therefore cannot be held liable. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))

(2d Cir.1988) (defendant entitled to judgment where record clear that blows were struck in such a rapid succession that officer "had no realistic opportunity to attempt to prevent them."). At the time the alleged excessive force was used, Dickenson had one hand on Mowry's left arm and was attempting to pull Mowry's right arm behind Mowry's back. Even Mowry stated that when he heard Noone running toward them he only had time to turn his head away before Noone overran them. Moreover, Noone's alleged use of excessive force was a single kick to the head, an event which Mowry concedes happened quickly and without warning. This was not a situation where the alleged excessive force continued for such a period of time that Dickenson, upon realizing what was happening, could have stopped it. *Id.* at 11-12.

Because a reasonable jury could not conclude otherwise, summary judgment should be granted in favor of Dickenson on the failure to intervene claim.

*III. Denial of Medical Treatment:* Mowry's third claim is for denial of medical treatment. The denial of medical treatment for a pre-trial detainee is evaluated under the Due Process Clause of the Fourteenth Amendment. *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996). Although not specifically defined by the Supreme Court, the due process rights of a pre-trial detainee are at least as great as the Eighth Amendment rights of a convicted prisoner. *City of Revere,* 463 U.S. at 244; *Weyant v. Okst,* 101 F.3d. at 856.

In *Weyant,* the Second Circuit established a two-part test to determine liability for denial of medical treatment. First, the denial of medical treatment must concern an objectively serious injury. *Weyant,* 101 F.3d at 856. A serious injury has been defined as "one that may produce death, degeneration or extreme pain." *Mills v. Fenger,* 2003 WL 251953, *4 (W.D.N.Y.2003) (citations omitted). Second, the plaintiff is required to show that based on what the defendant knew or should have known, the defendant acted with deliberate indifference to plaintiff's serious medical needs. *Weyant,* 101 F.3d at 856. Deliberate indifference is established if the defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical condition. *Weyant,* 101 F.3d at 856.

*5 Here, the undisputed facts establish that the defendants did not deny plaintiff medical treatment. Even assuming arguendo that Mowry's injury rose to the level of an objectively serious medical injury, there is no credible evidence in the record to base a finding that either Noone or Dickenson should have been aware of his need for medical treatment, but were indifferent to his needs. Indeed, the record demonstrates that Mowry never told the defendants that he needed medical attention and the injuries he now alleges were not apparent to them. Contrary to plaintiff's claims, Dickenson demonstrated his concern for plaintiff's well-being when he asked Mowry if he was alright and gave him time to catch his breath. Mowry did not ask for medical assistance or complain about his alleged injuries immediately following the arrest. At the county jail, Mowry stated that he did not need medical attention. It was not until the following day that Mowry first requested medical attention. Mowry admits that in response to this request, he was then treated by the medical personnel at the county jail and given a prescription for neck pain.

The record is devoid of credible evidence that either defendant acted with reckless disregard for the substantial risk posed by the plaintiff's serious medical needs. *See Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 338 (E.D.N.Y.2003) (to establish a constitutional violation the facts must give rise to a reasonable inference that defendants *knew* of serious medical needs and intentionally disregarded them.). Based on the record here, summary judgment should be granted in favor of defendants Dickenson and Noone on plaintiff's denial of medical treatment claim.

*Conclusion*

For all the foregoing reasons, defendants' Motions for Summary Judgment (Docket # 67, 70) are granted. Having granted defendants' motion for summary judgment by determining that plaintiff has failed to adduce evidence of a constitutional violation, plaintiff's motions for "dismissal of defendant's (sic) motion" and "cross motion" for summary judgement (Docket # 75) are denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2202645 (W.D.N.Y.)
(Cite as: 2004 WL 2202645 (W.D.N.Y.))


SO ORDERED.


W.D.N.Y.,2004.
Mowry v. Noone
Not Reported in F.Supp.2d, 2004 WL 2202645
(W.D.N.Y.)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

**H**

United States District Court, S.D. New York.
Chrisner DESULMA, Plaintiff,
v.
THE CITY OF NEW YORK, et al., Defendants.
**No. 98Civ.2078(RMB)(RLE).**

July 6, 2001.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

I. INTRODUCTION

**\*1** *Pro se* incarcerated plaintiff Chrisner Desulma ("Desulma") sued the City of New York and two Department of Corrections officers alleging violation of his Eighth and Fourteenth Amendment rights while he was an inmate on Rikers Island. Compl.[FN1] His claims were thereafter dismissed except as against defendant Goolsby, who has brought the instant motion for summary judgment. For the reasons which follow, I respectfully recommend Goolsby's motion be GRANTED.

> FN1. "Compl." refers to plaintiff's complaint, dated January 5, 1998.

II. BACKGROUND

A. Factual Background

The following account is based on Desulma's complaint and deposition testimony. The events which give rise to this cause of action occurred on December 27, 1996, when Desulma was incarcerated in the Adolescent Detention and Reception Center ("ADRC") at Rikers Island Compl.¶ 8. At midday, Desulma and approximately fifty other inmates from his housing unit were escorted in a line to the mess hall by officers Goolsby and an unidentified officer, "Jane Doe." *Id.* ¶ 9; Tr. at 83. Two inmates standing near Desulma in the line began "menacing" him by making unspecified threats and racial insinuations. Tr. at 58-59, 75-77. Desulma testified that officer Goolsby witnessed these threats. Tr. at 63, 79-80. Desulma requested protection, but Goolsby told him to defend himself. Tr. at 81.

During the meal, Desulma sat away from the inmates who bothered him. Tr. at 85. After the meal, as the group was preparing to leave the mess hall, Desulma attempted to ask Goolsby for protective measures against these inmates, whom he feared. Tr. at 134, 138. Although he did not find Goolsby, Desulma succeeded in speaking to Doe. *Id.* at 133-35. Desulma claims that Doe ignored his request for protective measures and instructed him to get into the line. Tr. at 134-135.

The inmates who had earlier threatened Desulma were again standing near him in line. *Id.* at 138. They began to "bother" Desulma, telling him that he "smell [ed]." Tr. at 141. Desulma later submitted changes to his deposition in which he claims the inmates said, "kill this negro, get you, we are going to get you stinky." Tr. Ch. 6.[FN2] Following their verbal abuse, the inmates attacked Desulma using their fists and a sharp weapon. Tr. at 141-43. They beat Desulma all over his body and slashed his face with the weapon, leaving a permanent scar. *Id.* at 143.

> FN2. "Tr. Ch." refers to Desulma's April 20, 2000, changes to his deposition transcript.

Desulma called for help during the attack, but the escorting officers did not intervene. *Id.* at 145. As Desulma attempted to run away from his attackers, he fell onto the floor near Doe's feet. *Id.* Desulma alleges that no correctional officer sought medical assistance until he "fell to the floor in a pool of blood," Compl. ¶ 18, at which point Doe called for emergency assistance over her radio

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

transmitter. *Id.* at ¶ 21. Desulma originally testified that Goolsby was not on the scene until Doe called for help, Tr. at 134, 138, 149, but later asserted that he had seen Goolsby "a few seconds" before and after the incident. Tr. Ch. at 6.

**\*2** Approximately twenty-five officers responded to Doe's call. Tr. at 147-49. The officers transported Desulma to the facility's medical clinic, Tr. at 150, where he received treatment requiring a total of twelve stitches. Com pl. ¶ 19-20. Desulma was subsequently transferred to live in a separate housing unit. Glass. Decl. ¶ 22.[FN3]

> **FN3.** "Glass Decl." refers to the declaration of Bryan D. Glass in support of defendant's motion to declare plaintiff's deposition transcript changes null and void.

B. Procedural Background

Desulma filed the instant complaint on January 5, 1998, against the City of New York and correctional officers Goolsby and Jane Doe, in their individual and official capacities, for failure to protect Desulma from other inmates during an incident at Riker's Island. He alleges violation of his Eighth and Fourteenth Amendment rights, *see* Compl. ¶ 32, and various tort violations under New York state law. *Id.* ¶ 34. Specifically, he alleges that Goolsby, "with deliberate indifference," failed to separate him from a group of inmates who had threatened him and "deliberately refused" to grant his request for protection. *Id.* ¶ 29-30.

At a status conference before Judge Shira A. Sheindlin on November 5, 1998, the complaint was dismissed with respect to all defendants except officer Goolsby. The ruling was confirmed in a written order issued by Judge Richard M. Berman on December 21, 1998. On December 3, 1998, Goolsby served an answer to the complaint, and discovery progressed as ordered. Desulma was deposed on April 23, 1999 and May 17, 1999.

In January 1999, Desulma requested that discovery materials be translated into Creole and that counsel be

appointed to assist him. The Court denied those requests by order dated March 16, 1999. On October 13, 1999, after the close of discovery, Goolsby filed the present motion. Desulma requested and received an extension of time, until January 14, 2000, in which to respond to Goolsby's motion. On December 24, 1999, Desulma requested an audiotape recording of his deposition. *See* Glass Decl., Exh. C. In an Order dated February 25, 2000, the Court denied the request, as no tapes existed, but granted Desulma permission to submit corrections to his deposition transcripts by April 21, 2000. *Id.,* Exh. D.

On April 20, 2000, Desulma filed, and served Goolsby with, fourteen pages of changes to the deposition. *Id.,* Exh. A. Goolsby objected and, on June 1, 2000, moved to have the changes declared null and void for failure to comply with Rule 30(e) of the Federal Rules of Civil Procedure. Goolsby argued that the changes were "a deliberate attempt by plaintiff to tailor his testimony to defeat defendant's previously served summary judgment motion." *See* Glass Decl.

On June 19, 2000, the Court ordered Desulma to have his changes signed and sworn, to fully explain each change, and to respond to Goolsby's motion by July 19, 2000. Desulma responded on July 11, 2000, by submitting to the Court the same fourteen pages of deposition transcript changes he had originally filed, along with a sworn affidavit and a declaration of service. He did not, however, submit explanations for his changes or respond to Goolsby's motion. Instead, Desulma requested, and was granted, extensions of time in which to comply with the court's Order of June 19, 2000, and in which to respond to Goolsby's motion for summary judgment. Desulma filed his response on November 16, 2000. The case was referred to the undersigned on December 28, 2000, and the motion was fully submitted when Goolsby filed reply papers on January 5, 2001.

C. The Instant Motion

**\*3** Goolsby argues that Desulma did not establish the elements of an Eighth Amendment "failure to protect" claim under § 1983 for three reasons: (1) he failed to show he was incarcerated under conditions posing a substantial risk of serious harm; (2) he failed to show Goolsby acted

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

with a sufficiently culpable state of mind; and (3) Goolsby is immune from liability under the doctrine of qualified immunity. *See* Def. Mem.[FN4]

> FN4. "Def. Mem." refers to Goolsby's memorandum of law in support of the motion for summary judgment, dated October 13, 1999.

Relying primarily on the deposition transcript changes he filed, Desulma contends that officer Goolsby acted with deliberate indifference to his safety and well-being by disregarding his requests for protective measures and by failing to intervene in the attack. Pl. Resp. at 11, 19, 22, 25.[FN5] Desulma also contends that Goolsby is not immune under the doctrine of qualified immunity. *Id* . at 17-18. Goolsby argues that Desulma should not be permitted to rely on the deposition transcript changes, and that, even if the changes were accepted into the record, Desulma cannot establish that Goolsby was deliberately indifferent to a substantial risk of serious harm to plaintiff. *See* Def. Rep.[FN6]

> FN5. "Pl. Resp." refers to Desulma's "motion for summary judgment and in opposition to defendant's motion for summary judgment," dated November 16, 2000.

> FN6. "Def. Rep." refers to Goolsby's reply to Desulma's response to the instant motion.

### III. DISCUSSION

#### A. Standards for Motion for Summary Judgment

A court shall grant a motion for summary judgment if it determines that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under this standard, summary judgment is proper if "viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." *Pension Benefit Guar. Corp. v. LTV Corp.,* 875 F.2d 1008, 1015 (2d Cir.1989) (internal quotations omitted), *rev'd on other grounds,* 496 U.S. 633 (1990). In making this determination, the court does not resolve disputed factual issues, but reaches a conclusion as to whether there exists "a genuine and material issue for trial." *Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1175 (2d Cir.1993). An issue of fact is "genuine" if it provides a basis for "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). If the record contains evidence which supports a reasonable inference in favor of the nonmoving party on the issues presented in the motion, summary judgment is not appropriate. *See* Knowles v. New York City Dept. of Corrections, 904 F.Supp. 217, 220 (S.D.N.Y.1995).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See* Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568 (2d Cir.1993) (*citing* Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). This burden may be met by demonstrating that there is a lack of evidence to support the nonmoving party's claim. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmoving party must then set forth "specific facts showing that there is a genuine issue for a trial." Fed.R.Civ.P. 56(e); *Celotex Corp.,* 477 U.S. at 321-22. A nonmoving party may not rely on conclusory allegations or conjecture to create disputed fact issues. *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d cir.1995); *Thomas v. Keane,* 2001 WL 410095 (April 23, 2001). Even in cases involving *pro se* plaintiffs, where the court has an obligation to construe the plaintiff's papers liberally, *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988), these same standards for dismissal apply. *Thomas,* 2001 WL 410095, at [*]3 (*citing* Lee v. Artuz 2000 WL 231083, at [*]2 (S.D.N.Y. Feb. 29, 2000)).

#### B. Deposition Transcript Changes

[*]4 Rule 30(e) of the Rules of Federal Procedure permits a witness to review the transcript of her deposition and make changes "in form or in substance" within thirty days of notification by the court reporter that the transcript is ready for review, and requires that the deponent sign a statement setting forth the reasons for each change. Rule 30(e), Fed.R.Civ.P. Courts have construed the Rule broadly, even accepting changes which contradict original

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

testimony. *Hlinko v. Virgin Atlantic Airways,* 1997 WL 68563 (S.D.N.Y. Feb. 19, 1997) (*citing, inter alia, Podell v. Citicorp Diners Club, Inc.,* 914 F.Supp. 1025, 1034 (S.D.N.Y.1996)). Original answers remain admissible at trial as admissions of a party. *Podell.,* 914 F.Supp. at 1034.

Desulma's submission of transcript changes include the following material changes to his initial testimony: (1) the two inmates who attacked him had harassed him the day before the incident, Tr. Ch. at 2; (2) he alerted Goolsby about the harassment the day before the incident, *id.;* (3) Goolsby was actually on the scene during the incident, Tr. Ch. at 6; (4) the two inmates threatened him with a knife when they verbally harassed him prior to the incident, Tr. Ch. at 4; (5) and the attackers said "kill this negro, get you, we are going to get you stinky," before attacking him. Tr. Ch. at 6.

Goolsby argues that the Desulma's changes should be rejected because they were tailored to oppose Goolsby's motion for summary judgment and do not comply with Rule 30(e). *See* Def. Rep. Desulma never submitted explanations as ordered by this Court on July 19, 2000, but maintains that the transcript changes were warranted because his interpreter had not translated his answers accurately. Pl. Resp. at 13. Although Rule 30(e) "does not require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes," *Podell v. Citicorp Diners Club, Inc .,* 914 F.Supp. at 1035, a court is free to reject changes in extreme situations. *See, e.g., Baker v. Ace Advertiser's Service,* 134 F.R.D. 65 (S.D.N.Y.1991) (changes rejected where they were so far-reaching as to render the transcript a nullity). A court may reopen deposition if the changes to the transcript are made without adequate reasons, or if they are so substantial as to render the transcript incomplete or useless. *See Hlinko v. Virgin Atlantic Airways,* 1997 WL 68563,[*]1 (*citing Allen & Co. v. Occidental Petroleum Corp.,* 49 F.R.D. 337, 341 (S.D.N.Y.1970).

Here, although Desulma's changes are not so substantial as to render the transcript incomplete or useless, Desulma never submitted explanations for his changes as required by Rule 30(e) and as ordered by this Court on July 19, 2000. The explanation Desulma offers in his opposition papers to the instant motion (that his changes were made

to correct the mistranslations of his Creole interpreter, *see* Pl. Resp. at 13) does not constitute "a statement reciting such changes and the reasons given by the deponent for making them." Fed.R.Civ.P. Rule 30(e). Furthermore, Desulma's explanation does not satisfy this Court's July 19, 2000 order instructing plaintiff to "fully explain each and every change made to the transcript." Desulma's changes are therefore unacceptable.

**\*5** Moreover, to allow Desulma's changes under these circumstances would permit him to tailor his testimony to meet specific deficiencies in his evidence. As a general proposition, a party may not rely on an affidavit that contradicts his deposition testimony in order to defeat a pending motion for summary judgment. *See, e.g ., Hale v. Mann,* 219 F.3d 61, 74 (2d Cir.2000) ( "[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.") (*quoting Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)). Similarly, Desulma's contradictory deposition changes, submitted to the Court six months after Goolsby filed her motion for summary judgment, should not provide a basis for avoiding summary judgment. The Court finds that, even if Desulma's changes did conform to the requirements of Rule 30(e), Desulma would not be permitted to rely upon them in opposing the instant motion.

C. 42 U.S.C. § 1983

In order to maintain a claim under Section 1983, a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law, and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States. *Mendez v. Walker,* 110 F.Supp.2d 209, 213 (*citing Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). Desulma has properly alleged that Goolsby, as a correctional officer, was acting under color of state law and that her conduct resulted in a violation of his Eighth Amendment rights.

As a prerequisite to bringing suit, a plaintiff must also show a defendant's direct or personal involvement in the alleged Constitutional deprivation. *Colon v. Coughlin,* 58

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

F.3d 865, 873 (2d Cir.1995); Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994). Personal involvement may take one of four forms: (1) direct participation in the infractions; (2) failure of a supervisory official to remedy wrong after learning of violation; (3) creation or sanction by a supervisory official of policy or custom under which unconstitutional practices occur; or, (4) gross negligence in managing subordinates. Williams v. Smith, 781 F.2d 319, 323 (2d Cir.1986).

Goolsby maintains that she is not liable because she was not present at the time of the slashing. Def. Mem. at 16-17. In fact, the record does not establish Goolsby's location during the slashing. Desulma testified that he was unable to locate Goolsby as the inmates were leaving the mess hall, Tr. 134, and did not see her again until after the incident when Doe called for assistance. Tr. 138, 149. In his reply papers, Desulma claims he "was assaulted in [the] presence of the same two corrections officers, Goolsby and Doe ." Pl. Rep. at 22. And in his changes to the transcript, Desulma claims that he saw Gooslby "before and after" the slashing. Tr. Ch. at 6. Whether Desulma saw Goolsby is not dispositive. Goolsby may have been present even if Desulma did not see her. Defendant has not offered any evidence to suggest that she was not there. Moreover, Desulma need not prove Goolsby's presence at the scene to prevail on his claim that she was deliberately indifferent to a substantial risk of serious harm to him. Construing all pleadings and evidence in Desulma's favor, Goolsby's knowledge of the events leading up to the attack would be enough to establish personal involvement for the purposes of 42 U.S.C. § 1983.

C. Eighth Amendment

*6 The Eighth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the infliction of cruel and unusual punishment. Failure-to-protect claims, because they are treated as challenges to conditions of confinement, are analyzed under the Eighth Amendment. See, e.g., Farmer v. Brennan, 511 U.S. 826 (1994); Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997) (stating that Eighth Amendment imposes on prison officials "a duty to protect prisoners from violence at the hands of other prisoners"); Edney v. Karringan, 69 F.Supp.2d 540, 544 n. 1 (S.D.N.Y.1999).

To prevail in a failure-to-protect case, a prisoner must establish that (1) he is incarcerated under conditions posing a "substantial risk of serious harm," Farmer, 511 U.S. at 834 (citing Helling v. McKinney, 509 U.S. 25 (1993)), and that (2) the prison official acted with "deliberate indifference" to the prisoner's health or safety. Farmer, 511 U.S. at 828 (citing Helling, 509 U.S. 25; Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)).

While the first part of the test is an objective determination about the severity of the conditions under which plaintiff is incarcerated, see Farmer, 511 U.S. at 834, the second part of the test invokes a subjective standard akin to criminal recklessness such that the defendant must "consciously disregard" a substantial risk of serious harm. Id. at 839-40. The official "has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620. The official must be aware of the risk or aware of facts from which the inference of risk could be drawn, and she must also draw the inference. Farmer, 511 U.S. at 837; Hemmings v. Gorczyk, 134 F.3d 104, 108 (2d Cir.1998) (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.1996)).

1. Objective Test: Conditions of Plaintiff's Incarceration

Desulma does not succeed in showing that he was incarcerated under conditions posing a substantial risk of serious harm, a standard which "contemplates 'a condition of urgency, one that may produce death, degeneration, or extreme pain," Hathaway, 37 F.3d at 66 (quoting Nance v. Kelly, 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)), for two reasons. First, Desulma does not show that the risk he faced was substantial. Second, he fails to show that the risk-to the extent that one existed-was one of serious harm.

Desulma had no prior altercations with the inmates who attacked him. He testified that he had never complained about them or requested separation from them before, id. at 160; that he did not know his attackers at the time of the

Page 6

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

incident, Tr. 52; and that he only became "enemies" with them en route to the mess hall. Tr. at 60. Desulma later asserts, by changing "no" answers to "yes" answers in the deposition transcript, that he did have an altercation with the same inmates previously, Tr. Ch. 2-3, 8, and adds that he had previously asked Goolsby for protection from the inmates. *Id.* at 8-9. Desulma does not describe the prior altercation.

**\*7** Nothing on the record or in the revisions shows that the inmates posed a substantial threat. By Desulma's account, the inmates told him he was "going to pay a price" and told him to get away from them because "he smell[ed]." Tr. at 59-60. These verbal statements alone do not indicate a substantial threat of serious harm. Indeed, Desulma even surmised that "the officers thought that was just words; they didn't believe anything could happen." Tr. at 63, 80. Finally, although Desulma changed his testimony to reflect that the inmates had actually threatened him with a knife, Tr. Ch. at 4, that fact alone would not be enough to establish a substantial risk.

2. Subjective Test: Defendant's Mental State

Desulma is also unable to show that Goolsby acted with the state of mind necessary to establish an Eighth Amendment violation. Desulma may properly rely on circumstantial evidence to prove Goolsby acted with the requisite mental state, because "[d]irect evidence that prison officials knew of and disregarded a serious risk of harm to a prison inmate will rarely be available," *Matthews v. Armitage,* 36 F.Supp. 121, 125 (N.D.N.Y.1999) (*citing Coppage v. Mann,* 906 F.Supp. 1025, 1036 (E.D.Va.1995)). The evidence he submits, however, fails to support the conclusion he argues before this Court. The record supports the conclusion that Goolsby was aware that Desulma feared his attackers because Desulma requested protective measures en route to the mess hall,[FN7] and because Goolsby witnessed the verbal altercation. However, given the lack of a prior history of violence between Desulma and those inmates, and the nature of the inmates' verbal threats against Desulma, Goolsby had no reason to infer the existence of a threat of harm, much less a life-threatening danger, as Desulma claims. Pl. Rep. at 21.

FN7. Desulma testified that he asked Goolsby for protection during a prior, unrelated altercation with two other inmates over the use of a telephone. *Id.* at 163-64. However, that testimony does not bolster Desulma's case because the request would not have put Goolsby on notice that Desulma risked harm from the two inmates involved in *this* case.

Goolsby's failure to intervene in the attack is not, by itself, a basis for liability. Although "[a] correctional officer's presence at an attack of an inmate, where he does nothing to stop an assault, may be sufficient to establish a claim under Section 1983," *Dresdner v. Brockton* (*citing Morales v. New York State Department of Corrections,* 842 F.2d 27 (2d Cir.1988)), an isolated omission to act by a state prison guard must be accompanied by evil intent, recklessness, or at least deliberate indifference to the consequences of the conduct. *Bass v. Jackson,* 790 F.2d 260, 262-63 (2d Cir.1986) (*quoting Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). The defendant must also be shown to have had "an extended opportunity to stop the attack but failed to take any action to do so." *Rucco v. Howard,* 1993 WL 299296 (S.D.N.Y. Aug. 4, 1993) (*citing Williams,* 508 F.2d at 546).

Here, there is no evidence that Goolsby deliberately disregarded Desulma's safety or had an opportunity to intervene in the attack. The fact that Doe called for help and Goolsby appeared shortly thereafter suggests that both officers responded immediately to the attack. At most, Goolsby's failure to heed Desulma's initial request for protection was negligent, and negligence is not a sufficiently culpable mental state for liability to attach in a failure-to-protect cases. *See Davidson v. Cannon,* 474 U.S. 344 (1986); *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996).

C. Qualified Immunity

**\*8** Under 42 U.S.C. § 1983, a public official is entitled to qualified immunity if her acts did not violate clearly established rights of which a reasonable officer would have known, or if she reasonably believed that her conduct did not violate those rights. *See Harlow v. Fitzgerald,* 457,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865
(Cite as: 2001 WL 798002 (S.D.N.Y.))

U.S. 800, 818 (1982); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998); *Brown v City of Oneonta, N.Y., Police Dept.,* 106 F.3d 1125, 1130-31 (2d Cir.1997). The test is whether, in light of the clearly established federal right, it was objectively reasonable for the official to believe that his or her actions were constitutional. *Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.), *cert. denied,* 498 U.S. 967 (1990).

An official is entitled to qualified immunity "if reasonable officials could disagree regarding whether the actions at issue violated the Constitution." Def. Mem. at 14. However, summary judgment will be granted on the basis of qualified immunity only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (*quoting Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987)). *See also Williams v. Greifinger,* 97 F.3d 699, 706 (2d Cir.1996); *Noguera v. Hasty,* 2000 WL 1011563,[*]18 (S.D.N.Y. July 21, 2000). Thus, "[i]f any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." *Lennon,* 66 F.3d at 420.

Goolsby argues that she and Doe acted in an objectively reasonable manner. Def. Mem. at 15. Based on the verbal harassment which preceded the attack, Goolsby argues, "reasonable correction officers at least could differ as to whether these comments alone were concrete enough to create a substantial risk of harm to plaintiff of imminent physical attack." *Id.* On summary judgment it is necessary to show that *no* reasonable trier of fact could find that the defendants' actions were objectively unreasonable. In this case, where the only notice of potential harm to Desulma was a request for protection and an incident of verbal harassment, Goolsby was, at most, merely negligent in failing to protect Desulma from the inmates who attacked him. She responded quickly to the attack, separating the inmates and transporting Desulma to the medical unit. On these facts, no reasonable jury could conclude that it was anything but objectively reasonable for Goolsby to believe her acts did not clearly violate an established federally protected right. She is therefore entitled to qualified

immunity.

IV. CONCLUSION

Because no genuine issue of material fact exists with respect to Desulma's claims, I respectfully recommend that defendant's motion for summary judgment be GRANTED.

**\*9** Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, Room 201, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2001.
Desulma v. City of New York
Not Reported in F.Supp.2d, 2001 WL 798002 (S.D.N.Y.), 50 Fed.R.Serv.3d 865

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)
(Cite as: 2002 WL 31677033 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michael Antonio PATTERSON, Plaintiff,
v.
COUNTY OF ONEIDA, New York; Oneida County
Sheriff's Department; Daniel Middaugh, in his
individual and official capacity as Sheriff; Peter
Paravati, in his individual and official capacity as
Undersheriff; William Chapple, in his individual and
official capacity as Chief; William Balsamino,[FN1] in his
official and individual capacity; John Does, in their
individual and official capacity as Employees and
Representatives of the County of Oneida; Lieutenant
Rende, in his individual and official capacity; and
Richard DePhillips, in his individual and official
capacity; Defendants.

FN1. This defendant's name correctly spelled is
Balsamico. He will be referenced with the
correct spelling throughout this
Memorandum-Decision and Order.

No. 5:00-CV-1940.

Oct. 30, 2002.

African-American correctional officer brought action
against county alleging racial discrimination in
employment. On county's motion for summary judgment,
the District Court, Hurd, J., held that: (1) limitations
period for officer to file Equal Employment Opportunity
Commission (EEOC) charge began to run at time of his
latest alleged unlawful employment practice, which was
his termination, and (2) officer failed to set forth any
evidence from which inference could be drawn that county
intentionally discriminated against Blacks in termination
during probation, training, or Sheriff's Emergency
Response Team (SERT) participation.

Motion granted.

West Headnotes

[1] Civil Rights 78 ⊂⊃ 1505(3)

78 Civil Rights
    78IV Remedies Under Federal Employment
Discrimination Statutes
        78k1503 Administrative Agencies and Proceedings
            78k1505 Time for Proceedings; Limitations
                78k1505(3) k. Operation; Accrual and
Computation. Most Cited Cases
    (Formerly 78k342)
Limitations period for African-American police officer to
file Equal Employment Opportunity Commission (EEOC)
charge under Title VII began to run at time of his latest
alleged unlawful employment practice, which was his
termination. Civil Rights Act of 1964, § 706(e), as
amended, 42 U.S.C.A. § 2000e-5(e).

[2] Civil Rights 78 ⊂⊃ 1405

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of
Proof
            78k1405 k. Employment Practices. Most Cited
Cases
    (Formerly 78k240(2))
African-American police officer failed to set forth any
evidence from which inference could be drawn that county
intentionally discriminated against Blacks in termination
during probation, training, or Sheriff's Emergency
Response Team (SERT) participation, in lawsuit claiming
equal protection violation; even though officer alleged
specific incidents of racial slurs and mace-shaving cream
assault by fellow officers, incidents were not reported to
someone in supervisory position, and special firearms
training was given only to select few officers who were
more senior than African-American officer. U.S.C.A.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)
(Cite as: 2002 WL 31677033 (N.D.N.Y.))

Const.Amend. 14; 42 U.S.C.A. § 1983.

**[3] Conspiracy 91**          **7.5(1)**

91 Conspiracy
    91I Civil Liability
        91I(A) Acts Constituting Conspiracy and Liability
Therefor
            91k7.5 Conspiracy to Interfere with Civil Rights
                91k7.5(1) k. In General. Most Cited Cases
African-American police officer could not maintain civil
rights conspiracy claim against county, since he failed to
prove that he was deprived of equal protection. U.S.C.A.
Const.Amend. 14; 42 U.S.C.A. § 1985(3).

**[4] Civil Rights 78**          **1126**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1126 k. Particular Cases. Most Cited Cases
    (Formerly 78k146)
African-American police officer could not maintain cause
of action against supervisor under § 1986 for allegedly
neglecting to prevent deprivation of officer's rights, since
officer failed to prove that anyone conspired to deprive
him of equal protection in violation of § 1985. U.S.C.A.
Const.Amend. 14; 42 U.S.C.A. § 1985(3); 42 U.S.C.A. §
1986.

A.J. Bosman, Utica, NY, for Plaintiff, of counsel.

Gorman, Waszkiewicz, Gorman and Schmitt, Utica, NY,
for Defendants, Bartle J. Gorman, of Counsel.

*MEMORANDUM-DECISION AND ORDER*

HURD, J.

I. INTRODUCTION

**\*1** Plaintiff Michael Antonio Patterson ("Patterson" or

"plaintiff") filed the complaint in this matter on December
18, 2000, asserting eleven causes of action pursuant to
federal and state law, the gravamen of which is race
discrimination in employment. The John Doe defendants
were never named and Richard DePhillips was never
served. Those defendants who were served answered
denying the material allegations of the complaint. The
defendants now move for summary judgment dismissing
all of plaintiff's claims. Plaintiff opposes. Oral argument
was heard on October 18, 2002, in Utica, New York.
Decision was reserved.

II. FACTS

Following are the facts, and inferences therefrom, taken in
the light most favorable to plaintiff, the nonmovant, as
must be done on a motion for summary judgment.

The Oneida County Sheriff's Department ("Sheriff's
Department") hired Patterson, an African American, as a
correctional officer on February 23, 1998, to work at the
Oneida County Jail ("the jail"). He and all new recruits
were probationary employees for a period of one year.

Patterson first heard racial slurs in July 1998 while
working the "B" block of the jail. He could not
specifically identify the speaker or speakers because the
door was locked. He did not report this or complain to
anyone. He heard racial comments, epithets, and slurs
spoken over the jail master control intercom
approximately twelve times from October 1998 [FN2]
through January 1999. He could not specifically identify
the speakers because the master control room that
contained the intercom microphone was locked. However,
only Sheriff's Department personnel had access to the
master control room. Again, he did not report this or
complain to anyone.

    FN2. There was no intercom in the jail prior to
    October 1998.

In January 1999 Patterson, while on duty at 1:00 or 2:00
a.m., was jumped by defendants William Balsamico
("Balsamico") and Richard DePhillips ("DePhillips") and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)
(Cite as: 2002 WL 31677033 (N.D.N.Y.))

an unknown third man. The three men sprayed mace in his face and covered him with shaving cream. Balsamico then told plaintiff that "Now you're a white boy with an Afro" and made other racial slurs. Plaintiff washed his eyes and returned to duty. Again, plaintiff did not complain or report the incident.

On January 22, 1999, plaintiff received a performance evaluation indicating that he fully met each requirement evaluated. His previous evaluations similarly indicated that he met job requirements. At some point an inmate alleged that Patterson assaulted him. Patterson responded by memorandum on February 3, 1999, that he did not remember any such incident. Defendant Chief Deputy William Chapple ("Chapple") became aware that local police responded to a domestic dispute between plaintiff and a female. Neither plaintiff nor the female were taken into custody by the local police. Chapple also became aware that plaintiff allegedly compromised the identity of an undercover officer working on the drug task force, was fired from his previous employment for refusing to take a drug test, and that he had been involved in dealing drugs. Accordingly, Chapple requested plaintiff's immediate termination for failure to successfully complete his probationary period due to misconduct.

**\*2** Plaintiff received notice of his termination on February 9, 1999. He had an exit interview with Chapple on March 9, 1999, and a union representative was present. Chapple told Patterson that details regarding the misconduct were confidential and may present a security risk. During the exit interview plaintiff did not mention any racial slurs or the January mace-shaving cream incident. On March 11, 1999, an Oneida County Legislator, Joseph Vescio, wrote a letter at Patterson's behest to defendant Sheriff Daniel Middaugh ("Middaugh") inquiring as to the reason for plaintiff's termination. Middaugh responded by letter that releasing details relating to plaintiff's misconduct would jeopardize the integrity of a sensitive investigation and possibly the safety of police officers. Middaugh suggested that it would be to plaintiff's benefit to have his personnel record reflect that he failed to successfully complete his probationary period, rather than that he was terminated for misconduct.

Patterson filed a Notice of Claim with Oneida County on April 16, 1999, and a Verified Complaint with the Equal Employment Opportunity Commission ("EEOC") on December 2, 1999. The Notice of Claim and the Verified Complaint set forth Patterson's claims based upon Middaugh's letter to Vescio and the racial epithets over the intercom from October 1998 through mid-January 1999. Neither mentions the January mace-shaving cream incident. A right-to-sue letter was sent on September 12, 2000, and received on September 29, 2000. This action followed.

III. DISCUSSION

A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Richardson v. New York State Dep't of Correctional Servs.,* 180 F.3d 426, 436 (2d Cir.1999). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Richardson,* 180 F.3d at 436; *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.,* 475 U.S. at 587. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.,* 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248-49; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587.

B. Analysis

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)
(Cite as: 2002 WL 31677033 (N.D.N.Y.))

1. Title VII Claims

**\*3** [1] Charges filed pursuant to Title VII must be brought within 180 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e). Plaintiff filed his EEOC charge on December 2, 1999. Thus, any unlawful employment practice must have occurred on or after June 6, 1999, in order for the charge to be timely. Here the latest alleged unlawful employment practice was plaintiff's termination on February 9, 1999. Accordingly, plaintiff's Title VII claims must be dismissed. Plaintiff's argument that his termination was within 300 days of the filing of the EEOC charge is unavailing, since the 300-day time limit applies only where, unlike here, a charge is filed with a State or local agency. *See id.*

2. Equal Protection under Sections 1981 and 1983

A claim under section 1981 requires proof that (1) the plaintiff is a member of a racial minority; (2) defendant intended to discriminate on the basis of race, and (3) the discrimination pertained to one of the statutorily enumerated activities. *Mian v. Donaldson, Lufkin & Jenrette Sec.,* 7 F.3d 1085, 1087 (2d Cir.1993)(per curiam). Equal protection under the laws is one of the enumerated activities. 42 U.S.C. § 1981. An equal protection claim pursuant to section 1983 requires a showing of intentional discrimination on the basis of race, national origin, or gender. *Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999). "A touchstone of equal protection is that the government may not subject persons to unequal treatment based on race." *Id.* at 49. Conclusory allegations are insufficient to establish the essential elements of an equal protection claim. *Mian,* 7 F.3d at 1088.

[2] It is undisputed that Patterson is an African-American, a racial minority. Plaintiff has failed, however, to set forth facts establishing intentional discrimination or unequal treatment based upon race. Patterson failed to report the specific incidents of racial slurs and the mace-shaving cream assault by fellow officers to someone in a supervisory position, such as Chapple, Lieutenant Rende, Paravati, and Middaugh. Because these incidents went unreported they do not demonstrate any intent by the defendants to discriminate against Patterson.

Plaintiff makes conclusory allegations that there is unequal treatment in termination during probation, in the opportunity to take firearms and OC Spray training, and in making application to become a member of the Sheriff's Emergency Response Team ("SERT").

Plaintiff states that all Blacks are terminated during their probationary period. Plaintiff further discredits defendants' submissions tending to show that both whites and Blacks are terminated during probation. However, plaintiff fails to set forth any facts establishing that Blacks are, in fact, treated differently than whites as far as termination during probation.

Plaintiff further alleges that Blacks are denied an equal opportunity to receive OC Spray and firearms training. However, defendant has shown that Patterson did in fact receiving OC Spray training on October 21, 1998. Additionally, defendants have presented evidence that firearms training was given to only a select few officers and that all of those given firearms training from January 1995 until the present were more senior than plaintiff (in most cases significantly more senior). Chapple testified that one of the minimum requirements to apply for SERT is successful completion of the probationary period. While Patterson failed to meet that minimum requirement, at least two Black officers did apply. One Black applicant was rejected due to excessive absenteeism (acceptable work attendance is another minimum requirement). The second Black applicant was accepted into SERT but injured her ankle during training.

**\*4** Plaintiff has set forth no evidence or facts from which an inference could be drawn that defendants intentionally discriminated against Blacks in termination during probation, training, or SERT participation. Accordingly, Patterson's equal protection claims must be dismissed.

3. Conspiracy under Sections 1985 and 1986

[3] Section 1985 provides a cause of action for redress when two or more persons conspire to, inter alia, deprive a person or class of persons of equal protection of the

Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)
(Cite as: 2002 WL 31677033 (N.D.N.Y.))

laws. 42 U.S.C. § 1985(3). An essential element of a conspiracy claim is deprivation of the right at issue. *Mian, 7 F.3d at 1087.* Plaintiff failed to establish that there was any genuine issue of material facts relating to his denial of equal protection claim. Accordingly, the conspiracy claim must be dismissed.

[4] Section 1986 provides a cause of action when a person neglects to prevent a deprivation of rights as set forth in section 1985. 42 U.S .C. § 1986. "[A] § 1986 claim must be predicated upon a valid § 1985 claim." *Mian, 7 F.3d at 1088.* Patterson does not have a valid § 1985 claim. Accordingly, his § 1986 claim must be dismissed.

4. Richard DePhillips

DePhillips was never served with the complaint. Thus, any claims against him must be dismissed for lack of personal jurisdiction.

5. State Law Claims

All of Patterson's federal law claims must be dismissed. Therefore, supplemental jurisdiction over his state law claims is declined. *See* 28 U.S.C. § 1367(c)(3).

IV. CONCLUSION

Patterson's Title VII claims must be dismissed as the conduct all occurred more than 180 days prior to the filing of his EEOC charge. Plaintiff has not established any genuine issue of material fact with regard to his equal protection, conspiracy, and failure to prevent a conspiracy claims and they must be dismissed. Personal jurisdiction over DePhillips is lacking and claims against him must be dismissed. Having dismissed all of plaintiff's federal law claims, supplemental jurisdiction over his state law claims is declined.

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. All federal law claims are DISMISSED;

3. All state law claims are DISMISSED without prejudice.

The Clerk of the Court is directed to enter judgment dismissing the complaint in its entirety.

IT IS SO ORDERED.

N.D.N.Y.,2002.
Patterson v. County of Oneida
Not Reported in F.Supp.2d, 2002 WL 31677033 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Edward P. GRIFFIN-NOLAN, Plaintiff,
v.
PROVIDENCE WASHINGTON INSURANCE
COMPANY and Howard Blute, in his Individual
Capacity as Manager for the Business Development
Executives at Washington Insurance Company,
Defendants.
**No. 504CV1453FJSGJD.**

June 20, 2005.

Chamberlain, D'Amanda, Oppenheimer & Greenfield
LLP, The Galleries of Syracuse, Syracuse, New York, for
Plaintiff, Mairead E. Connor, of counsel.

City of Syracuse Corporation Counsel, Syracuse, New
York, for Defendants, David H. Walsh, IV, of counsel.

MEMORANDUM-DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

**\*1** Plaintiff's complaint asserts (1) a 42 U.S.C. § 1983
cause of action for false arrest and denial of First
Amendment rights against Defendants City of Syracuse
("City"), Mullen, and Hennessey, alleging that Defendants
arrested him for speaking to Defendant officers about their
conduct in arresting a third-party; (2) a § 1983 cause of
action for false arrest and denial of First Amendment
rights against all Defendants, alleging that they arrested
him because they believed he might file a complaint of

police misconduct; (3) a § 1983 cause of action for failure
to train against Defendant City, alleging that Defendant
City acted with deliberate indifference in failing to train its
officers with respect to what constitutes the crime of
obstruction of justice and how to handle the public; (4) a
§ 1985(3) cause of action against all Defendants for
conspiracy to deprive him of the equal protection of the
law and of his equal privileges and immunities, alleging
that Defendants conspired to so deprive him out of animus
for his attempt to prevent them from injuring a
third-person on the basis of that third-person's race or
color; (5) a common law false arrest claim against all
Defendants; (6) a common law false imprisonment claim
against Defendants Mullen, Cecile, and City; (7) a
common law malicious prosecution claim against all
Defendants; (8) a common law libel claim against
Defendant Hennessey, alleging that he made false
statements in his Complaint Information; and (9) a claim
for attorney's fees pursuant to 42 U.S.C. § 1988.

Based upon these claims, Plaintiff seeks (1) declaratory
relief with respect to all causes of action, (2) injunctive
relief with respect to all causes of action other than those
made pursuant to § 1983, (3) compensatory damages, (4)
exemplary or punitive damages, and (5) costs,
disbursements, and legal fees.

Currently before the Court is Defendants' motion to
dismiss Plaintiff's complaint pursuant to Rules 12(b)(5)
and 12(b)(6) of the Federal Rules of Civil Procedure.[FN1]

FN1. Defendants' motion to dismiss does not
address Plaintiff's claim for attorney's fees
pursuant to 42 U.S.C. § 1988.

II. BACKGROUND [FN2]

FN2. Given the procedural posture of this case,
the Court assumes the truth of the allegations in
Plaintiff's complaint.

On the evening of December 16, 2003, Plaintiff was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

working as a licensed massage therapist at his booth in the Carousel Center mall. *See* Dkt. No. 1 at ¶ 10. Around 8:00 p.m. of that evening, he saw a "Hispanic man of color" ("Paredes") walking toward him and noticed a mall security officer pointing Paredes out to Defendants Hennessey and Mullen. *See id.* at ¶ 11. When Defendant Hennessey tried to stop Paredes by placing his hand on Paredes' chest, Paredes spat on the floor and continued shouting that he was going to kill someone. *See id.* at ¶ 12. Defendant Hennessey then took Paredes behind Plaintiff's booth, told him to show some respect, and smashed his back and head against a concrete pillar. *See id.* at ¶¶ 13-14. Paredes then either pushed or kicked at Defendant Hennessey, at which point they both tumbled and knocked over Plaintiff's booth. *See id.* at ¶¶ 15-16. With Paredes face-down on the floor, Defendant Hennessey placed his knee in Paredes' back and began punching him in the back. *See id.* at ¶¶ 18-19. Defendant Mullen then also placed his knee in Paredes' back and began punching him in the back and sides. *See id.* at ¶ 21. Defendant officers each hit Paredes six or more times after they had subdued him. *See id.* at ¶ 22.

**\*2** Plaintiff crouched by Defendant officers and told them that they had gone over the top and were out of control. *See id.* at ¶ 24. Defendant Mullen told Plaintiff to get back, and Plaintiff complied. *See id.* at ¶¶ 26-27. After Defendant officers continued to punch Paredes in the back, Plaintiff again told them that they were over the top. *See id.* at ¶¶ 28-29. Defendant Mullen told Plaintiff that, if he did not stop, he would be arrested for Obstructing Governmental Administration. *See id.* at ¶ 30. Plaintiff stopped speaking to Defendant officers, and they pulled Paredes up and led him away. *See id.* at ¶¶ 31-32.

At approximately 9:00 p.m., Defendant Mullen returned to Plaintiff's booth with Defendant Cecile and a mall security guard. *See id.* at ¶ 33. Defendant Cecile told Plaintiff that he understood that Plaintiff had been involved in an incident earlier in the evening and asked Plaintiff to explain what happened. *See id.* at ¶ 34. As soon as Plaintiff began to explain, Defendant Cecile stopped him and asked him whether he understood that he could be arrested. *See id.* at ¶ 35. Defendant Cecile told Plaintiff that, at the time of the incident, it was Defendants Hennessey's and Mullen's call whether to arrest Plaintiff but that, if Plaintiff made a complaint, it would be his call whether to arrest Plaintiff. *See id.* at ¶ 37. After Plaintiff

said that he was not sure how the complaint procedure worked, Defendant Cecile showed Plaintiff the patch on his shoulder and said, " 'It's right here with me, right now." ' *See id.* at ¶¶ 38-39. Plaintiff told Defendant Cecile that he did not think that this was the only way to file a complaint. *See id.* at ¶ 40. Defendant Cecile then told Plaintiff that, if he filed a complaint, Defendant Cecile would take him down. *See id.* at ¶ 41. Next, Defendant Cecile told Defendant Mullen, " 'He's not happy. We're going to get a complaint. Take him in,' or words to that effect." *See id.* at ¶ 42. When Plaintiff said that he had things at his booth that he could not leave unsecured, Defendant Cecile told him that he should have thought of that before. *See id.* at ¶ 44. Upon Defendant Cecile's direction, Defendant Mullen arrested Plaintiff for Obstructing Governmental Administration by giving him an appearance ticket. *See id.* at ¶¶ 45-46.

That same night, Defendant Hennessey submitted a complaint information affidavit in support of Plaintiff's arrest. *See id.* at ¶ 47. The affidavit contained a number of statements that were false and that Defendant Hennessey knew to be false when he made them. *See id.* at ¶¶ 48-49. Plaintiff's counsel filed a motion to dismiss the information for insufficiency. *See id.* at ¶ 51. On January 10, 2004, the Syracuse City Court dismissed the information in its entirety. *See id.* at ¶ 52.[FN3] In or about November 2004, Carousel Center management informed Plaintiff that he could not set up his booth during the holiday season because it was concerned about potential negative publicity arising from these incidents. *See id.* at ¶ 53.

FN3. It appears to the Court that this dismissal actually occurred on January 14, 2004, and was made pursuant to New York Criminal Practice Law § 170.40. *See* Dkt. No. 9 at Pt. 5.

**\*3** Plaintiff filed the instant action on December 15, 2004. *See* Dkt. No. 1.

III. DISCUSSION

A. Defendants' motion to dismiss for insufficient service of process pursuant to Rule 12(b)(5) of the Federal Rules

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

of Civil Procedure

Defendants argue that the Court lacks personal jurisdiction over them because Plaintiff failed to serve them with summonses. The docket sheet contains four affidavits of service that indicate that each Defendant was served with the summons and the complaint sometime between January 12, 2005, and January 26, 2005. *See* Dkt. Nos. 5-8. Perhaps these affidavits are mistaken; Plaintiff's counsel has filed an affidavit stating that Plaintiff personally served summonses and complaints for all Defendants upon Defendants' counsel on February 8, 2005, one day after Defendants filed their motion to dismiss. *See* Dkt. Nos. 9, 14 at ¶ 4. Since Defendants do not address insufficiency of service of process in their reply memorandum of law, the Court presumes that they were served summonses and are abandoning their motion to dismiss pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure. Regardless, both Local Rule 7.1(a)(2) and common sense dictate that a motion to dismiss for a failure to serve summonses requires a supporting affidavit, which Defendants have not provided. *See* L.R. 7.1(a)(2). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's complaint pursuant to Rule 12(b)(5) of the Federal Rules of Civil Procedure.

B. Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure

*1. Standard of review*

In considering a motion to dismiss for failure to state a claim, the court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir.1999).* Hence, dismissal is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir.1994)* (quotation omitted).

*2. Defendant City's liability for Plaintiff's § 1983 claims*

A municipality may only be held liable under § 1983 when its policies or customs result in a plaintiff's constitutional injury. *Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978).* The existence of a policy or custom may be inferred when a plaintiff presents evidence that a " 'municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction....' " *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir.1998)* (quotation and footnote omitted). Contrary to some earlier Second Circuit cases, there is no heightened pleading requirement for claims of municipal liability. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 167-68 (1993)* (rejecting contention that "plaintiff must do more than plead a single instance of misconduct" to state a claim for municipal liability); *contra Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir.1993)* (citation omitted). As the Supreme Court noted, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Leatherman, 507 U.S. at 168-69.*

**\*4** Plaintiff's complaint alleges that Defendant City has a policy or custom of threatening those who verbally challenge, or indicate the desire to file a complaint about, police misconduct with Obstructing Governmental Administration and that Defendant City has shown deliberate indifference in failing to train its police officers in how to handle the public while making arrests and failing to train its officers about what constitutes the crime of Obstructing Governmental Administration. *See* Dkt. No. 1 at ¶¶ 55, 64, 71-73. Plaintiff's allegations of municipal liability are directly related to his allegation of personal injury and, if shown to be true according to the evidence, might support a determination of municipal liability. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City for failure to adequately plead municipal liability.

*3. Plaintiff's § 1983 and common law false arrest and false imprisonment claims*

*a. elements of false arrest and false imprisonment*

"The elements of false arrest ... under § 1983 are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

'substantially the same' as the elements under New York law." *Boyd v. City of N.Y.,* 336 F.3d 72, 75 (2d Cir.2003) (quotation omitted). The elements of false arrest and false imprisonment claims are identical: " '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." ' *See Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir.2003) (quotation omitted).

The central dispute between the parties is whether the issuance of an appearance ticket constitutes the requisite confinement.

*b. common law false arrest and false imprisonment*

Every New York case of which the Court is aware that has considered whether the issuance of an appearance ticket constitutes confinement has held that the issuance of an appearance ticket, in and of itself, does not constitute confinement for purposes of a common law false arrest or false imprisonment claim. *See Du Chateau v. Metro-North Commuter R.R. Co.,* 253 A.D.2d 128, 129, 132 (1st Dep't 1999) (citations omitted) (police officer escorted plaintiff from train, talked to him, and issued an appearance ticket); *Kramer v. Herrera,* 176 A.D.2d 1241, 1241 (4th Dep't 1991) (citations omitted); *Pozzaghera v. Anderson,* 136 A.D.2d 912, 913 (4th Dep't 1988) ("Plaintiff's sole contention is that he was detained by the service of an appearance ticket. This did not restrict plaintiff's freedom and, therefore, does not form a basis for his wrongful arrest claim." (citation omitted)); *Pritchett v. State,* 61 A.D.2d 1110, 1110 (3d Dep't 1978); *cf. Reinhart v. Jakubowski,* 239 A.D.2d 765, 766 (3d Dep't 1997) (issuance of criminal summons requiring court appearance insufficient to support false arrest claim); *Vill. of Ellenville v. Searles,* 235 A.D.2d 692, 693 (3d Dep't 1997) (brief traffic stop in order to serve process did not constitute requisite confinement) (citations omitted).

**\*5** Plaintiff contends, however, that his complaint alleges more than the mere issuance of an appearance ticket. Conduct that accompanies the issuance of an appearance ticket certainly can constitute confinement for purposes of a false arrest or false imprisonment claim. *See Wiggins v. Metro-North Commuter R.R. Co.,* 228 A.D.2d 198, 198 (1st Dep't 1996) (police escorted plaintiff off train, questioned him in a railroad police facility, and issued an appearance ticket). Unfortunately, Plaintiff does not specify which of his allegations he believes show that Defendants confined him. The relevant allegations are:

33. Approximately one hour later, at about 9:00 p.m., Officer Mullen returned to Plaintiff's booth with [Sergeant Cecile] and a mall security guard.

34. Sergeant Cecile told Plaintiff that he understood he had been involved in an incident earlier and asked the Plaintiff what happened.

35. As the Plaintiff began to tell him, Sergeant Cecile interrupted Plaintiff and asked if Plaintiff understood that he could be arrested.

36. Plaintiff was quite surprised at this statement as he had complied with Officer Mullen's directive and had not interfered with Paredes' arrest or done anything unlawful.

37. Sergeant Cecile said that right then it was the officer's call, but if they were going to receive a complaint from the Plaintiff, it would be his call whether to arrest Plaintiff.

38. Plaintiff said that he was not sure how the complaint procedure worked.

39. Sergeant Cecile showed Plaintiff the patch on his shoulder and said, "It's right here with me, right now."

40. Plaintiff said that he did not think that was the only way to file a complaint.

41. Sergeant Cecile then told Plaintiff, "I'll tell you right now if you're filing a complaint, I'm taking you down," or words to that effect.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

42. Sergeant Cecile told Officer Mullen, "He's not happy. We're going to get a complaint. Take him in," or words to that effect.

43. Plaintiff explained that he had expensive things in his booth that he could not leave unsecured.

44. Sergeant Cecile told Plaintiff that he should have thought of that before.

45. Sergeant Cecile told Officer Mullen to give Plaintiff an appearance ticket, which Officer Mullen did.

See Dkt. No. 1 at ¶¶ 33-45. Although Plaintiff alleges that Defendant Cecile threatened to arrest him, the mere threat to arrest does not constitute confinement. See Blumenfield v. Harris, 3 A.D.2d 219, 220 (1st Dep't 1957) (citations omitted), aff'd 3 N.Y.2d 905 (1957).FN4

FN4. In articulating his first cause of action, Plaintiff alleges that "[i]n the course of arresting Plaintiff, plaintiff was not free to leave and was confined against his will at the Carousel Center." See Dkt. No. 1 at ¶ 58. However, in light of the more specific allegations that Plaintiff made in his statement of facts, this allegation is too vague and conclusory to support a reasonable inference that Defendants confined him.

Accepting all of Plaintiff's allegations as true and drawing every reasonable inference from them, the Court does not find that he has alleged that Defendants took any actions that would constitute confinement for purposes of a common law false arrest or false imprisonment claim. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim.

c. § 1983 false arrest

*6 The question of whether the issuance of an appearance

ticket constitutes confinement for purposes of § 1983 is not so clear. Defendants rely upon Angel v. Kasson, 581 F.Supp. 170, 177-78 (N.D.N.Y.1983) ("[I]t [is] well settled that the issuance of such tickets under the provisions of N.Y.Crim. Proc. Law § 150.10 does not constitute an arrest." (citation and footnote omitted)). Plaintiff, on the other hand, relies upon Dorman v. Castro, 214 F.Supp.2d 299 (E.D.N.Y.2002), which states that,

[a]lthough this is a close case, the Court finds that Plaintiffs were subject to a "seizure" under the Fourth Amendment. Plaintiffs claim that their liberty was restrained because "at the point when the Plaintiffs were informed that they were being issued a Summons" they "were not free to leave until the Plaintiffs had the Summons in hand."

Id. at 308 (quotation omitted). Dorman goes on to note that "district courts in this circuit that have analyzed Murphy [v. Lynn, 118 F.3d 938 (2d Cir.1997) ], however, have held that the mere issuance of an appearance ticket, without any restraint on travel, is a sufficient restraint of liberty to constitute a 'seizure' under the Fourth Amendment." Id. (citing Kirk v. Metropolitan Trans. Auth., No. 99 CV 3787, 2001 WL 258605, *15 (S.D.N.Y. Mar. 14, 2001); Kirton v. Hassel, No. 96 CV 1371, 1998 WL 146701, *6 (E.D.N.Y. Mar. 25, 1998); Sassower v. City of White Plains, 992 F.Supp. 652, 656 (S.D.N.Y.1998)) (other citation omitted).FN5

FN5. Contrary to Dorman's statement, two of the supporting cases it cites do not involve appearance tickets and the third, Kirk, involves a desk appearance ticket that the defendant issued after the plaintiff had been arrested and detained. Kirk, 2001 WL 258605, *2-*4.

Dorman and all the supporting cases that it cites rely upon Murphy. Murphy, applying Albright v. Oliver, 510 U.S. 266 (1994), held that, in order for a plaintiff to establish a § 1983 malicious prosecution claim, he "must show ... that the initiation or pendency of judicial proceedings" resulted in a Fourth Amendment "seizure." Murphy, 118 F.3d at 944. The court went on to hold that "[t]he liberty deprivations regulated by the Fourth Amendment are not limited to physical detention." Id. at 945. Finally, the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

court, relying upon Justice Ginsburg's solitary concurrence in *Albright,* held that

> while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and *may order him to make periodic appearances,* such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.

*Id.* at 946 (emphasis added).

Like *Murphy,* all three of the supporting cases that *Dorman* cites concern malicious prosecution claims. There is certainly considerable similarity between the analysis of a § 1983 malicious prosecution claim and a § 1983 false arrest claim; both arise out of the Fourth Amendment's protection against unreasonable seizures. However, *Murphy* does not expressly address false arrest claims. Furthermore, there is reason to constrain the application of *Murphy* to the precise issues it addresses. Judge Jacobs, dissenting in *Murphy,* after noting the majority's reliance upon Justice Ginsburg's solitary concurrence, pointed out that "[a] probable cause determination is required only for 'those suspects who suffer restraints on liberty *other* than the condition that they appear for trial." ' *Id.* at 953, 955 (quoting *Gerstein [v. Pugh],* 420 U.S. [103,] 125 n. 26, 95 S.Ct. [854,] 869 n. 26 [ (1975) ] (Judge Jacobs' emphasis)) (footnote omitted). In *Sassower,* Judge Lowe noted the novelty of the *Murphy* holding and quoted Judge Jacobs' statement that " 'strange is the majority's holding that [plaintiff] was seized within the meaning of the Fourth Amendment because he was required to appear in court." ' *Sassower,* 992 F.Supp. at 655, 656 (quotation omitted).

**\*7** Although in the context of a malicious prosecution claim *Murphy* would be controlling, given the tenuousness of its reasoning, the Court holds that the issuance of an appearance ticket does not, in and of itself, constitute confinement for purposes of a § 1983 false arrest or false imprisonment claim. Furthermore, since the circumstances surrounding the issuance of the appearance ticket in this case do not present any alternative forms of the restraint of Plaintiff's liberty, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to

state a claim.

**4. Plaintiff's § 1983 First Amendment claims**

Second Circuit First Amendment retaliation case law is, to put it mildly, confusing. There are at least three formulations of the elements of a First Amendment retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) ((1) protected speech or conduct, (2) the defendant's adverse action against the plaintiff, and (3) " 'a causal connection between the protected speech and the adverse action" ' (quotation omitted)); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 91 (2d Cir.2002) ((1) conduct that the First Amendment protects that (2) prompts or substantially causes the defendant's action (citations omitted)); *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001) ((1) protected speech or conduct that (2) motivates or substantially causes the defendant's action, which action (3) effectively chills the plaintiff's exercise of his First Amendment right (citation omitted)).

In an attempt to make sense of this case law, one approach is to distinguish cases according to broad types. The great majority of First Amendment retaliation cases arise in the prisoner and public employee contexts. Less typical are those cases, like the one currently before the Court, in which a private citizen alleges that state actors took some action against him in retaliation for his exercise of his First Amendment rights. Unfortunately, even in this subset of cases, there is disagreement about the elements of the claim. The most recent case in this subset to set forth the elements of a First Amendment retaliation claim is *Dougherty.* In that case, the plaintiff alleged that the defendants had revoked a previously issued building permit in retaliation for his exercise of his First Amendment rights. Although the court indicated that there may have been additional protected speech, it specifically noted the plaintiff's allegation that the permit revocation occurred soon after the defendants' receipt of his opposition papers to their motion to dismiss an action that he had filed in relation to an earlier denial of a permit. *See Dougherty,* 282 F.3d at 91-92. The court held that the circumstances that the plaintiff alleged gave rise to a sufficient inference of a causal relationship between his protected conduct and the defendants' action to withstand a motion to dismiss. *See id.* at 92.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

*8 The next most recent case in the subset of private citizen plaintiffs is *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98 (2d Cir.2001). *Garcia* involved a student who claimed that the defendants dismissed him from medical school in retaliation for his exercise of his First Amendment rights. The court followed the same formulation of the elements of a First Amendment retaliation claim as did *Gill* but concluded that the plaintiff's assertions did not satisfy the third element of that formulation. *See id.* at 106-07 (quotation and other citation omitted).

After *Garcia,* the next most recent case in this subset is *Curley.* The facts of that case are more analogous to those of the instant action than are those of either *Dougherty* or *Garcia.* The plaintiff in *Curley* alleged that the defendants arrested him in retaliation for comments that he had made while campaigning for municipal office about a police cover-up and failure to discipline. *See Curley,* 268 F.3d at 72-73. The court found that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim because the existence of probable cause to arrest him negated the second element of such a claim and because the fact that the plaintiff continued his campaign and later campaigned for another municipal office negated the third, "chilling," element of the claim. *See id.* at 73.

*Curley* is distinguishable from *Dougherty* and *Garcia.* All the Second Circuit cases that the Court has found involving a private citizen plaintiff who alleges that the defendant arrested him in retaliation for his exercise of his First Amendment rights have articulated the same formulation of the elements of a First Amendment retaliation claim as did *Curley. See Kerman v. City of N .Y.,* 261 F.3d 229, 241-42 (2d Cir.2001) (citation omitted); *Connell v. Signoracci,* 153 F.3d 74, 79 (2d Cir.1998) (citations omitted). Although it might be difficult to explain the distinction between private citizen arrestee plaintiff cases and the other private citizen plaintiff cases, the distinction is present in the case law. Therefore, the Court will follow the *Curley* formulation of the elements of a First Amendment retaliation claim.[FN6]

FN6. The only Second Circuit case that Plaintiff

cites in support of his First Amendment retaliation claims is *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). *Gagliardi* applies the same formulation of the elements of the claim as does *Dougherty. See id.* at 194 (quotation and other citations omitted). However, *Gagliardi,* like *Dougherty,* is a private citizen zoning dispute case rather than a private citizen arrestee case.

The only challenge [FN7] that Defendants currently make to Plaintiff's First Amendment retaliation claims is that he fails to allege that they prevented him from filing a compliant, i.e., he fails to allege that Defendants' actions effectively chilled him from exercising his First Amendment rights. However, this challenge reads Plaintiff's claims too narrowly. Two distinct forms of speech are at issue in Plaintiff's first two causes of action. Plaintiff's first cause of action alleges that he verbally complained about Defendants' actions during the course of their arrest of Paredes. From Plaintiff's second cause of action, it may be reasonably inferred that he also desired to file a formal complaint about Defendants' actions after the arrest incident. With respect to the second cause of action, Plaintiff has not alleged that Defendants' actions effectively chilled him from filing a complaint. Therefore, Plaintiff's second cause of action fails to state a First Amendment claim. Accordingly, the Court grants Defendants' motion to dismiss the First Amendment claims in Plaintiff's second cause of action for failure to state a claim.

FN7. It is possible that Plaintiff's conduct in criticizing Defendants' actions during the course of their arrest of Paredes may not be protected activity. If the allegations in Defendant Hennessey's affidavit in support of the complaint information are true, Defendants likely had probable cause to arrest Plaintiff for Obstructing Governmental Administration and, thus, their threat to arrest him on that charge was privileged. *See* Dkt. No. 1 at ¶ 48. However, since Defendants have not raised the issue of whether Plaintiff's conduct was privileged, and the Court must accept the allegations in Plaintiff's complaint as true, the Court cannot address this issue at this time.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

**\*9** However, with respect to Plaintiff's first cause of action, the Court finds that it may reasonably infer from the complaint that Defendants' conduct effectively chilled Plaintiff's speech. The relevant allegations are:

 24. Plaintiff then crouched down and told the officers that they were "over the top" and that they were "out of control" or words to that effect.

 25. Plaintiff did this because the police officers were brutalizing Paredes.

 26. Officer Mullen told Claimant to get back.

 27. Claimant complied by stepping back.

 28. Officers Mullen and Hennessey then continued to punch Paredes on the back after Paredes was subdued.

 29. Plaintiff told the officers again that they were "over the top" or words to that effect.

 30. Officer Mullen then told the Plaintiff that if he didn't stop, he would be arrested for Obstructing Governmental Administration.

 31. Plaintiff stopped speaking to the officers.

*See* Dkt. No. 1 at ¶¶ 24-31. Accordingly, since Plaintiff has sufficiently alleged that Defendants' (or at least Defendant Mullen's) actions effectively chilled his exercise of his First Amendment rights, the Court denies Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim.

*5. Plaintiff's § 1985(3) claims*

Defendants have asserted three bases for the dismissal of

Plaintiff's § 1985(3) claims. First, they argue that Plaintiff, as a white person, lacks standing to assert a § 1985(3) claim. Second, they contend that Defendants, as agents or employees of a corporate entity, by definition, may not conspire with one another. Finally, they assert that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*i. standing*

Despite the age and extensive use of § 1985(3), case law contains little discussion of the question of who has standing to assert a claim under that statute.[FN8] However, the Court finds that the case law provides sufficient guidance to answer the question currently before it: whether a non-minority person who alleges that he was injured by a conspiracy that aimed to deprive minority persons of the equal protection of the law has standing to assert a § 1985(3) claim.

 FN8. The parties have cited conflicting precedents, none of which are binding on this Court. Defendants cite two cases for the proposition that a plaintiff asserting a § 1985(3) claim must himself be a member of a class that the statute protects: *Puglisi v. Underhill Park Taxpayer Ass'n,* 947 F.Supp. 673, 692 (S.D.N.Y.1996) (citations omitted); *McLoughlin v. Altman,* No. 92 Civ. 8106, 1993 WL 362407, *6 (S.D.N.Y. Sept. 13, 1993) (citation omitted). Although *McLoughlin* cites *Griffin v. Breckinridge,* [403 U.S. 88, 102,] 91 S.Ct. 1790, 1798 (1971), for the proposition that "a claimant must show, among other things, that she belonged to the type of class that is protected by that statute," *McLoughlin,* 1993 WL 362407, at *6, it does not appear that *Griffin* stands for such a proposition. Likewise, although *Puglisi* discusses several other cases, when it holds "that plaintiff cannot bring this § 1985(3) claim because ... plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination[,]" *McLoughlin* is the only case that the court cited that supports this holding. *Puglisi,* 947 F.Supp. at 692.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

The cases upon which Plaintiff relies are also suspect. He contends that a white person who has sought to vindicate the rights of members of a racial minority and against whom the defendants conspire has standing to assert a § 1985(3) claim. He cites three primary cases to support this proposition: *Maynard v. City of San Jose,* 37 F.3d 1396, 1403-04 (9th Cir.1994) (citations and footnote omitted); *Pisello v. Town of Brookhaven,* 933 F.Supp. 202, 216 (E.D.N.Y.1996) (citing *Maynard* ); *Bryant v. Polston,* No. IP 00-1064-C-T/G, 2000 WL 1670938, *7 (S.D.Ind. Nov. 2, 2000)* (citing *Maynard* ). In *Maynard,* the Ninth Circuit sought to apply the law of that circuit which provided that "[p]laintiffs have standing under Section 1985 only if they can show they are members of a class that the government has determined 'require[s] and warrant[s] special federal assistance in protecting their civil rights." ' *Maynard,* 37 F.3d at 1403 (quotations and other citation omitted). The court reasoned that, because Title VII "grants special protection to whites who are denied association with members of other groups because of an employer's discriminatory practices" and "to all employees-regardless of race-who are subjected to retaliation for assisting in the investigation of discriminatory employment practices," such persons may have standing to assert a § 1985(3) claim. *Id.* (citation omitted). The plaintiff in *Maynard* had alleged that his employer and other defendants had retaliated against him for complaining about discriminatory hiring practices. *See id.* at 1399-1400. Since it does not appear that the Second Circuit has articulated a general statement of the requirement for standing under § 1985(3), the Court does not find *Maynard* persuasive.

The Supreme Court has discussed the statute's purpose: "[t]he predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views towards the Negro." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v.*

*Scott,* 463 U .S. 825, 836 (1983). This statutory purpose implies that, if a white person who sought to vindicate the rights of members of a racial minority were injured by a conspiracy that aimed to deny members of that racial minority of the equal protection of the laws, he would have standing to assert a § 1985(3) claim.

**\*10** At least two Courts of Appeals have expressly held that a plaintiff asserting a § 1985(3) claim need not himself be a member of a class that the statute protects. *See Cutting v. Muzzey,* 724 F.2d 259, 260 (1st Cir.1984) (holding that a non-Italian had standing to assert a § 1985(3) claim against members of a town planning board who allegedly conspired to deprive Italians of access to housing); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1244 (3d Cir.1978) (en banc ) ("[M]embers of a conspiracy to deprive women of equal rights are liable under § 1985(3) to persons who are injured in furtherance of the object of the conspiracy, whether male or female."), *vacated on other grounds,* 442 U.S. 366 (1979).[FN9] Although the Second Circuit has not addressed whether a white person may have standing to assert a § 1985(3), the Court finds that, in light of the discussion in *Scott,* the holdings of *Cutting* and *Novotny* are persuasive. Therefore, the Court concludes that the fact that Plaintiff is white does not, in and of itself, bar him from asserting a § 1985(3) claim. Consequently, since Plaintiff has alleged that a conspiracy whose object was to deprive the constitutional rights of a member of a racial minority injured Plaintiff while he was seeking to vindicate those rights, the Court finds that he has adequately alleged standing for his 42 U.S.C. § 1985(3) claim.

FN9. The Supreme Court vacated *Novotny* because the plaintiff in that case alleged that the conspiracy that injured him had the goal of depriving women of their Title VII rights. The Court held that, because allowing a plaintiff to base a § 1985(3) cause of action upon rights that Title VII created would circumvent the procedural requirement that Congress had built into Title VII, "deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny,* 442 U.S. at 378. Since the Fourth Amendment creates the rights of Paredes of which Plaintiff alleges Defendants conspired to deprive him, the Court's holding

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

does not bar Plaintiff's action.

*ii. intra-corporate conspiracy doctrine*

" 'Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together[ ]' " while acting within the scope of their employment. *Nassau County Employee "L" v. County of Nassau,* 345 F.Supp.2d 293, 304 (E.D.N.Y.2004) (quotations and other citations omitted); *see Crudele v. City of N.Y. Police Dep't,* No. 97 Civ. 6687, 2004 WL 1161174, *5 (S.D.N.Y. May 24, 2004) (citations omitted). Although courts first applied this doctrine to cases involving public corporations, they have subsequently held that the doctrine is applicable to municipal entities and their officers, agents, and employees. *See County of Nassau,* 345 F.Supp.2d at 304 (citation omitted); *Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003) (quotation omitted). "However, '[a]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.' " *County of Nassau,* 345 F.Supp.2d at 304-05 (quotation omitted); *see Stoner v. N.Y. City Ballet Co.,* No. 99 Civ. 0196, 2002 WL 523270, *9 (S.D.N.Y. Apr. 8, 2002) (quotation and other citation omitted).

Individual Defendants are officers of Defendant City. *See* Dkt. No. 1 at ¶¶ 7-9. Plaintiff's allegation that at the time that individual Defendants "conspired to violate Plaintiff's civil rights and committed acts in furtherance of such conspiracy, they were acting as police officers for the City of Syracuse[ ]" is presumably an admission that individual Defendants were acting within the scope of their employment. *See* Dkt. No. 1 at ¶ 79.

**\*11** Nonetheless, Plaintiff contends that the personal interest exception applies. "[T]hat exception applies where 'a plaintiff adequately alleges that each defendant possessed an independent, personal conspiratorial purpose.' " *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (quotation and other citation omitted); *see Salgado v. City of N.Y.,* No. 00 Civ. 3667, 2001 WL 290051, *9 (S.D.N.Y. Mar. 26, 2001). Plaintiff has not alleged that individual Defendants had a personal interest in their alleged conspiracy. *See* Dkt. No.

1 at ¶¶ 77-83. In his motion papers, Plaintiff concedes that he "does not allege Defendants' personal stake in their bias against Plaintiff or Paredes...." *See* Dkt. No. 15 at 14. However, he contends that he has "allege[d] sufficient facts to infer that the Defendants were motivated by personal gain in silencing Plaintiff about what he witnessed concerning their brutality and/or misconduct in subduing and arresting Paredes and preventing Plaintiff from filing a complaint about such misconduct." *See id.* at 14-15 (citations omitted). He further argues that "the complaint alleges sufficient facts to infer that Defendants' employment opportunities and interest in not answering a complaint about their misconduct was Defendants' personal stake or interest in participating in the conspiracy." *See id.* at 15. However, since Defendant City arguably has the same general interest, Plaintiff's allegations do not give rise to a reasonable inference that individual Defendants' interests in the alleged conspiracy were distinct from those of Defendant City.

Accordingly, since the intra-corporate conspiracy doctrine applies, the Court grants Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim.[FN10]

> [FN10.] Since the Court concludes that the intra-corporate conspiracy doctrine applies, it will not address Defendants' alternative argument that Plaintiff's factual allegations are insufficient to state a conspiracy claim.

*6. Plaintiff's common law malicious prosecution claims*

In order to recover for malicious prosecution, a plaintiff must establish four elements: that a criminal proceeding was commenced; that it was terminated in favor of the accused; that it lacked probable cause; and that the proceeding was brought out of actual malice. *Cantalino v. Danner,* 96 N.Y.2d 391, 394-95 (2001) (citations omitted). Defendants argue that a dismissal in the interest of justice of an accusatory instrument pursuant to New York Criminal Practice Law § 170.40 cannot constitute a favorable termination. However, Defendants only cite pre-*Cantalino* case law to support their argument. *Cantalino* directly addressed "whether the dismissal of criminal charges against plaintiff in the interest of justice constituted a termination in her

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

favor." *Id.* at 395. It expressly rejected "a per se rule that a dismissal in the interest of justice can never constitute a favorable termination," and held that

the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused. A case-specific rule is particularly appropriate for dismissals in the interest of justice, since the trial court is required to state on the record its reasons for dismissing the criminal charges....

**\*12** *Id.* at 396 (internal citation omitted). Unfortunately, in this case, the state court did not state on the record its reasons for dismissing the charges. *See* Dkt. No. 9 at 2. Furthermore, even if the state court had stated its reasons on the record, that record is not part of Plaintiff's pleadings. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's common law malicious prosecution claims for failure to state a claim.

*7. Plaintiff's common law libel claim*

Defendants argue (1) that Plaintiff has failed to comply with New York Civil Practice Law and Rules § 3016(a)'s requirement that a complaint asserting a claim for libel or slander set forth the particular words complained of and (2) that, if the Court dismisses all of Plaintiff's federal claims, it should decline to exercise jurisdiction over his state claims.

Since federal law governs the procedural issues in this case, " 'the mode of pleading defamation is governed by Rule 8, Fed.R.Civ.P.' " *Kelly v. Schmidberger,* 806 F.2d 44, 46 (2d Cir.1986) (quotation omitted). Therefore, the heightened pleading requirement of New York Civil Practice Law and Rules § 3016(a) does not apply to this action. *See Silverman v. City of N.Y.,* No. 98-CV-6277, 2001 WL 218943, \*8 (E.D.N.Y. Feb. 2, 2001) (quotation and other citation omitted). The allegations of libel in Plaintiff's complaint satisfy Rule 8's requirements of "a short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8(a), (e)(1); *see* Dkt. No. 1 at ¶¶ 47-49, 94-96. Furthermore, the Court has not dismissed all of Plaintiff's federal claims. Accordingly, the Court denies Defendants' motion to

dismiss Plaintiff's libel claim for failure to state a claim.

IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Defendants' motion to dismiss Plaintiff's complaint for insufficient service of process is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 claims against Defendant City of Syracuse for failure to sufficiently allege municipal liability is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common law false arrest and false imprisonment claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 false arrest claims for failure to state a claim is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his second cause of action is GRANTED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1983 First Amendment claims in his first cause of action for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's § 1985(3) claims for failure to state a claim is GRANTED; and the Court further

**\*13** ORDERS that Defendants' motion to dismiss

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)
(Cite as: 2005 WL 1460424 (N.D.N.Y.))

Plaintiff's common law malicious prosecution claims for failure to state a claim is DENIED; and the Court further

ORDERS that Defendants' motion to dismiss Plaintiff's common libel claim for failure to state a claim is DENIED.

IT IS SO ORDERED.[FN11]

> **FN11.** The following claims of Plaintiff remain in this action: (1) § 1983 claims for denial of First Amendment rights against Defendants City, Mullen, and Hennessey, alleging that these Defendants arrested him for speaking to Defendant officers about their conduct in arresting a third-party; (2) § 1983 claims for failure to train against Defendant City; (3) common law malicious prosecution claims against all Defendants; (4) a common law libel claim against Defendant Hennessey; and (5) a claim for attorney's fees pursuant to 42 U.S.C. § 1988.

N.D.N.Y.,2005.
Griffin-Nolan v. Providence Wash. Ins. Co.
Not Reported in F.Supp.2d, 2005 WL 1460424 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Ethel BOND, Plaintiff,
v.
BOARD OF EDUCATION OF THE CITY OF NEW
YORK, Martha Rodriguez-Torres, as Principal of
Public School 156, and Oswaldo Malave, as Assistant
Principal of Public School 156, Defendants.
**No. 97 CV 1337.**

March 17, 1999.

ORDER

GERSHON, District J.

**\*1** Plaintiff Ethel Bond ("Bond") is a fifty-two year old,
African-American woman who has been a teacher for the
New York City Board of Education ("BOE") since 1981
and a delegate to the United Federation of Teachers
("UFT") since 1992. Defendants are the BOE, Martha
Rodriguez-Torres ("Rodriguez-Torres"), the principal of
Public School 156 and Oswaldo Malave ("Malave"), the
assistant principal of Public School 156. Plaintiff filed this
action in March 1997, seeking injunctive and monetary
relief. She alleges retaliation pursuant to the National
Labor Relations Act ("NLRA"), 29 U.S.C. § 158, and age
discrimination pursuant to the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 623 and 626.
Specifically, plaintiff alleges that defendants retaliated
against her for her involvement in the UFT by threatening
to "get rid of" her and by giving her unsatisfactory
performance ratings in December 1994 and June 1995,
and that they discriminated against her because of her age
by requiring her to submit weekly lesson plans,
reassigning her paraprofessional to other teachers, and
denying her a promotion to the position of team leader.

Plaintiff moves to amend her complaint to include claims
under 42 U.S.C. §§ 1983, 1985(3), 1986 and for
defamation under state law. In addition to the allegations
contained in the original complaint, the proposed amended
complaint includes allegations that plaintiff was suspended
and that defendants placed derogatory materials in her
personnel file. The proposed pleading states that the
materials accused plaintiff of neglecting to follow
prescribed lesson plans, but it does not specify the exact
language contained in such materials.

Defendants oppose plaintiff's motion to amend on the
ground that leave to amend would be futile.

DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure
provides, in pertinent part, that "a party may amend the
party's pleading only by leave of court or by written
consent of the adverse party; and leave shall be freely
given when justice so requires." Amendments are
generally favored as they tend " 'to facilitate a proper
decision on the merits.' " *Sokolski v. Trans Union Corp.,*
*178 F.R.D. 393, 396 (E.D.N.Y.1998)* (citation omitted).
"If the underlying facts or circumstances relied upon by a
plaintiff may be a proper subject of relief, he ought to be
afforded an opportunity to test his claim on the merits."
*Foman v. Davis,* 371 U.S. 178, 182 (1962).

The party opposing an amendment must establish that
leave to amend would be prejudicial or futile or that there
exists undue delay, bad faith or dilatory motive on the part
of the moving party. *See Foman,* 371 U.S. at 182; *Scharff*
*v. Claridge Gardens, Inc.,* 1990 WL 186879 \*2
(S.D.N.Y.). A proposed amendment is futile only if it fails
to state a claim and could not survive a motion to dismiss.
*See Scharff,* 1990 WL 186879 at \*2.[FN1] "If the [movant]
has at least colorable grounds for relief, justice ...
require[s]" that leave to amend be granted. *Golden Trade,*
*S.r.L. v. Jordache,* 143 F.R.D. 504, 506 (S.D.N.Y.1992)
(quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot*
*BlockBldg. 1 Housing Dev. Fund Co., Inc.,* 608 F.2d 28,
42 (2d Cir.1979)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

FN1. On a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (quoting Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836 (1994)). A motion to dismiss "is addressed solely to the face of the pleadings, and '[t]he court's function...is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." ' Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co., 834 F.Supp. 605, 607 (E.D.N.Y.1993) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985)).

Plaintiff's Section 1985(3) Claim

*2 42 U.S.C. § 1985(3) states, in relevant part:

If two or more persons in any state ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Plaintiff alleges that, by giving her unsatisfactory performance ratings, requiring her to submit lesson plans, placing derogatory materials in her personnel file, suspending her and threatening to get rid of her, Rodriguez-Torres and Malave acted in concert and with unnamed conspirators to retaliate against her for her union activities and to discriminate against her based on her age. Defendants argue that leave to amend to include a claim of conspiracy under Section 1985(3) would be futile because such a claim is barred by the intracorporate conspiracy doctrine.

Under that doctrine, officers, agents and employees of a single corporate entity are legally incapable of conspiring together. See Solla v. AETNA Health Plans of New York Inc., 14 F.Supp.2d 252, 257 (E.D.N.Y.1998). The Second Circuit has imported the doctrine into Section 1985 jurisprudence and has dismissed a claim of conspiracy against officers and employees of a non-profit institution. See Herrmann v. Moore, 576 F.2d 453 (2d Cir.), cert. denied, 439 U.S. 1003 (1978). An exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity. See Roniger v. McCall, 22 F.Supp.2d 156, 168 (S.D.N.Y.1998); Solla, 14 F.Supp.2d at 257-59. Thus, whether the doctrine is applicable here depends on whether Malave and Rodriguez-Torres were acting in furtherance of the BOE's interests or whether their conduct was motivated by personal interest. Plaintiff's proposed amended complaint specifically states that Malave and Rodriguez-Torres were acting "in the ordinary course of employment," and there are no allegations that either defendant had a personal interest in discriminating against plaintiff apart from any interests held by the BOE. Although the complaint includes an allegation that Rodriguez-Torres wanted to "get rid of" plaintiff, personal bias does not constitute personal interest and is not sufficient to defeat the intracorporate conspiracy doctrine. See Johnson v. Nyack Hospital, 954 F.Supp. 717, 723 (S.D.N.Y.1997). Rather, as in Natale v. Town of Darien, Conn., 1998 WL 91073 * 5 (D.Conn.), plaintiff alleges only the classic circumstance for application of the intracorporate conspiracy doctrine, namely, that defendants acted within the scope of their employment. Therefore, plaintiff has failed to state a claim of conspiracy upon which relief can be granted, and she is not entitled to amend her complaint to include such a claim under Section 1985(3).

Plaintiff's Section 1986 Claim

*3 42 U.S.C. § 1986 states, in relevant part, that:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

the power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented....

Plaintiff alleges that the BOE "adopted, with little or no investigation, all wrongful acts" taken by Rodriguez-Torres and Malave, and that such "willful neglect" by the BOE deprived her of equal protection of the laws in violation of 42 U.S.C. § 1986. "Courts within this circuit have interpreted § 1986 as merely giving a remedy for misprision of a violation of 42 U.S.C. § 1985." *Dangler v. New York City Off Track Betting Corp.,* 1998 WL 599711 *6 (S.D.N.Y.) (citation and quotations omitted). Since plaintiff has failed to state a cognizable conspiracy claim under Section 1985(3), it necessarily follows that her Section 1986 claim must also be dismissed.

Plaintiff's Section 1983 Claim

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) she was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was committed by a person acting under the color of state law. *See Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). "[A] complaint must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *See Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). Defendants do not dispute that they were acting under the color of state law in their positions as administrators in a public high school. Rather, they argue that the complaint is conclusory and that plaintiff has not properly alleged that she was deprived of a right secured by the Constitution and laws of the United States.

In *Alfaro,* the Second Circuit held that plaintiffs' "general and conclusory allegation" that they were deprived of "a prompt administrative hearing" to review the denial of their application for taxi medallions did not meet the requisite standard for pleadings in a Section 1983 action.

*See id.* Here, however, plaintiff specifies how and when defendants discriminated against her (*i.e.,* by giving her unsatisfactory performance ratings and requiring her to submit weekly lesson plans, etc.), the reasons for such discrimination (*i.e.,* her age and membership in a labor union), and the injury suffered (*i.e.,* suspension and denial of a promotion). Thus, the factual allegations in plaintiff's proposed amended complaint are not so conclusory as to require dismissal.

**\*4** The more difficult issue is whether plaintiff has properly alleged that she was deprived of a right secured by the Constitution or laws of the United States. Although plaintiff does not articulate a specific legal basis for her Section 1983 claim in the body of the proposed amended complaint, in her reply brief she states: "Plaintiff has made sufficient allegations of a deliberate policy and practice by the Board of Education that allow principals of Schools under it to harass, defame, unfairly target, discipline and punish teachers under such principals. This conduct of the defendants promoted a hostile working environment and that is a deprivation of equal protection." Thus, it is assumed that plaintiff is alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.[FN2] Defendants argue that leave to amend to include a Section 1983 equal protection claim would be futile because the ADEA provides the exclusive remedy for age discrimination claims and that plaintiff is barred from making a claim based on her status as a union activist because government employers at the state level are exempt from the NLRA.

FN2. In the jurisdiction section of the complaint, plaintiff states that the action arises under Title VII of the Civil Rights Act and under the Fourth, Fifth, Sixth, Thirteenth and Fourteenth Amendments to the United States Constitution. As defendants point out, the complaint does not contain any allegations from which it could be inferred that defendants violated plaintiff's Fourth, Fifth, Sixth or Thirteenth Amendment rights. The Fourth Amendment prohibits unreasonable searches and seizures, which are not at issue here; the Fifth Amendment prohibits deprivations of due process by the federal government, which is not a party to this action; the Sixth Amendment applies to criminal prosecutions only; and the Thirteenth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

Amendment prohibits involuntary servitude, which is not alleged.

Defendants' contention that plaintiff is barred from making a claim of anti-union bias under Section 1983 because state and municipal employers are not subject to the NLRA is without merit. Plaintiff's equal protection claim is not based on any rights afforded her under the NLRA, but on her right to equal protection under the Equal Protection Clause itself. Cf. *Greene v. Hawes,* 913 F.Supp. 136, 142 (N.D.N.Y.1996) (denying fair representation claim for lack of jurisdiction under Section 1983). The Equal Protection Clause clearly protects individuals from discriminatory acts by state and municipal officials based on union membership. Although union members are not a suspect class, the Supreme Court has held that discrimination based on union membership must satisfy the rational basis test to survive scrutiny under the Equal Protection Clause. See *City of Charlotte v. Local 660, International Association of Firefighters,* 426 U.S. 283, 286 (1976) (city's refusal to withhold dues from union members' paychecks must meet standard of reasonableness to survive scrutiny under the Equal Protection Clause). See also *Local 749, AFSCME, Council 4, AFL-CIO v. Ment,* 945 F.Supp. 30, 36 (D.Conn.1996) (dismissing plaintiffs' claim under the Equal Protection Clause because plaintiffs failed to allege facts sufficient to show that they were discharged based on union membership). The existence of a federal statute, which applies to federal government employers *only,* does not change this. In other words, it is precisely because the NLRA provides no protection to plaintiffs discriminated against by municipal employers that plaintiff's equal protection claim is not preempted by the NLRA.

The Second Circuit has not ruled on whether the ADEA preempts claims of age discrimination under Section 1983. The circuits that have considered the issue have held that the ADEA provides the exclusive remedy for such discrimination. See *Zombro v. Baltimore City Police Dep't,* 868 F.2d 1364, 1369 (4th Cir.), *cert. denied,* 493 U.S. 850 (1989); *Ray v. Nimmo,* 704 F.2d 1480, 1485 (11th Cir.1983); *Paterson v. Weinberger,* 644 F.2d 521, 525 (5th Cir.1981). And the district courts in this circuit are split. Compare *Jungels v. State University College of New York,* 922 F.Supp. 779, 785 (W.D.N.Y.1996) (ADEA does not preempt age discrimination claims under Section 1983); *Reed v. Town of Branford,* 949 F.Supp. 87, 90

(D.Conn.1996) (same), *with Gregor v. Derwinski,* 911 F.Supp. 643, 651 (W.D.N.Y.1996) (ADEA provides the exclusive remedy for age discrimination); *Reale v. Jenkins,* 1993 WL 37091 *4 (S.D.N.Y.1993) (same). However, the Second Circuit has held that employment discrimination claims under Section 1983 are not preempted by concurrent Title VII claims, stating that "Title VII is not the exclusive remedy for discrimination claims against state or municipal employers, where those claims derive from violations of Constitutional rights." *Annis v. County of Westchester, N.Y.,* 36 F.3d 251, 254 (2d Cir.1994). See also *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.), *cert. denied,* 510 U.S. 1164 (1994) ("a § 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII.") (citation and quotations omitted). Given the current uncertain state of the law and the Second Circuit's holdings in the employment discrimination context, plaintiff will be permitted to amend her complaint to include an age discrimination claim under Section 1983. The issue of preemption can be revisited at a later date if necessary.

### Defamation

**\*5** Section 3813(1) of the New York Education Law requires a plaintiff to serve a notice of claim before filing a tort action against the BOE. Since plaintiff acknowledged at oral argument that she never filed a notice of claim, plaintiff has failed to state a claim of defamation against the BOE upon which relief can be granted.

In addition, plaintiffs alleging defamation in New York must set forth "the particular words complained of" in the complaint. N.Y.C .P.L.R. 3016(a). Failure to specify the allegedly defamatory language warrants dismissal. See *Gill v. Pathmark Stores, Inc.,* 237 A.D.2d 563, 564 (2d Dep't 1997); *Vardi v. Mutual Life Ins. Co. of N.Y.,* 136 A.D.2d 453, 456 (1st Dep't 1988). Failure to state the particular person or persons to whom the comments were made also requires dismissal. See *Gill,* 237 A.D.2d at 564. Since plaintiff's proposed amended complaint does not state the exact language contained in the materials defendants placed in her personnel file, nor does the complaint specify who read the file, plaintiff has failed to state a claim upon which relief may be granted, and leave

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)
(Cite as: 1999 WL 151702 (E.D.N.Y.))

to amend would be futile.

CONCLUSION

Plaintiff's motion for leave to amend the complaint to
include a state law defamation claim and claims under 42
U.S.C. §§ 1985(3) and 1986 is denied. Plaintiff's motion
to amend the complaint to include a claim under 42 U.S.C.
§ 1983 is granted. Plaintiff is directed to serve and file an
amended complaint in conformity with this order within
ten days.

SO ORDERED.

E.D.N.Y.,1999.
Bond v. Board of Educ. of City of New York
Not Reported in F.Supp.2d, 1999 WL 151702 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robin WALKER, Plaintiff,
v.
NEW YORK CITY DEPARTMENT OF
CORRECTIONS, Defendant.
**No. 01 Civ. 1116(LMM).**

Nov. 19, 2008.

West KeySummary
**Civil Rights 78 🗝️ 1172**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1172 k. Disparate Treatment. Most Cited
Cases
A female corrections officer was entitled to proceed with
her state and city Human Rights Laws and Title VII
discrimination claims on the basis of her discipline. She
presented evidence of a similarly situated male officer
who was subject to less discipline than she was for similar
violations. The corrections department claimed that their
arrests were processed differently. However, the female
office submitted evidence of pretext by showing that the
officers' arrests were, in fact, processed exactly the same
way. The corrections department ultimately admitted this
fact. 42 U.S.C.A. § 1983; Civil Rights Act of 1964, § 701,
42 U.S.C.A. § 2000e; McKinney's Executive Law § 290.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** Plaintiff Robin Walker ("Walker" or "Plaintiff")

initiated the present action against her employer, the New
York City Department of Corrections ("DOC" or
"Defendant"), alleging civil rights violations arising out of
alleged retaliation and discrimination in the terms and
conditions of her employment under Title VII of the Civil
Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.
§ 2000e et seq.; 42 U.S.C. §§ 1981, 1983, 1985; the New
York State Human Rights Law, N.Y. Exec. Law § 290 et
seq. (McKinney 1993 & Supp.1999), and the New York
City Administrative Code, N.Y.C. Admin. Cod. § 8-107
(1998). Defendant moves for summary judgment on all
counts. For the reasons set forth below, Defendant's
motion is GRANTED in part, and DENIED in part.

I. BACKGROUND

A. Procedural Background

Plaintiff Robin Walker filed *pro se* an Amended
Complaint in this court on April 16, 2001. In her
Amended Complaint, Walker alleges that her employer,
the DOC, retaliated and discriminated against her in the
terms and conditions of her employment on the basis of
her gender. On June 5, 2001, Defendant filed its Answer,
denying any civil rights violations and asserting various
affirmative defenses. Defendant filed its motion for
summary judgment on July 18, 2003. Plaintiff filed her
opposition on February 18, 2008. Defendant filed its reply
on July 16, 2008.[FN1]

    FN1. There was justifiable delay in the parties
    filing their briefs, the details of which are not
    relevant to the instant motion.

B. Factual Background

As Defendant moved for summary judgment, the
following recitation of facts reflects either an undisputed
or otherwise conceded version of events, or facts taken in
a light most favorable to Plaintiff.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

1. Discipline

Walker was employed by the DOG at the time of the
events giving rise to this controversy-from January 1999
through October 2002. (Affidavit of Robin Walker in
Opposition of Motion for Summary Judgment ("Walker
Aff.") ¶ 3.) Walker and Timberlyn Parker ("Parker") were
engaged in an intimate relationship between 1995 and
1999. (*Id.* at ¶ 5.) Parker was also employed as a DOC
corrections officer, but unlike Walker, he was a member
of the Emergency Services Unit ("ESU") and the
Commissioner's Football Team ("CFT"), elite DOC units
that, at the time relevant to this controversy, were either
exclusively open to males or male-dominated. (*Id.* at ¶¶
10-13; Walker Dep. 98:3-99:18.) In early 1999, Walker's
relationship with Parker ended, and the two engaged in an
ongoing domestic dispute throughout 1999 and 2000 that
resulted in both Walker and Parker being arrested on three
separate occasions during that period. (Walker Aff. ¶ 9.)
The DOC's alleged disparate discipline of Walker for her
involvement in this domestic dispute gives rise to her
allegations of gender discrimination. (Walker Dep.
118:18-119:18, 108:23-109:12.)

On January 30, 1999, Walker was arrested and charged
with aggravated harassment for calling the residence and
workplace of Agnes Whitehurst ("Whitehurst"), Parker's
new girlfriend and a DOC employee, (Ex. P, Declaration
of Michael Delarco ("Delarco Decl.")), and threatening
her harm. (Exs. A, D, Delarco Decl.) A protective order
against Walker was issued for Whitehurst's benefit. (Ex.
B, Delarco Decl.) As a result of Walker's arrest, the DOC's
Alfred Quarterman ("Quarterman") suspended Walker for
five days without pay. (Walker Dep. 114:23-25, 20:13-16,
22:18-19.) While Walker was suspended, the DOC
confiscated her personal firearm, and when Walker
returned to duty, the DOC temporarily suspended her
on-duty firearm privileges. (*Id.* at 20:23-25.) As a result of
Walker's firearm privileges being suspended, she was
unable to work gun-affiliated posts, including escorting
inmates and making hospital runs. (*Id.* at 119:13-18.)
Walker's ability to work overtime was seriously impeded.
(*Id.*)

**\*2** Walker was arrested a second time on July 23, 1999
and charged with criminal contempt and violating
Whitehurst's order of protection (Exs. E, F, Delarco Decl.)

Quarterman imposed another five-day suspension without
pay, confiscated Walker's personal firearm while
suspended, and upon her return, temporarily revoked her
on-duty firearm privileges. (Ex. C, Delarco Decl.; Walker
Dep. 119:2-18.)

On November 28, 2000, Walker was arrested a third time
and charged with criminal mischief for damaging Parker's
and Whitehurst's vehicles. (Ex. G, Delarco Decl.) The
DOC's Eric Perry suspended Walker, this time for
ten-days without pay because it was her third arrest
(Walker Dep. 115:7-19.) Walker's on-duty firearm
privileges were also suspended. (*Id.* at 119:2-18.)

On January 20, 1999, ten days before Walker's first arrest
in this domestic dispute, Parker was arrested and charged
with aggravated harassment and harassment for calling
Walker's residence and threatening her. (Ex. I, Delarco
Decl.) He also "allegedly followed [Walker] with his
vehicle and stated that he was 'going to get her.' " (*Id.*) An
order of protection for Walker's benefit was issued against
Parker. (Walker Dep. 119:6-12.) Despite his arrest, the
DOC did not suspend Parker, did not confiscate his
personal firearm, nor did it suspend his on-duty firearm
privileges. (*Id.* at 93:2-8; Ex. C, Affirmation of Ilana L.
Deutsche ("Deutsche Aff.").)

On March 4, 1999, Parker was arrested a second time in
connection with his and Walker's dispute and was charged
with criminal contempt and aggravated harassment. (Ex.
I, Delarco Decl.) Parker allegedly blocked Walker's
vehicle, harassed her about a prior arrest, and threatened
to have another person file false allegations with the police
if Walker reported the incident. (Ex. G, Delarco Decl.) As
a result of his arrest, the DOC suspended Parker, effective
March 5, 1999 at 6:30 pm. (Ex. J, Delarco Decl.) The
DOC confiscated Parker's personal firearm for the period
of his suspension. (*Id.*) According to DOC records, Parker
completed his suspension in five-and-a-half hours on
March 6, 1999 at 12:01 am, at which time he regained
possession of his personal firearm. (*Id.*) In 2000, Parker
was arrested a final time in connection with his dispute
with Walker and was charged with sexual misconduct.
(Walker Dep. 91:20-25.)

Immediately after her first arrest and suspension, Walker

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

began complaining to her supervisors at the DOC about what she considered to be discriminatory treatment in its discipline. (*Id.* 112:4-12 .) On January 31, 1999, Walker wrote a letter to the DOC's Summary Suspension Review Committee ("Suspension Committee") in care of the DOC s Director of the Equal Employment Opportunity Commission ("EEOC"), requesting her suspension be reversed since Parker was not suspended for his arrest on similar charges ten days prior. (Ex. P, Delarco Decl.) Luis Burgos ("Burgos"), the DOC's EEOC Director, denied Walker's request to reverse her suspension and referred Walker to DOC Inspector General Michael Caruso ("Caruso" or "Inspector General Caruso"). (Walker Dep. 105:2-9.) Walker then complained by letter to Caruso that her suspensions were discriminatory. (Walker Aff. f 19; Walker Dep. 112:4-25, 116:20-25.) Walker received no response from Caruso or other resolution of her complaint. (Walker Dep. 116:20-25.) In the same time period, Walker also complained to Elmer Toro ("Toro"), Commissioner of the Investigative Division. (*Id.* at 117:25-118:12; Ex. Q, Delarco Decl.) Walker did not receive a response from Toro. (Walker Dep. 118:13-15.)

**\*3** On March 23, 1999, Walker filed a charge of gender discrimination and retaliation with the EEOC based on her January 1999 suspension. (Ex. A, Delarco Decl.) In the charging document, Walker recounted that Parker was not suspended for his January 20, 1999 arrest for harassment and aggravated harassment, while Walker was suspended for five days following her January 30, 1999 arrest on similar charges. (*Id.*) The EEOC determined that there was sufficient evidence that Walker "was disciplined more severely than a similarly situated male." (Ex. C, Deutsche Aff.)

The EEOC further noted that the DOC's explanation that it disciplined Walker and Parker differently due to a discrepancy in the way their arrests were processed was not credible. (*Id.*) The EEOC observed that only after it requested documentation showing that the arrests were processed differently-that Parker was only issued a Desk Appearance Ticket, while Walker was required to "go through the system," as the DOC alleged-did the DOC admit that Walker's and Parker's arrests were, in fact, processed in the same manner. (*Id.*) The EEOC noted that it was implausible that the DOC was unaware of their "mistake," considering Walker had made several internal complaints prior to filing with the EEOC, and that the

DOC conducted its own examination into the facts underlying Walker's charge in order to submit its position paper responding to Walker's charge. (*Id.*) The EEOC concluded that there was reason to believe that the DOC's discipline of Walker may have been discriminatory and/or retaliatory in violation of Title VII and issued a right-to-sue letter. (*Id.*)

On March 11, 1999, Walker wrote a letter to Bernard Kerik ("Kerik" or "Commissioner Kerik"), then Commissioner of the DOC, complaining that she had been suspended for the same conduct for which Parker had not, and complaining that despite her writing three previous letters to the DOC administration, she had yet to receive a response or other resolution. (Ex. Q, Delarco Decl.) Walker copied Toro in the Investigative Division on this letter. (*Id.*) Walker reiterated her complaints in another letter to Kerik dated March 29, 1999. (*Id.*)

Beginning on March 16, 1999, the DOC instituted charges against Walker and Parker for violations of DOC rules and regulations. For all three arrests, the DOC charged Walker with "conduct unbecoming an officer and of a nature to bring discredit upon the Department." (Exs. D, F, G, Delarco Decl.) For her January 1999 and November 2000 arrests, the DOC also charged that Walker "failed to timely notify her command of the incidents ... which resulted in her arrest and failed to timely submit a written report regarding the incidents resulting in her arrest." (Exs. D, G, Delarco Decl.) The DOC instituted the same charges against Parker for his January 20, 1999 and March 4, 1999 arrests. (Ex. I, Delarco Decl.)

On March 12, 2002, Walker had a hearing with the DOC administration concerning her three arrests and an unrelated incident for which she was also disciplined. (Walker Dep. 22:3-7; Ex. H, Delarco Decl.) The unrelated incident involved Walker leaving her post while on duty in March of 2002. (Ex. R, Delarco Decl.) Walker signed a plea agreement, admitting to the three incidents involving Parker. (*Id.*) The plea agreement provided that Walker would incur a twenty-nine day suspension without pay, and with credit for time already served on suspension, and a forfeiture of thirty six vacation days. (Ex. H, Delarco Decl.) Although Parker had two prior disciplinary incidents on his record, the DOC required only that he forfeit seven vacation days as discipline for his three

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

arrests. (Walker Dep. 24:11-19.)

2. Failure to Promote

**\*4** On four separate occasions, Walker was eligible for promotion to vacant positions with the title of captain. On the first three of these occasions, Walker was considered for promotion and was ultimately denied. (Walker Aff. ¶ 22.) Bureau Chief of Administration Catherine Raymond ("Chief Raymond"), Warden of the Adolescent Reception and Detention Center ("ARDC") James P. Barry ("Warden Barry"), Inspector General Caruso and the Department Chief Davoren ("Chief Davoren") were responsible for denying Walker's promotions.

Chief Raymond served as the DOC s Bureau Chief of Administration when Walker was considered for the three promotions at issue. (Declaration of Catherine Raymond in Support of Defendant's Motion for Summary Judgment ("Raymond Decl.") ¶ 1.) As Bureau Chief of Administration, Chief Raymond was responsible for recommending to Chief Davoren whether a corrections officer eligible for promotion should be promoted. (*Id.* at ¶ 3.) In making her recommendation, Chief Raymond considered, *inter alia,* the DOC EEOC clearance form, recommendations from the DOC's Inspector General's office and Investigative Division, and an Employee Performance Service Record (also known as a "22R form"), which includes a recommendation from the applicant's commanding officer as to whether the candidate should be promoted. (*Id.* at ¶ 4.) For each promotion to captain for which Walker was eligible, Chief Raymond recommended that Walker not be promoted. (*Id.* at ¶¶ 8, 11, 12.)

Warden Barry was Walker's commanding officer as Warden of the Adolescent Reception and Detention Center ("ARDG"). (Declaration of James P. Barry in Support of Defendant's Motion for Summary Judgment ("Barry Decl.") ¶ 1.) Warden Barry also recommended each time that Walker not be promoted. (*Id.* at ¶¶ 10-15.) While at ARDC, Warden Barry's responsibilities included submitting an Employee Performance Service Record, or "22R form," to Chief Raymond, including his personal recommendation as to whether an eligible employee under his supervision should be promoted to captain. (*Id.* at ¶ 6.)

In making the decision whether or not to recommend promotion, Warden Barry routinely considered much of the information contained in the 22R form-(1) the employee's disciplinary record, (2) the employee's tardiness and attendance records, (3) any awards or special recognition the employee has received, and (4) the employee's educational history. (*Id.* at ¶ 7.) Ultimately, Chief Davoren decided whether eligible officers were promoted, in part based on Chief Raymond's and Warden Barry's recommendations. (Raymond Decl. ¶¶ 9, 11, 13.)

a. March 2002

Upon passing the civil service examination in 2001, Walker for the first time became eligible for promotion to the rank of captain. (Walker Aff. ¶ 23; Walker Dep. 100:14-101:4.) Walker's name was placed on a list of eligible officers at number three hundred and five out of some three thousand applicants. (Walker Dep. 100:14-101:4.) In March 2002, the first vacancy in the captain position arose. (Walker Aff. ¶ 24.)

**\*5** In March 2002, the Bureau Chief of Administration's office notified Warden Barry that Walker was eligible and being considered for promotion to captain and requested that he submit an Employee Performance Service Record on Walker. (Barry Decl. ¶ 8.) Warden Barry submitted the 22R form, including his personal recommendation that Walker not be promoted. (*Id.* at ¶ 10.) Warden Barry testified that his recommendation was unfavorable because "she had four separate disciplinary charges pending against her that charged her with serious misconduct." (*Id.*) Based in part on Warden Barry's recommendation, Chief Raymond recommended to Chief Davoren that Walker not be promoted. (Raymond Decl. ¶ 8) Chief Raymond also considered Inspector General Caruso's recommendation that Walker not be promoted, and the fact that at the time, Walker had disciplinary charges pending against her. (*Id.*)

Chief Davoren ultimately decided not to promote Walker based on Chief Raymond's and Warden Barry's recommendations. (*Id.* at ¶ 9.)

b. July 2002

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

In July 2002, Walker was again considered for promotion to a vacancy with the title of captain. (Raymond Decl. ¶ 10; Barry Decl. ¶ 11.) Again, Warden Barry submitted a 22R form to Chief Raymond, including his recommendation that Walker not be promoted. (Barry Decl. ¶ 13.) Warden Barry testified that while preparing the 22R form, "it was brought to [his] attention that Ms. Walker had entered into a plea agreement on March 12, 2002 for the four separate disciplinary charges that were pending when [he] submitted the Employee Performance Service Record on her behalf on March 1, 2002." (*Id*. at ¶ 12.) Warden Barry testified that he did not recommend Walker for promotion because Walker pled guilty to three of four charges of "serious misconduct" and agreed to a twenty-nine-day suspension and forfeiture of thirty six vacation days. (*Id*. at ¶ 13.) Based on Warden Barry's unfavorable recommendation, Chief Raymond recommended to Chief Davoren that Walker not be promoted. (Raymond Decl. ¶ 11.) Chief Davoren agreed with their recommendations and refused to promote Walker. (*Id*.)

c. October 2002

In October, 2002, Walker was considered a third time for a vacancy to the title of captain. (Raymond Decl. ¶ 12; Barry Decl. ¶ 11.) Warden Barry testified that he did not recommend Walker's promotion for the same reasons he did not recommend her promotion in July of 2002-that she pled guilty to misconduct and agreed to a suspension and forfeiture of vacation days. (Barry Decl. ¶ 13.) Again, Chief Raymond also recommended that Walker not be promoted based, in part, on Warden Barry's recommendation. (Raymond Decl. ¶ 12.) On this occasion, however, Chief Raymond herself reviewed Walker's disciplinary record "after being advised ... by Inspector General Caruso that Walker's 'disciplinary record should be clearly scrutinized prior to being considered for promotion.' " (*Id*.) On the basis of Warden Barry's negative recommendation and Chief Raymond's review of Walker's disciplinary record, which now included the suspension and forfeiture of vacation days, Chief Raymond recommended to Chief Davoren that Walker not be promoted. (*Id*.) Based on Chief Raymond and Warden Barry's negative recommendations, Chief Davoren elected not to promote Walker. (*Id* . at ¶ 14.)

**\*6** Both Chief Raymond and Warden Barry testified that at the times they were asked to recommend whether Walker should be promoted, they were unaware that Walker had filed any charges of discrimination with the EEOC. (Raymond Decl. ¶ 14; Barry Decl. ¶ 14.) Chief Raymond added that the clearance forms she obtained from the EEOC office regarding Walker's March and October eligibility for promotion "did not contain any information concerning specific complaints of discrimination made against Ms. Walker or made on Ms. Walker's behalf. Rather, the clearance forms merely stated '[i]nquiry reveals past/present investigation(s) will not affect promotion.' " (Raymond Decl. ¶ 14.)

Walker was again considered for promotion to the title of captain in July of 2003. (Barry Decl. ¶ 15.) Despite Warden Barry's recommendation that Walker not be promoted based on her "extensive disciplinary history," Walker was ultimately promoted to captain on July 3, 2003. (*Id*.)

3. Transfers among DOC Facilities

Throughout Walker's tenure with the DOC, she attempted to secure assignment to the Queens County Courts ("Queens Courts"), which is a preferred command within the DOC. (Walker Aff. ¶ 21.) Queens Courts is considered a preferred command because unlike other commands, corrections officers are not in a jail facility; there is relatively little inmate contact; and the corrections officers work nine-to-five shifts with weekends off. (Walker Dep. 48:3-50:23.)

After approximately three years of requesting transfers to Queens Courts every six months, Walker was assigned to Queens Courts on July 28, 1996. (Walker Dep. 48:8-16; Ex. R, Delarco Decl.) On September 9, 1996, Walker was transferred from Queens Courts to the Queens House of Detention for Men ("Queens House"). (Ex. R, Delarco Decl.) Walker complained to Commissioner Kerik by letter dated February 27, 1997 that she was repeatedly denied transfer back to Queens Courts and that transfers were not done according to proper procedure. (Ex. L, Delarco Decl.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

From May 27, 1997 to May 3, 1998, Walker was reassigned to Queens Courts. (Ex. R, Delarco Decl.) On May 4, 1998, Walker was transferred to Queens House. (*Id.*) In a letter dated December 7, 1998 and addressed to Commissioner Kerik, Walker complained that the May 1998 transfers from Queens Courts to Queens House were done improperly. (Ex. 0, Delarco Decl.) Walker alleged that the transfers were not done in order of reverse seniority in that an officer with less seniority was not transferred from Queens Courts, while Walker was transferred. (*Id.*) Walker further complained that she had been "speaking out" about the unfairness of the May 1998 transfers, and that while there had been vacancies in Queens Courts since Walker was transferred out, she had not been allowed to return in retaliation for her complaints. (*Id.*)

Finally, on July 19, 1999, Walker was reassigned to Queens Courts until she was again transferred to Queens House on December 31, 1999. (Ex. A, Delarco Decl.). Walker was subsequently transferred several more times among DOC facilities. (Walker Aff. ¶ 20.)

## II. DISCUSSION

### A. Amendment of the Amended Complaint

**\*7** Defendant New York City Department of Corrections ("DOC") moves for summary judgment on all claims on the grounds that the DOC, as an agency of the city of New York ("the City"), is not a suitable defendant under Chapter 17 § 396 of the New York City Charter. (Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Summ. J. Br.") 4.) Chapter 17 § 396 of the New York City Charter reads "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 17 § 396. Defendant is correct that Walker has not named a suitable defendant in the present action. *See id.* However, this court permits Walker to amend her Amended Complaint, pursuant to Federal Rule of Civil Procedure 15(a), to substitute New York City as

defendant.

At the time Walker filed her Complaint and Amended Complaint with this court, she was proceeding *pro se.* Walker has since retained counsel, and in defending against summary judgment, Walker requests leave of the court to amend the Amended Complaint to substitute New York City as defendant. Federal Rule of Civil Procedure 15(a) grants the court broad discretion in determining whether to grant leave to amend, requiring only that "[t]he court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a)(2). "The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.' " Rachman Bag Co. v. Liberty Mutual Ins., 46 F.3d 230, 234 (2d Cir.1995) (quoting Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

The Second Circuit has interpreted Rule 15(a)(2) and *Foman* to require leave to amend in the absence of bad faith, undue prejudice, or futility. *See* Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir.1993) ("Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend."). This court finds neither bad faith on the part of Plaintiff, nor any prejudice to the City, so that it need only be determined whether permitting Walker to amend at this stage of the litigation would be futile in the context of the present action.

The Second Circuit considers an amendment to be futile if the amended pleading would be unable to withstand a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6). Lucente v. IBM, 310 F.3d 243, 258 (2d Cir.2002). Relevant here, a plaintiff seeking to amend a complaint to substitute a new defendant must be able to withstand dismissal of the amended complaint on statute of limitations grounds. *See* Grace v. Rosenstock, 228 F.3d 40, 53 (2d Cir.2000). The statute of limitations for § 1983, Title VII claims, and claims under New York state and city Human Rights Laws is three years. *See* Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir.1998) (stating causes of action under New York Human Rights Law are subject to a three-year statute of limitations); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

Cir.2002) (applying a three-year statute of limitations to a § 1983 claim arising from events occurring in New York; Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir.2004) (applying a three-year statute of limitations to Title VII claims). Because the injuries Walker complains of occurred and were known to her between 1999 and 2002, and because Walker seeks in 2008 to substitute the City as defendant, her amended claims would be time-barred if they do not "relate back" to the filing of the first Amended Complaint, which was timely filed. See Fed.R.Civ.P. 15(c).

**\*8** There are three requirements for relation back to apply to an amended pleading adding a new party. First, the claims against the newly added party must arise out of the same transaction or occurrence set out in the original pleading. Fed.R.Civ.P. 15(c) (1)(B). Second, within the time period required by Rule 4(m) for serving the summons and complaint, the new defendant must have had notice of the action such that it will not suffer prejudice in defending on the merits. Fed.R.Civ.P. 15(c)(1)(C)(i). Third, in the same time period, the new defendant either did know or should have known, that but for a mistake regarding the proper party's identity, the earlier action would have named the new defendant. Fed.R.Civ.P. 15(c)(1)(C)(ii).

In the present action, the first requirement-that the claims to be asserted against the City arise out of the same conduct, transaction or occurrence as those of the first Amended Complaint-is easily satisfied. Walker seeks only to replace the DOC with the City as Defendant, since the City Charter precludes suit against a municipal agency, and instead requires such suits name the City as defendant. Clearly then, the allegations in Walker's proposed second amended complaint would remain completely unchanged. Therefore, the second amended complaint's claims would arise out of the same transaction or occurrence as did those in the first Amended Complaint. Whether Walker's second amended complaint relates back, then, turns on whether within the period required by Rule 4(m) FN2, the City had sufficient notice of the action such that it will not suffer prejudice in now defending on the merits and whether the City should have known that but for Walker's mistake in naming the DOC, the City would have been named as defendant in the first Amended Complaint. See Fed.R.Civ.P. 15(c)(1)(C).

FN2. In most cases, Rule 4(m) requires service of process on all defendants within 120 days of filing the complaint. Fed R. Civ. P. 4(m).

The requirements for relation back are rooted in the concept of notice. "[T]he touchstone for relation back ... is notice, i.e., whether the original pleading gave a party adequate notice of the conduct, transaction or occurrence that forms the basis of the claim or defense." United States v. Baylor Univ. Med. Ctr., 469 F.3d 263, 270 (2d Cir.2006) (internal quotations and citations omitted). "The rationale of rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." Id. (quoting Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 159 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984)) (internal quotations and citations omitted).

Although actual notice is preferable, the Second Circuit has long recognized that in certain circumstances constructive notice can satisfy the notice requirements of Rule 15(c). See Vasquez v. Mill, 2006 WL 2789914, at *5 (S.D.N.Y.2006) (citing cases). "Under the constructive notice doctrine, 'the court can impute knowledge of a lawsuit to a new defendant government official through his attorney, when the attorney also represented the officials originally sued, so long as there is some showing that the attorney[s] knew that the additional defendants would be added to the existing suit.' " Scott v. Coughlin, 944 F.Supp. 266, 270 (S.D.N.Y.1996) (quoting Velez v. Koehler, 1991 WL 130918, at *2 (S.D.N.Y.1991), vacated on other grounds, 138 F.3d 474 (2d Cir.1998)). For the government attorney to have sufficient notice to satisfy relation back, the critical inquiry is whether the attorney knew or should have known that the new defendants would be named. See Gleason v. McBride, 869 F.2d 688, 693 (2d Cir.1989).

**\*9** Applying this doctrine, the City had sufficient notice of Walker's action so as to avoid prejudice. Here, the City had constructive notice of the action through its attorney, the Corporation Counsel of the City of New York. Walker timely filed the Amended Complaint in this action on April 16, 2001, naming DOC as defendant. On June 5, 2001, Corporation Counsel answered Walker's Amended Complaint on the DOC's behalf. Because the City and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

DOC are both represented by the Corporation Counsel, notice of Plaintiff's action can be imputed to the City through its counsel. Corporation Counsel, and therefore the City, had notice of Plaintiff's action within the 120-day period specified by Rule 4(m) because Corporation Counsel knew that under the City Charter, the DOC was an improper defendant, and that Walker's suit could only proceed against the City. From that time, Corporation Counsel, and therefore the City, clearly "[were] on notice to prepare a defense for foreseeable defendants, and thus had every incentive to preserve evidence, interview witnesses, and 'otherwise defend the case with vigor.' " Scott, 944 F.Supp. at 270-71 (quoting Velez, 1991 WL 130913, at *3). Moreover, in Defendant's summary judgment motion and reply, Corporation Counsel clearly asserts defenses on the City's behalf. Accordingly, no prejudice would be worked on the City in continuing to defend the action on its merits.

Finally, Walker succeeds in establishing that the City should have known that but for Walker's mistake in naming the DOC, the City would have been named as defendant in the action. See Fed.R.Civ.P. 15(c)(1)(C)(ii). The Federal Rules provide remedy to a plaintiff who make precisely this type of pleading error. Under Rule 15, the concept of "mistake" was introduced in response to "several cases in which plaintiffs, unaware of the technical requirements of the law, mistakenly named institutional instead of individual defendants." Soto v. Brooklyn Correctional Facility, 80 F.3d 34, 35 (2d Cir.1996). "The amendment was expressly intended to preserve legitimate suits despite such mistakes of law at the pleading stage." Id. at 36. The "mistake" inquiry turns on "whether, under clearly established law, the proper defendants knew that they, and not the named defendants, should have been sued." Id.

At the time Walker filed this action in 2001, it was well-established that under the New York City Charter, municipal agencies are not discrete legal entities and therefore cannot be named as defendants in suits for damages. See, e.g., Adams v. Galletta, 966 F.Supp. 210, 212 (S.D.N.Y.1997) ("Thus, where a plaintiff has named the Department of Corrections as a defendant, he has sued a non-suable entity."); Echevarria v. Dep't of Corr. Servs. and City of New York, 48 F.Supp.2d 388, 391 (S.D.N.Y.1999) ("Settled case law applying [§ 396] establishes that suits against the DOC are suits against a non-suable entity and are properly dismissed upon that basis."). Here, Walker was required to name the City as defendant, and the City should have known that her failure to name the City itself, rather than the DOC, was Walker's mistake. See Soto, 80 F.3d at 37 (finding "mistake" when complaint was legally insufficient without new defendant); cf. Martinez v. Robinson, 2001 WL 498407, *3 (S.D.N.Y.2001) (finding no "mistake" when complaint was legally sufficient without new defendant). It is apparent to this court and should have been to the City that Walker's "failure to [name the City] cannot be considered a matter of choice; but for [her] mistake as to the technicalities of constitutional tort law, [Walker] would have named [the City] ... within the limitations period." Soto, 80 F.3d at 37.

*10 Walker has satisfied the requirements for relation back under federal law, such that permitting amendment in this action would not be futile. Walker is therefore entitled to amend her Amended Complaint to substitute the City as Defendant.[FN3]

> FN3. From this point, references to "Defendant" will refer to the City of New York.

B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is not 'genuine' unless 'the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.' " Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 45 (2d Cir.2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.' " Overton v. N.Y. State Div. of Military & Naval Affairs, 373 F.3d 83, 89 (2d Cir.2004) (quoting Anderson, 477 U.S. at 248).

In weighing a motion for summary judgment, ambiguities

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *See Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). However, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Fed.R.Civ.P. 56) (emphasis and internal quotations omitted). "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) (citations omitted).

Motions for summary judgment in employment discrimination cases are generally inappropriate because victims are "seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburg,* 928 F.2d 528, 533 (2d Cir.1991). "[I]n discrimination cases where state of mind is at issue, [the Second Circuit] affirm[s] a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir.2004) (internal quotations and citations omitted).

However, the Court of Appeals has gone "out of [its] way to remind district courts that the impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000) (internal quotations and citation omitted). "It is now beyond the cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001). Thus, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 40 (2d Cir.1994).

C. § 1981 Claim

*11 Defendant moves for summary judgment on the basis that Walker fails to state a claim under § 1981 because

Walker alleges only gender-based discrimination and not racial discrimination. (Def.'s Summ. J. Br. 4.) § 1981 reads:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

*Runyon v. McCrary,* 427 U.S. 160, 164, 96 S.Ct. 2586, 49 L.Ed.2d 415 n.l (1976) (setting forth statute). "[Any] claim of gender discrimination [is] plainly outside the scope of § 1981, which deals with discrimination on the basis of race or alienage." *Hawkins v. 1115 Legal Serv. Care,* 163 F.3d 684, 693 (2d Cir.1998).

Defendant is correct that Walker does not allege in her Amended Complaint that the DOC discriminated against her on the basis of her race, but rather asserts only gender-based discrimination claims. In fact, in her deposition, Walker was asked "do you believe that those alleged adverse actions were taken against you because of your race?" (Walker Dep. 120:2-4.) Walker responded with an unequivocal "[n]o, not because of my race." (*Id.* at 120:7.) Further, in Walker's EEOC charge, she indicated only discrimination on the basis of sex and retaliation. (Ex. A, Delarco Decl.) There is simply no evidence in the record to suggest that Walker alleges or has suffered any racial discrimination. In fact, since filing her *pro se* Amended Complaint, Walker seems to have abandoned any allegation, whether originally intended or unintended, of racial discrimination, as she fails to respond to Defendant's motion for summary judgment on the § 1981 claim.

"[B]ecause § 1981 only prohibits race discrimination ... and does not prohibit gender discrimination," *Pergament v. Federal Exp. Corp.* 2007 WL 1016993, *7 (E.D.N.Y.2007) (citing *Lauture v. Int'l Bus. Machs. Corp.,* 216 F.3d 258, 260-61 (2d Cir.2000); *Anderson v. Conboy,* 156 F.3d 167, 170 (2d Cir.1998)), Defendant is GRANTED summary judgment on the § 1981 claim.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

D. § 1985 Claim

Defendant moves for summary judgment on Walker's § 1985 conspiracy claim, arguing that the intracorporate conspiracy doctrine makes a § 1985 conspiracy among DOC employees legally impossible. A claim for conspiracy to violate civil rights under § 1985, "requires an agreement between two or more actors to inflict an unconstitutional injury." *Anemone v. Metro. Transp. Auth.,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006) (citing *Ciambriello,* 292 F.3d 307, 324-25 (2d Cir.2002)). The Second Circuit has applied the intracorporate conspiracy doctrine to § 1985 actions. *See id.* at 603 (citing *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66, 70-71 (2d Cir.1976)). "Under the 'intracorproate conspiracy' doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." *Salgado v. City of New York,* 2001 WL 290051, at *8 (S.D.N.Y.2001) (citing *Herrmann,* 576 F.2d at 459; *Girard,* 530 F.2d at 71-72). An exception exists if the individuals are motivated by a separate, personal stake in carrying out the entity's objective. *Id.*

*12 In her Amended Complaint, Walker alleges that "officials of the Department of Correction conduct [sic] did knowingly and deliberately conspire to violated [sic] her Section1983 [sic] protections when it failed to discipline Officer Parker as the Plaintiff, and deliberately lied to both Plaintiff and the EEOC that it did in fact suspend Officer Parker." (Amended Compl. ¶ 20.) However, it appears that Walker has also abandoned this allegation, as she fails to respond to Defendant's motion for summary judgment on this claim. In any event, because employees of the DOC are employees of a single entity for purposes of the intracorporate conspiracy doctrine, *see Malone v. City of New York,* 2006 WL 2524197, *11 (E.D.N.Y.2006), and because Walker does not allege any personal motivations on the part of DOC employees such that their actions would fall within the exception to the doctrine, Defendant's summary judgment motion on the § 1985 claim is GRANTED.

E. § 1983, Title VII, and State and City Human Rights

Law Discrimination & Retaliation Claims

1. Discrimination

a. *McDonnell-Douglas* Burden-Shifting Analysis

Walker alleges the DOC discriminated against her on the basis of her gender when it disciplined her more harshly than it did Parker.[FN4] (Amended Compl. ¶¶ 11-14, 17-18, 19-20.) Walker contends that in subjecting women to a higher level of discipline, and specifically, in subjecting Walker and Parker to different levels of discipline for similar conduct, the DOC violated her civil rights under § 1983, Title VII, and New York State and City Human Rights Laws. (*Id.*)

> FN4. Plaintiff's counsel misconstrues the claim Plaintiff asserted in her Amended Complaint, filed *pro se.* Plaintiff alleged and provided evidence of gender discrimination on the basis of the discipline alone. However, in opposing summary judgment, counsel seems to redraw the claim and assert that the DOC's failure to promote Plaintiff was an act of gender discrimination. The court's analysis will analyze the claims consistently with the Amended Complaint. That the DOC ultimately failed to promote Plaintiff on the basis of her disciplinary record, which itself is alleged to have resulted from gender discrimination, goes instead to the issue of damages.

This court considers the Title VII, State and City Human Rights Laws and § 1983 discrimination claims together, as the Second Circuit applies the same analysis to these claims. *See Ferraro v. Kellwood Co.,* 440 F.3d 96, 99 (2d Cir.2006) ("The standards for liability under [state and city Human Rights Laws] are the same as those under the equivalent federal antidiscrimination laws."); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000) (applying Title VII analysis to state and city Human Rights Laws claims); *Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) (indicating that § 1983 claims are analyzed similarly to Title VII claims); *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

L.Ed.2d 407 (1993) (assuming that Title VII burden-shifting analysis applies equally to § 1983 employment discrimination claims).

Establishing a *prima facie* case of discrimination under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), does not require an onerous showing and avoids dismissal of a plaintiff's case at the summary judgment stage. *See, e.g., Joseph v. Leavitt,* 465 F.3d, 87-90 (2d Cir.2006); *Holcomb v. Iona College,* 521 F.3d 130, 138 (2d Cir.2008).

At the outset, a plaintiff can avoid dismissal by presenting the "minimal" *prima facie* case defined by the Supreme Court in McDonnell Douglas. This requires no evidence of discrimination. It is satisfied by a showing of membership in a protected class, qualification for the position, an adverse employment action, and preference for a person not of the protected class.

**\*13** *Joseph,* 465 F.3d at 90 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 153-54 (2d Cir.2000)).

Walker establishes the first element of her *prima facie* case, as Defendant concedes that Walker, a woman, is a member of a protected class. (Def.'s Summ. J. Br. 6.) The second element of Walker's *prima facie* case requires a showing that she was qualified for the position as a DOC corrections officer. *See Joseph,* 465 F.3d at 90. "[B]eing 'qualified' refers to the criteria the employer has specified for the position." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 127 (2d Cir.2004). "[T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that 'he possesses the basic skills necessary for performance of [the] job.' " *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 92 (2d Cir.2001) (quoting *Owens v. New York City Housing Auth.,* 934 F.2d 405, 409 (2d Cir.1991)) (alteration in original). In effect, a plaintiff need only show a "basic eligibility" for the position, and not the greater showing that her performance is satisfactory to the employer. *See id.*

In this case, Walker has produced sufficient evidence that

she was qualified for her position as a corrections officer. By the time of Walker's first discipline in her dispute with Parker/ she had been employed as a DOC corrections officer for nine years. (Ex. R, Delarco Decl.) In the years prior to Walker's discipline, she received two awards, officer of the month and a certificate of appreciation. (*Id.;* Walker Dep. 24:11-13.) Despite the fact that Walker's employer may have been dissatisfied with her conduct in relation to her dispute with Parker, Walker clearly "possesse[d] the basic skills necessary for performance on the job." *Slattery,* 248 F.3d at 92.

Third, to make out her *prima facie* case, Walker must establish that she suffered an adverse employment action. *See Joseph,* 465 F.3d, at 90. Defendant concedes the DOC's discipline constitutes an adverse employment action. (Def.'s Summ. J. Br. 6.)

Fourth, Walker must also establish that the circumstances surrounding her discipline permit an inference of discrimination. *See Williams,* 368 F.3d at 126 (citing McDonnell Douglas, 411 U.S. at 802; *Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001)). "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000).

For disparate treatment to be probative of discrimination, a plaintiff must first demonstrate she was " 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Id.* (quoting *Shumway v. UPS,* 118 F.3d 60, 64 (2d Cir.1997)). The factfinder usually determines whether two employees are similarly situated. *See id.* However, the Second Circuit has provided guidance to help courts resolve at the summary judgment stage whether employees are similarly situated such that disparate treatment raises an inference of discrimination.

**\*14** The Second Circuit has acknowledged that the factors to be considered in determining whether persons are "similarly situated in all material respects" will vary by case. *Graham,* 230 F.3d at 40. However, it advises courts to consider "(1) whether the plaintiff and those he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* (citing cases). To compare conduct under this standard, a plaintiff's and comparator's facts and circumstances need only bear a "reasonably close resemblance" and need not be identical. *Id.*

As a threshold matter, Walker has provided sufficient evidence to support a finding that she and Parker are similarly situated. First, they appear to have been subject to the same workplace standards of conduct. Both Walker and Parker were corrections officers for the DOC. (Exs. I, R, Delarco Decl.) Second, upon their arrests, the DOC instituted charges for "violations of rules and regulations" against Parker and Walker. (Exs. D, F, G, I, Delarco Decl.) Each charging document lists "specifications," or details of the manner in which the officer allegedly violated the rules and regulations.[FN5]

> [FN5.] In Walker's subsequent plea agreement, the language of the specifications was changed in ways immaterial to the court's analysis. (Ex. H, Delarco Decl.)

For all three of Walker's arrests, the DOC charged her with "conduct unbecoming an officer and of a nature to bring discredit upon the Department." (Exs. D, F, G, Delarco Decl.) For her January and November arrests, the DOC also charged that Walker had "failed to timely notify her command of the incidents ... and failed as required to timely submit a written report regarding the incidents resulting in her arrest." (Exs. D, G, Delarco Decl.)

On March 16, 1999, the DOC commenced charges of violations of rules and regulations against Parker for his conduct in the dispute. (Ex. I, Delarco Decl.) For the January 20, 1999 arrest and March 4, 1999 arrest, Parker was charged with violating the rules and regulations by "engag[ing] in conduct unbecoming of an officer and of a nature to bring discredit upon the Department." (*Id.*) For both arrests, the DOC also charged Parker had "failed as required to timely notify his command of the incident ... and failed as required to timely submit a written report regarding the incident resulting in his arrest." (*Id.*) Parker was arrested a third time for his dispute with Walker and

was charged with sexual misconduct. (Walker Dep. 91:14-25.) There is no evidence in the record that the DOC charged Parker for this arrest.

Because Walker and Parker were both corrections officers, and the DOC charged them with the same violations of rules and regulations for their conduct and listed the same specifications as to how they violated those rules, it would appear that Parker and Walker were subject to the same standards of conduct in the workplace.

Finally, to be similarly situated for disparate treatment analysis, a plaintiff and her comparator must have engaged in acts of "comparable seriousness." *Graham,* 230 F.3d at 38. Walker has also satisfied this element, as she and Parker were arrested on similar charges for similar conduct. Walker called and threatened Whitehurst at work and at home and was charged with aggravated harassment. (Ex. D, Delarco Decl.) Walker damaged Parker's and Whitehurst's cars and was charged with criminal contempt, violating an order of protection and criminal mischief. (Exs. F, G, Delarco Decl.) Parker threatened Walker and was charged with aggravated harassment. (Ex. I, Delarco Decl.) On a separate occasion, Parker threatened and harassed Walker and was charged with criminal contempt and harassment. (*Id.*) While their conduct is not identical, the severity of their conduct is comparable, as is evidenced by the fact that the DOC subjected them to the same charges of "violations of rules and regulations," namely, "conduct unbecoming ... and of a nature to bring discredit upon the Department" and failure to "timely notify ... command ... and to timely submit a report regarding the incident resulting in ... arrest." (Exs. F, G, I, Delarco Decl.)

**\*15** The circumstances surrounding their conduct also suggests that Plaintiff and Parker were similarly situated, as it appears that Parker had a more extensive disciplinary history with the DOC than did Walker. Crediting Walker's uncontroverted testimony, at the time they were disciplined, Parker had two previous disciplinary marks on his record, while Walker had none. (Walker Dep. 24:4-19.) Where, as here, Walker had a less significant disciplinary history than her comparator, it follows that the circumstances weigh in favor of finding them similarly situated, such that any disparate treatment may be probative of discrimination.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

As Walker and Parker were subject to the same standards of workplace conduct and engaged in reasonably similar conduct under similar circumstances, a rational factfinder could find that Walker and Parker were similarly situated, such that any disparate treatment by the DOC could be probative of discrimination.

Plaintiff has also introduced sufficient evidence to support a finding that the DOC disciplined Plaintiff more harshly than it did Parker. Walker's discipline for her three arrests [FN6] totaled a twenty-nine day suspension, without pay, confiscation of her personal firearm for that period, a forfeiture of thirty six vacation days and repeated temporary suspensions of her on-duty firearm privileges. (Ex. H, Delarco Decl.; Walker Dep. 20:16-24:10.) By contrast, Parker was not suspended at all for his January 20, 1999 arrest. (Walker Dep. 92:3-9, 93:2-12.) For Parker's March 4, 1999 arrest, at 4:06 p.m. on March 5, Chief of Administration Sheila M. Vaughn ("Vaughn") sent a "notification of suspension" to all members of the DOC informing them that Parker had been suspended effective March 5 at 6:30 p.m. (Ex. J, Delarco Decl.) At 6:30 p.m. the same day, Vaughn sent a "notification of completion of suspension" to all members of the DOC indicating that effective March 6 at 12:01 a.m., Parker would complete his suspension. (*Id.*) Ultimately, Parker forfeited seven vacation days. (Walker Dep. 24:4-19.) He received no further suspensions or other discipline during the course of his dispute with Walker. (*Id.*)

> FN6. Walker's plea agreement also included discipline for an incident where she allegedly left her post while on duty, to which Walker pled not guilty. (Ex. H, Delarco Decl.)

Plaintiff has therefore made out the final element of her *prima facie* case of discrimination by showing through disparate treatment that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination. Defendant resists this conclusion by arguing that Walker has failed to create a factual issue because she "admitted at her own deposition that Parker was treated differently because of his connections to higher ranking officers and not because he was male." (Defendant's Reply Memorandum of Law in

Further Support of its Motion for Summary Judgment ("Def.'s Reply Br.") 6.) Defendant is correct that some of Walker's statements weaken her allegation that the DOC discriminated against her on the basis of gender.

For example, when asked "[d]o you believe that you were suspended after your first arrest in 1999 because you're a female," Walker answered "no." (Walker Dep. 97:10-13.) When asked "do you believe that you had your gun privileges taken away because you are female," Walker replied "no." (*Id.* at 97:7-9.) When asked whether she believed that Parker was not suspended when he was arrested in 1999 because he is a male, Walker first asked for and was denied the opportunity to elaborate, and then conceded that she was unsure whether Parker was not suspended because he is a male. (*Id.* at 97:14-23.) When asked if she knew why Parker was not suspended, Walker answered "[b]ecause of his association and connections with higher ranking officers because he's a member of the Emergency Service Unit which he has been for most of his tenure on the job, and he's also a member of the football team which, again, he's spent a large amount of time in that area as well, and both of those units are connected to the commissioner." (*Id.* at 97:24-98:10.)

**\*16** While these portions of Walker's deposition call into question whether she will ultimately prevail on her gender discrimination claim, they are not fatal at the summary judgment stage of litigation. An examination of the evidence shows that Walker also submitted evidence that more clearly supports her claim that the DOC discriminated on the basis of gender when disciplining its officers. So, while the court acknowledges the lack of clarity in the factual record, this is an obstacle Plaintiff may have to overcome at a later stage of litigation, and not before this court at summary judgment. *See Thompson, 896 F.2d at 720* (stating that at summary judgment, ambiguities in the factual record are to be construed in the non-moving party's favor). Despite Defendant's contention otherwise, Walker has introduced evidence that more clearly supports her claim that the DOC disciplined its officers in a discriminatory fashion.

First, in Walker's EEOC charge of discrimination, she contrasted the discipline she received for her January 30, 1999 arrest with that received by Parker for his January 20, 1999 arrest. (Ex. A, Delarco Decl.) She charged

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

gender discrimination and retaliation and described the discrimination as a continuing action. (*Id.*) In her deposition, when asked what kind of discriminatory conduct she was subjected to, Plaintiff responded "I was treated unfairly and different from a male correction officer who was in the same situation as I was." (Walker Dep. 91:10-16.) Although she later equivocated when asked "is it your belief that [Parker] wasn't suspended at this time because he's a male," her initial answer was "yes. Male in the ESU and football team." (*Id.* at 109:18-21.) When asked the basis for her belief, Walker responded "because he was a male." (*Id.* at 109:22-23.) While the evidentiary record is by no means entirely favorable to Walker, she has introduced sufficient facts to create an issue of material fact as to whether the DOC s different discipline is attributable to gender discrimination.

As a final argument, Defendant disregards these portions of the record and attempts to recast Walker's Title VII claim as "she was discriminated against because she, as a female, was excluded from the ESU and CFT." (Def.'s Reply Br. 3.) Defendant then argues that this allegation is absent from the Amended Complaint, the EEOC charge, and Walker's deposition, and that Walker never alleged that she tried to gain admission to either group. (*Id.*) Defendant contends that these omissions are fatal to Plaintiff's Title VII claim because her EEOC charge did not allege that she was excluded from these organizations, so these allegations are now time-barred. (*Id.*) Construed this way, Walker's failure to file an EEOC charge complaining of women's exclusion from elite DOC units would have made any Title VII claim on that basis time-barred.

However, Defendant's argument that Walker's claim is time-barred is unpersuasive because it was not necessary for Walker to file an EEOC charge based on women's exclusion from elite units, when her discrimination claim is based only on disparate discipline. The DOC is correct that "[a]n individual wishing to challenge an employment practice under [Title VII] must first file a charge with the EEOC." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 127 S.Ct. 2162, 2166, 167 L.Ed.2d 982 (2007). Defendant is also correct that Plaintiff never filed an EEOC charge alleging gender discrimination in DOC's exclusion of female officers from elite DOC units. However, Defendant fails to properly identify the employment practice forming the basis for Plaintiff's Title VII claim.

**\*17** "In addressing the issue whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue." *Id.* In this case, Plaintiff's Title VII claim is based on the disparate discipline only, not her exclusion from DOC's elite units, which may be discriminatory conduct that was independently actionable, had Plaintiff filed an EEOC charge on that basis. However, Walker only seeks to introduce evidence of women's exclusion from elite units to further support her claim of gender discrimination in the DOC's discipline of its officers. Title VII does not bar an employee from using prior, independently discriminatory acts as background evidence supporting a timely claim. *AMTRAK v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). An uncharged discriminatory act cannot itself be the basis for Title VII claim, as the plaintiff would have failed to exhaust her administrative remedies; but it can serve as support for a separate, charged discriminatory act that forms the basis of a Title VII claim. *See id.* "In other words, events that are themselves incapable of sustaining a discrimination claim can serve as evidence in support of another, valid claim." *Henry v. Wyeth Pharmaceuticals, Inc.*, 2007 WL 4526525, \*4 n. 4 (S.D.N.Y.2007) (citing *Morgan*, 536 U.S. at 113).

In sum, Walker's attempt to elaborate as to what may have motivated the DOC to dole out discipline in a discriminatory fashion is not fatal to her claim at this juncture. Construing facts and drawing attendant inferences in Plaintiff's favor, it cannot be said that she has not submitted sufficient evidence for a reasonable factfinder to conclude that the DOC's discipline was itself intentionally discriminatory on the basis of her gender, and that Plaintiff's Title VII claim is rooted in that discriminatory conduct. Despite Defendant's objections, this court is persuaded that Walker has made out her *prima facie* case.[FN7]

FN7. Defendant also argues that Plaintiff's affidavit testimony that women were excluded from elite units is "contradictory" to her deposition testimony and "self-serving" and must be disregarded in the instant motion. (Def.'s Reply Br. 3-4.) The court acknowledges this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

argument, but finds it wholly unpersuasive. To find support for this argument, Defendant isolates certain portions of Plaintiff's deposition testimony, thereby failing to acknowledge that Plaintiff did, in fact, testify in her deposition about Parker's membership in ESU and CFT. (Walker Dep. 98:3-99:18.) Her subsequent elaboration about the fact that women were either excluded from or underrepresented in those groups is hardly inconsistent with her deposition testimony, when viewed in its entirety.

"By making out this 'minimal' *prima facie* case, even without evidence of discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action." *Joseph,* 465 F.3d at 90. As Plaintiff has succeeded in establishing her *prima facie* case, the DOC must offer a nondiscriminatory explanation as to why Walker suffered more severe discipline than did Parker. *See id.* In its briefs, Defendant fails to proffer any reason for its more severe discipline of Walker. In the DOC's EEOC position paper responding to Walker's charge of gender discrimination, the DOC explained that Walker and Parker were punished differently for their January 1999 arrests because their arrests were processed differently. (Ex. C, Deutsche Aff.)

As the employer has articulated a nondiscriminatory reason for Walker's discipline, the presumption that the DOC discriminated against Walker disappears and Walker must provide evidence permitting a rational factfinder to conclude that her discipline resulted from prohibited discrimination. *See Joseph,* 465 F.3d at 90. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000). Walker succeeds by submitting evidence of pretext-that the officers' arrests were, in fact, processed exactly the same way. (Ex. C, Deutsche Aff.) The DOC ultimately admitted this fact. (*See id.*) Plaintiff has therefore met her burden of production under the *McDonnell-Douglas* burden-shifting discrimination analysis, so that her state and city Human Rights Laws and Title VII discrimination claims on the basis of her

discipline may proceed. Defendant is DENIED summary judgment on those claims.

b. § 1983 Claim and Municipal Liability

**\*18** Plaintiff's § 1983 claim for violations of her equal protection and due process rights under the state and federal constitutions may also proceed. As this court has granted Plaintiff's request to amend the Amended Complaint to assert liability directly against the City, Walker's § 1983 claim is subject to the municipal policy or custom requirement of *Monell v. Dep't of Social Servs. of the City of N.Y .,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff has provided sufficient evidence of a municipal policy or custom of gender discrimination in the DOC's discipline of its officers such that a reasonable factfinder could find the City liable for DOC's alleged constitutional violations.

When the Supreme Court first decided that municipalities could be held liable as "persons" under § 1983, the Court also required that a plaintiff prove the "alleged unlawful action [was] implemented or was executed pursuant to a governmental policy or custom." *Reynolds v. Giuliani,* 506 F.3d 183, 190 (2d Cir.2007) (citing *Monell,* 436 U.S. at 694). "*Monell* reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees as incompatible with § 1983's causation requirement." *Id.* Accordingly, for a plaintiff to succeed on a § 1983 claim against a municipality, she must show that either through affirmative conduct or through failure to act, the municipality established a policy or custom to which the alleged misconduct can be attributed. *See id.* at 191-92.

In opposing summary judgment on this point, Walker appears to allege that the City has an unofficial policy or custom of gender discrimination in disciplining its officers because policymakers failed to act upon Walker's complaints of alleged gender discrimination in the discipline of DOC officers. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp. Mem.") 18.) So, Walker alleges that the basis for municipal policy or custom is not Quarterman's or Barry's decision to suspend her for her arrests, but DOC policymakers' failure to act upon

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

Walker's complaints that Quarterman and Barry disciplined her in a discriminatory fashion. (*See id.*)

Generally, if an official has final decision-making authority over an alleged constitutional deprivation, his actions or inactions are official policy, such that municipal liability can attach for a § 1983 claim. See *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir.2003); *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004). "Whether a particular official has final policymaking authority, such that his decisions may trigger municipal liability, is to be determined by referring to state law." *Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 143 (2d Cir.1999) (internal quotations and citations omitted). Not only must the official have policymaking power, but the actions or inaction at issue must be within the scope of his policymaking authority. See *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir.2008) (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)).

**\*19** On the other hand, where, as here, the alleged constitutional violation was committed by a subordinate municipal official, " § 1983 plaintiffs may establish that the city is liable for their injuries by proving that 'the authorized policymakers approved a subordinate's decision and the basis for it.' " *Amnesty,* 361 F.3d at 126 (quoting *Praprotnik,* 485 U.S. 112 at 127, 108 S.Ct. 915, 99 L.Ed.2d 107). A plaintiff can do this by showing that the policymaker ratified or ordered the subordinate's actions. See *Roe,* 542 F.3d at 37. Or a plaintiff can show that a policymaking official "exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty,* 361 F.3d at 126 (internal citations and quotations omitted).

A plaintiff can show deliberate indifference by submitting evidence showing the need for better monitoring to prevent constitutional violations. See *Tierney v. City of New York,* 2007 WL 895133, \*18 (S.D.N.Y.2007) (citing *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 122-23 (2d Cir.1991)). "This, in turn, can be shown by complaints of civil rights violations which are followed by

no meaningful attempt on the part of the municipality to take steps to foreclose their recurrence." *Id.* (citing *Ricciuti,* 941 F.2d at 122-23). But to infer a policymaker's acquiescence in subordinates' discriminatory practices, the unlawful practice must be made manifestly clear to the policymaker. See *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999) (quoting *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992)).

In attempting to withstand Defendant's motion for summary judgment on the issue of municipal liability, Walker neglects to indicate exactly who allegedly failed to act in light of her complaints that she had suffered gender discrimination, instead attributing these alleged failures to "the DOC" generally. (*See* Pl.'s Opp. Mem. 17-18.) However, the record reveals that Walker complained of gender discrimination to the DOC Suspension Committee, DOC Inspector General Caruso, DOC Commissioner Bernard Kerik, DOC EEOC Director Luis Burgos, and DOC employee Elmer Toro. Though both the evidentiary record and Plaintiff's legal argument on municipal liability are sparse, each actor will be analyzed in turn.

Walker alleges that she first requested from DOC EEOC Director Burgos that her suspension be overturned because Parker had been arrested under similar circumstances ten days prior and had not been suspended. (Walker Dep. 105:2-3.) Burgos denied her request. (*Id.*) However, the dearth of evidence relating to what investigation, if any, preceded Burgos' decision to deny Walker's request to reverse her suspension precludes this court from engaging in any meaningful analysis as to whether his alleged inaction reasonably could subject the City to liability. The fact that Burgos did not grant Walker's request to reverse her suspension does not adequately speak to the issue of whether his conduct manifested deliberate indifference. Therefore, Burgos' alleged inaction cannot be the basis for subjecting the City to liability.

**\*20** When Burgos denied Walker's request for a reversal, he referred her to Inspector General Michael Caruso. (Walker Dep. 116:20-25.) Walker testified that Caruso "ignored [her] request" and that the outcome of her grievance was "nothing." (Walker Dep. 116:13-25.) This is the extent of Plaintiff's evidence on the issue of whether municipal liability can attach for Caruso's alleged failure

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

to investigate her complaint of gender discrimination. Importantly, the court is left without any evidentiary basis for determining whether Caruso is a policymaker, such that his inaction could expose the City to liability. Therefore, Plaintiff has not discharged her burden of introducing sufficient evidence that a reasonable factfinder could conclude that Caruso's inaction should give rise to municipal liability under *Monell.*

Nor can Walker's complaint to the Suspension Committee form the basis for municipal liability under *Monell.* Walker's evidence on this point is again limited, and even drawing all reasonable inferences in her favor, it is insufficient to withstand summary judgment on her *Monell* claim. In a letter dated January 31, 1999 and addressed to the Suspension Committee in care of the DOC's E.E.O.C. Director, Walker recounted the disparate discipline she and Parker received for their January 1999 arrests. (Ex. P, Delarco Decl.) She explained that they were arrested on the same charges, and that Parker was not suspended, while she was. (*See id.*) Walker wrote "[t]his is not fair and equal treatment. Both officer [sic] should be treated the same." (*Id.*) Walker then requested that her suspension be reversed. This court need not pass on the question of whether the Suspension Committee is a policymaker with regards to disciplining DOC officers because *Monell* liability cannot attach based on the Committee's alleged inaction. It is true that the Committee denied Walker's request to reverse her suspension, but there are no facts in the record to show that the Committee made that determination without conducting an investigation or that they otherwise displayed deliberate indifference to her complaint of gender discrimination. That an employee complained and did not garner the outcome she desired is not the type of municipal conduct contemplated by Monell's policy or custom requirement. *See Wimmer,* 176 F.3d at 137.

Plaintiff also testified that she complained to Commissioner of the Investigative Division Elmer Toro, (Walker Dep. 117:25-118:12), and that she did not receive a response. (*Id.* at 118:13-15.) The only evidence submitted that reflects Toro's alleged involvement in Walker's complaint of discrimination is a March 11, 1999 letter addressed to Commissioner Kerik and copied to Toro. (Ex. Q, Delarco Decl.) Toro's failure to respond to this letter cannot be the basis for extending municipal liability. In the letter, Walker complains that Parker was

suspended for five-and-a-half hours for his second arrest on March 4, 1999 and not suspended at all for his prior arrest. (*Id.*) She indicated that for her first arrest, she was suspended for five days. (*Id.*) Walker "asked that [she] receive fair and equal treatment .... " (*Id.*) She wrote "I have also asked for an explanation as to why the double standard between the way I'm being treated regarding this situation as oppose [sic] to Officer Parker?" (*Id.*) But Walker proceeded to answer her own question by writing,

**\*21** [i]n relation to this, it is obvious that I am not being treated fairl [sic], as well as I'm being retaliated against for my previous complaints of unfairness within this department. Officer Parker has been a member of the Emergency Service Unit for approximately 8 year and he is a member of the Department of Corrections football team, he is being protected due to his association to the above. Will you please tell me why I am not being treated equally?

(*Id.*) This letter fails to evidence that Walker put Toro on notice of an alleged constitutional violation. Instead, based upon this letter alone, which is the only evidence submitted of Toro's knowledge of Walker's grievance, Toro would only have been aware that Walker complained of favoritism and other conduct she found objectionable. Importantly, the conduct Walker complained of in the March 11, 1999 letter is not unconstitutional. *See Fisher v. Vassar College,* 114 F.3d 1332, 1368-69 (2d Cir.1997) (noting that "back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility" are non-discriminatory). As Plaintiff cannot show that Toro exhibited deliberate indifference to alleged constitutional violations, his failure to respond to her complaint cannot form the basis for municipal liability.

Finally, Walker complained directly to the Commissioner of the DOC Bernard Kerik in another letter in March of 1999. (Ex. Q, Delarco Decl.) A reasonable factfinder could conclude that Kerik's failure to investigate or otherwise respond to Walker's March 29, 1999 letter can be the basis for extending liability to the City. The commissioner of the DOC is a policymaker for purposes of setting the DOC's personnel policies. *See Mandell v. County of Suffolk & John Gallagher,* 316 F.3d 368, 385 (2d Cir.2003) (concluding that the Suffolk County police commissioner is a policymaker for setting

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

department-wide personnel policies). "Moreover, because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability." *Amnesty,* 361 F.3d at 127. However, "in such a case the subordinates' 'discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials.' " *Wimmer,* 176 F.3d at 137 (quoting *Sorlucco,* 971 F.2d at 871).

In Walker's March 29, 1999 letter to Commissioner Kerik, she complained that she had made four prior attempts to resolve the "unfair, disparaging and discriminating treatment" by the DOC. (Ex. Q, Delarco Decl.) Walker detailed the disparate discipline she and Parker received for their arrests on criminal harassment charges. (*Id.*) She explained that "[h]e is a male officer assigned to the Emergency Service Unit ... [and] also a member of the department's Football Team" and that she is a "female officer with no ties or attachments." While this letter is not devoid of allegations of favoritism, Walker's use of the words "discriminating treatment" together with her clear indication that she is contrasting her discipline with that of a similarly situated "male" is enough to have put the Commissioner on notice that Walker was alleging unconstitutional gender discrimination. Crediting Walker's testimony that she received no response or other resolution from Kerik, a reasonable factfinder could find that his inaction amounted to deliberate indifference to Walker's alleged constitional violation. As such, under *Monell,* Kerik's inaction, as a policymaker, is sufficient that a reasonable factfinder could conclude that the City had a policy or custom of gender discrimination in the discipline of DOC officers. Plaintiff's *Monell* claim against the City therefore withstands Defendant's summary judgment, and Defendant's summary judgment motion on § 1983 claim for discrimination in the DOC's discipline of its officers is DENIED.

2. Retaliation

*22 Plaintiff alleges the DOC retaliated against her for filing the March 1999 EEOC charge of gender discrimination by failing to promote her, by subjecting her to harsh discipline, and by transferring her out of Queens Courts and among various DOC commands.

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [an employee has] opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U .S.C.2000e-3(a). *McDonnell Douglas'* burden-shifting analysis applies also to Title VII retaliation cases. *See Slattery,* 248 F.3d 87 at 94; *see also Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005).

To make out a *prima facie* case of retaliation, a plaintiff must establish that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Raniola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001) (quoting *Gordon v. New York City Bd. Of Educ.,* 232 F.3d 111, 116 (2d Cir.2000)). The showing required for a plaintiff to make out a *prima facie* case and survive summary judgment is minimal. *See Jute,* 420 F.3d at 173.

Once a plaintiff establishes the *prima facie* case, "the onus falls on the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action....[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* Each alleged act of retaliation will be considered in turn.

a. Failure to Promote

Defendant argues that Walker cannot demonstrate that the DOC officials who recommended she not be promoted were aware that she filed an EEOC charge and that Walker cannot establish a causal connection between her filing the EEOC charge and the decision not to promote her. (Def.'s Summ. J. Br. 13.) Defendant does not dispute that Plaintiff engaged in a protected activity by filing a charge of gender

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

discrimination with the EEOC. (*Id.*)

Although Plaintiff did not provide any evidence to contradict Chief Raymond's and Warden Barry's testimony that they were unaware that she had filed an EEOC charge, such evidence is unnecessary to satisfy the knowledge requirement in a *prima facie* case of retaliation. *See Raniola,* 243 F.3d at 624. All that is required is that the "employer" be aware that a plaintiff engaged in a protected activity. *See id.* "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 210 (2d Cir.2006) (quoting *Gordon,* 232 F.3d at 116).

**\*23** It is evident that at the time Plaintiff was considered for promotion, from March 2002 through July 2003, the DOC had knowledge of Walker's EEOC charge. First, the DOC had responded to her EEOC charge by the time the EEOC issued its determination on April 11, 2000. (*See* Ex. C, Deutsch Aff.) Second, Chief Raymond testified that when she inquired with the DOC EEOC office as to whether Walker was cleared for promotion, it indicated that an investigation of discrimination was either completed or was underway. (*See* Raymond Decl. ¶ 14.) Walker has therefore provided sufficient evidence that the DOC was aware that she had engaged in a protected activity by filing a discrimination charge with the EEOC.

However, Walker's retaliation claim for denials of promotions fail because Plaintiff is unable to show a causal connection between filing the EEOC charge and the denials of her promotions. Causation can be established either through indirect proof-that the protected activity was closely followed in time by an adverse action or by a showing of disparate treatment-or through direct proof of retaliatory animus. *See Gordon,* 232 F.3d at 117. Plaintiff sets forth no direct proof of retaliatory animus. Instead, she argues that Inspector General Caruso and Chief Davoren failed to provide affidavits in support of Defendant's summary judgment motion and that they "may have known of Walker's complaints." (Pl.'s Opp. Mem. 20.) This is clearly inadequate to withstand a summary judgment motion. "Even in the discrimination context ... a plaintiff must provide more than conclusory allegations

to resist a motion for summary judgment." *Holcomb v. Iona College,* 521 F.3d 130, 137 (2d Cir.2008)

Plaintiff's circumstantial proof, either through a showing of temporal proximity or of disparate treatment, is also insufficient. Plaintiff simply argues that "following these complaints of discrimination, Plaintiff Walker was denied three promotional opportunities." (Pl.'s Opp. Mem. 20.) Importantly, the first time Plaintiff was denied promotion was March of 2002, (Walker Aff. ¶ 24), about three years after she filed her EEOC charge. (*See* Ex. A, Delarco Decl.) Generally, three years would be considered well outside the timeframe that would suggest causation or retaliatory animus. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 274, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that twenty months was too long an interval to establish causation). All three denials of promotions occurred more than three years after Plaintiff filed her EEOC charge, and are therefore too remote in time from her filing an EEOC complaint to create a factual issue as to whether the DOC failed to promote her in retaliation for filing the EEOC charge. Because Plaintiff fails to provide sufficient evidence that a reasonable factfinder could conclude that the DOC failed to promote her as retaliation for her filing an EEOC charge of gender discrimination, Defendant's summary judgment motion is GRANTED.

b. Unwanted Transfers

**\*24** Plaintiff alleges that after she filed her gender discrimination charge with the EEOC in March of 1999, the DOC retaliated against her by repeatedly transferring her among DOC commands. (Amended Compl. ¶ 22; Walker Dep. 130:17-18; Walker Aff. ¶¶ 4, 20.) While the Amended Complaint is somewhat unclear and identifies the transfers at issue only as "unwanted transfers," it appears from subsequent pleadings that Walker is alleging that her July 1999 transfer to Queens Courts was an act of retaliation, as was her December 1999 transfer from Queens Courts, and several subsequent transfers among "less prestigious units." (Pl.'s.Opp.Mem.20.)

"[T]o prevail on a claim for retaliation under Title VII, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse,

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Kessler,* 461 F.3d 199 at 207 (quoting *Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006)). Title VII's retaliation provision was meant to encompass a broader range of employer actions than would be actionable under its discrimination provision; the retaliation provision is not limited to redressing employer actions that affect the compensation, terms, conditions or privileges of employment. *See id.* A reassignment of duties may qualify as an adverse employment action, if a reasonable person in plaintiff's position and circumstances would find the employer's action harmful enough to dissuade her from either instituting or supporting a discrimination charge. *See id.* at 209 (quoting *White,* 126 S.Ct. at 2409).

In the present case, Walker has not provided sufficient evidence for a reasonable factfinder to conclude that her transfer to Queens Courts was an adverse employment action. In fact, Walker's evidence strongly favors the opposite conclusion-that she viewed her transfer to Queens Courts as a transfer to a "preferred command." (Walker Aff. ¶ 21; Walker Dep. 48:6-21; Ex. K, Delarco Decl.) Walker testified that Queens Courts was a non-jail environment, with regular shifts and weekends off, and little inmate contact. (Walker Dep. 48:3-50:23; Ex. K, Delarco Decl.) In fact, Walker complained when she was transferred from Queens Courts to other commands, (Ex. O, Delarco Decl.), and she frequently requested to be transferred to Queens Courts when she was assigned elsewhere. (Walker Dep. 48:6-16; Ex. K, Delarco Decl.) There is simply no evidence in the record that the July 1999 transfer to Queens Courts was "materially adverse." Therefore, the transfer to Queens Courts cannot be considered an adverse employment action for purposes of establishing Walker's Title VII retaliation claim.

Similarly, Walker has not created a triable issue of fact as to whether her transfers among "less prestigious units" constitute adverse employment actions. The extent of Plaintiff's evidence regarding these transfers is that she was transferred approximately five times between March 25, 1999 and the time of her deposition [FN8] (Walker Dep. 130:17-131:8), and that these transfers were "unwanted" and the commands "ill-favored." (Walker Aff. ¶¶ 4, 20.) Evidence of Walker's own dissatisfaction with being

transferred among DOC facilities is insufficient to carry her burden. *See Kessler,* 461 F.3d at 209 ("The standard for assessing such a reassignment is an objective, rather than a subjective, one."); *Reckard v. County of Westchester,* 351 F.Supp.2d 157, 161 (S.D.N.Y.2004) ("The Plaintiff's subjective dissatisfaction with her assignments is insufficient."). Therefore, Plaintiff has provided insufficient evidence that her transfers after March 1999 among DOC facilities constituted an adverse employment action for her Title VII retaliation claim.

> FN8. The court recognizes that any actions that occurred subsequent to Plaintiff filing her Amended Complaint cannot be considered in this action.

**\*25** Finally, although Walker has provided sufficient evidence that her transfer from Queens Courts was an adverse employment action in that Queens Courts was a preferred command, she fails to make out her *prima facie* case because she cannot demonstrate that there was a causal connection between her filing the EEOC gender discrimination charge and her transfer from Queens Courts. This court has already noted in the context of Plaintiff's discrimination claims that Queens Courts was considered a preferred command. (Walker Dep. 48:3-50:23; Ex. K, Delarco Decl.) Walker's reassignment from Queens Courts, a preferred command, to another command within the DOC could be materially adverse to a reasonable employee, such that the reassignment would deter the employee from reporting discrimination or supporting charges of discrimination. *See Kessler,* 461 F.3d at 209 (finding a triable fact issue where an employee's new duties were dirtier, more arduous and less prestigious).

However, Plaintiff fails to show that there was any causal connection between her filing an EEOC charge of gender discrimination and the adverse employment action of transferring her from Queens Courts. To meet the causal connection requirement, Plaintiff must show that filing the EEOC gender discrimination charge "was a substantial motivating factor" in the DOC's decision not transfer her from Queens Courts. *Deters v. Lafuente,* 369 F.3d 185, 190 (2d Cir.2004). It is insufficient for Plaintiff to "rely on conclusory assertions of retaliatory motive, but [she] must offer instead some tangible proof to demonstrate that [her]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

version of what occurred was not imaginary." *Id.* As direct proof of retaliatory motive is often scarce, a plaintiff can establish the causal connection indirectly by showing that the adverse action was undertaken shortly after the protected activity. *See Cifra v. GE,* 252 F.3d 205, 217 (2d Cir.2001).

In this case, Plaintiff offers no direct evidence of retaliatory motive in her transfer from Queens Courts. Nor can Plaintiff indirectly establish a causal connection through any temporal proximity between filing her EEOC charge and the transfer from Queens Courts. Walker filed her EEOC charge on March 23, 1999. (Ex. A, Delarco Decl.) She was transferred from Queens Courts on December 31, 1999, more than nine months later. (Ex. R, Delarco Decl.) "[The Second Circuit] has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). While the cases are not entirely consistent, a nine-month interval is likely too long to establish retaliatory motive or an inference of causation. *See Magilton v. Tocco,* 379 F.Supp.2d 495, 504 (S.D.N.Y.2005) (finding that "ordinarily the passage of nine months between the protected activity and the alleged retaliation is far too much to permit an inference of retaliation"); *Chamberlin v. Principi,* 247 Fed. Appx. 251, 254 (2d Cir.2007) (finding an adverse action five months after the protected activity too remote to establish causation); *Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir.1990) (finding a three-month interval likely insufficient to establish causation). Walker has even more difficulty establishing retaliatory animus based on time alone when she was transferred to Queens Courts, the preferred command, months after she had filed her EEOC charge.

**\*26** Plaintiff has not submitted sufficient evidence to raise an inference that the DOC retaliated against her by transferring her from Queens Courts. Therefore, Defendant's summary judgment motion on Plaintiff's Title VII claims for retaliation on the basis of her transfers to and from Queens Courts and among other DOC facilities is GRANTED.

**c. Discipline**

Plaintiff argues that the DOC retaliated against her for filing an EEOC charge by disciplining her in July 1999 and November 2002. Defendant does not dispute that Plaintiff engaged in a protected activity by filing a charge of gender discrimination with the EEOC, or that Plaintiff's discipline constitutes an adverse employment action. (Def.'s Summ. J. Br. 13, 17.) Defendant seems to argue that Plaintiff has set forth insufficient evidence of Quarterman's and Perry's knowledge of her filing an EEOC charge. (*See id.*) As discussed in the context of Plaintiff's retaliation claims for failure to promote, knowledge of the protected activity need not be attributed to the persons responsible for the adverse action, but only to the institution generally. *See Kessler,* 461 F.3d, at 210. It is undisputed that the DOC was aware of Plaintiff's EEOC complaint in March of 1999. (See Ex. A, Delarco Decl.) The DOC's knowledge is sufficient. *See Kessler,* 461 F.3d at 210.

Plaintiff establishes retaliatory animus or causation on the basis of disparate treatment between Walker and Parker. A plaintiff can establish retaliatory animus or causation through circumstantial evidence, including evidence that she was treated differently from another employee who engaged in similar conduct. *See Raniola,* 243 F.3d at 625. As Plaintiff is able to show that Parker, a similarly-situated employee, engaged in substantially the same conduct and received far less severe discipline, Plaintiff can establish that her discipline was a result of the DOC's retaliatory animus. Walker succeeds in making out her *prima facie* case of retaliation based on the DOC's discipline of her.

At this point, the DOC must set forth a non-retaliatory explanation for disciplining Walker. *See Jute,* 420 F.3d at 173. The DOC attempted to explain away Walker's more severe punishment by setting forth an argument for which it was later unable to provide proof and indeed later rescinded-that the officers' arrests were processed in a different way. (Ex. C, Deutsche Aff.) Once an employer's asserted justification is established as false, a reasonable factfinder could conclude that the employer was motivated by retaliatory animus. *See Reeves,* 120 S.Ct. at 2109. Defendant is therefore DENIED summary judgment on Plaintiff's Title VII claim for retaliation based on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)
(Cite as: 2008 WL 4974425 (S.D.N.Y.))

DOC's discipline of Walker.

III. Order

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to Plaintiff's §§ 1981 and 1985 claims, and her Title VII retaliation claims based on failure to promote and unwanted transfers. As to the remaining claims, Defendant's summary judgment motion is DENIED.

**\*27** SO ORDERED.

S.D.N.Y.,2008.
Walker v. New York City Dept. of Corrections
Not Reported in F.Supp.2d, 2008 WL 4974425 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.